1     IN THE UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF TEXAS
2       EL PASO DIVISION

3 BRANDON CALLIER,     )
             )
4    Plaintiff,   )
 v          ) No. 3:22-cv-00301-FM
5             )
 JASCOTT ENTERPRISES, LLC, )
6 JASCOTT INVESTMENTS, LLC, )
 and JOHN DOES 1-4,   )
7             )
    Defendants.   )

8

9 ***********************************************************

10     **ORAL AND VIDEO DEPOSITION OF**

11     **BRANDON LATREULL CALLIER**

12     **JANUARY 8, 2024**

13     **Volume 1**

14 ***********************************************************

15

16     ORAL AND VIDEO DEPOSITION of BRANDON

17 LATREULL CALLIER, produced as a witness at the instance

18 of the Defendants, and duly sworn, was taken in the

19 above-styled and numbered cause on JANUARY 8, 2024, from

20 9:49 a.m. to 4:34 p.m., at the offices of ACR Ink, LLC,

21 221 North Kansas Street, Suite 505, El Paso, Texas,

22 pursuant to the Federal Rules of Civil Procedure.

23       Reported by:

24       Ginger G. Zachary, CSR, RPR, CRR

25       Melody C. Joiner, CSR

1                    **A P P E A R A N C E S**

2        FOR THE PLAINTIFF:
             Mr. Chris R. Miltenberger
3            THE LAW OFFICE OF CHRIS R. MILTENBERGER, PLLC
             1360 North White Chapel Boulevard, Suite 200
4            Southlake, Texas  76092
             (817) 416-5060
5            *chris@crmlawpractice.com*

6

7        FOR THE DEFENDANTS:
             Mr. Michael R. Nevarez
8            THE NEVAREZ LAW FIRM, PC
             7362 Remcon Circle
9            El Paso, Texas  79912
             (915) 225-2255
10           *mnevarez@lawofficemrn.com*

11

12       ALSO PRESENT:
             Video Technician Roger Navarro
13           Mr. Robert Sharpe

14

15                         **INDEX**
                                                         **PAGE**
16  BRANDON LATREULL CALLIER

17       By Mr. Nevarez                                     5

18  Reporter's Certificate                                215

19  Corrections and Signature                             216

20

21

22

23

24

25

**EXHIBITS**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| Exhibit A | Binder of Exhibits | 22 |
| Exhibit 01 | Summons in a Civil Action and Plaintiff's Original Complaint | 89 |
| Exhibit 02 | PTIN Directory, Aero Tax Services | 94 |
| Exhibit 03 | Texas Franchise Tax Public Information Report | 96 |
| Exhibit 04 | Assumed Name Certificate | 97 |
| Exhibit 05 | Texas Secretary of State Global Person Search | 98 |
| Exhibit 06 | Plaintiff's First Amended Complaint | 142 |
| Exhibit 07 | Verizon Bill for Period 3-26-2022 to 4-25-2022 | 146 |
| Exhibit 08 | Verizon Bill for Period 4-26-2022 to 5-25-2022 | 158 |
| Exhibit 09 | Spreadsheet Entitled "Upwise-Pac Western" | 164 |
| Exhibit 10 | Spreadsheet Entitled "Unified Funding-Capybara" | 168 |
| Exhibit 11 | Spreadsheet Entitled "Direct Funding Now-Kalamata" | 170 |
| Exhibit 12 | Spreadsheet Entitled "LionHead-Kalamata" | 171 |
| Exhibit 13 | Spreadsheet Entitled "Pearl Capital" | 171 |
| Exhibit 14 | Spreadsheet Entitled "Todays Advance-Arsenal WH RD" | 172 |
| Exhibit 15 | Spreadsheet Entitled "AR Capital Direct Merchants FU" | 172 |
| Exhibit 16 | Spreadsheet Entitled "Fundkite - Peak Source, LLC" | 173 |

**EXHIBITS (continued)**

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 17 | Spreadsheet Entitled "CFS CAP, LLC, Qualifier" | 173 |
| Exhibit 18 | Spreadsheet Entitled "Mulligan - Finwise" | 174 |
| Exhibit 19 | Spreadsheet Entitled "Mulligan - Trust FI" | 175 |
| Exhibit 20 | Spreadsheet Entitled "True Cash Offer-House" | 175 |
| Exhibit 21 | Spreadsheet Entitled "Tax Resolvers" | 175 |
| Exhibit 22 | Spreadsheet Entitled "UCES United Wealth" | 176 |
| Exhibit 23 | Spreadsheet Entitled "Coach Christian" | 176 |
| Exhibit 24 | Spreadsheet Entitled "Shopfunder" | 177 |
| Exhibit 25 | Spreadsheet Entitled "Direct Funding Club" | 177 |
| Exhibit 26 | Spreadsheet Entitled "Verite" | 178 |
| Exhibit 27 | Spreadsheet Entitled "PMF" | 178 |
| Exhibit 28 | Spreadsheet Entitled "Debt Consultants Group" | 178 |
| Exhibit 29 | Spreadsheet Entitled "Titan" | 178 |
| Exhibit 30 | Spreadsheet Entitled "El Paso Cosmetic" | 179 |
| Exhibit 31 | Spreadsheet Entitled "American First Life" | 179 |
| Exhibit 32 | Spreadsheet Entitled "Ethos Life 4374" | 179 |
| Exhibit 33 | Spreadsheet Entitled "Alexa Assurance 4374" | 180 |

1

### EXHIBITS (continued)

2 | NO. | DESCRIPTION | PAGE

3 | Exhibit 34 | Spreadsheet Entitled "Splash Advance, LLC, Bridge Conso" | 180

4

Exhibit 35 | Spreadsheet Entitled "Fortune 500" | 181

5

Exhibit 36 | Spreadsheet Entitled "MGM Funding" | 181

6

Exhibit 37 | Spreadsheet Entitled "Commercial Lending" | 181

7

8 | Exhibit 38 | Spreadsheet Entitled "Spearhead" | 181

9 | Exhibit 39 | Spreadsheet Entitled "Sheet 1" | 182

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE VIDEO TECHNICIAN:  Good morning.  We

2    are on the record.  The date is Monday, January 8, 2024,

3    and the time is 9:49 a.m.  This is the video deposition

4    of Brandon Callier.

5            Will counsel attending please state your

6    appearances, please?

7            MR. NEVAREZ:  Yes.  Michael R. Nevarez for

8    the defendants, JaScott Enterprises, LLC, and JaScott

9    Investments, LLC.

10            MR. MILTENBERGER:  And who's he?

11            MR. NEVAREZ:  He -- he's not on -- on the

12    case today.

13            MR. MILTENBERGER:  So -- but you -- can you

14    identify yourself for the record?

15            MR. NEVAREZ:  Yeah.

16            MR. SHARPE:  Sure.  Robert Sharpe,

17    S-H-A-R-P-E.

18            MR. MILTENBERGER:  Okay.  Chris

19    Miltenberger for Plaintiff.

20            And just to check, before we start, what's

21    his relevance to the case?

22            MR. NEVAREZ:  He's an associate of mine.

23            MR. MILTENBERGER:  Okay.  Good.  Thank you.

24

25

1                  BRANDON LATREULL CALLIER,

2    having been first duly sworn, testified as follows:

3                       EXAMINATION

4    BY MR. NEVAREZ:

5        Q.   Okay.  Would you please give your full name for

6    the record?

7        A.   Brandon Latreull Callier.

8        Q.   All right.  Would you spell the middle name,

9    please?

10       A.   It's L-A-T-R-E-U-L-L.

11       Q.   Okay.  And you're the plaintiff here.

12       A.   Yes, sir.

13       Q.   Okay.  And so have you ever had your deposition

14   taken before?

15       A.   I have not.

16       Q.   No?

17       A.   No.

18       Q.   Have you ever testified in court before?

19       A.   No.

20       Q.   Okay.  So let me just go over a few ground

21   rules so that you understand the process.  First of all,

22   I'm going to be asking you numerous questions.  If you

23   don't understand the question, then ask me to repeat it

24   or -- or to clarify the question, so you understand

25   the -- the question and your answer is correct and

1  truthful, because you are under oath.

2            MR. NEVAREZ:  You've -- you've sworn him

3  in?

4       Q.   (BY MR. NEVAREZ)  So do you understand that?

5       A.   Yes, sir.

6       Q.   Okay.  Now, the other thing is do say "yes" or

7  "no" or -- or whatever your answer verbally, as opposed

8  to just nodding or shaking your head.  You understand

9  that?

10      A.   Yes.

11      Q.   Okay.  And then so -- and then most importantly

12  for the court reporter, try to wait until I finish my

13  question before answering, and I'll -- I'll do the same,

14  so we don't have each other speaking over each other.

15      A.   Yes.

16      Q.   Do you understand that?

17      A.   Yes.

18      Q.   Okay.  Do you have any questions?

19      A.   No.

20      Q.   Okay.  I'd like to start off by getting --

21  getting your background.  Where were you born?

22      A.   Tyler, Texas.

23      Q.   Okay.  And how long did you live there?

24      A.   Three years.

25      Q.   And -- and then you went --

1    A.   Moved to Sacramento, California.

2    Q.   Sacramento.  Okay.

3              And how long were you in Sacramento?

4    A.   Four years.

5    Q.   Four years.  Okay.

6              Sounds like you're a military child?

7    A.   No, sir.

8    Q.   No?  Okay.

9              So after Sacramento, where -- where did you

10   move to?

11   A.   Back to Tyler, Texas.

12   Q.   Okay.  And how long did you live in Tyler,

13   Texas, after Sacramento?

14   A.   About two years.

15   Q.   Okay.  And after that, where did you live?

16   A.   In Signal Hill, California.

17   Q.   And how long were you there?

18   A.   About two years.

19   Q.   Okay.  After that?

20   A.   Chino, California.

21   Q.   And how long were you in Chino?

22   A.   About five years or so.

23   Q.   Okay.  So did you graduate from high school in

24   Chino, California?

25   A.   I -- we moved -- no.

Brandon L. Callier - January 8, 2024          10

1    Q.   Where did you graduate from high school?

2    A.   Tyler, Texas.

3    Q.   Okay.

4    A.   Moved back to Tyler after Chino.

5    Q.   Okay.  I see.

6         MR. MILTENBERGER:  Objection,

7    nonresponsive.

8    Q.   (BY MR. NEVAREZ)  Okay.  And so, now, did you

9    go to college after high school?

10   A.   Yes, sir.

11   Q.   And where did you go to college?

12   A.   Texas Tech University, University of Texas at

13   Tyler, University of Texas at El Paso, Strayer

14   University, and Penn State University.

15   Q.   What was the third one?

16   A.   Strayer.

17   Q.   Strayer?

18   A.   Yeah.

19   Q.   Where's that?

20   A.   It's in, I want to say, Washington, D.C.  I --

21   I did that one online.

22   Q.   I see.  Okay.

23        All right.  And so where did you get your

24   degree from?

25   A.   I have degrees from Texas Tech, Penn State,

Brandon L. Callier - January 8, 2024          11

1  UT Tyler, and Strayer.  I finished my UTEP accounting

2  degree at Strayer.

3      Q.  I see.  Okay.  So was it a degree from Texas

4  El Paso or from Strayer?

5      A.  It was from Strayer.

6      Q.  Okay.  And then so what was the degree from

7  Penn State that you got?

8      A.  Master's of public administration.

9      Q.  And your degree in accounting from Strayer, was

10 that a BA, a bachelor's?

11     A.  Yes, sir.

12     Q.  So do you have any other degrees?

13     A.  Master's of business administration.

14     Q.  Where is that from?

15     A.  U- -- UT Tyler.  Psychology from Texas Tech.

16              MR. MILTENBERGER:  Objection,

17 nonresponsive.

18     Q.  (BY MR. NEVAREZ)  Any other degrees?

19     A.  No.

20     Q.  Okay.  So the -- your master in public

21 accounting, that was a two-year position?  Was that --

22 was that in person or online?

23     A.  Which -- you -- you said master's in

24 accounting.  I don't have a master's in accounting.

25     Q.  No.  Master in public administration.

Brandon L. Callier - January 8, 2024          12

1      A.   In public administration, I did the Penn State

2  degree online.

3      Q.   Online.  Okay.

4           And your degree from Texas Tech in

5  psychology, was that also online?

6      A.   In person.

7      Q.   I see.

8           And your MBA from UT Tyler, is that online

9  or in person?

10     A.   In person.

11     Q.   Okay.  So let me now -- and that's all your

12  degrees.

13     A.   Yes, sir.

14     Q.   Okay.  So let -- let's start off with your

15  employment history.  Which was your first degree when

16  you -- that was your bachelor's --

17     A.   Psychology.

18     Q.   -- in accounting?

19     A.   Psychology.

20     Q.   Psychology?

21           Oh.  So after -- after -- when did you get

22  that?

23     A.   December 1997.

24     Q.   Okay.  And so what was your first employment

25  after that?

1    A.    I managed a furniture store called "Brad's

2  Mattress Factory" in Tyler, Texas.

3    Q.    Okay.  And how long did you work there at

4  the...

5    A.    It was a long time ago.  I think about two

6  years.

7    Q.    Okay.  So then in approximately 1999, you went

8  from being manager at the furniture store to -- to

9  where?

10    A.    I started working for PFL Life as a --

11    Q.    PFL Life?

12    A.    Yes.

13    Q.    And what is PLF -- PFL Life?

14    A.    It's an insurance company.

15    Q.    Insurance?

16           Okay.  And where was that?

17    A.    Tyler, Texas.

18    Q.    And how long did you do that?

19    A.    About three years.

20    Q.    Okay.  Up until about 2002?

21    A.    Yes.

22    Q.    So where did you go after PFL Life?

23    A.    From there, I took a break while I was in grad

24  school, and then in 2000-and- --

25    Q.    Which grad school was that?

Brandon L. Callier - January 8, 2024          14

```
1      A.   UT Tyler, getting an MBA.

2      Q.   Okay.  For how long?

3      A.   Two years.

4      Q.   So until about 2004?

5      A.   2003.

6      Q.   2003.  Okay.

7           So what did you do in 2003 for employment?

8      A.   Started working for the Army.

9      Q.   You enlisted?

10     A.   No.

11     Q.   No?

12     A.   Army civilian employee.

13     Q.   Okay.  And where was that?

14     A.   Fort Bliss, Texas.

15     Q.   And what did you do for the Army?

16     A.   I started as an acc- -- auditing intern.

17     Q.   Auditor?

18     A.   Yes.

19     Q.   For what -- specifically, what entity in the

20 Army?

21     A.   Can you be specific when you say "what entity"?

22     Q.   Yeah.  I mean, obviously, the Army is a huge

23 department.  What -- what part of the department did you

24 work for at Fort Bliss?

25     A.   I worked for the internal audit and compliance
```

Brandon L. Callier - January 8, 2024          15

1   department.

2       Q.   Okay.   And how long did you -- were you an

3   auditor for the Army?

4       A.   For two years.

5       Q.   Okay.   And your title was "auditor"?

6       A.   Yeah.   Yes.

7       Q.   Okay.   So where did you go from there?

8       A.   Still worked for the Army at Fort Bliss, and I

9   became a budget analyst.

10      Q.   And how long did you do that?

11      A.   About three years.

12      Q.   Okay.   So we're about 2008?

13      A.   Approximately.

14      Q.   Yeah.   Okay.

15               And so what did you do after you left your

16  budget analyst position?

17      A.   I took a position as an auditor -- I mean --

18  excuse me -- an accountant.

19      Q.   And where was that?

20      A.   Fort Bliss.

21      Q.   Army?

22      A.   Yes.

23      Q.   And the title there was?

24      A.   I was a lead auditor -- excuse me -- lead

25  accountant.

Brandon L. Callier - January 8, 2024          16

```
1    Q.   Okay.  And how long did you do that?

2    A.   Probably about five years.

3    Q.   So about 2013?

4    A.   It could have been 2012, 2013, in that range.

5    Q.   Okay.  So where -- where did you -- what did

6    you do after your -- terminated your lead accountant

7    position?

8    A.   Still at Fort Bliss, I became the chief of

9    accounting.

10    Q.   And how long were you the chief of accounting?

11    A.   Until 2021.

12    Q.   Okay.  And so what did you do after you ceased

13    becoming chief of accounting?

14    A.   I've been self-employed.

15    Q.   Okay.  Specifically, you began working as -- as

16    what?  Doing what?

17    A.   I have a accounting and -- excuse me -- a tax

18    and bookkeeping service.

19    Q.   And the name of that?

20    A.   Aero Tax Services.

21    Q.   So you started Aero Tax Services in 2021,

22    approximately?

23    A.   No.  I began it probably 2015 or so.

24    Q.   I see.

25             MR. MILTENBERGER:  Objection,
```

1  nonresponsive, strike -- move to strike everything after

2  the answer "no."

3       Q.   (BY MR. NEVAREZ)  So you -- so you were working

4  as part of Aero Tax Services in 2015, but on a part-time

5  basis while you were with the Army?

6       A.   Can you rephrase that?

7       Q.   You -- you say you opened Aero Tax Services

8  about 2015.  Did you work under Aero Tax Services in

9  2015, beginning 2015 to 2021?

10      A.   I didn't work under Aero Tax Services.

11      Q.   Okay.  Well, what did you do after under Aero

12 Tax Services?  Anything?

13      A.   I owned it.

14      Q.   Yeah.  Well, okay.  You -- so you owned it, but

15 you didn't operate as Aero Tax Services?

16      A.   Yes, I operated the business.

17      Q.   Beginning 2015?

18      A.   Approximately.

19      Q.   Okay.  So --

20      A.   Approximately on all of these dates.

21      Q.   Sure.  Sure.

22            So that was while you were still chief of

23 accounting?

24      A.   Yes.

25      Q.   And so what kind of services did you provide as

Brandon L. Callier - January 8, 2024          18

1   part of Aero Tax Services?

2       A.   Tax preparation, bookkeeping.

3       Q.   Individual, corporate, all kinds?

4       A.   All kinds.

5       Q.   Okay.  And so when did you become enrolled in

6   the IRS?

7       A.   Can you rephrase the question or define

8   "enrolled"?

9       Q.   Well, you know, you can become an enrolled

10  agent.

11      A.   I'm not an enrolled agent.

12      Q.   You're not an enrolled agent?

13              Now, in 2015, did you open Aero Tax

14  Services as a business entity, or was that a d/b/a?

15      A.   The bus- -- it's a d/b/a.

16      Q.   Okay.  So it's a sole proprietorship.

17      A.   No, sir.

18      Q.   No?  No longer?

19              In 2- -- in 2015, was it sole

20  proprietorship or a business entity?

21      A.   It was a business entity.

22      Q.   Okay.  What kind of a business entity was it?

23      A.   LLC.

24      Q.   Okay.  And were you the sole owner?

25      A.   Yes.

1     Q.   Were you the only mem- -- you -- so you were

2   the only member.

3     A.   Yes.

4     Q.   Okay.  Did you have employees?

5     A.   Yes.

6     Q.   Beginning 2015, how many employees did you

7   have?

8     A.   Four.

9     Q.   And that was in 2015?

10    A.   To the best of my knowl- -- memory, yes.

11    Q.   Okay.  And how long did you operate Aero Tax

12  Services, LLC?

13    A.   Approximately four years.

14    Q.   So until about 2015 -- or 2025?  Four years?

15  Oh, no.  I'm sorry.  You're -- you're back in 2015.

16  Until about 2020?

17    A.   2019ish, 2020 maybe.

18    Q.   Okay.  So what did you do after that, after you

19  ceased operating under Aero Tax Services, LLC?

20    A.   I opened a nail salon.

21    Q.   A nail salon?

22    A.   Yes.

23    Q.   And what's the name of the nail salon?

24    A.   Vanity Nail Bar.

25    Q.   Would you spell that?

Brandon L. Callier - January 8, 2024          20

```
 1        A.    Vanity?  V-A-N-I-T-Y.  Nail, N-A-I-L.  Bar,
 2   B-A-R.
 3        Q.    Okay.  And was that also a business entity?
 4        A.    Yes, sir.
 5        Q.    What kind of business entity was it?
 6        A.    It was a C corp -- no.  Excuse me -- an S corp.
 7        Q.    Okay.  And were you the only owner,
 8   shareholder?
 9        A.    No.
10        Q.    Who -- who were the other shareholders?
11        A.    Lloyd Robertson.
12        Q.    Is that the only one?
13        A.    Yes.
14        Q.    And what was your share of the -- of the
15   S corp?
16        A.    50/50.
17        Q.    And what -- what did you -- what kind of
18   services did Vanity Nail Bar provide?
19        A.    Manicures, pedicures.
20        Q.    And what was your role there?
21        A.    I owned it.
22        Q.    Were -- you were 50 percent owner.  What did
23   you do?  Did you operate as -- as a manager, a
24   bookkeeper?
25        A.    I kept the books, made the schedule.
```

Brandon L. Callier - January 8, 2024          21

1     Q.   Okay.  Did you also provide manic- -- manicure

2  and pedicure services?

3     A.   No.

4     Q.   Okay.  And so is that still -- are you still

5  operating under Vanity Nail Bar?

6     A.   No.

7     Q.   When did that cease?

8     A.   COVID, whatever year COVID started, 2001.  I

9  don't remember.

10    Q.   2001?

11    A.   I don't -- when it -- oh, excuse me.  2021,

12  whatever year COVID started.

13    Q.   Okay.  So you had to shut down because of

14  COVID, basically?

15    A.   Yes.

16    Q.   Okay.  So what did you do after that?

17    A.   Started Aero Tax Services again.

18    Q.   You started Aero Tax Services up again?

19    A.   Yes.

20    Q.   Okay.  And so that was approximately 2019-2020?

21  Because that -- that's usually when people refer to

22  COVID, as 2019, December 2019.

23    A.   Sir, I can't speculate on when that was because

24  I don't remember when COVID started.

25    Q.   Okay.  So did you operate under the -- the old

1   Aero Tax Services, LLC, entity?

2        A.   Can I clarify something from earlier?

3        Q.   Sure.

4        A.   You asked me a question.  I don't want it to

5   seem like I was contradicting myself.  You asked me if

6   Aero Tax Services was a d/b/a, and I told you yes -- or

7   business entity was a d/b/a, and I told you yes.  Aero

8   Tax Services is a d/b/a of Aero Services, LLC.

9        Q.   I see.  Okay.

10        A.   When I started -- going back to your other

11   question, I reregistered Aero Tax Services, LLC, as its

12   own actual LLC and not a d/b/a.

13        Q.   I see.  Make sure I get this correct.

14             So back in 2015, you actually formed Aero

15   Services, LLC.

16        A.   Yes.

17        Q.   That was doing business as Aero Tax Services.

18        A.   Yes.

19        Q.   And then later, you formed Aero Tax Services,

20   LLC.

21        A.   Yes.

22        Q.   And when was that, approximately?

23        A.   Probably 2021, 2022.  I -- my dates are a

24   little hazy from COVID.

25        Q.   Sure.

Brandon L. Callier - January 8, 2024          23

1          And so what -- what did you -- were you the

2    sole member of Aero Tax Services, LLC?

3        A.   Yes.

4        Q.   And how many employees did you have?

5        A.   Three.

6        Q.   And what kind of services did Aero Tax

7    Services, LLC, provide?

8        A.   Tax preparation and bookkeeping.

9        Q.   For individual, as well as businesses?

10       A.   Yes.

11       Q.   Okay.  And are you still operating under Aero

12   Tax Services, LLC?

13       A.   Yes.

14       Q.   Okay.  And what is the -- the business address

15   of Aero Tax Services, LLC?

16       A.   10921 Pellicano Avenue, Suite 100, El Paso,

17   Texas 79935.

18       Q.   Okay.

19       A.   It's possibly -36.  I get it confused.

20       Q.   I see.

21          And what's the phone number there?

22       A.   I do not know the phone number off the top of

23   my head.  It's on my website.

24       Q.   And what's the domain for your website?

25       A.   Aerotaxservices.com.

1     Q.   Okay.  And so how many -- you still have three

2  employees?

3     A.   Really, two right now.

4     Q.   And who are the employees?

5     A.   Yazmain Gonzalez.

6     Q.   I'm sorry.  What?

7     A.   Yazmain, Y-A-Z-M-A-I-N --

8     Q.   Okay.

9     A.   -- Gonzalez and Paula -- excuse me -- shoot --

10  Barbara Silva.

11     Q.   Okay.  So what does Yazmain Gonzalez do?

12     A.   Prepares taxes.

13     Q.   And Barbara Silva?

14     A.   Prepares taxes.

15     Q.   Do you also prepare taxes?

16     A.   Yes.

17     Q.   Okay.  So let me present you with an exhibit.

18            MR. MILTENBERGER:  Thank you.

19            MR. NEVAREZ:  We'll mark this as Exhibit A.

20            (Exhibit A marked.)

21            MR. MILTENBERGER:  Exhibit what?

22            MR. NEVAREZ:  A, as in "apple."

23     Q.   (BY MR. NEVAREZ)  And Exhibit A consists of 125

24  individual exhibits.  If you go to the first page,

25  that -- that's marked as "Exhibit Number 1."  Do you see

1   that?

2        A.   Yes, sir.

3        Q.   Okay.  Down at the bottom, you see where it

4   says "JaScott Investments-001"?

5        A.   Yeah.

6        Q.   Okay.  That -- that's called "a Bates stamp."

7   Are you familiar with Bates stamps?

8        A.   No, sir.

9        Q.   Okay.  I'm going to refer to these as "Bates

10  stamp" and then the number.

11       A.   Okay.

12       Q.   Okay.  So let me ask you to go to Exhibit A,

13  Exhibit Number 1, Bates stamp JaScott Investments-2 --

14  -0002.  Do you see that?

15       A.   Yes.

16       Q.   Okay.  That has a time stamp of -- on the -- on

17  the left-hand column, 4-2-2022.  Do you see that?

18       A.   Yes.

19       Q.   And then the next column says "Max Williams."

20  And then the column after that, the third column, it

21  says "Brandon Callier."  Do you see that?

22       A.   Yes.

23       Q.   Are you familiar with Max Williams?

24       A.   I do not know Max Williams.  No.

25       Q.   You -- you don't know him?

1    A.   No.

2    Q.   You've never talked to Max Williams?

3    A.   To the best of my knowledge, no.

4    Q.   Okay.  Now, the next column is blank.  The

5    fifth column has the number "9153834604."  Do you see

6    that?

7    A.   Yes.

8    Q.   Are you familiar with that number?

9    A.   Yes.

10    Q.   What is that number?

11    A.   That is my personal cell phone number.

12    Q.   Okay.  Now, the next column after that entitled

13    "Company," it says "Aero Services, LLC."

14    A.   Yes.

15    Q.   That's the firm that you indicated was doing

16    business as Aero Tax Services --

17    A.   Yes.

18    Q.   -- right?

19              MR. MILTENBERGER:  Objection to the form of

20    the question.  Just at what point in time?

21              MR. NEVAREZ:  Whenever it was doing

22    business as Aero Tax Services.

23              MR. MILTENBERGER:  But what -- what's the

24    point in time in reference to the question, so that the

25    witness can answer it?

Brandon L. Callier - January 8, 2024          27

1          MR. NEVAREZ:  It -- it wasn't referenced to

2   any point in time.

3       Q.  (BY MR. NEVAREZ)  But as a follow-up, in

4   April 2 of 2022, were you operating as Aero Services,

5   LLC?

6       A.  No.

7       Q.  You were not?

8           Then the LLC -- Aero Services, LLC, was no

9   longer in existence?

10      A.  Correct.

11      Q.  Okay.  Were you operating as Aero Tax Services?

12      A.  I was operating -- yes.

13      Q.  Okay.  But not as a d/b/a of Aero Services,

14  LLC?

15      A.  Corre-...

16      Q.  You were operating Aero Tax Services as a

17  d/b/a, a sole proprietorship?

18      A.  Yes.

19      Q.  In April 2 of 2022?

20      A.  Yes.

21      Q.  Okay.  Now, the next column is "Email Address,

22  callier74@gmail.com."  Is that your email address?

23      A.  Yes.

24      Q.  Now, the next column says "Looking Amount,

25  60k."  I believe that stands for "60,000."  Have you

Brandon L. Callier - January 8, 2024          28

1  ever looked for a loan in the amount of 60,000 on behalf

2  of Aero Tax Services --

3       A.   No.

4       Q.   -- or Aero Tax Services, LLC?

5       A.   No.

6       Q.   Never have.

7       A.   No.

8       Q.   So the next column after that, it says "Funding

9  Purposes, working capital."  You've -- have you ever

10 looked for a loan for working capital for Aero Tax

11 Services?

12      A.   No.

13      Q.   Or Aero Services, LLC?

14      A.   No.

15      Q.   Okay.  So let me refer you to the next page,

16 which is JaScott Investments Bates 3.  That's entitled

17 "Exhibit Number 2."  Do you see that?

18      A.   Yes.

19      Q.   And the page after that is Bates stamp JaScott

20 Investments-0004.  Do you see that?

21      A.   Yes.

22      Q.   So I'm going to provide you an audio fi- -- I'm

23 going to play for you an audio file.

24      A.   Okay.

25      Q.   I'd like for you to listen to it.

Brandon L. Callier - January 8, 2024          29

```
 1                    (Audio played.)
 2                    MR. CALLIER:  Hello.
 3                    MR. FAWZY:  (Indiscernible) good morning.
 4   How are you?
 5                    MR. CALLIER:  I'm good.  How are you?
 6                    MR. FAWZY:  I'm doing great.  Thank you so
 7   much for asking.  I -- I hope you're free at this moment
 8   and you're having a wonderful day.
 9                    Did you have the chance to receive my
10   email?
11                    MR. CALLIER:  Well, I'm loo- -- I'm looking
12   for it in -- in my email.  This is Upwise, right?
13                    MR. FAWZY:  JaSc-...
14                    (Audio stopped.)
15        Q.   (BY MR. NEVAREZ)  Do -- do you recognize that,
16   those voices?
17        A.   I recognize my voice --
18        Q.   Okay.
19        A.   -- or what I assume is my voice.
20        Q.   I see.
21                    (Audio played.)
22                    MR. FAWZY:  Five techniques for --
23                    UNIDENTIFIED SPEAKER:  Oh.
24                    MR. FAWZY:  (Indiscernible.)  A la chica.
25                    MR. CALLIER:  Hello?
```

ACR Ink, LLC

Brandon L. Callier - January 8, 2024          30

1          MR. FAWZY:  Hello.  Brandon?

2          MR. CALLIER:  Yes.

3          MR. FAWZY:  Hey.  This is Mark.  I'm just

4  calling you back with JaScott Investment.  You just

5  spoke to one of my associates, Allen.  You are looking

6  for $50,000?  Am I correct about that?

7          MR. CALLIER:  Yeah.  From -- you said

8  "Allen"?

9          MR. FAWZY:  Correct.  Yeah.  You spoke to

10  my associate, Allen.  So are you in front of a computer

11  right now?

12          MR. CALLIER:  Yes.

13          MR. FAWZY:  Okay.  I am sending you the

14  application.  You're going to get the application from

15  mark.fawzy@jascott.org, so -- and I can see your email

16  here as callier74@gmail.com.  Is that your best email?

17          MR. CALLIER:  Yes.

18          MR. FAWZY:  Okay.  Give me one second.  The

19  subject line is "funding offer."  And what kind of

20  payment term are you looking for?

21          MR. CALLIER:  I don't know.  Weekly,

22  monthly.  Either one would be good.

23          MR. FAWZY:  Weekly and monthly.  Perfect.

24  Perfect.  And do you -- do you have any positions right

25  now, any loans right now, currently at this moment?

Brandon L. Callier - January 8, 2024          31

1          MR. CALLIER:  No.

2          MR. FAWZY:  Perfect.  Perfect.

3          (Audio stopped.)

4     Q.   (BY MR. NEVAREZ)  Okay.  Do you recognize those

5 voices?

6     A.   One voice is mine, and the other voice

7 identified himself as Mark Fawzy.

8     Q.   Okay.  And you -- so you recognize Mark Fawzy's

9 voice?

10     A.   I recognize Mark Fawzy's name.

11     Q.   Okay.  But you don't recognize his voice?

12     A.   I don't recognize voices from a year ago from

13 people I've never met.

14     Q.   I see.  Okay.

15          So let me -- let me continue playing it.

16          Maybe not.  Okay.  I'm sorry.  For some

17 reason, the audio's gone off.

18          MR. NEVAREZ:  Okay.  Let's go off the

19 record, please.

20          THE VIDEO TECHNICIAN:  Off the record at

21 10:28 a.m.

22          (Break taken.)

23          THE VIDEO TECHNICIAN:  And we are back on

24 the record at 10:42 a.m.

25     Q.   (BY MR. NEVAREZ)  Okay.  We're going to start

1    back from the record -- from the beginning.

2                    (Audio played.)

3                    MR. FAWZY:  A la chica.

4                    MR. CALLIER:  Hello?

5                    MR. FAWZY:  Hello.  Brandon?

6                    MR. CALLIER:  Yes.

7                    MR. FAWZY:  Hey.  This is Mark.  I'm just

8    calling you back with JaScott Investment.  You just

9    spoke to one of my associates, Allen.  You are looking

10   for $50,000?  Am I correct about that?

11                   MR. CALLIER:  Yeah.  From -- you...

12                   (Audio stopped.)

13       Q.   (BY MR. NEVAREZ)  Okay.  And so you said, yes,

14   you were looking for $50,000?

15       A.   (No verbal response.)

16       Q.   Do you want me to replay that for you?

17       A.   You can replay it.

18                   (Audio played.)

19                   MR. FAWZY:  Yeah.  You spoke to my

20   associate, Allen.  So are you in front of a computer

21   right now?

22                   MR. CALLIER:  Yes.

23                   MR. FAWZY:  Okay.  I am sending you the

24   applic- --

25                   (Audio stopped.)

1      MR. NEVAREZ:  I am sorry.  That didn't --

2  that didn't start it, so I'll start it again.

3              (Audio played.)

4      MR. FAWZY:  (Indiscernible.)  A la chica.

5      MR. CALLIER:  Hello?

6      MR. FAWZY:  Hello.  Brandon?

7      MR. CALLIER:  Yes.

8      MR. FAWZY:  Hey.  This is Mark.  I'm just

9  calling you back with JaScott Investment.  You just

10 spoke to one of my associates, Allen.  You are looking

11 for $50,000?  Am I correct about that?

12     MR. CALLIER:  Yeah.  From -- you said

13 "Allen"?

14     MR. FAWZY:  Correct.

15             (Audio stopped.)

16     Q.  (BY MR. NEVAREZ)  So you were looking for

17 50,000?

18     A.  I believe I was saying "yeah" confirming that I

19 had spoken to someone named Allen.

20     Q.  So you weren't looking to 50- -- for 50,000.

21 Is that -- is that your testimony?

22     A.  My -- I was looking to find out who was calling

23 me.

24     Q.  Okay.  So you -- you testified that you

25 remembered Mark Fawzy.  That you've dealt with Mark

Brandon L. Callier - January 8, 2024                34

1    Fawzy?

2         A.   I remember Mark Fawzy from my complaint.

3         Q.   Do you remember speaking to Mark Fawzy?

4         A.   I remember someone identifying themself as Mark

5    Fawzy in emails and phone calls.

6         Q.   Okay.  And is it your testimony that you never

7    asked for $50,000 from -- in your discussions with Mark

8    Fawzy?

9         A.   No.

10        Q.   So did you -- do you want me to replay this

11   again?  Mr. Fawzy asked you if -- and I'll represent to

12   you that that's Mark Fawzy's voice, okay?

13        A.   Uh-huh.

14        Q.   In that audio recording of a telephone

15   conversation with you, he asked you if you wanted

16   $50,000, and you said yes.  Were you asking for 50,000

17   from Mark Fawzy?

18        A.   No.  My "yeah" was confirming the pre- -- when

19   he preceded, and he said, "You spoke to Allen earlier,"

20   or whatever.  I was confirming that, I believe.

21        Q.   Okay.  Yeah.  I understood that part.

22             My question is, did you ever ask for

23   $50,000 from Mark Fawzy?

24        A.   Did I ever ask?

25        Q.   Yes.  Did you ever try to get a loan from Mark

Brandon L. Callier - January 8, 2024          35

1  Fawzy for $50,000?

2      A.  I filled out a applica- -- an application

3  later, yes.

4      Q.  Okay.  So --

5      A.  I don't remember the dollar amount.

6      Q.  Okay.  Well, let -- let's continue on with the

7  conversation.

8              (Audio played.)

9              MR. FAWZY:  You spoke to my associate,

10  Allen.  So are you in front of a computer right now?

11              MR. CALLIER:  Yes.

12              MR. FAWZY:  Okay.  I am sending you the

13  application.  You're going to get the application from

14  mark.fawzy@jascott.org, so -- and I can see your email

15  here as --

16              (Audio stopped.)

17      Q.  (BY MR. NEVAREZ)  Did -- did you understand

18  that part?

19      A.  Yes.

20      Q.  What is your understanding of what Mark Fawzy

21  just said?

22      A.  That he was sending me an application.

23      Q.  For what purposes?

24      A.  I don't believe he identified the purpose.

25      Q.  No.

1          What was your understanding of the purpose

2    for sending you an application?

3          A.   I don't know what -- I can't speak to what his

4    purpose was.  My purpose for receiving an application

5    was to try to find out the lender.

6          Q.   To try to find out the lender.

7          A.   Yes.

8          Q.   So you were never interested in a $50,000 loan?

9          A.   No.

10         Q.   So why would you even try to get an application

11   if you're not interested for a $50,000 loan?

12         A.   To find out the lender.

13         Q.   What -- for what purposes?

14         A.   To find out who was violating the TCPA.

15         Q.   This is the first call you'd ever had with Mark

16   Fawzy; is that correct?

17         A.   I can't say.

18         Q.   Have -- had you ever had a phone call prior to

19   April 8th of 2022?

20         A.   My call log is in my complaint.

21         Q.   Yes.  That's not my question.

22         A.   And I believe the call log indicates calls

23   prior to that date, this phone call.

24         Q.   Okay.  So getting back to my question, you were

25   not interested in getting a $50,000 loan in your

1  communications with Mark Fawzy?

2      A.  No, I was not interested in taking $50,000 from

3  JaScott.

4      Q.  Okay.  So -- well, let's continue on with the

5  conversation.

6              (Audio played.)

7              MR. FAWZY:  -- callier74@gmail.com.  Is

8  that your best email?

9              MR. CALLIER:  Yes.

10             MR. FAWZY:  Okay.

11     Q.  (BY MR. NEVAREZ)  So --

12             MR. FAWZY:  Give me one second.

13     Q.  (BY MR. NEVAREZ)  So you're --

14             MR. FAWZY:  The subject line is "funding

15  offer."  And what kind of payment term are you looking

16  for?

17             MR. CALLIER:  I don't know.  Weekly,

18  monthly.  Either one would be good.

19             MR. FAWZY:  Weekly and monthly.  Perfect.

20  Perfect.  And do you -- do you have any positions right

21  now, any loans right now, currently at this moment?

22             MR. CALLIER:  No.

23             MR. FAWZY:  Perfect.  Perfect.  All right.

24  Just give me one second.

25             (Audio stopped.)

Brandon L. Callier - January 8, 2024          38

1      Q.   (BY MR. NEVAREZ)  So you're discussing the

2   terms of the loan with him and -- and your

3   qualifications for a loan, your eligibility for a loan?

4      A.   I wouldn't characterize it as that, no.

5      Q.   Okay.  What would you characterize it?

6      A.   Well, he certainly didn't discuss terms of a

7   loan.

8      Q.   Well, I mean, he wanted to know if you were

9   interested in paying weekly or monthly, and you said

10  "weekly or monthly," right?  That's not the terms of a

11  loan?

12     A.   Well, I guess so.  In my -- in my mind, it

13  would have been something else, but --

14     Q.   Okay.

15     A.   -- fine for purposes of this discussion.

16     Q.   I'm sorry.  What?

17     A.   For the purposes of this discussion, we can

18  call it "terms of a loan."

19     Q.   Okay.

20              (Audio started.)

21              MR. FAWZY:  I believe the -- all right.  It

22  should be DocuSign, okay?  Your name, Brandon Callier.

23              MR. CALLIER:  (Indiscernible.)

24              MR. FAWZY:  Yeah.  You're going to DocuSign

25  on your email.  Can you please give it a check if you

Brandon L. Callier - January 8, 2024          39

1    got it or not?  It should be on your inbox by now.  And

2    I am sending you another email where you're going to

3    have all the information about my company and

4    everything -- my website, address, and everything that

5    you require.  Just (indiscernible).  The subject line is

6    "funding offers."  Yeah.  It's sent.  Can you please

7    check your inbox, sir?  Did you receive it?  Sir, are

8    you there?

9                 MR. CALLIER:  Oh, shoot.  Yeah, I got it.

10   I have to make a phone call to a vendor real quick, so

11   give me about 20 minutes, and then I'll take care of

12   this.

13                MR. FAWZY:  Okay.  Perfect.  So --

14                MR. CALLIER:  Okay.

15                MR. FAWZY:  -- it's a very simple

16   procedure.  You just have to fill out the application.

17   It just takes five minutes of your time, and send it

18   back to me with the last four (indiscernible).  I'll

19   come back with the offer in the next 30 minutes, all

20   right?

21                MR. CALLIER:  Okay.

22                MR. FAWZY:  The 50,000 you're looking for,

23   I'll --

24                MR. CALLIER:  Yeah.

25                MR. FAWZY:  -- have it ready for you.

Brandon L. Callier - January 8, 2024                40

1   (Indiscernible.)

2               MR. CALLIER:  Yeah.  Last four of

3   (indiscernible).

4               MR. FAWZY:  Thank you so much.  I'm calling

5   you back in --

6               MR. CALLIER:  Okay.

7               MR. FAWZY:  -- 20 minutes.

8               MR. CALLIER:  Okay.

9               MR. FAWZY:  Perfect.

10               MR. CALLIER:  Thank you so much.  Bye.

11               MR. FAWZY:  Bye.

12               (Indiscernible.)  A la chica.

13               MR. CALLIER:  Hello?

14               (Audio stopped.)

15      Q.  (BY MR. NEVAREZ)  Okay.  So he sent you an

16   application via email, and you confirm your receipt

17   right on that phone call, right?

18      A.  Yes, sir.

19      Q.  So at that point in time, you already knew who

20   the lender was.  You accomplished what you said you were

21   meaning to accomplish.

22      A.  That's not correct.

23      Q.  Okay.  So you didn't know who the lender was?

24      A.  Absolutely not.

25      Q.  Didn't he identify himself as JaScott

Brandon L. Callier - January 8, 2024          41

1   organization?

2       A.   JaScott didn't make a loan to me --

3       Q.   No.

4       A.   -- an offer to me.

5       Q.   Did they -- but you -- he told you he was

6   representing JaScott org, right?

7       A.   Yes, he did.

8       Q.   Okay.  So at that point in time, you knew who

9   the -- who the purported lender was supposed to be,

10  right?

11      A.   No.

12      Q.   No?

13      A.   No.

14      Q.   Okay.  But you got the application, right, via

15  DocuSign?  You confirmed that.

16      A.   Yes.

17      Q.   And that told you who the lender was.

18      A.   No.

19      Q.   No?

20      A.   No.

21               MR. MILTENBERGER:  Is there a question?

22  Objection.

23      Q.   (BY MR. NEVAREZ)  So -- so you still didn't

24  know who the lender was?

25      A.   Correct, I did not know who the lender was.

ACR Ink, LLC

Brandon L. Callier - January 8, 2024                42

1      Q.   When did you find out who the lender was?

2      A.   When I received a contract that had Pac Western

3  in it -- on it.   That was the lender.

4      Q.   Okay.   So now, let me ask you about this:   Why

5  did you not tell Mark Fawzy, "Do not ever call me again.

6  I'm on the do-not-call registry.   Do not ever call me

7  again"?   Why didn't you tell Mark Fawzy that right then

8  and there?

9      A.   I wanted to find out who the lender was.

10     Q.   Oh, what you had already found out, that he was

11 going to send you an application.   Why did you not tell

12 him, "Do not ever call me again.   I'm on the do-not-call

13 registry"?

14               MR. MILTENBERGER:   Objection, asked and

15 answered.

16               You can answer it one more --

17               THE WITNESS:   Okay.

18               MR. MILTENBERGER:   -- time.

19     A.   I wanted to find out who the lender was.

20     Q.   (BY MR. NEVAREZ)   Okay.   Well, you -- you

21 didn't ask him who's -- you didn't ask Mark Fawzy, "Who

22 is the lender?"   You just -- he said he was going to

23 send you an application.   He wanted to find out if you

24 wanted to pay by the month or -- or by the week.   He

25 discussed the 50,000.

1           You didn't ask -- why didn't you ask him,

2  "Who is the lender?"  "All I want to do is find out who

3  the lender is," why didn't you ask him that?  Why didn't

4  you tell him that?

5      A.   Right.  Most likely, he would have not told me

6  who the lender was.

7      Q.   No.

8           Why did you not ask him --

9      A.   I just told you why.

10     Q.   -- who was the lender?

11     A.   I just --

12          MR. MILTENBERGER:  Hold on.  Wait until

13  he -- wait until he finishes his question.

14          THE WITNESS:  Oh, okay.  I'm sorry.

15          MR. MILTENBERGER:  And I'm going to object

16  to it.  It was asked and answered.

17          MR. NEVAREZ:  Okay.

18          MR. MILTENBERGER:  You can't argue with

19  him.  You can ask a question.

20          MR. NEVAREZ:  I'm not arguing with him.

21  He --

22          MR. MILTENBERGER:  Well --

23          MR. NEVAREZ:  I -- he says he wanted to

24  find out.

25     Q.   (BY MR. NEVAREZ)  Why didn't you ask him, "All

Brandon L. Callier - January 8, 2024                44

1    I want to do is find out who the lender is.  I'm not

2    interested in a loan"?

3              MR. MILTENBERGER:  Objection, asked and

4    answered.  He just answered that.

5         Q.  (BY MR. NEVAREZ)  You still have to answer.

6    He's got his objection.

7         A.  Okay.  Real simple.

8              MR. MILTENBERGER:  You can have the court

9    reporter read back your previous answer, if you want.

10             MR. SHARPE:  You don't have to --

11             MR. NEVAREZ:  No.  No.  He's --

12             MR. MILTENBERGER:  Wait a second.

13             MR. NEVAREZ:  This is --

14             MR. MILTENBERGER:  Are you speaking?

15             MR. NEVAREZ:  You've got your objection on

16   the record.  He has to answer, or are you telling him

17   not to answer?

18             MR. MILTENBERGER:  No, I'm not.

19             But I'm asking is -- I forget your name,

20   but are you -- are you representing the wit- -- or

21   the -- the defendant in this case?

22             MR. NEVAREZ:  No.  I told you he's just

23   here, my -- he's my associate.

24             MR. MILTENBERGER:  Okay.

25             MR. NEVAREZ:  He's helping me, okay?

Brandon L. Callier - January 8, 2024          45

1          MR. MILTENBERGER:  Okay.  Well, then he

2  should not speak and make objections during the --

3          MR. NEVAREZ:  He didn't make an

4  objection.

5          MR. MILTENBERGER:  Well, he did speak

6  during the deposition.

7          MR. NEVAREZ:  He did.  Okay.

8          MR. MILTENBERGER:  Okay.  So --

9          MR. NEVAREZ:  He won't --

10         MR. MILTENBERGER:  And I don't appreciate

11 your associate telling me how to make objections.  If

12 you -- you and I want to have an exchange, we can --

13         MR. NEVAREZ:  He didn't tell you how to

14 make an objection, sir.

15         MR. MILTENBERGER:  Okay.

16    Q.   (BY MR. NEVAREZ)  Okay.

17    A.   Sir, written proof of who the lender is is

18 undeniable, so I wanted written proof.

19    Q.   Okay.  Well, that still doesn't answer my

20 question.

21    A.   It does answer your question, sir.

22    Q.   Why didn't you tell him, "I -- I -- I -- I need

23 to know who the lender is"?

24         MR. MILTENBERGER:  Objection, asked and

25 answered.  He just answered you that.

1              MR. NEVAREZ:  No, he didn't.  No, he

2  hasn't.  He's -- he -- he -- his answer was

3  nonresponsive.

4              THE WITNESS:  Sir --

5              MR. MILTENBERGER:  You may not have liked

6  the answer, but he gave you an answer.  You can't keep

7  asking the same question over and over.

8              MR. NEVAREZ:  Until he gives me an answer,

9  I can.

10              MR. MILTENBERGER:  Well, he's given you an

11  answer.

12              MR. NEVAREZ:  Okay.  Do you have an

13  objection?

14              MR. MILTENBERGER:  You don't like the

15  answer.

16              MR. NEVAREZ:  State your objection, and

17  then we'll move on.

18              MR. MILTENBERGER:  Yes.  I stated it.

19              MR. NEVAREZ:  Okay.

20              MR. MILTENBERGER:  Asked and answered.

21              MR. NEVAREZ:  All right.

22     Q.  (BY MR. NEVAREZ)  Why didn't you tell him that

23  you -- you needed to know who the lender was?

24     A.  I wanted --

25              MR. MILTENBERGER:  Objection, asked and

1    answered.

2       A.   -- written proof of who the lender was.

3       Q.   (BY MR. NEVAREZ)  Well, why didn't you tell

4    him, "I need written proof of who the lender was" -- or

5    "is"?

6       A.   I did not feel the need to tell him that

7    because filling out a contract and getting an

8    application -- excuse me -- and getting a contract is an

9    unequivocal way of finding out who the lender is.

10      Q.   Okay.  So you're discussing $50,000.  Is that

11   for a personal loan?

12      A.   It is to find out who the lender is.

13      Q.   So you were pretending, trying to get a loan in

14   order to find out who the lender was?

15      A.   In order to find out what company was at the --

16   was behind the numerous phone calls I had received.  The

17   lender.

18      Q.   Well, why were you pretending -- why is it

19   necessary to find out who the lender is by pretending

20   that you want a $50,000 loan?

21      A.   Because the application that JaScott sent over

22   did not list Pac Western as the lender.  And on the

23   phone call, Mr. Fawzy did not say he's calling on behalf

24   of Pac Western to loan -- to make the loan.

25      Q.   It doesn't -- that -- that's not the question.

ACR Ink, LLC

1              Why are you pretending to -- to get a

2    $50,000 loan in order to get an application?

3              MR. MILTENBERGER:  Objection, asked and

4    answered.  He was trying to find out --

5              MR. NEVAREZ:  No.

6              MR. MILTENBERGER:  -- who the lender was.

7              MR. NEVAREZ:  It's not responsive.  You've

8    got your objection.

9        A.   Sir, I've asked -- I've given you essentially

10   the same answer each and every time you've asked me.

11   I'm not going to change my answer, the substance of it.

12   I wanted to know who the lender was.

13              I did not know who the lender was because

14   JaScott did not identify -- who on the phone call did

15   not identify what company they were calling on behalf of

16   to make a loan, nor did they have it in their email, nor

17   did they have it on the application, so I had no idea

18   who the lender was.

19       Q.   (BY MR. NEVAREZ)  But if you didn't want a

20   loan, why didn't you just tell him, "Frankly, I don't --

21   I don't want a $50,000 loan.  I don't -- I don't care

22   who the lender is.  I don't need 50,000, so let's not

23   talk about 50,000 or an application or a loan"?  Why

24   didn't you just tell him that?

25       A.   I've answered your question.

Brandon L. Callier - January 8, 2024          49

1      Q.   No.  Answer it again.

2      A.   I wanted to find out who the lender was.

3      Q.   Okay.  So why did you not tell him, Mr. Fawzy,

4  at that point in time, "I'm on the do-not-call registry.

5  Do not ever call me again"?

6      A.   I told Mr. Fawzy that at a later time.  I told

7  him that multiple times, and he ignored it.

8      Q.   Well, you didn't tell him in this call, did

9  you?

10      A.   No, I did not.

11      Q.   Okay.  Why not?

12      A.   I wanted to find out who the lender was.

13      Q.   Well, it doesn't matter who the lender is.  Why

14  did you not tell him, "Do not ever call me again"?

15          MR. MILTENBERGER:  Asked and answered,

16  objection.

17      A.   I'm going to tell you the same thing over and

18  over.  I wanted to find out who the lender was.

19      Q.   (BY MR. NEVAREZ)  Okay.  Well, let me ask you

20  this:  If you had told Mr. Fawzy, "Do not ever call me

21  again," is it possible that that would have been the end

22  of your conversations with him?

23      A.   I'm going to answer your question, but this is

24  pure speculation.  Based on the fact that later on I

25  told him in a text message, "Do not ever call or text me

1  again," and he called and text me some 60 or 70 times

2  after that, I'm going to suspect that the answer is no.

3      Q.   Okay.  Well, so you did not comply with the

4  do-not-call registry requirement of telling the caller,

5  "Do not ever call me again"; is that correct?

6              MR. MILTENBERGER:  Objection --

7      A.   That is not correct.

8      Q.   (BY MR. NEVAREZ)  Do you want me to play the

9  audio back again?

10      A.   Well, sir, you didn't specify if you meant on

11  that phone call or ever.

12      Q.   It's -- this is what we're talking about, sir.

13      A.   Okay.

14      Q.   This is what we're talking about.  Do you want

15  me to play you the call --

16      A.   The --

17      Q.   -- over again?

18      A.   No, you don't --

19              MR. MILTENBERGER:  Objec- -- hold on.  Hold

20  on.

21              Objection to the form of the question, to

22  the extent it requires a legal conclusion about

23  complying with the do-not-call registry.  If you want to

24  add -- ask facts about what was said on the

25  conversation, that's proper.

1    Q.   (BY MR. NEVAREZ)  Do you want me to play the --

2    the call back over again?

3    A.   No.  I have your answer, sir.

4    Q.   No.  I'm not giving you an answer.  I'm trying

5    to --

6    A.   No.  No.

7    Q.   -- get your answer.

8    A.   I'm telling you I'm going to answer your

9    question.

10    Q.   You did -- is it true that you did not tell

11    Mark Fawzy, "Do not ever call me again.  I'm on the

12    do-not-call registry"?

13    A.   On that phone call?

14    Q.   Yes.

15    A.   That is true, I did not tell him that.

16    Q.   Okay.  Is it your testimony that you had told

17    him prior to this call?

18    A.   No.  I did not tell him that prior to this

19    call.

20    Q.   Okay.  All right.

21    A.   It is my testimony --

22              MR. MILTENBERGER:  Objection,

23    nonresponsive.

24              THE WITNESS:  Oh, okay.

25    A.   It is my testimony that it's Mr. Fawzy's

Brandon L. Callier - January 8, 2024          52

1   responsibility to check the do-not-call registry prior

2   to calling me.  It is not my responsibility to tell him

3   at that point in time.  He should have called -- he

4   should have checked prior to calling me.

5            MR. MILTENBERGER:  Objection,

6   nonresponsive, move to strike.

7        Q.  (BY MR. NEVAREZ)  But you -- you -- you pursued

8   a discussion about getting a $50,000 loan, purportedly.

9   That was the representation, that this whole loan

10  application was for $50,000, right?

11       A.  If that's what Mr. Fawzy says on the audio.

12       Q.  Well, he does say 50,000, and you don't say,

13  "No, I'm not -- I'm not interested in 50,000.  I'm not

14  interested in any loan.  Do not ever call me again."

15  You just allowed him to continue the discussion about

16  the $50,000 loan; isn't that correct?

17       A.  Yes.

18       Q.  And you did not tell him, "Do not call,"

19  regardless of whose responsibility it is.

20       A.  On that phone call, no, I did not.

21       Q.  Okay.  And you hadn't told him prior to this

22  phone call.

23       A.  No.

24       Q.  "No," what?

25       A.  No, I did not.

1    Q.   Okay.  So let me direct your attention now to,

2    again, Exhibit A, Exhibit Number 3, which is on Bates

3    page 5 and goes on to Bates page 6.  You see that?

4    A.   Yes, sir.

5    Q.   Okay.  And that's a copy of an email from you

6    to Mr. Fawzy, "Subject:  Re:  Funding officers [sic]."

7    You see that?

8    A.   Yes.

9    Q.   Dated April 9, 2022.  You see that?

10   A.   Yes.

11   Q.   Okay.  And then so your reply to -- this is

12   your reply to Mr. Fawzy, right?

13   A.   (No verbal response.)

14   Q.   Is that your email address?

15   A.   I would have to look, sir.

16        Yes, that's my email address.  It looks

17   like it's a reply from me to Fawzy.

18   Q.   Okay.  And that your email address is

19   callier74@gmail.com.

20   A.   Yes.

21   Q.   And -- and your reply is dated April 9th of

22   2022, right?

23   A.   Yes.

24   Q.   And -- and that's the day after this phone

25   call.

1    A.   Yes.

2    Q.   And that phone call was April 8th, right?

3    A.   Yes.

4    Q.   Okay.  And Mr. Fawzy's email to you on this

5   Bates page 6 says, "Here is the link for the lending

6   application.  Please click on this and -- and filled it

7   out."  And then the link is entitled "Complete Lending

8   Application."  You see that?

9    A.   Yes.

10    Q.   Okay.  And then it's got -- so he's sending you

11   the application, as he stated in that audio telephone

12   call.

13    A.   Yes.

14    Q.   Okay.  So -- and your reply was, "Here are the

15   statements."  And if -- you have four attachments as a

16   ZIP file; is that correct?

17    A.   Appears to be correct.

18    Q.   And so there's -- there's a January statement,

19   there's a February statement, and then there's two other

20   files, "20220331-statements-55" and then

21   "20211231-statements-55."  So your response to

22   Mr. Fawzy's lending application was sending him four

23   bank statements.

24    A.   Yes.

25    Q.   And so why did you not reply, "Who is the

1   lender?"

2       A.   Because I felt like the best way to find out

3   the lender was to get it in writing via a funding offer.

4       Q.   Well, this is a written email document, right?

5   I mean, you print it out.

6       A.   Yeah.

7       Q.   You've got it in writing.

8       A.   Sir, if you can point to me --

9             MR. MILTENBERGER:  Well, objection --

10            THE WITNESS:  Sorry.

11            MR. MILTENBERGER:  -- to the form.  Was

12   there a question pending when you said "you've got it in

13   writing"?

14            MR. NEVAREZ:  No.  He -- he answered before

15   I finished my question.

16            THE WITNESS:  Sorry.

17            MR. MILTENBERGER:  Okay.  You got to let

18   him finish his question so we'll --

19            THE WITNESS:  Sorry.

20            MR. MILTENBERGER:  -- know what question

21   you're answering.

22            THE WITNESS:  Okay.

23            MR. MILTENBERGER:  So please wait until he

24   finishes his question.

25            THE WITNESS:  Yes.

1   Q.   (BY MR. NEVAREZ)   So this is a written

2   document, right?   I mean, you print it -- you can print

3   it out.   It comes into your computer.   You can print it

4   out.   It's a written document, satisfying one of your

5   criteria.

6              MR. MILTENBERGER:   Objection to the form.

7   Q.   (BY MR. NEVAREZ)   Is that correct?

8   A.   That's not close to correct, no, sir.

9   Q.   Okay.   Well, you wanted to find out who the

10   lender was in writing.

11   A.   Sir --

12              MR. MILTENBERGER:   Objection, form.

13   Q.   (BY MR. NEVAREZ)   Is that correct?

14              MR. MILTENBERGER:   Is there a question?

15   Q.   (BY MR. NEVAREZ)   Is that correct or not?

16   A.   That is correct.

17   Q.   Okay.   So why did you not reply to Mr. Fawzy

18   and say, "Tell me in writing via email who the lender

19   is"?

20              MR. MILTENBERGER:   Objection, asked and

21   answered.

22   Q.   (BY MR. NEVAREZ)   He's got his objection.   It's

23   your --

24   A.   Okay.   I have no faith at all that had I said,

25   "Who is the lender," Mr. Fawzy would have emailed me

Brandon L. Callier - January 8, 2024                57

1   back and said "Pac Western."

2       Q.   Well, I -- I haven't heard anything about

3   Pac Western at this point in time.  How did you come up

4   with Pac Western back then?

5       A.   I filled out an application, this application,

6   and I received from Mr. Fawzy a funding contract from

7   Pac Western.

8       Q.   So that told you who the lender was, right?

9       A.   That was --

10      Q.   When you -- when you clicked on the

11  application, you discovered it was Pac Western, right?

12      A.   No.

13      Q.   No?

14      A.   No.

15      Q.   How -- how did you discover it was Pac Western?

16      A.   When Pac Western sent over the con- -- when

17  Mr. Fawzy sent the -- the contract offer.

18      Q.   Now, what was the link?

19      A.   Your --

20      Q.   What was the link?  Was -- was that not a link

21  to an application for a Pac Western loan?

22      A.   No, it was not.

23      Q.   What was it for?

24      A.   To the best of my recollection -- I don't have

25  it in front of me, but I know for absolute fact that it

Brandon L. Callier - January 8, 2024          58

1   did not say "Pac Western" on there.  I'm almost certain

2   it -- doing this from a year ago -- that it -- or over a

3   year ago -- that it said "JaScott" on the application.

4   I don't know that to be fact, but I do know that nowhere

5   in any of this did it say the lender was Pac Western.

6        Q.   Okay.  Well, but it -- but your testimony is

7   that when you clicked on the link, it said "JaScott

8   Investments."  Is that correct?  Is that your testimony?

9        A.   It -- that is to the best of my recollection.

10       Q.   Okay.  So then at -- at that point in time, you

11  knew who -- if not -- that the lender was -- may be

12  JaScott Investments, right?

13       A.   No.

14       Q.   You didn't know?  Okay.

15            Well, then, why didn't you reply to

16  Mr. Brandon Callier [sic] and says, "This link opens up

17  a JaScott Investments application.  Who is the lender?"

18  Why did you not reply to -- to Mr. Fawzy and ask him

19  that?

20       A.   It didn't cross my mind, sir.

21       Q.   Okay.  Why did you not reply to this email and

22  say, "Do not ever call me again.  I am on the

23  do-not-call registry"?

24       A.   I was in the process of doing reasonable

25  investigation to find out who the lender was.

1    Q.   Okay.  So as of April 9, your second contact

2    with Mr. Fawzy, you still had not told him, "Do not call

3    me ever again.  I am on the do-not-call registry"; is

4    that correct?

5    A.   That is correct.

6    Q.   Okay.  Let's move on to the next page of

7    Exhibit A, which is JaScott-7.  Do you see that?

8    A.   Yes.

9    Q.   That's your -- would you identify what that is?

10   A.   That is a March statement, business checking

11   statement for Gonna Keep on Truckin, LLC.

12   Q.   Okay.  And who is Gonna Keep on Truckin, LLC?

13   A.   It's a company I do the taxes for.

14   Q.   I see.  Okay.

15        And did they authorize you to pursue a

16   loan, or why did you provide Mr. Fawzy these particular

17   bank statements?

18        MR. MILTENBERGER:  Objection, form of the

19   question.

20   A.   I submitted those bank statements in an attempt

21   to find out who the lender was.  Yes, I was authorized

22   to submit those bank statements.

23   Q.   (BY MR. NEVAREZ)  I see.

24        So Gonna Keep on Truckin authorized you to

25   submit these bank statements to Mr. Fawzy as part of a

Brandon L. Callier - January 8, 2024                60

1  loan application?

2       A.   As part of an investigation.

3       Q.   Okay.  So they were -- and who at Mr. -- at

4  Gonna Keep on Truckin authorized you to do that?

5       A.   George Duron, D-U-R-O-N.

6       Q.   Now, did you tell Mr. Duron, "We're not really

7  looking for a loan.  I'm just going to continue to have

8  these discussions with Mr. Fawzy or JaScott because I

9  want to find out who the lender is"?

10      A.   I told Mr. Duron that I was not going to take a

11 loan in his company's name, and I was submitting the

12 application and the statements simply as part of an

13 investigation.

14      Q.   And he agreed to go along with your pretending

15 to want to get a loan?

16      A.   He agreed to allow me to use the bank

17 statements.

18      Q.   Okay.

19      A.   He said --

20      Q.   So he was complicit with your actions.

21      A.   I don't know what you mean by "he was complicit

22 with my actions."

23      Q.   He agreed to you pretending to get a loan from

24 Mark Fawzy.

25      A.   He agreed to me using his company bank

1    statements to find out who the lender was.

2         Q.   I see.  Without ever wanting a loan.

3         A.   He knew that I had no intention of using his

4    business to procure money via a loan.

5         Q.   And he approved that.

6         A.   Yes, he approved it.

7         Q.   Okay.  So that bank statement from Gonna Keep

8    on Truckin, that's Bates page 7 through 14; is that

9    correct?

10        A.   To the best of my knowledge, it looks correct

11   to me.

12        Q.   Well, Bates stamp 14 is page 8 of 8, and that's

13   the March 2022 bank statement, right?

14        A.   Correct, sir.

15        Q.   So Bates stamp 15 is the January bank

16   statement; is that correct?

17        A.   Yes, sir.

18        Q.   And that's -- that goes -- continues to Bates

19   stamp 22.

20        A.   Okay.

21        Q.   Is that correct?

22        A.   Yes.

23        Q.   Okay.  And this is the February -- I'm sorry --

24   the January 2022 bank statement that Mr. Duron provided

25   you.

Brandon L. Callier - January 8, 2024          62

1      A.   Yes.

2      Q.   Okay.  Now, moving on to Bates stamp 23, that's

3  the first page of the bank -- of the February 2022 bank

4  statement, page 1 of 8, Bates stamp 23, and that

5  continues to Bates stamp 30?

6      A.   Okay.

7      Q.   Is that correct?

8      A.   Yes.

9      Q.   And then Bates stamp 31, that's the Decem- --

10          ELECTRONIC DEVICE:  I didn't understand

11  that.

12          MR. NEVAREZ:  I'm sorry.

13      Q.   (BY MR. NEVAREZ)  Bates stamp 31, that's the

14  first page of the December 2021 bank statement, and that

15  continues on to December -- I'm sorry -- to Bates stamp

16  38?

17      A.   Yes.

18      Q.   And you -- and your testimony is that you

19  provided these to try to find out who the lender was.

20      A.   Yes.

21      Q.   So you're providing -- your testimony is you're

22  providing bank statements to somebody without even

23  knowing who the lender is to get a loan?

24      A.   I provided bank statements to JaScott to find

25  out who JaScott was calling to lend on behalf of.

Brandon L. Callier - January 8, 2024          63

1    Q.   Okay.  Well, why did you at no time prior to

2   submitting the bank statements tell Mr. Fawzy, "I ain't

3   giving you anything until you tell me who the lender

4   is"?

5    A.   I went along -- played along with Mr. Fawzy to

6   find out who the lender was.  Behaving in the manner in

7   which you've been describing would not have furthered my

8   investigation, in my opinion, as I was attempting to

9   find out who the lender was.

10   Q.   And what was the goal of -- your goal of trying

11  to find out who the lender was?

12   A.   To find out on whose behalf JaScott is

13  violating the TCPA on behalf of.

14   Q.   Well, if -- if JaScott was violating the TCPA,

15  what difference or matter who else was involved in

16  violating the TCPA?  Why did you not tell Mr. Fawzy,

17  "You're violating the TCPA because I'm on the

18  do-not-call registry.  Do not ever call me again" --

19          MR. MILTENBERGER:  Objection --

20   Q.   (BY MR. NEVAREZ)  -- instead of sending him the

21  bank statements?

22   A.   Can you rephrase that?  Because I -- I heard

23  multiple questions in -- in there.

24   Q.   Instead of sending Mr. Fawzy the bank

25  statements, why didn't you tell him, "I'm not going to

ACR Ink, LLC

Brandon L. Callier - January 8, 2024                64

1  get involved in this.  JaScott is -- is trying to

2  solicit a loan from me.  I'm on the do-not-call

3  registry.  Do not ever call me again"?  Why didn't you

4  tell him that instead of sending him the bank

5  statements?

6      A.  Sir, I handled it in the way I best saw fit at

7  the time.  I wanted to find out who the lender was.

8  Behaving in the manner in which you're saying is not

9  going to help me further that cause.

10     Q.  What -- and the cause was to find out who the

11 lender was?

12     A.  That is why I filled out that application.

13     Q.  Okay.  But you already knew that JaScott was

14 purportedly violating the TCPA; is that correct?

15     A.  Yes.

16     Q.  And you already knew Mr. Mark Fawzy, on behalf

17 of JaScott, was purportedly violating the TCPA, right?

18     A.  One more time.

19     Q.  You already knew that Mr. Fawzy was purportedly

20 violating the TCPA by calling you.

21     A.  Yes.

22     Q.  Okay.  So you already knew that two people or

23 two entities -- jascott.org, JaScott Investments, and

24 Mark Fawzy -- were supposedly violating the TCPA, right?

25     A.  Yes.

Brandon L. Callier - January 8, 2024          65

1      Q.   Okay.  So recognizing that there are

2 violations, supposedly, of the TCPA by JaScott

3 Investments and Fawzy, why didn't you tell him, "Okay.

4 Stop calling me.  I am on the do-not-call registry"?

5      A.   For the 15th time, at least, I wanted to find

6 out who the lender was.

7      Q.   For what reason?  To -- to add an additional

8 pers- -- entity that -- in the violation of --

9 purportedly, of the TCPA?

10      A.   Well, if you're going to hold people

11 accountable, then you should hold everyone accountable,

12 so I wanted to find out what lender was behind the phone

13 calls.

14      Q.   Okay.  So -- so you remained silent and

15 continued on with pretending that you wanted a loan

16 aft- -- after the -- you submitted the bank statements.

17      A.   Is that a question?

18      Q.   Yes.

19      A.   Can you rephrase it?

20      Q.   Did you continue on pretending that you wanted

21 a loan, even though you didn't want a loan?

22      A.   I wanted to find out who the lender was, so I

23 did not tell Mr. Fawzy anything other than what I needed

24 to say to find -- to eventually get sent a contract.

25      Q.   Okay.  But you didn't want a loan personally,

1  and neither did Gonna Keep on Truckin, but, yet, you

2  pretended that you wanted a loan.

3              MR. MILTENBERGER:  Objection.  Is that a

4  question?

5      Q.   (BY MR. NEVAREZ)  Is that not correct?

6      A.   I wanted to find out who the lender was.

7      Q.   But you never asked who the lender was.  You

8  never asked him in the -- in the phone call, you never

9  asked him via email, "Who is the lender?"

10             MR. MILTENBERGER:  You're just arguing with

11  him.

12      Q.   (BY MR. NEVAREZ)  Right?  Is that --

13             MR. MILTENBERGER:  Ask the facts.

14      Q.   (BY MR. NEVAREZ)  Is that --

15             MR. NEVAREZ:  Well, please stop

16  interrupting my -- my questions, okay?

17             MR. MILTENBERGER:  Well, I'm trying to find

18  a question --

19      Q.   (BY MR. NEVAREZ)  Is that not correct?

20             MR. MILTENBERGER:  -- in there.

21             MR. NEVAREZ:  Mr. Miltenberger, please stop

22  interrupting, okay?

23             MR. MILTENBERGER:  Continue on.

24      Q.   (BY MR. NEVAREZ)  Is that not correct?

25      A.   Can you repeat the question?

1          MR. NEVAREZ:  Would you please repeat the

2   question?

3               (Question read as follows:  But you never

4                asked who the lender was.  You never asked

5                him in the -- in the phone call, you never

6                asked him via email, "Who is the lender?")

7          MR. MILTENBERGER:  Objection, compound

8   question.  Object to the form.

9      Q.  (BY MR. NEVAREZ)  And then the end of -- the

10  end of that was, is that not correct?

11     A.  I did not ask him who the lender was.

12     Q.  Okay.  But, yet, you continued to pretend that

13  you were looking for a loan when you really weren't.

14     A.  Yes.

15     Q.  And neither was Gonna Keep on Truckin.

16     A.  Correct.

17          MR. MILTENBERGER:  Do you need to take a

18  break?

19          THE WITNESS:  My back's just hurting,

20  but --

21          MR. NEVAREZ:  Do you want to take a break?

22          THE WITNESS:  No.  No.  No.

23          MR. NEVAREZ:  That's fine.  We can take a

24  break.

25          THE WITNESS:  No.  No.  No.

1          MR. SHARPE:  I could use a break.

2          MR. MILTENBERGER:  Take five minutes.

3          MR. NEVAREZ:  I -- I need to -- I could

4    use -- go to the rest room.

5          THE VIDEO TECHNICIAN:  Off the record at

6    11:25.

7          (Break taken.)

8          THE VIDEO TECHNICIAN:  And we are back on

9    the record at 11:35 a.m.

10     Q.   (BY MR. NEVAREZ)  Okay, Mr. Callier.  You're --

11   you're on the exact page I wanted to point you to.

12   Thank you.  Bates stamp page 54 --

13     A.   Yes, sir.

14     Q.   -- of this Exhibit A.  Is that the loan

15   application that you submitted and filed via DocuSign?

16     A.   It appears to be, yes.

17     Q.   Okay.  Now, you identify yourself as -- "legal

18   company (& d/b/a):  Gonna Keep on Truckin, LLC."  And

19   in -- you indicated there that -- about in the middle,

20   "requested financing amount:  60,000"; is that correct?

21     A.   Yes.

22     Q.   And that -- that's your DocuSign signature at

23   the bottom of that --

24     A.   Yes.

25     Q.   -- quiz?

Brandon L. Callier - January 8, 2024                69

1       A.   Yes.

2       Q.   Yes.  Okay.

3            So this was -- according to the -- on -- on

4   the right-hand side, "use of funds," you indicated that

5   the use of the funds was going to be for more trucks?

6       A.   Yes.

7       Q.   So -- and then under "business owner

8   information," you indicated "full name:  Brandon

9   Callier," hundred percent ownership.

10      A.   Yes.

11      Q.   But you -- you weren't the owner, were you?

12      A.   No.

13      Q.   So this is a false statement.

14      A.   It was a statement submitted in order to find

15  out who the lender was.

16      Q.   It was a false statement.  You were not the

17  owner.

18      A.   No, I was not.

19      Q.   You -- you were not a hundred percent owner of

20  Gonna Keep on Truckin, LLC; is that correct?

21      A.   Correct.

22      Q.   And then under "cell phone," you put down

23  "(915) 383-4604."  That's your personal cell phone

24  number?

25      A.   That's what -- yes.

Brandon L. Callier - January 8, 2024                70

1    Q.   Okay.  And then below that is your email

2    address, callier74@gmail.com, right?

3    A.   Yes.

4    Q.   And then on the very bottom left-hand corner,

5    "title:  owner."  You're representing yourself as the

6    owner of Gonna Keep on Truckin, right?

7    A.   Yes.

8    Q.   And that's not true, is it?  That's not

9    correct.

10   A.   Correct.  I'm not the owner of Gonna Keep on

11   Truckin.

12   Q.   Now, did -- and did Mr. George Duron, the owner

13   of Gonna Keep on Truckin, LLC, did he review this loan

14   application?

15   A.   No, he did not.

16   Q.   Did he approve you -- you submitting this loan

17   application?

18   A.   Yes, he did.

19   Q.   Did he approve for you to misstate that you

20   were the hundred percent owner?

21   A.   Yes.

22   Q.   Did he approve that you apply for $60,000 for

23   more trucks, even though he never wanted the money?

24   A.   He approved that I apply with the intention of

25   never taking a loan of any sort.

Brandon L. Callier - January 8, 2024                    71

1      Q.   I see.

2           And for how many other loans has Mr. Duron

3  allowed you to use his bank statements in order to

4  conduct these investigations of yours?

5      A.   I want to say four, maybe five others.

6      Q.   Okay.  And those are all in the Western

7  District of Texas?

8      A.   I -- I did not sue all of those companies.

9      Q.   Oh, okay.  And why not?

10     A.   Because not all of them received text messages

11 from me saying, "Don't ever call or text me again," and

12 then continued to call and text me.

13     Q.   Okay.  So -- so now you've -- now you've got a

14 DocuSign loan application sent to you, and at the top

15 left-hand corner, it says "JaScott."

16     A.   Yes, sir.

17     Q.   You see that?

18     A.   Yes, I see that.

19     Q.   So now you've found out who is -- is involved

20 in the loan application process.

21     A.   No, sir.

22     Q.   Well, they sent you a loan application that you

23 filled out.

24     A.   Sir, as stated before, I wanted to find out who

25 the lender was.  That is nowhere on this application.

ACR Ink, LLC

Brandon L. Callier - January 8, 2024          72

1      Q.   It doesn't matter.

2      A.   Okay.

3      Q.   It says on the top left-hand corner "JaScott."

4      A.   Uh-huh.

5      Q.   They provided you a loan application as part of

6  the loan application process for a business loan on

7  behalf of Gonna Keep on Truckin, LLC; is that correct?

8      A.   Yes.  They provided me that application.

9      Q.   Okay.  So why did you not then and there sue

10 JaScott and Mark Fawzy?

11     A.   As stated previously numerous times, I wanted

12 to find out who the lender was.

13     Q.   Okay.  But you -- you understand you're --

14 you're designated as a serial litigator.  In other

15 words, you have a whole history of filing lawsuits based

16 on the TCPA.

17     A.   I have a history --

18          MR. MILTENBERGER:  Would you -- just a

19 second.

20     Q.   (BY MR. NEVAREZ)  Is that correct?  Is that

21 correct?

22     A.   No, sir.

23     Q.   You haven't filed TCPA lawsuits before?

24     A.   Yes, I've filed TCPA lawsuits.

25     Q.   In fact, you've filed many TCPA lawsuits; is

Brandon L. Callier - January 8, 2024          73

1   that not correct?

2        A.   Depending upon what the definition of "many"

3   is, that could be correct.

4        Q.   Dozens?

5        A.   Yes.

6        Q.   Okay.  You -- so you have filed dozens of TCPA

7   lawsuits.

8        A.   Yes.

9        Q.   And, in fact, didn't the Western District of

10  Texas categorize you or indicate that you were a serial

11  TCPA litigator?

12       A.   No, sir.

13       Q.   No?

14       A.   No.

15       Q.   You -- you didn't read the -- the -- the most

16  recent order that was issued wherein the Court indicated

17  that you were a serial TCPA litigator?

18       A.   I don't recall the Court labeling me a serial

19  TCPA litigator.

20       Q.   Well, they used the word "serial."

21       A.   Okay.

22       Q.   Do you remember the Court --

23       A.   No, I don't remember that order.

24       Q.   Okay.  Well, it's in the record.

25            MR. MILTENBERGER:  Objection.  Is that a

Brandon L. Callier - January 8, 2024          74

1    question?

2        Q.   (BY MR. NEVAREZ)   So as a serial litigator,

3    familiar with TCPA litigation, why didn't you sue

4    JaScott and Fawzy and then later on add the lender that

5    you were interested in figuring out who it was?

6              MR. MILTENBERGER:   Objection to the form of

7    the question, assumes facts not in evidence.

8        A.   I had no idea who the lender was and was in no

9    position to sue the lender.

10       Q.   (BY MR. NEVAREZ)   But you already admitted that

11   JaScott and Fawzy purportedly had already violated the

12   TCPA; isn't that correct?

13       A.   JaScott was not the lender.

14       Q.   It doesn't matter.

15       A.   And JaScott was calling on behalf of some other

16   company, entity, to make a loan.   I wanted to find out

17   who that entity was.

18       Q.   Okay.   But is it not your position that as of

19   this April 8th, 2022, date, you already thought that

20   JaScott was a violator of the TCPA?

21       A.   Yes.

22       Q.   And you also believed that Fawzy was violating

23   the TCPA.

24       A.   My belief, then and now, is that Fawzy was an

25   employee and/or authorized agent of JaScott, and they

ACR Ink, LLC

Brandon L. Callier - January 8, 2024          75

1    are -- and -- and, essentially, one and the same entity,

2    so I don't make a distinction between Fawzy and JaScott.

3    What I was trying to find out was who the lender was,

4    because they were violating it on behalf of some other

5    entity.

6         Q.   Okay.  But -- but -- but your position at this

7    point was -- was that JaScott was vi- -- had already

8    violated the TCPA -- is that not correct -- as of this

9    date?

10             THE WITNESS:  Would you read back my answer

11   to that question?  He's asked -- he's asked me that like

12   ten times.

13        Q.   (BY MR. NEVAREZ)  No.  No.  No.  At this -- as

14   of this date, April 8th, 2022, is it your position that

15   JaScott was already violating the TCPA?

16        A.   I answered that a minute ago.  Yes.

17        Q.   Okay.  And by the same token, regardless of

18   whether you think Fawzy and JaScott are one and the

19   same, as of this date, did you not also think that

20   Fawzy -- Fawzy was also in violation of the TCPA?

21        A.   I believed that Fawzy worked for JaScott, and

22   JaScott was responsible.  I believed that Fawzy was

23   violating the TCPA on behalf of JaScott.

24        Q.   Oh, so -- so at this point in time, both

25   JaScott and Fawzy were, in your opinion, in violation of

1   the TCPA.

2       A.   Yes.

3       Q.   Okay.  Why did you not sue them at that point

4   in time and then later on add the lender that you didn't

5   know who it was?

6                 MR. MILTENBERGER:  Objection, asked and

7   answered.

8       A.   Sir --

9                 MR. NEVAREZ:  No, he didn't answer it

10  and --

11      A.   I've answered -- I've ans- -- I've answered

12  this question repeatedly.  I wanted to find out who the

13  lender was, so I went along with JaScott and Fawzy in

14  this process.  I don't know how else to explain that to

15  you.

16      Q.   (BY MR. NEVAREZ)  Okay.  So you continued to

17  pretend that you wanted a business loan to find out who

18  the lender was on a loan that you didn't -- never

19  intended to take out?

20                MR. MILTENBERGER:  Objection.  Is there a

21  question?

22      Q.   (BY MR. NEVAREZ)  Is that correct?  Is that

23  what you were doing?  You continued to --

24      A.   I was --

25      Q.   Did you continue to pretend that you were

1  looking for a 60,000 business loan --

2      A.   I continued --

3      Q.   -- in order to find out who the lender was,

4  even though you never intended to -- to close on the

5  $60,000 loan?

6      A.   I in- -- I took reasonable measures to find out

7  who the lender was because, as you can see in this loan

8  application, nowhere in here does it say "Pac Western."

9  Nowhere in any of the emails did it say "Pac Western."

10 Pac Western was the lender.  Pac Western is not listed

11 in this loan application.

12     Q.   So you continued pretending that you wanted the

13 $60,000 loan, that you never intended to close on, to

14 find out who the lender was going to be?

15              MR. MILTENBERGER:  Objection.  Is there a

16 question there.

17     Q.   (BY MR. NEVAREZ)  Is that correct?

18              MR. MILTENBERGER:  It's -- objection, asked

19 and answered.

20     A.   I've been telling you the same thing for -- I

21 don't know -- an hour.  I wanted to find out who the

22 lender was.  Who the lender was was not disclosed to me

23 on this loan application that you just provided to me.

24 It's part of the record.  It's part of the evidence.  It

25 does not say "Pac Western" anywhere in here.

Brandon L. Callier - January 8, 2024          78

1          The way I found -- the -- the way I was

2   going to find out was -- how I find -- found out, by

3   submitting this application and getting a contract offer

4   from Pac Western.

5      Q.   (BY MR. NEVAREZ)   On a loan that you never

6   intended to close on.

7      A.   Yes.   I never intended to close on the loan

8   because I was solely filling out an application in order

9   to find out the lender.

10      Q.   Okay.   All right.   Okay.   Well, let me -- let

11   me refer you to Bates JaScott Investments-109, which is

12   Exhibit Number 22, and that's a graphic representation

13   of an audio file.   Let me play that audio file for you

14   right now.

15          (Audio played.)

16          (Indiscernible.)

17          MR. CALLIER:   Hello.

18          MR. FAWZY:   Brandon, are you alone --

19          MR. CALLIER:   Yeah.

20          MR. FAWZY:   -- at this moment, bro?

21          MR. CALLIER:   Who's this?

22          MR. FAWZY:   This is Mark.   I'm the finance

23   manager of JaScott Investments.   I was working on your

24   paperwork.   How are you?

25          MR. CALLIER:   I'm good.   How are you?

Brandon L. Callier - January 8, 2024          79

1          MR. FAWZY:  I'm doing great.  Thank you so

2   much for asking.  Okay.

3               (Audio stopped.)

4     Q.   (BY MR. NEVAREZ)  And that's your -- that's

5   your voice answering Mark Fawzy's phone call?

6     A.   I believe it is.

7     Q.   Okay.

8               (Audio played.)

9          MR. FAWZY:  Real quick, I can see that you

10  had some previous bankruptcies in 2017 and '19.  Am I

11  correct about that?

12          MR. CALLIER:  Yes.

13          MR. FAWZY:  Okay.  So, yeah, it was a bit

14  difficult when we tried to get you the offer, but I have

15  done the impossible task possible.  Good news for you.

16  We have an offer.  We have the $50,000 ready for you.

17  It's on the top of our table right now.  So are you

18  willing to hear the offer for $50,000?

19          MR. CALLIER:  Yeah.

20          MR. FAWZY:  Okay.  So $50,000, it is

21  approved.  You're pre- -- you are approved for this

22  money, and the payback amount would be only $71,000 for

23  6.5 months, and the payment -- and the payment amount

24  will be $2,605 daily, Monday through Friday, no -- no

25  working days, and all we need is your driver license,

Brandon L. Callier - January 8, 2024          80

1   voided check, and tax return paper, and we can get you

2   the money by today.

3               MR. CALLIER:  And what?  What was the last

4   thing?

5               MR. FAWZY:  Your driver license, voided

6   check, and tax return paper.  That's all I need.

7               MR. CALLIER:  Okay.

8               MR. FAWZY:  And we can get you the money by

9   today.

10              MR. CALLIER:  Tax return from which --

11              MR. FAWZY:  So --

12              MR. CALLIER:  -- from what year?

13              MR. FAWZY:  From last year.

14              MR. CALLIER:  Okay.

15              MR. FAWZY:  Yeah.  Perfect.  So should I

16   prepare the contract paper?

17              MR. CALLIER:  Yeah, go ahead.

18              MR. FAWZY:  Yeah.  Perfect.  All right.  I

19   am preparing the contract paper, and I'm -- I'm sending

20   you another email, and just send me your voided check,

21   driver license, and tax return papers, and we will

22   proceed.  The money is getting to your account --

23              MR. CALLIER:  Yeah.  Well, I just --

24              MR. FAWZY:  -- all right?

25              MR. CALLIER:  -- went to the -- I just left

Brandon L. Callier - January 8, 2024          81

1   to go to the lake.  I can send the driver's license and

2   the voided check because I have that in my email.

3   The --

4                MR. FAWZY:  Okay.

5                MR. CALLIER:  -- tax return I'll have to

6   send when I get back.

7                MR. FAWZY:  No worries.  No worries.  Take

8   your time.  Just send those over to me right now, and I

9   am submitting this file to the underwriter, and I'm

10  preparing the contract paper, all right?  So we'll get

11  you --

12               MR. CALLIER:  Okay.

13               MR. FAWZY:  -- the money as soon as

14  possible.

15               MR. CALLIER:  Okay.  Great.  Okay.

16               MR. FAWZY:  Thank you so much.

17               MR. CALLIER:  All right.

18               MR. FAWZY:  Have a wonderful day.

19               MR. CALLIER:  Bye.

20               MR. FAWZY:  Talk to you soon, bro.

21               MR. CALLIER:  Thanks.  Bye.

22               (Indiscernible.)

23               (Audio stopped.)

24      Q.   (BY MR. NEVAREZ)  That was -- that was your

25  voice, right?

Brandon L. Callier - January 8, 2024          82

1    A.   Yes.

2    Q.   Okay.   Again, why didn't you ask him who the

3    lender was?

4    A.   I wanted it in paper, in writing.

5    Q.   I mean, but you could have asked him, right?

6              MR. MILTENBERGER:   Objection.   Is that a

7    question?

8    Q.   (BY MR. NEVAREZ)   You could have asked him,

9    right?

10   A.   Him telling me over the phone is not me having

11   it in writing.

12   Q.   Okay.

13             MR. MILTENBERGER:   Objection,

14   nonresponsive, move to strike the answer.

15   Q.   (BY MR. NEVAREZ)   Why didn't you ask him, "Who

16   is the lender?"

17   A.   I wanted it in writing.

18   Q.   Why didn't you ask him, "Who is the

19   underwriter?"

20   A.   The underwriter is the lender, to the best of

21   my knowledge, and I wanted it in writing.

22   Q.   Why didn't you tell him, "I'm on the

23   do-not-call registry.   Do not ever call me again"?

24   A.   I was trying to get in writing who the lender

25   is and saying that at that time would not have furthered

1  me in that process.

2      Q.   But you didn't tell Mr. Fawzy, "Do not ever

3  call me again," is that correct, up until this point?

4      A.   At that point in time, no.

5      Q.   Okay.

6      A.   There were...

7      Q.   So Mr. Fawzy was operating under the pretense

8  that you had created that you were going to get a

9  $50,000 business loan; is that correct?

10     A.   I can't speak to what pretense Mr. Fawzy was

11 operating under.

12     Q.   Well, you didn't clarify to him that I'm not

13 interested in any loan.

14     A.   You should probably ask Mr. Fawzy under what

15 pretense he was operating under.

16     Q.   No.  No.  I'm asking you:  Why did you not

17 clarify to him there, "I am not interested in the loan"?

18 That's -- that's --

19     A.   I don't --

20          MR. MILTENBERGER:  Objection, asked and

21 answered.

22     A.   I've said the same thing every -- every time

23 you've asked me the question, and my answer isn't going

24 to change because it's why I did what I did, which is I

25 wanted in writing who the lender was.

1    Q.   (BY MR. NEVAREZ)   Okay.   The problem,

2   Mr. Callier, is that -- is that Mr. Fawzy and JaScott

3   are operating under false pretenses that you're

4   interested in a loan.   You're creating all this work for

5   Fawzy and JaScott and the underwriter.

6    A.   Uh-huh.

7    Q.   And -- and you're not representing to them the

8   truth, that you're not interested in the loan.   Gonna

9   Keep on Truckin is not interested in the loan.   Stop

10   working.   Why did you not clarify that you were not

11   interested in a loan?

12         MR. MILTENBERGER:   Objection, asked and

13   answered.   He repeated the ans- --

14         MR. NEVAREZ:   It's -- it's a different

15   question, sir.

16         MR. MILTENBERGER:   No.   You're just

17   prefacing --

18         MR. NEVAREZ:   State your object- --

19         MR. MILTENBERGER:   No.   I'm stating my

20   objection.

21         MR. NEVAREZ:   State your objection.

22         MR. MILTENBERGER:   The objection is asked

23   and answered.

24         MR. NEVAREZ:   Okay.

25         MR. MILTENBERGER:   You've prefaced it a

Brandon L. Callier - January 8, 2024          85

1  different way a thousand times.  At some point, I'm

2  going to tell him not to answer because you're asking

3  the same thing over and over.

4              MR. NEVAREZ:  Okay.

5              MR. MILTENBERGER:  You're making argument,

6  not asking questions.

7              MR. NEVAREZ:  Your objection is there and

8  noted.

9              MR. MILTENBERGER:  Ask facts.

10     Q.   (BY MR. NEVAREZ)  Why did you not tell

11  Mr. Fawzy that this whole thing is a pretense to try to

12  find out who the lender was?

13     A.   I wanted to find out who the lender was.

14  Telling Mr. Fawzy that would not have furthered me in

15  that quest.

16     Q.   But you never asked him who the -- who is the

17  lender, did you?

18     A.   I asked Mr. Fawzy not to call me anymore or

19  text me anymore, and he did so 70 times after that, so

20  I --

21     Q.   Okay.  Let's move on to -- in Exhibit A, Bates

22  stamp JaScott-111.  You see that?

23     A.   Yes.

24     Q.   This is from Dave Thurber at Upwise Capital to

25  Mark Fawzy, copying you; is that correct?

Brandon L. Callier - January 8, 2024          86

```
1        A.   Yes.

2        Q.   And -- and this email is dated April 13, 2022?

3        A.   Yes.

4        Q.   Do you admit that you received this -- copy of

5   this email?

6        A.   I admit that I am cc'd on there, if this is a

7   true and correct copy of that email traffic.

8        Q.   Okay.  Well, it says, "Good afternoon, Brandon.

9   I will be assisting with the closing process."  So

10  this -- this tells you who the lender is, who the

11  underwriter is; is that correct?

12       A.   No.  That is not correct.

13       Q.   No?

14            "Funding manager" is Dave Thurber's title.

15  That wasn't sufficient to tell you who the lender was?

16       A.   Sir, if you could point to me on this paper

17  where it says "Pac Western," I'd be happy to say where

18  this email tells me that the lender was Pac Western.

19       Q.   Well, it doesn't matter whether it's

20  Pac Western or not.  This is -- this is part of the

21  business loan application process.

22       A.   Sir, you just asked me to conf- --

23            MR. MILTENBERGER:  Objection.  Let him ask

24  his question.

25            THE WITNESS:  Okay.  Sorry.  Sorry.
```

Brandon L. Callier - January 8, 2024          87

1          MR. MILTENBERGER:  He wasn't finished.  He

2    didn't ask a question yet.

3          THE WITNESS:  Sorry.

4          MR. MILTENBERGER:  He just made a

5    statement.

6    Q.   (BY MR. NEVAREZ)  This is part of the business

7    loan application process.  At this point in time, would

8    you say that Ja- -- Dave Thurber and Upwise Capital are

9    violating the TCPA as well?

10   A.   I can't speak to -- without having my complaint

11   in front of me to reference, I can't say whether Upwise

12   was in violation at this point in time.

13   Q.   Were they in violation at any point in time?

14   A.   Yes.

15   Q.   Okay.  So did you reply to this email that you

16   were cc'd on saying, "I'm not interested in any loan.

17   Gonna Keep on Truckin's not interested in any loan"?

18   A.   Thinking back over a year, I would, you know,

19   have to preface this and say, you know, I'm doing this

20   from memory from a year ago, but most likely I would not

21   have replied to this email saying, "No, I'm not

22   interested," because I hadn't received a contract at

23   this point in time.

24   Q.   Well, he's -- he's explaining to you on this

25   email -- in the middle, from there, he explains to you

1  that "Per Mark's email, please send over the business

2  voided check and your driver's license," which is what

3  Mr. Fawzy said on that telephone call that we just

4  heard; is that correct?

5       A.   Yes, that's what the email is saying.

6       Q.   And that "We will send you contracts sometime

7  tomorrow once we have received both," right?

8       A.   Yes.

9       Q.   And then, "From there, the order for funding

10 will go as follows:"  The signed contracts, and then

11 there's the bank verification and the funding call,

12 right?

13      A.   That is what the email says.

14      Q.   And so, again, you -- you did not respond to

15 this saying, "Do not ever call me again or email me.  I

16 am on the do-not-call registry"; is that correct?

17      A.   Correct.

18      Q.   Okay.  And then if we go to Bates stamp 114,

19 that's -- that's an email dated April 12th.  Do you see

20 that from you to Dave Thurber, Upwise Capital?  Is that

21 correct?

22      A.   Yes.

23      Q.   And then if you go to Bates stamp 116 of

24 Exhibit A, that's the voided check that was requested by

25 Mark Fawzy and Dave Thurber and -- is that correct?

Brandon L. Callier - January 8, 2024          89

1          A.   Yes.

2          Q.   Okay.  And -- and Mr. -- Mr. George Duron gave

3    you a copy of that check for your use in continuing your

4    investigation?

5          A.   Yes.

6          Q.   And then Bates stamp 117, the next page, that's

7    a copy of your driver's license?

8          A.   Yes.

9          Q.   And that you provided to Dave Thurber and

10   Mr. Fawzy in order to continue your loan application for

11   the $50,000 for --

12         A.   To continue my investigation, yes.

13         Q.   And Bates stamp 119, down at the bottom, that's

14   from you to Mr. Thurber and Upwise Capital, continuing

15   on to 120, where you provide -- is that correct?

16         A.   Yes.  I provided my -- yes.

17         Q.   And then Bates stamp 126 of Exhibit A, that's

18   an email from Dave Thurber at Upwise Capital to you

19   dated April 13 of 2022; is that correct?

20         A.   Yes.

21         Q.   And Mr. Thurber, funding manager at Upwise

22   Capital, says, "Brandon, contracts were sent to you just

23   now.  Bank verification is below.  Let me know when you

24   complete both."  Do you see that?

25         A.   Yes.

1    Q.   And did you click on that link to
2  DecisionLogic?
3    A.   It's been a year, so I don't remember, but most
4  likely no.
5    Q.   Most likely no.  Why not?
6    A.   Because I had no intention of taking a loan, so
7  there would be no reason for me to click that link
8  and -- and -- and finish the process.
9    Q.   And did you reply to Mr. Thurber or to Mark
10 Fawzy saying, "Not interested in a loan.  Not going to
11 click on your link"?
12   A.   Sorry.  My back's hurting.
13             I don't believe so.
14   Q.   Okay.  Do you need to take a break?
15   A.   Are we going to break for lunch at any point?
16   Q.   Well, yeah.
17   A.   I mean, if we're going to -- it depends on when
18 we're going to break for lunch.  I mean, I'll just power
19 through and just --
20   Q.   Well, I mean, if your back's hurting and you
21 need to take a break, just say so.
22   A.   Yeah, I kind of need to take a break.
23             MR. NEVAREZ:  Okay.  That's fine.
24             THE WITNESS:  Sorry.
25             MR. NEVAREZ:  No problem.

1          THE VIDEO TECHNICIAN:  Off the record at

2  12:09.

3          (Break taken.)

4          THE VIDEO TECHNICIAN:  And we are back on

5  the record at 12:58 p.m.

6      Q.  (BY MR. NEVAREZ)  Okay.  So I think we left off

7  on April 12th of 2022.  Let me refer you to Exhibit A,

8  Bates page JaScott Investments-149.  That's Exhibit

9  Number 33.  You got it?

10     A.  Uh-huh.

11     Q.  You recognize that?

12     A.  Yes.

13     Q.  Okay.  So let me refer you to Exhibit Number 1.

14          (Exhibit 01 marked.)

15     Q.  Oops.

16          And so Exhibit Number 1 is a copy of your

17  original complaint in this matter --

18     A.  Okay.

19     Q.  -- and the summons and the exhibits; is that

20  correct?

21     A.  Appears to be -- well...

22          Yes.

23     Q.  Okay.  And so your Exhibit A is the same as

24  my -- Exhibit A of your original complaint is the same

25  as that Bates stamped page 0149 of my Exhibit A; is that

1  correct?  Except that mine isn't cut off at the bottom.

2  Do you see that?

3       A.   Yes.

4       Q.   Okay.  So referring you to my Exhibit A, Bates

5  149, Mitchell Scott says --

6            MR. SHARPE:  No, that's not Mitchell

7  Scott.

8       Q.   (BY MR. NEVAREZ)  I -- I'm sorry.  It says,

9  "Bra-" -- you're saying -- rather, it -- it says, "Hey,

10  Brandon.  This is Mark over here from JaScott

11  Investment.  I got good news for you.  Call me back,

12  please."  And that was actually Mark Fawzy, right?

13       A.   Well, I presumed it was Mark Fawzy.  However,

14  your exhibit says that Mitchell Scott was sending those

15  text messages.

16       Q.   Yeah.  But your understanding is, based on your

17  Exhibit A, that that's actually Mark Fawzy, right?

18  Because that's --

19       A.   Well, that was my understanding at the time,

20  but you --

21       Q.   Okay.

22       A.   -- would obviously know better from your end

23  who was sending me those text messages.

24       Q.   Okay.  And then so you reply, "In a meeting.

25  Will call when able."

1      A.   Yes.

2      Q.   Okay.  And then he keeps sending you, after

3  that, four separate text messages.  First one, "Yes.

4  Sure.  I'm waiting."  Second one is, "Please check your

5  email.  Just send over the business voided check and

6  driver's license.  That's all we require," right?

7      A.   Yes.

8      Q.   Okay.  Now, again, you -- you did not tell them

9  that -- in response to this, text messages, that you

10 were really not interested in a business loan or any

11 kind of loan.

12     A.   No, I did not say that in that message.

13     Q.   And, again, you didn't tell Mr. Fawzy that "I'm

14 on the do-not-call registry.  Stop bothering me," did

15 you?

16     A.   No.

17          MR. MILTENBERGER:  Objection to the form of

18 the question.  It doesn't state when.

19     Q.   (BY MR. NEVAREZ)  Well, did you ever tell

20 Mr. Fawzy that you were on the do-not-call registry?

21     A.   I told Mr. Fawzy that I was bombarded with

22 calls and please don't ever call or text me again.

23     Q.   But that's not what -- that's not the question.

24     A.   Well, that's my answer.

25     Q.   Did you ever tell Mr. Fawzy you were on the

Brandon L. Callier - January 8, 2024          94

1  do-not-call registry?

2      A.  No, and I'm not required to say I'm on the

3  do-not-call registry when I tell someone to stop calling

4  and texting me.

5      Q.  But Mr. Fawz- -- you had led Mr. Fawzy to

6  believe -- as well as Mr. Thurber to believe that you

7  were interested in a $50,000 business loan to buy trucks

8  for Keep on Truckin.  So did -- did you ever clarify to

9  them that, no, I wasn't interested in a 50,000 business

10 loan?

11     A.  I clarified to them that I wanted them to stop

12 calling and texting me.

13     Q.  But they were operating under the -- the

14 impression that you were asking for a $50,000 business

15 loan.

16     A.  And I was operating under the impression that

17 JaScott trained their employees to honor do-not-call

18 requests.

19     Q.  Okay.  Exhibit C of your original complaint,

20 Exhibit 1 here --

21     A.  Yes.

22     Q.  -- that's the merchant agreement that was sent

23 to you for your signature; is that correct?

24     A.  Yes, sir.

25     Q.  Okay.  And so -- and that was sent to Gonna

1   Keep on Truckin, LLC d/b/a Gonna Keep on Truckin, right?

2        A.   Yes, sir.

3        Q.   And then you were going to be the guarantor,

4   apparently, according to this?

5        A.   I filled out the application, sir.

6        Q.   Okay.  But according to this, you were going to

7   be the guarantor?

8        A.   If that's what it says.

9        Q.   Okay.  And at this point, you've now got --

10  figured out who the lender is, right?

11       A.   Yes.

12       Q.   Okay.  And this was April 13th of 2022, right?

13       A.   That's when it was dated.  That does not mean

14  that that's when I received it.  I don't -- I can't -- I

15  can't confirm that that's the date I actually opened

16  up -- opened it up or saw it.

17       Q.   Sure.  But -- but this date -- they prepared

18  this based on your representations.  In the middle, it

19  says, "purchase price:  $50,000," right?  Do you see

20  that?  Do you --

21       A.   Yes.

22       Q.   Okay.  And then here again, this is -- the

23  phone number listed on this Exhibit C of your original

24  complaint is that (915) 383-4604, which you said was

25  your personal cell phone number?

Brandon L. Callier - January 8, 2024          96

1       A.   The application asks for my cell phone number,

2   and I listed my cell phone number.

3       Q.   Okay.  But that's -- that is -- is that not a

4   business phone number?

5       A.   It is absolutely not a business phone number.

6       Q.   Okay.  Well, let me refer you to Exhibit

7   Number 2.

8                (Exhibit 02 marked.)

9       A.   Uh-huh.

10               MR. NEVAREZ:  Maybe I should staple that.

11               MR. MILTENBERGER:  Thanks.

12               MR. NEVAREZ:  Is there a stapler over

13   there?

14               MR. MILTENBERGER:  I've got it right here.

15       Q.   (BY MR. NEVAREZ)  Okay.  This is a document

16   that's available online to the public.

17       A.   Uh-huh.

18       Q.   Do you recognize that document?

19       A.   Yeah.

20       Q.   Okay.  That's a PTIN directory?

21       A.   Yeah.

22       Q.   Registered tax return preparers and

23   professionals, right?

24       A.   Yes.

25       Q.   And you're a member of that?

1      A.   Am I member of the PTIN directory?

2      Q.   Yeah.

3      A.   I assume that when you get a PTIN, they -- they

4  list it there.

5      Q.   Okay.  And right there, it says "Aero Tax

6  Services - El Paso Tax -- El Paso, Texas, tax firm,"

7  right?

8      A.   Yes.

9      Q.   And then on the bottom left-hand, it says "Aero

10 Tax Services, Brandon L. Callier" --

11     A.   Uh-huh.

12     Q.   -- 6336 Franklin Trail, El Paso, Texas, and

13 then it's got your telephone number, the -4604.

14     A.   Yeah.  I have no control over what a commercial

15 entity --

16     Q.   Well, they didn't make it up.  I mean, you

17 know, this -- somehow they got notice that your -4604

18 number --

19     A.   Uh-huh.

20     Q.   -- is a business number for Aero Tax Services.

21 That's what they published it.  Where -- right?  I mean,

22 according to this.  Is that not correct?

23     A.   That's what they published.

24     Q.   Okay.  And on page 2 of this Exhibit Number 2,

25 again, that -4604 number is listed for Aero Tax

1    Services, right?

2        A.   Yeah.   That's what it says there.

3        Q.   Okay.   Let me show you Exhibit Number 3.

4             (Exhibit 03 marked.)

5        Q.   Do you recognize that document?

6        A.   Yes.

7        Q.   And what is that?

8        A.   That is a Texas franchise tax report.

9        Q.   Okay.  And that's for taxpayer Aero Services,

10   LLC?

11       A.   Uh-huh.

12       Q.   Parentheses, "Aero Finance, LLC"?

13       A.   Yes.

14       Q.   Are those affiliated corporations?

15       A.   From -- Aero Finance was a d/b/a of Aero

16   Services back in 2000- -- looks like '14 when that was

17   filled out ten years ago.

18       Q.   Okay.  And is that your signature down in the

19   bottom left-hand corner?

20       A.   Yes.

21       Q.   And you're listed as president?

22       A.   Yes.

23       Q.   And the date of that is November 20, 2014?

24       A.   Yes.

25       Q.   And there's that same -4604 number.

Brandon L. Callier - January 8, 2024          99

1      A.   Yes.

2      Q.   And this is a business franchise tax return,

3  right?

4      A.   Yes.  From ten years ago, yes.

5      Q.   Okay.  Well, let me refer you to Exhibit

6  Number 3.

7              THE REPORTER:  This will be 4.

8              MR. NEVAREZ:  4?  Okay.

9              (Exhibit 04 marked.)

10     Q.   (BY MR. NEVAREZ)  Do you recognize that

11 document?

12     A.   Yes.

13     Q.   And what is that?

14     A.   An assumed name certificate.

15     Q.   Okay.  And -- and you filled this out?

16     A.   Yes.

17     Q.   And then so this is filed Aero Tax Services?

18     A.   Yes.

19     Q.   Okay.  And then GTA Global Holdings, LLC, what

20 is that?

21     A.   That is a entity I formed last year.

22     Q.   Last year?

23              And so is this the firm that took over for

24 Aero Tax Services?

25     A.   Yes.

Brandon L. Callier - January 8, 2024          100

1      Q.   Okay.  And so is GTA Global Holdings still in

2  operation?

3      A.   Well, operating under Aero Tax Services.

4  GTA Global Holdings isn't operating for anything.

5      Q.   Oh, okay.  So GTA is doing business as Aero Tax

6  Services.

7      A.   Yes.

8      Q.   Okay.  And so GTA d/b/a Aero Tax Services is

9  still in operation.

10     A.   Yes.

11     Q.   Okay.  So let me show you GT- -- Exhibit

12  Number 5.

13               (Exhibit 05 marked.)

14     Q.   And that's a list of entities from the Texas

15  Secretary of State that you've been doing business as,

16  right?

17     A.   That is not a correct -- that's not correct.

18     Q.   What -- what is not correct?

19     A.   If it says "registered agent," that doesn't

20  mean I'm -- I'm just a registered agent for that

21  company.  It's not my company.

22     Q.   Okay.  Well, let -- let's -- let's go

23  through -- let's go through the first one.  Brandon

24  Callier; title, president of entity.  And that -- that's

25  your corporation that -- your LLC that you formed?

1      A.   Yeah, I formed that 10, 12, whatever years ago.

2      Q.   Okay.  And then the third entity down,

3  "person," that's your name.  Manager of Aero Motors,

4  LLC.  That's also an entity that you formed?

5      A.   I didn't form it.

6      Q.   Who formed it?

7      A.   I don't remember, but it was formed on my

8  behalf.

9      Q.   On your behalf.  Okay.

10      A.   Yeah.

11      Q.   So you were the sole owner of that LLC?

12      A.   Yeah.  I never operated that.

13      Q.   Okay.  The next one down, Glam Doll, LLC?

14      A.   Uh-huh.

15      Q.   Is that -- was that also an entity that was

16  formed by you or on your behalf?

17      A.   No.

18      Q.   No?

19           And so you were only the registered agent?

20      A.   I was only the registered agent.

21      Q.   You were not an owner?

22      A.   No.

23      Q.   Did you operate on their behalf --

24      A.   No.

25      Q.   -- for other purposes other than a registered

1  agent?

2      A.  I was registered agent.

3      Q.  I'm sorry.  What?

4      A.  I was their registered -- registered agent.

5  That's it.

6      Q.  That's it.  Okay.  All right.

7              The next one down, Flight Tyme, Inc.?

8      A.  Yes.

9      Q.  You were director?

10     A.  Listed as a director.  We never actually opened

11  up or operated.

12     Q.  Who is "we"?

13     A.  Myself and Nubia Herrera.  Well, wait.  No.

14  Sorry.  It is my -- it was myself and Nubia Herrera.  I

15  was going to be in a business with her, and then I

16  backed out at the last moment.

17     Q.  Okay.  But that was formed on your behalf.

18     A.  It was formed, yes.

19     Q.  Okay.  The next one down, DC's Enterprises,

20  LLC, is that your entity as well?

21     A.  No.

22     Q.  You were just a registered agent there?

23     A.  Yes.

24     Q.  Okay.  The next one down, K1 Construction, is

25  that your entity as well?

1        A.   No.

2        Q.   You were only the registered agent?

3        A.   Yes.

4        Q.   Next one down is Sheth A Korp, Inc.  Is that

5   your entity?

6        A.   No.

7        Q.   You were only the registered agent?

8        A.   Yes.

9        Q.   And then the next one down, ASK Solutions

10   Group, LLC, is that your entity?

11        A.   No.

12        Q.   You were only the registered agent?

13        A.   Yes.

14        Q.   And Bral- -- Brandon Callier, the last one,

15   GTA Hol- -- Global Holdings, obviously, that's --

16        A.   Yes.

17        Q.   -- the one we just went through, right?

18        A.   Right.

19        Q.   Okay.  Now, as concerns Glam Doll, LLC, did you

20   ever file any TCPA actions on their behalf?

21        A.   No.

22        Q.   DC Enterprise, LLC, did you file -- ever file

23   any TCPA actions on their behalf?

24        A.   No.

25        Q.   K1 Construction, LLC, did you ever file any

Brandon L. Callier - January 8, 2024          104

1  TCPA actions on their behalf?

2      A.   Sir, I'm not an attorney.  I can't file TCPA

3  actions on anybody's --

4      Q.   Well, as --

5      A.   -- behalf --

6      Q.   -- a complainant.  When I say "file on behalf,"

7  I mean as -- as a complainant, as a -- as a plaintiff.

8      A.   I cannot file anything on anyone else's behalf,

9  except for Brandon Callier, because I am not an

10  attorney.

11      Q.   No, but -- but you can be a representative as a

12  plaintiff, as an aggrieved plaintiff, for any of these

13  corporations.

14      A.   Small claims court is the only court in which a

15  nonattorney can file something on behalf of someone that

16  is not that person.

17      Q.   Okay.  To your knowledge, has Glam Doll, LLC,

18  ever filed any TCPA actions?

19      A.   Not to the best of my knowledge.

20      Q.   TC -- DC Enterprises, LLC, have they ever -- do

21  you know if they've ever filed any TCPA actions?

22      A.   Not to the best of my knowledge.

23      Q.   K1 Construction, LLC?

24      A.   Not to the best of my knowledge.

25      Q.   And Sheth A Korp, Inc.?

Brandon L. Callier - January 8, 2024          105

1     A.   Not to the best of my knowledge.  This is all

2  public record.

3     Q.   Right.

4          ASK Solutions Group, have you ever filed

5  any TCPA actions on their behalf?

6     A.   I've never filed any TCPA actions --

7     Q.   Well, I mean --

8     A.   -- on anyone's behalf.

9     Q.   -- have you ever been -- do you know if they've

10  ever filed any TCPA actions?

11     A.   Not to the best of my knowledge.

12     Q.   Okay.  Who prepared the -- the articles of

13  certification for Glam Doll, LLC?

14     A.   Sir, I don't remember.  It may have been me.  I

15  do not remember.

16     Q.   It may have been you?

17     A.   It's possible.

18     Q.   Okay.

19     A.   I don't remember.

20     Q.   DC Enterprises, LLC, who -- who prepared the --

21  the articles for that?

22     A.   Well, that's...

23     Q.   Who filed the articles for -- for that?

24     A.   I probably did, but I don't remember.

25     Q.   K1 Construction, LLC, who filed the formation

Brandon L. Callier - January 8, 2024          106

1   documents for that?

2        A.   I know I did that.

3        Q.   You -- you did?

4        A.   Yes.

5        Q.   Okay.  Sheth A Korp, Inc., who filed the -- the

6   formation documents for that?

7        A.   I'm pretty sure I did.

8        Q.   Okay.  ASK Solution Groups [sic], who --

9        A.   I don't even remember what ASK -- I don't even

10  remember ASK Solutions Group, so I -- I can't answer

11  about that.

12       Q.   Okay.  Okay.  Well, with regard to Glam Doll,

13  who prepared the formation documents?

14       A.   Sir, if I don't remember who filed them, I -- I

15  don't remember who prepared them.

16       Q.   Okay.  DC Enterprises, LLC, who prepared the

17  formation documents?

18       A.   It's possible it was me, but I don't remember.

19       Q.   Okay.  K1 Construction, who --

20       A.   I prepared that.

21       Q.   You prepared the formation documents?

22       A.   Yes.

23       Q.   Sheth A Korp, who prepared the formation

24  documents?

25       A.   I prepared that.

1    Q.   And you don't remember ASK Solutions.

2    A.   I -- I do not remember that.  I don't know who

3  they are.

4    Q.   Okay.  Now, what about Gonna Keep on Truckin?

5  Who prepared the formation documents for Gonna Keep on

6  Truckin, LLC?  Do you know?

7    A.   I do not know.

8    Q.   Now, what about Vanity National -- or Vani- --

9  Vanity Nail Bar, did they ever file any TCPA actions?

10   A.   No.

11   Q.   Okay.  Who -- who prepared the formation

12  documents for them?

13   A.   I probably did.

14   Q.   You filed them as well?

15   A.   I'm fairly certain that I did.

16   Q.   Now, who is Pau- -- Paula Dominguez?

17   A.   She used to work for me.

18   Q.   Used to?  No longer?

19   A.   Correct.

20   Q.   When did she -- what period did she work for

21  you?

22   A.   During 2023.  I don't remember the exact dates.

23   Q.   Now, do you have a cell phone number other than

24  the one ending in 4604?

25   A.   Yes, I have other cell phones.

Brandon L. Callier - January 8, 2024          108

1     Q.   And what are those?

2     A.   I do not remember off the top of my head.  I

3  have a separate cell phone for Aero Tax Services.

4     Q.   For who?

5     A.   Aero Tax Services.

6     Q.   And what is that?

7     A.   I don't remember off the top of my head.  It's

8  on my website.

9     Q.   Okay.  Are you familiar with -- well, hold

10 on -- (915) 227-1219?

11    A.   That's my wife's phone number.

12    Q.   And your wife is Ana?

13    A.   Yes.

14    Q.   What about (905) 533-1411?

15    A.   One more time.

16    Q.   (905) 533-1411.

17    A.   I don't know what that phone number is.

18    Q.   Okay.  What about (915) 744-2215?

19    A.   That was my phone number when I was chief of

20 accounting at Fort Bliss.

21    Q.   Do you recall when you ceased to use that

22 number?

23    A.   Whatever year COVID started, sir.

24    Q.   I see.

25    A.   2021ish.

Brandon L. Callier - January 8, 2024          109

1      Q.   That was a VOIP number?

2      A.   No.  It was a landline.

3      Q.   Landline?

4               What about (903) 445-9506.

5      A.   (903) 445-?  I have no idea what that phone

6  number is.

7      Q.   Okay.  What about (915) 568-2236?

8      A.   That's a Fort Bliss phone number.  May have

9  been my phone number before I be- -- became the chief of

10 accounting and got a new number.

11     Q.   So that would have been a government number?

12     A.   Yes.

13     Q.   What about (383) 460-4604?

14     A.   Repeat that number.

15     Q.   Area code (383) 460-4604.

16     A.   I don't know what that is.

17     Q.   Okay.  So the only number that you have

18 available is that number ending in 4604?

19     A.   Also -- well, what do you mean, "available"?  I

20 have a cell phone (915) 245-4- -- -4374, also.

21     Q.   I'm sorry.  Say -- say that --

22     A.   (915) 245-4374.

23     Q.   And that's under your name?

24     A.   Yes.

25     Q.   And the carrier?

Brandon L. Callier - January 8, 2024        110

1      A.    Boost Mobile, I think.

2      Q.    Okay.  So that's your personal cell number.

3      A.    I have two personal cell numbers.

4      Q.    The -- this one that ends in 4374 and then the

5  one that ends in --

6      A.    4604.

7      Q.    4604.  Okay.

8            Why do you have two personal cell phone

9  numbers?

10     A.    It's not uncommon.

11     Q.    No.  But the question is, why do you have?

12     A.    Why?  Because I want two personal cell phones.

13  I don't have a specific reason.

14     Q.    I see.

15            Now, do you use the one ending in 4374 for

16  business purposes?

17     A.    No.

18     Q.    Okay.  But you have used and listed the -4604

19  number for business purposes.

20     A.    I do not use it for business purposes.

21     Q.    Well, you called and texted -- I mean, you

22  texted Mark Fawzy --

23     A.    Mark Faw- --

24     Q.    -- for business purposes in trying to get --

25  entice him into giving you an application for a $50,000

Brandon L. Callier - January 8, 2024          111

1   business loan.

2        A.   Mark Fawzy, unsolicited, contacted me on my

3   cell phone number.

4        Q.   But you provided that number --

5        A.   I did not provide that number.

6        Q.   -- to Max Williams, didn't you?

7        A.   No.  I don't know who Max Williams is, sir.

8        Q.   You don't know who Max Williams is?

9        A.   I do not.

10       Q.   You've never communicated with Max Williams?

11       A.   To the best of my knowledge, I've never spoken

12  to Max Williams.

13       Q.   Okay.  So do you know how Mark Fawzy got your

14  -4604 number?

15       A.   According to your documents that I saw earlier,

16  he got it from Max Williams, so that would be a question

17  for him.  I can't speak for how Mark Fawzy did anything.

18       Q.   Yeah.  No.  I'm just trying to find out if you

19  know.

20            So your testimony is you don't really know

21  how Mark Fawzy got your -4604 number?

22       A.   That is a question that should be directed

23  towards Mark Fawzy.

24       Q.   No.  I'm asking you if you know.

25       A.   I've already told you I don't know, sir.

1    Q.  Okay.  All right.  Let me ask you to go to

2    your -- to Exhibit Number 1, your original complaint.

3    We already went through Exhibit C.  You see --

4    A.  Exhibit 1 or --

5    Q.  No, I --

6    A.  -- Exhibit I.

7    Q.  Exhibit Number 1 --

8    A.  Okay.

9    Q.  -- which is your original complaint.

10   A.  Oh.

11   Q.  Exhibit C of that --

12   A.  Oh, I see.  I got you.

13   Q.  -- is the merchant agreement that was sent to

14   you --

15   A.  Okay.

16   Q.  -- dated April 13th.  Do you see that?

17   A.  Yes.

18   Q.  Okay.  That's -- that's a nine-page document;

19   is that correct?

20   A.  Correct.

21   Q.  And then the next page is page 1 of 2, entitled

22   "Joint Affidavit of Confession of Judgment."  Is that

23   correct?

24   A.  That's what it says.

25   Q.  And then it's -- page 2 of 2's got your name,

1    Brandon Callier, on behalf of Gonna Keep on Truckin, LLC

2    d/b/a Gonna Keep on Truckin.  It's unsigned.  Why is

3    this appended to your original complaint?

4         A.   It was part of the contract.

5         Q.   The contract?

6         A.   Yes.  That nine-page contract included these

7    two pages --

8         Q.   I see.

9         A.   -- where they wanted me to sign, so that if I

10   defaulted on the loan, they would be able to come after

11   me individually.

12        Q.   Right.

13             So on this date that this Exhibit C of

14   Exhibit Number 1 was prepared, April 13th of 2022,

15   Upwise still believed that you were looking for a

16   business loan; is that correct?

17        A.   I can't tell you what Upwise was --

18        Q.   Well, they sent it to you --

19        A.   -- what they believed.

20        Q.   They -- they sent it to you, not on a

21   personal -- as a personal contract.  This is supposed to

22   be a business contract.  This is what you were looking

23   for, the name of the lender.  This is Upwise Capital, as

24   the lender, giving you the merchant agreement for your

25   signature, right?

1      A.   That is a contract from Pac Western.

2      Q.   Well, it says "Upw-" -- it says "Upwise

3  Capital" up on the top left-hand corner, page 1 of

4  Exhibit C, of your Exhibit C.

5      A.   Uh-huh.  Yes.  And I'm going to refer to them

6  as "Pac Western" because -- to differentiate between

7  that Up- -- Pac Western, which as a d/b/a of Upwise,

8  which is wholly a distinct and separate entity from the

9  Upwise from Mr. Thurber that was contacting me.  So I

10 don't want to confuse the two entities.  They're two

11 different entities.

12     Q.   Two different Upwise Capitals?

13     A.   Yes.

14     Q.   Okay.  Well, this one that was prepared as

15 Exhibit C, that was prepared by Mr. Thurber --

16     A.   That is from --

17     Q.   -- sent to you by Mr. -- Mr. Thurber?

18     A.   I would have to go back in the record.  I don't

19 know if Thurber sent it or if Fawzy sent it, but that

20 contract is from Pac Western.

21     Q.   Okay.  But this was sent to you as part of your

22 attempt to solicit that $50,000 loan so that you could

23 find out who the lender would be.

24     A.   It was sent to me as part of my investigation,

25 trying to determine who the lender was, which turned out

1    to be Pac Western.

2         Q.   And you never signed this agreement.

3         A.   Correct.

4         Q.   Okay.  And did you present it to Mr. Jorge

5    Duron for signature?

6         A.   It was never presented to anyone for signature.

7         Q.   So this was part of the -- your attempt to find

8    out who the lender was, based on your representations to

9    Thurber, Fawzy, and Upwise, that you wanted the $50,000

10   loan; is that correct?

11        A.   Can you repeat that?

12        Q.   Is it correct that this was -- this Exhibit C

13   was prepared as a result of your attempt or your -- your

14   representation to Fawzy and Thurber that you wanted the

15   $50,000 business loan?

16        A.   It was prepared as a direct result of the

17   application that I filled out in my attempt to find out

18   who the lender was.

19        Q.   And then the page after that, the -- the page

20   after that page 2 of 2 of your Exhibit C is an April 13,

21   2022, statement prepared for your signature as -- on

22   behalf of Gonna Keep on Truckin, LLC d/b/a Gonna Keep on

23   Truckin; is that correct?

24        A.   Correct.

25        Q.   And that's also part of that $50,000 business

1  loan application?

2      A.   It's a part of the contract that they sent

3  over.

4      Q.   Okay.  And then the next page after that is the

5  DocuSign, requesting that you sign the documents; is

6  that correct?

7      A.   Correct.

8      Q.   But you never signed.

9      A.   I didn't sign it the first time, second, or

10  third time that you asked me, sir.  I never signed it.

11      Q.   Okay.  Now, your Exhibit E of your original

12  complaint, Exhibit 1 here in this deposition, is the

13  Pac Western email to you dated April 19, 2022?

14      A.   I'm trying to find Exhibit E, sir.

15      Q.   You got it?

16      A.   Yes.

17      Q.   And that was from Pac Western to you.  "Please

18  DocuSign:  Gonna Keep on Truckin agreement 041322"?

19      A.   Okay.  Yes.

20      Q.   Okay.

21      A.   Can we clarify something?

22      Q.   Sure.

23      A.   An answer from before?

24      Q.   Okay.

25      A.   You asked me if Dave Thurber had sent the

Brandon L. Callier - January 8, 2024          117

1    contract.  I told you I didn't remember if it was him or

2    Fawzy.

3        Q.   Uh-huh.

4        A.   Looking at this email, the contract came

5    directly from Pac Western.

6        Q.   Right.

7             Okay.  And that Exhibit F of your

8    complaint, Exhibit 1 of this deposition, you see that?

9        A.   Yes.

10       Q.   That's your em- -- that's your text?

11       A.   Yes.

12       Q.   That was the -- back to Fawzy?

13       A.   Well, it was either to Fawzy or to Mr. Scott

14   because your copy of those text messages to that phone

15   number say that those text messages were going to

16   Mitchell Scott.  I was under the impression I was

17   communicating with Mr. Fawzy.  But either way, as you

18   can clearly see, I said, "Please don't call or text me

19   again."

20       Q.   Okay.  And -- and you don't -- but you don't

21   know who you're responding to is your testimony?

22       A.   My belief was -- at the time, was that I was

23   responding to Mr. Fawzy.  Now, based on what you

24   presented to me, I'm of the opi- -- belief that it's

25   possible I was actually responding to Mitchell Scott,

Brandon L. Callier - January 8, 2024          118

1    one of the owners of JaScott.

2        Q.   Okay.  Okay.  But, again, you don't -- you

3    don't -- you don't explain to whomever the recipient of

4    your text is that you're on the do-not-call -- "Do not

5    call me ever again," do you?

6        A.   It's not a requirement.  No, I do not.

7        Q.   You did not.

8        A.   I did not.

9        Q.   Okay.  And -- and then the next page, which is

10   your Exhibit G, you say -- you're sending it to

11   everyb- -- everyone.  You don't know -- you don't know

12   who's who.  Was this directed back to Mr. Fawzy?

13       A.   Was what directed to Mr. Fawzy?

14       Q.   This email -- this text that I'm just reading

15   to you that's your Exhibit G.

16       A.   This Exhibit G, which apparently is the same as

17   Exhibit H -- and so I may have --

18       Q.   Well, we haven't gotten there yet.

19       A.   -- may have had a mis- -- wait.  Is this still

20   G?  E, F, G, yeah.  Yeah, they're essentially the same.

21            I sent this.  This is -- this text message

22   is directed to Mark Fawzy to the phone number that Mark

23   Fawzy or Mitchell Scott -- whichever one it actually

24   was -- was texting me from.

25       Q.   Okay.

Brandon L. Callier - January 8, 2024        119

1      A.   I can't direct text messages to anyone other

2  than the recipient -- or the -- the phone number that

3  that text message went to.

4      Q.   Okay.  Okay.  So now let's go to H, and that's

5  dated -- your Exhibit H is dated April 20, up at --

6  right below the Exhibit H label, April 20 at 11:04, and

7  that's apparently from Fawzy again or...

8      A.   No.

9      Q.   Now, who was that from?

10     A.   Looking at the phone number, it looks like that

11  is from Dave, and it says there on the April 20th email,

12  "This is Dave at Upwise."

13     Q.   Okay.  And so he's ask- -- still asking you if

14  you're going to be signing.

15     A.   Yes.  He asked me if I was going to be signing.

16     Q.   Okay.

17     A.   To complete -- to -- to look at his words, he

18  says, "So will you be signing?  I'll text since you

19  don't want me to call."

20     Q.   Right.

21     A.   Yeah.

22     Q.   Okay.  Well, let me -- let me play you another

23  audio.  This one is dated April 21st.

24     A.   Okay.

25              (Audio played.)

Brandon L. Callier - January 8, 2024          120

1                    (Indiscernible.)

2                    MR. CALLIER:  Hello.

3                    MR. FAWZY:  Hello, sir.  This is Mark from

4     JaScott.  Do I have your permission to speak to you for

5     a minute?

6                    MR. CALLIER:  Mark from Chase card?

7                    MR. FAWZY:  Yes, Mark from JaScott.

8                    MR. CALLIER:  No, you don't.

9                    MR. FAWZY:  I'm the same person where you

10    signed the application.  You sent over your bank

11    statement.  You got approved for $50,000 --

12                    MR. CALLIER:  (Indiscernible.)

13                    MR. FAWZY:  -- with a better -- yes.  And

14    you -- you accepted the offer.  You sent me your

15    driver's license and voided check.  Everything was done

16    from my side.

17                    So the reason for my call is I sincerely

18    apologize for, when I get back to you, you were getting

19    bombarded with so many calls.  I know many people start

20    trying to call you, but I am the only guy who's going to

21    give you the $50,000 with such a great pay rate term.

22                    Just block all the numbers.  Just don't

23    pick up.  If it's possible, just save my number as the

24    name "Mark."  You have the bank verification on your

25    email.  You just have to fill it out.  It will take two

1  minutes, and you'll have the $50,000 on your bank

2  account by today, sir.

3            MR. CALLIER:  Okay.  Can you -- can you

4  resend me the -- the documents so I can know -- so I can

5  find it in my email?

6            MR. FAWZY:  Exactly.  Exactly.  I can do it

7  right now.  And -- and I -- I hope you remember you

8  spoke to me.  I know that you got bombarded with so many

9  people, but we have your driver license, voided check,

10 and I'm going to send you the bank verification again

11 right now.  Are you in front of the computer, sir?

12           MR. CALLIER:  Yes, I'm in front of my

13 computer.

14           MR. FAWZY:  Okay.  Give me -- give me one

15 second, sir.  I sincerely apologize for all the trouble

16 you have gone through, but be with me on the line,

17 and I'm just sending it over to you.  Give me one

18 second, sir.  I hope you're having a wonderful day.  Are

19 you busy this morning, sir?  Am I trou- -- am I being a

20 bother to you?

21           MR. CALLIER:  Yeah.  Yeah, it's going okay.

22           MR. FAWZY:  Okay.  Just give me one second,

23 sir.  I am sending it.  My underwriter, Dave, he also

24 tried to call you, but some reason -- no worries.  Just

25 give me one second.  Yeah.  Here is the conversation.

1   Okay.  It's getting sent.  The subject line is "bank

2   verification."  And you have it on your inbox.  Please

3   give it a check now.  You got it from

4   markfawzy@jascott.org.  You received --

5                   MR. CALLIER:  Okay.

6                   MR. FAWZY:  -- a DecisionLogic link there.

7   Please -- yeah, please give it a check.  Take your time,

8   sir.  We don't have any rush.

9                   UNIDENTIFIED SPEAKER:  Goodness.  We have

10  76 properties pop up under his name.

11                  UNIDENTIFIED SPEAKER:  (Indiscernible.)

12                  UNIDENTIFIED SPEAKER:  Some dude I might

13  sue.

14                  MR. CALLIER:  Hey, let me call you --

15                  MR. FAWZY:  Yeah.  Yeah.

16                  MR. CALLIER:  Can I call you back in --

17  give me like ten minutes.  I just have someone in the

18  office.  Just give me -- let me call you right back.

19                  MR. FAWZY:  Sure, sir.  Sure.  Take your

20  time.

21                  MR. CALLIER:  Yes.  Give me like ten

22  minutes.

23                  MR. FAWZY:  Just save my number as "Mark."

24  You can just save --

25                  MR. CALLIER:  "Mark"?

1          MR. FAWZY:  -- my number as "Mark."  And

2   please don't --

3          MR. CALLIER:  Okay.

4          MR. FAWZY:  -- pick up anyone's call.  I'm

5   your guy.  I'm just one step behind.  You just need to

6   fill out the bank --

7          MR. CALLIER:  (Indiscernible.)

8          MR. FAWZY:  -- verification, and the money

9   will be in your account in five minutes, sir.  Yeah.

10          MR. CALLIER:  This is your number,

11   (612) 662-4205?

12          MR. FAWZY:  Exactly.  This is my number.

13   Just save down the number --

14          MR. CALLIER:  Okay.

15          MR. FAWZY:  -- and call me back anytime

16   whenever you require.

17          MR. CALLIER:  Okay.

18          MR. FAWZY:  You have it already on your

19   inbox.  Thank you so much.

20          MR. CALLIER:  Yes.

21          MR. FAWZY:  It's been (indiscernible).

22   Thank you.

23          MR. CALLIER:  Yeah.  All right.  Thanks.

24          MR. FAWZY:  Thank you.

25          (Audio stopped.)

Brandon L. Callier - January 8, 2024          124

1      Q.   (BY MR. NEVAREZ)  So that was your voice,

2   right?

3      A.   Yes.

4      Q.   Okay.  And so do you recall that phone call?

5      A.   I do recall that phone call.

6      Q.   Okay.  Now, this was after you already knew who

7   the lender was.

8      A.   This was after I knew who the lender was and

9   after I had already delivered four do-not-call requests.

10     Q.   Well, I haven't seen -- I know you've labeled

11  some as "do-not-call requests."  I know you label

12  them --

13     A.   Uh-huh.

14     Q.   -- as such, but I don't think they really

15  qualify --

16     A.   Oh, okay.

17     Q.   -- as a do-not-call request.

18     A.   Well --

19     Q.   But -- but that's --

20     A.   Okay.

21     Q.   -- beside the point.  That's a matter of law.

22     A.   Yeah.

23     Q.   He asked you if he was bothering you, and you

24  said no.

25     A.   Well, he was bothering me.

ACR Ink, LLC

1    Q.   Well, you told him no.

2    A.   Yes.

3    Q.   You misled him again.

4    A.   No.

5    Q.   You've been misleading Mr. Fawzy and Dave

6  Thurber all along.

7    A.   No.

8              MR. MILTENBERGER:   Objection.   Is there a

9  question?

10   Q.   (BY MR. NEVAREZ)   Haven't you?

11   A.   No.

12   Q.   You've -- you -- you misled them to bel- --

13  into thinking that you were actually interested in a

14  $50,000 business loan.   Did you not -- did you not

15  mislead them in that way?

16   A.   I took reasonable steps to find out who was

17  make- -- who they were making phone calls on behalf of,

18  the lender.

19   Q.   You in- -- you induced them into doing all

20  kinds of paperwork through your misrepresentations.

21   A.   Uh-huh.

22             MR. MILTENBERGER:   Objection.   Is there a

23  question?

24   Q.   (BY MR. NEVAREZ)   Do you understand that?   You

25  induced them to do all of these loan applications and to

1   keep calling you because you requested $50,000 based on

2   the -- on your misrepresentation to them.

3       A.   Are you asking --

4       Q.   Is that not true?

5       A.   -- me a question, or are you just take --

6   stating --

7       Q.   Is that not true?

8       A.   -- your opinion?

9       Q.   No.  I'm -- I'm asking you if that's not true.

10      A.   It is not true.

11      Q.   What part is not true?

12      A.   I did not ask them to make the initial phone

13  call to me.  That was on them.  And I didn't ask them to

14  continue to ignore do-not-call requests.  And you don't

15  have to say that it's -- acknowledge that it's a

16  do-not-call request, but, "Please don't ever call or

17  text me again," is a pretty clear request to not be

18  called or text again.

19      Q.   Do you understand that you led them bel- -- to

20  believe that -- that you were conducting business

21  activities?

22      A.   I can't speak for what their -- for what their

23  understanding was, sir.

24      Q.   Well, you -- you filled out the loan

25  application on behalf of Gonna Keep on Truckin to get

Brandon L. Callier - January 8, 2024          127

1   $50,000 for -- for trucks.

2        A.   You asked me about what they thought.

3        Q.   Well --

4        A.   I'm not them.

5        Q.   No.  You led them to believe that you were

6   looking for a $50,000 loan on behalf of Gonna Keep on

7   Truckin.  Is that not correct?

8        A.   I can't tell you what they thought.

9        Q.   Well, that's what your loan application says.

10  You want me to show you the loan application again?

11       A.   My loan application was to find out who the

12  lender was.  Had the loan application said "Pac Western"

13  on it, then there would have been no need.

14       Q.   So you misrepresented the facts to them.  Is

15  that not correct?

16       A.   That is not correct.  That's your assessment.

17       Q.   What -- what part of your representation was

18  correct as it concerns a loan application?

19       A.   What part of --

20       Q.   You weren't -- you weren't a hundred percent

21  owner, which is what you put down on the loan

22  application.  You -- you -- Gonna Keep on Truckin wasn't

23  looking for a $50,000 loan to buy trucks.  So what part

24  of the loan application was -- was not a

25  misrepresentation?

1    A.   The loan application was a reasonable step for

2  me to take in order to find out who the lender was.

3    Q.   So -- so you induced them into doing all the --

4  all of this work, all this loan application, as a result

5  of your misrepresentation.  Do you disagree with that?

6    A.   Yes, I disagree with that.

7    Q.   Well, how do you disagree with that?

8    A.   What they do as a result of unsolicited phone

9  calls -- I never asked them to call me.  They called me.

10  And when they called me, they didn't say who they were

11  lending on behalf of.  It is not my responsibility to

12  make sure they appropriately identify who they're

13  calling on behalf of.  So I took reasonable steps to

14  find out who the lender was.

15    Q.   Okay.  Well, do you understand that they acted

16  based on your failure to disclose the truth?

17            MR. MILTENBERGER:  Objection to the form of

18  the question.  At what point in time?  Are you talking

19  about the initial call or afterwards?

20            MR. NEVAREZ:  I -- I --

21    A.   Sir --

22            MR. NEVAREZ:  Whenever.

23    A.   Can you read -- can you --

24            MR. NEVAREZ:  Could you read back the

25  question?

Brandon L. Callier - January 8, 2024          129

```
 1              (Question read as follow:  Well, who do you
 2                understand that they acted based on your
 3                failure to disclose --)
 4              THE REPORTER:  Oh.  Let me start over.
 5              (Question read as follows:  Well, do you
 6                understand that they acted based on your
 7                failure to disclose the truth?)
 8       A.   Sir, I do not believe that they act- -- that
 9  any actions that they took were based on anything that I
10  said or did.  If their actions were based on anything
11  that I said or did -- or did, they probably would have
12  honored one of the four explicit requests to stop
13  calling me.  And had they honored any of those requests,
14  we wouldn't be sitting here.
15       Q.   (BY MR. NEVAREZ)  I don't -- I haven't seen any
16  explicit requests where you're telling them not to --
17  not to call you.  In fact, this is -- this phone call,
18  April 20th, after you already realized who the lender
19  was, you're still engaging them in -- in conversation
20  to -- towards the $50,000 loan application.
21              You -- you -- at this point in time, you
22  already knew who the lender was, and you didn't tell
23  Mark Fawzy, "Not interested in the $50,000 loan.  Do not
24  ever call me again.  I'm on the do-not-call registry."
25       A.   Sir, that --
```

1          MR. MILTENBERGER:  Whoa.  Whoa.  Whoa.

2          Objection.

3    Q.   (BY MR. NEVAREZ)  Isn't that correct?

4          MR. MILTENBERGER:  Wait.  Objection to the

5    form of the question, compound question.  You're making

6    long statements, then saying "isn't that correct?"

7          MR. NEVAREZ:  All right.

8          MR. MILTENBERGER:  He -- he can't answer a

9    long --

10          MR. NEVAREZ:  I'll -- I'll rephrase the

11   question.

12          MR. MILTENBERGER:  Break it down by each

13   little subpart and ask him if that -- I mean, get to the

14   point, not these long speaking questions that he has to

15   remember four different things that you said in the

16   middle of the question.

17   Q.   (BY MR. NEVAREZ)  So af- -- af- -- as of

18   April 20th, phone call with Mr. Fawzy, you didn't tell

19   him you were no longer interested in the loan, did you?

20   A.   No, I did not.

21   Q.   You did -- you -- you didn't tell him that

22   Gonna Keep on Truckin was no longer interested in a

23   loan.

24   A.   I didn't tell him on that phone call.  I told

25   him four -- four or five times -- I'd have to go through

1   the record -- prior to that phone call.

2       Q.   That -- that Gonna Keep on Truckin was no

3   longer interested in a loan?

4       A.   Not to call or text me anymore.

5       Q.   Okay.  I'm not talking about that.

6            I'm talking about you telling him whether

7   or not you were still interested or Gonna Keep on

8   Truckin was still interested in a loan.  You never told

9   him.

10      A.   I don't have to tell them that.  All I have to

11  tell them is to stop calling and texting me.

12      Q.   Okay.  That's fine.  But -- but you never --

13  you never -- you -- you continued to conceal the fact

14  that you and Gonna Keep on Truckin was never interested

15  in a business loan.

16           MR. MILTENBERGER:  Objection to the form.

17  Is there a question?

18      Q.   (BY MR. NEVAREZ)  Is that -- isn't that

19  correct?

20      A.   That I continued to -- repeat the question,

21  sir.

22      Q.   As of April 20th, you still had not told them

23  that you weren't interested in the business loan; isn't

24  that correct?

25      A.   No.  As of April 20th, I had not told them that

1  I was not interested in a business loan.  I simply asked

2  them on multiple occasions to stop calling and texting

3  me.

4      Q.  Do you want me to play the call again?  You --

5  you said you were still interested in -- in -- in the --

6  in the loan.

7      A.  Yes.  I told him to send me the contract again.

8      Q.  Yeah.  So you're concealing the truth from

9  Mr. Fawzy.

10     A.  So I don't know -- well, I can't consult my

11  attorney right now, so --

12     Q.  Isn't that --

13     A.  I --

14     Q.  -- true?  You're -- you're concealing the fact

15  that there's no need for them to send you another

16  business loan application because you're not going to

17  sign.

18     A.  The need for the contract was to have evidence

19  that they were calling, soliciting me, after I had made

20  four or five do-not-call requests.

21     Q.  And that's to establish foundation for your

22  TCPA lawsuit?

23     A.  At this point, yes.  I was going to file a TCPA

24  lawsuit because they had ignored four or five requests

25  to stop calling me.

1      Q.   So let me refer you to another phone call.

2   This one's April 22.

3                  (Audio played.)

4                  MR. CALLIER:  Hello.

5                  MR. FAWZY:  Good -- or good morning.  How

6   are you?

7                  MR. CALLIER:  I'm good.  How are you?

8                  MR. FAWZY:  I'm doing great.  Thank you so

9   much for asking.  I -- I hope you're free at this moment

10  and you're having a wonderful day.  Did you get the

11  chance to receive my email?

12                 MR. CALLIER:  Well, I'm loo- -- I'm looking

13  for it in -- in my email.  This is --

14                 MR. FAWZY:  Uh-huh.

15                 MR. CALLIER:  -- Upwise, right?

16                 MR. FAWZY:  Ja- --

17                 MR. CALLIER:  Hello?

18                 MR. FAWZY:  -- -Scott Investment.  You got

19  the bank verification --

20                 MR. CALLIER:  From JaScott.

21                 MR. FAWZY:  -- and also the contract paper.

22  If you got the --

23                 MR. CALLIER:  Oh.

24                 MR. FAWZY:  -- chance now, you can just

25  go -- go to your inbox and you -- it could just take

Brandon L. Callier - January 8, 2024          134

1   five minutes, the bank verification.  You know the

2   DecisionLogic link is there.  Click on that and sign all

3   the contract paper.  But please confirm me.  Did you

4   receive my email or not?  Otherwise, I'm going to send

5   it over again.  Can you please give it a check?

6                MR. CALLIER:  No.  I -- I don't have --

7                MR. FAWZY:  No?

8                MR. CALLIER:  I -- I see it.  I'm clicking

9   on it right now.  It -- it says "DecisionLogic"?

10               MR. FAWZY:  Yes, DecisionLogic, and you got

11   a contract paper.  You got a contract paper as well.

12               MR. CALLIER:  Right.

13               MR. FAWZY:  Do you see the contract paper,

14   sir?

15               MR. CALLIER:  No.  Yeah, I'm trying to find

16   the contract.  The contract is from --

17               MR. FAWZY:  It's from (indiscernible) --

18               MR. CALLIER:  -- Pac Western Financial?

19               MR. FAWZY:  Exactly.  That's the one.  The

20   contract paper is Pac Western Financial.  And do you see

21   the DecisionLogic link?  That's the bank verification

22   link.  That's all you need to do.  That's the remaining

23   two things you need to do.

24               MR. CALLIER:  Okay.  Yeah.

25               MR. FAWZY:  Okay.

1          MR. CALLIER:  And --

2          MR. FAWZY:  I'm -- I'm on the line.

3          MR. CALLIER:  -- and sign the --

4          MR. FAWZY:  You can -- uh-huh.

5          MR. CALLIER:  And I'm trying to find the --

6   the contract, so I can -- I got to sign it, right?

7          MR. FAWZY:  You can just -- you can just

8   search for (indiscernible) under Pac West Financial.

9   Click on that --

10         MR. CALLIER:  Where?

11         MR. FAWZY:  -- inbox at --

12         MR. CALLIER:  (Indiscernible.)

13         MR. FAWZY:  You got the contract from

14  (indiscernible), yeah, Pac Western Financial.

15  Pac Western Financial.  It should be on your inbox.

16  Just give it a check.  There should be a contract paper.

17  I'm on the line, sir.  Please take your time.  We don't

18  have any rush.  You can take as much time as you want.

19         MR. CALLIER:  Okay.

20         MR. FAWZY:  Yes.

21         MR. CALLIER:  I -- I finally see it.

22         (Mr. Sharpe not present.)

23         MR. FAWZY:  And you can find the

24  DecisionLogic link on -- from my inbox,

25  markfawzy@jascott.

1          MR. CALLIER:  (Indiscernible.)  Okay.
2   Great.  All right.  So I got it.
3          MR. FAWZY:  Yeah.  Okay.
4          MR. CALLIER:  Give me like 20 minutes.  I
5   just want to read through, because it's a lot of
6   paperwork, but I have the --
7          MR. FAWZY:  Uh-huh.
8          MR. CALLIER:  -- contract and the bank
9   verification, so just give me a chance to just read this
10  and -- and I will be back with you shortly.  All right.
11  Thank you, sir.
12         MR. FAWZY:  Okay.  But you --
13         MR. CALLIER:  (Indiscernible.)
14         MR. FAWZY:  -- you got the contract paper,
15  and you also found --
16         MR. CALLIER:  Yeah.  Yeah, I have it.
17         MR. FAWZY:  -- the link, right?
18         MR. CALLIER:  I have the -- yeah.
19         MR. FAWZY:  Okay.
20         MR. CALLIER:  I have the link and then the
21  contract.
22         MR. FAWZY:  Uh-huh.
23         MR. CALLIER:  So just let me just read
24  through it real quick.  Give me like 20 minutes.
25         MR. FAWZY:  Okay.

1          MR. CALLIER:  Thank you, sir.

2          MR. FAWZY:  Okay.  I'll give you -- if you

3   don't mind, with your...

4          (Audio stopped.)

5     Q.   (BY MR. NEVAREZ)  So there again, Mr. Callier,

6   you already knew who the lender was.  You knew -- you

7   already knew who the underwriter, and you still didn't

8   tell him, "This has all been a ruse to find out who the

9   lender was," as you claim you wanted to know.

10          You're engaging him in business

11   conversations about a 50,000 -- -thousand business loan

12   for trucks, purportedly on behalf of Gonna Keep on

13   Truckin.  And you didn't tell him, "No, this is --

14   really, I don't need the loan.  I don't want the loan."

15   No, you -- you say you're going to get back to them.

16          Why didn't you just tell him right then and

17   there, "We're not going to close on the loan.  We don't

18   want the loan.  No need to keep talking about a loan.

19   We're not going to sign" -- they would have given up on

20   that.  Why didn't you just tell them that?

21          (Mr. Sharpe present.)

22          MR. MILTENBERGER:  Objection to the form of

23   the question to the extent that it's compound and

24   includes a number of statements prior to the actual

25   question.  I just want to make sure he's answering the

1    actual question you asked.

2        A.   I was actually going to ask if you wanted me to

3    consider the -- you keep ask- -- you keep saying I did

4    this, I did that, I did this, I did that, leading up to

5    what then becomes a question.  I don't acknowledge --

6        Q.   (BY MR. NEVAREZ)  No.  My --

7        A.   -- any of the things that you say I did.

8        Q.   No.  My --

9        A.   So --

10       Q.   I'm sorry.  Let -- let me rephrase my question.

11       A.   The last --

12       Q.   Okay.  Let --

13       A.   Yeah, your --

14       Q.   So you'll -- so you don't misunderstand.  I

15   don't care about what you did.  It's what you didn't do

16   that I care.

17              Why didn't you tell him, "This $50,000

18   business loan application was all a charade.  We're not

19   interested"?  Why didn't you tell him?

20       A.   And my -- what I'm saying to you is that I'm

21   not taking into account all your leading statements that

22   finally get to a question.

23              I had made at least four, maybe five -- I

24   have to see the record -- requests for them to stop

25   calling me, which is all I am required to do under the

1   law.  At some point, if they ignore the first, second,

2   third, and fourth do-not-call requests, I stop making

3   the request.  I have no reason to believe they're going

4   to honor the request because they ignored the first

5   four.

6             So -- and as a general rule -- and this --

7   it's been my experience -- and this has happened to me

8   multiple times -- that when I make repeated do-not-call

9   requests to people, they get upset.  I had made four, or

10  so, at -- four or five at this point, and I saw no --

11  there was no belief on my part that any of those

12  requests moving forward would be honored.

13      Q.   Okay.  You're -- you're a serial TCPA litigant.

14      A.   I'm a defender of my rights.

15      Q.   And -- and --

16             MR. MILTENBERGER:  Let him -- let him --

17             THE WITNESS:  Okay.  Sorry.

18             MR. MILTENBERGER:  -- ask a question.

19      Q.   (BY MR. NEVAREZ)  And you --

20      A.   Sorry.

21      Q.   -- have your -- your personal phone number,

22  your personal cell with -- with Boost Mobile you said?

23  And that ends in what?  What -- what are the four digits

24  there, your -- your Boost number, the last four?

25      A.   4374.

Brandon L. Callier - January 8, 2024          140

1        Q.   4374.  Okay.

2             So that's your personal cell phone number.

3   Do you -- do you use that for business purposes?

4        A.   My business has its own separate and distinct

5   phone number.  I don't know it off the top of my head,

6   but it is on my website.

7        Q.   That's not responsive, sir.

8             Your Boost --

9        A.   No.

10       Q.   Your -- your --

11       A.   I do not use that Boost number -- which is my

12   secondary personal cell phone number, I do not use it

13   for business.

14       Q.   Okay.  Have you ever filed a TCPA action using

15   that -4374 number?

16       A.   I have filed maybe two or three.

17       Q.   And which ones were those?

18       A.   I have no idea.

19       Q.   Do you use that as part of your tax business?

20       A.   No.

21       Q.   Okay.  But yet, on your -4064 number, you've --

22   you have been using that for business purposes.

23       A.   No.

24       Q.   Well, I mean, that's part of the exchange with

25   Fawzy and -- and Thurber --

Brandon L. Callier - January 8, 2024          141

1       A.   I didn't ask them --

2       Q.   -- in your -- the business --

3       A.   Sorry.

4       Q.   -- loan application.

5            MR. MILTENBERGER:  Objection.  Is there a

6  question?

7       Q.   (BY MR. NEVAREZ)  So you have used it for

8  business personal numbers -- for business communications

9  regarding that $50,000 loan application.

10           MR. MILTENBERGER:  Objection --

11      A.   I don't -- that doesn't sound like a question

12  to me.

13      Q.   (BY MR. NEVAREZ)  Well, did -- did you not, in

14  fact, use that -- that number, that -4604, as -- didn't

15  you even list it on your loan application?

16      A.   That loan application asked me for my cell

17  number.

18      Q.   And you put down that -- that -4604 --

19      A.   Yeah.

20      Q.   -- on a business loan application.

21      A.   I put down the phone number that they were

22  contacting me on as part of my investigation.  I didn't

23  want to give them any other numbers to con- -- to harass

24  me on.

25      Q.   Why didn't you put down the Gonna Keep on

1   Truckin phone number?

2        A.   That's not my phone number.

3        Q.   Okay.  But -- but they allowed you to use them

4   as part of your -- what you claim is an investigation,

5   right?

6        A.   (No verbal response.)

7        Q.   They -- they all- -- Gonna Keep on Truckin

8   allowed you to use their bank statements.  Why didn't

9   they allow you to use a phone number for them?

10       A.   I didn't say they didn't allow me to do

11  anything.  I said that I put the phone number that they

12  were -- "they" being JaScott and Upwise -- were

13  contacting me on.

14       Q.   All right.  Now, do -- do you understand that

15  the TCPA covers residential numbers, right?

16       A.   Yes.  And this has already been litigated with

17  respect to my phone number.

18       Q.   And do you understand that it doesn't cover

19  business relationships?

20       A.   I understand the TCPA, sir.

21       Q.   Okay.  You understand that the TCPA doesn't

22  cover business relationships, a use of phone numbers for

23  business relationships?

24       A.   I understand that it is not as black and white

25  as you want to make it out to be right now.

1     Q.   But you un- -- you do understand --

2     A.   I understand that -- excuse me.  Sorry.

3     Q.   You do understand that the Code of Federal

4  Regulations pertaining to the TCPA in the case that it

5  doesn't apply to business relationships?

6     A.   Repeat your question, please.

7     Q.   Do you understand that the Code of Federal

8  Regulations indicates that the TCPA isn't applicable to

9  business relationships, business communications?

10    A.   Yes.  I understand that if a number is used

11 predominantly for business, that it could -- and it's

12 considered a business line, that it could not have

13 residential telephone protection.

14    Q.   Well, I don't see the word "predominantly" in

15 there, but...

16         Let me refer you to my Exhibit A, Bates

17 stamp 235, which is Exhibit Number 58.  Do you see that?

18    A.   Yes.

19    Q.   So Dave Thurber up at Upwise Capital says he

20 wants to know why you have gone MIA on us.  I -- I

21 assume that's "missing from action"?

22    A.   That would be my understanding.

23    Q.   And you didn't respond to that, did you?

24    A.   I don't recall, but if there's no response,

25 then I didn't respond.

Brandon L. Callier - January 8, 2024          144

1    Q.   So back on Exhibit A, my Exhibit A, Bates stamp

2   0248, do you see that?  That's from Dave Thurber, Upwise

3   Capital, copying you, April 26 of 2022.  "So you don't

4   need our 50k dollars?  Anyone else approving you with

5   two bankruptcies?"  Did you respond to that?

6    A.   I don't recall ever seeing that email, but if

7   I -- I don't think so.

8    Q.   That's your email address, though, right?

9    A.   Yeah, that's my email address.

10    Q.   And then Bates stamp 257 of my Exhibit A,

11   April 27th, 2022, from Dave Thurber.  You're cc'd on

12   that.  "Brandon, we have never had a borrower go this

13   MIA on us."  Do you see that?

14    A.   Yeah, I see that.

15    Q.   They still think you're doing a business loan

16   application.

17         MR. MILTENBERGER:  Objection.  Is there a

18   question?

19    Q.   (BY MR. NEVAREZ)  Wouldn't you agree?  They're

20   still talking about your busine- -- your $50,000

21   business loan application.

22    A.   I agree that they continued to solicit me for a

23   loan after I had asked them four different times to stop

24   calling me.

25         MR. NEVAREZ:  What's our last number?

ACR Ink, LLC

1        THE REPORTER:  6 will be next.

2        MR. NEVAREZ:  6 will be next.  Okay.

3    Q.  (BY MR. NEVAREZ)  So, Mr. Callier, you

4 recognize Exhibit Number 6?

5            (Exhibit 06 marked.)

6    A.  Yes, sir.

7    Q.  And -- and so this is your first amended

8 complaint?

9    A.  Yes, sir.

10   Q.  Okay.  Now, on page 3 of your first amended

11 complaint, paragraph 10, you say that the TCPA makes it

12 unlawful to make any call, other than a call for

13 emergency purposes or made without the prior written

14 con- -- express consent of the called party, using an

15 automatic telephone dialing system or an artificial or

16 prerecorded voice to any telephone number assigned to a

17 cellular telephone service.

18            None of these phone calls or text messages

19 or even the emails were pursuant to an automated system,

20 were they?

21   A.  No.  I don't claim that they were.

22   Q.  Okay.  And when you had discussion with Max

23 Williams -- or, rather, when Max Williams got your phone

24 number, the -4064 number, you provided your consent to

25 be contacted at that number.  Wouldn't you agree?

Brandon L. Callier - January 8, 2024          146

1      A.   As I told you twice previously, I don't recall

2  ever speaking to Max Williams ever in my life.   I don't

3  know who Max Williams is.   So, no, I do not agree.

4           MR. SHARPE:   I had these thoughts here.

5  Right here.

6      Q.   (BY MR. NEVAREZ)   Okay.   So let me refer you to

7  page 18 of Exhibit Number 6, your first amended

8  complaint, paragraph 100.   Second paragr- -- second

9  sentence, "Defendant Scott was also copied on emails and

10  coordinated with Mark Fawzy, Dave Thurber, and Max

11  Williams in their attempt to coerce Plaintiff into

12  signing the MCA contract."   Of course, "Max Williams" is

13  misspelled there.   But that's how we know you know Max

14  Williams.

15      A.   Well, I -- in that -- I'm -- I'm saying that he

16  must have been copied on an email, and I got the email

17  from there, but I don't know who Max Williams is.

18      Q.   Well, again, Max Williams is the person who got

19  your name and number.   That was the first exhibit of

20  Exhibit A that I had you look at, Bates stamp Exhibit A

21  JaScott Investments-002.   Do you see that?

22      A.   I remember that.

23      Q.   Max Williams.

24      A.   Uh-huh.

25           MR. SHARPE:   There's no emails with Max

Brandon L. Callier - January 8, 2024          147

1  Williams copied.

2                 MR. NEVAREZ:  Huh?

3                 MR. SHARPE:  He hasn't produced any emails

4  with Max Williams copied.

5       Q.   (BY MR. NEVAREZ)  So on page 7, paragra- --

6  paragraph 29, "Defendant Western employees, contracts

7  with, and authorizes independent sales organizations"?

8       A.   What page are you -- where are you at, sir?

9       Q.   I'm still on the first amended complaint.

10      A.   No.  What paragraph?

11      Q.   Page 7, paragraph 29.

12      A.   Okay.

13      Q.   And then paragraph 30, "Defendant Western

14  controlled the behavior of the IS- -- ISOs."  So how do

15  you know that Defendant Western employed and controlled

16  the behavior of ISOs?

17      A.   I assume.

18      Q.   You -- so you don't -- you don't have any facts

19  to support that?

20      A.   No.  I hadn't gone through discovery at this

21  point, had any -- and wasn't privy to the internal

22  operations of Western.  So when you formally -- so, no,

23  I made an assumption.

24      Q.   Okay.  Paragraph 33.  Prior to this phone call

25  of April 4, 2022, Plaintiff had never spoken to any of

Brandon L. Callier - January 8, 2024          148

1   the defendants, had never filled out an application with

2   any of the defendants, had never heard of any of the

3   def- -- and never established a business relationship.

4              So do you disagree that -- that your --

5   your loan -- business loan application for 50,000

6   doesn't constitute a business transaction?

7        A.   That came after --

8        Q.   No, it came after, but the question remained.

9        A.   Yes.  At the point I filled out a application

10  with them, it would have established a business

11  relationship, as is defined or the -- yes.

12       Q.   Okay.

13       A.   And it would have been severed on the first of

14  the four or five do-not-call requests that I initiated.

15       Q.   Okay.  Well, let me -- let me refer you to

16  Exhibit 7.

17              (Exhibit 07 marked.)

18       Q.   Do you recognize Exhibit 7?

19       A.   Yes.

20       Q.   And that's the April bill for the phone number

21  in question?

22       A.   Yes.

23       Q.   -4604?

24       A.   Yes.

25       Q.   So that's actually Ana -- your wife, Ana

1   Callier's phone number?

2       A.   That's my phone number, sir.

3       Q.   Okay.  But it -- it's her account.

4       A.   She opened the account.  That is my phone

5   number.

6       Q.   She doesn't use it.

7       A.   No, sir.

8       Q.   Okay.  Now, your wife, she's aware that you're

9   involved in numerous TCPA lawsuits, right?

10      A.   My wife is aware that I have filed TCPA

11  lawsuits, yes.

12      Q.   Okay.  And is she aware that you're using her

13  number, her Verizon account number?

14      A.   My wife is aware that I have filed TCPA

15  lawsuits with my phone number ending in 4604.

16      Q.   Okay.  Is she aware that you filed the lawsuit

17  in question using this -4604 number?

18      A.   My wife is not aware of any specifics of any

19  case that I have filed.

20      Q.   But she's aware that you're filing numbers, but

21  she's not aware that you're filing using the -- that

22  -4604 number?  Is that --

23      A.   I can't speak to what my wife is or is not

24  aware of.  What I can tell you is that that is my phone

25  number.

1      Q.   So she doesn't know if -- whether or not you're

2  using the -4604 for TCPA purposes?

3              MR. MILTENBERGER:   Objection to the form of

4  the question.  "used for TCPA purposes," could you be

5  more -- clarify the question?

6      Q.   (BY MR. NEVAREZ)   You have -- you have numerous

7  TCPA lawsuits, right?

8      A.   I have more than one, yes.

9      Q.   And -- and you -- and do you know how many of

10 those used the -4604 number?

11     A.   I do not know the exact number, no.

12     Q.   Many, probably.

13     A.   Many.

14     Q.   Is she aware that you're using this -4604

15 number in these TCPA lawsuits?

16     A.   My wife is aware that I use my phone number

17 ending in 4604 for whatever purposes I -- I -- I want

18 to, to include TCPA lawsuits if the need happens to

19 arise.

20     Q.   Okay.

21              MR. SHARPE:   And she gives him full

22 authority and discretion.

23              MR. NEVAREZ:   Yeah.  Right.

24              MR. SHARPE:   That's important.

25     Q.   (BY MR. NEVAREZ)   So you have her approval.

1    A.   It is my phone number, sir.  I do not need --

2    Q.   Was she --

3    A.   -- her approval.

4    Q.   Well, has she told you do not use the -4604

5  number for any of your TCPA actions?

6    A.   No.

7    Q.   So she's in agreement with you continuing to

8  use the -4604 number in your TCPA actions.  She hasn't

9  objected, right?

10    A.   There's no reason for her to object.  It's my

11  phone number.

12    Q.   Well, I mean, it's her -- it's under her name,

13  so if she doesn't object, she's complicit with your use

14  of the -4604 number.  Would that be correct?

15    A.   If I were to call you right now, sir, or when I

16  had my phone, it's going to show up as "Brandon Callier"

17  on the caller ID, and Brandon Callier is the only person

18  who has ever used that phone number and has any

19  authority or control over that phone number.

20    Q.   Well, that didn't answer my question.  That was

21  not responsive.

22    A.   Well, rephrase your question.

23    Q.   Is -- has she ever objected to your use of the

24  -4604 number for any of your TCPA actions?

25    A.   You asked me that question, and I already

1   answered no.

2        Q.   Okay.  All right.  Well, let -- let -- let's go

3   to -- let's go to -- well, let -- let me ask you this:

4   On page 1 of Exhibit Number 7 -- and for the record,

5   Exhibit Number 7 has -- consists of 48 pages, plus two

6   other pages at the end.

7                  What -- you see the "Ana Callier"?  What --

8   what is that number that's been blacked out?

9        A.   You want my wife's cell phone number?

10       Q.   Whatever this number is.

11       A.   That's my wife's cell phone number.

12       Q.   Well, there's -- there's four numbers here.

13       A.   Yeah.

14       Q.   They're all listed as "Ana Callier."  What is

15   the first one that's blacked out?

16       A.   (915) 227-1219.

17       Q.   227-?

18       A.   -1219.

19       Q.   -1219.

20                  What's the second number?

21       A.   That is my minor daughter's phone number, and

22   I'm not going to give it to you.

23       Q.   That's whose dau- -- what's her name, your

24   daughter's name?

25       A.   My daughter's name is Emma.

1    Q.   Emma.

2            Okay.  And what's the third number?

3    A.   That is my mom.

4    Q.   Your mom.

5    A.   Yes.

6    Q.   And what number is that?

7    A.   (903) 830-6360.

8    Q.   I'm sorry.  (915)?

9    A.   830-6360.  I reserve the right to correct that.

10   Q.   Okay.  So you're not sure what it is?

11   A.   It's possible I got a digit wrong.

12   Q.   Okay.

13   A.   I don't want to say definitively that that's

14   the number and then have it be wrong and be accused --

15   Q.   Are the last four --

16   A.   -- of something --

17   Q.   I'm sorry.  Are the last numbers 6360?

18   A.   I believe that they are, but just in case that

19   is not, I just want to qualify --

20   Q.   Okay.

21   A.   -- we might have to correct that.

22   Q.   That's fine.

23   A.   (903) area code.

24   Q.   9- -- 9- what?

25   A.   (903).

1     Q.   And where is that?

2     A.   Tyler, Texas.

3     Q.   Okay.  All right.  Now, let me refer you to

4  Exhibit 6, which is your first amended complaint, page

5  11.  You see that first call, 4-4-2022?  Where is that

6  call on here?

7     A.   What?

8     Q.   That -- looking at page --

9     A.   The first call.

10     Q.   -- 11 of --

11     A.   Okay.

12     Q.   -- Exhibit Number 6, your first amended

13  complaint, do you see that table A?

14     A.   Yes.

15     Q.   The first call is dated 4-4-2022, caller ID

16  (612) 662-4225?

17     A.   Yes.

18     Q.   Where is that on Exhibit 7?

19     A.   Sir, that is a missed call.  Verizon phone

20  records do not show missed calls.

21     Q.   Well, what record do you have to support that

22  that call took place?

23     A.   I kept a log.

24     Q.   I see.

25          What proof do you have that the log is

1  correct or -- as to this entry?

2      A.   Well, I'm willing to swear under oath that it's

3  correct.

4      Q.   I see.

5           So -- so this first call doesn't appear in

6  this Verizon statement, Exhibit Number 7.

7      A.   It probably -- it should not appear because it

8  was a missed phone call.

9      Q.   Same for the second call on table A --

10     A.   Yes, sir.

11     Q.   -- of Exhibit 6?

12     A.   Yes.

13     Q.   What about the third call, April 5, 2022?

14     A.   I declined the phone call, so it would not

15  appear.

16     Q.   Would not appear in Exhibit 7?

17     A.   Yes.

18     Q.   Yes, it would not appear?

19     A.   Yes, it would not appear.  Yes.

20     Q.   Okay.  Okay.  So what about -- so all of these

21  calls on that page 11, what -- well, scratch that.

22           Number 4 is a text on April 5, 2022.  Would

23  that appear on this Exhibit Number 7?

24     A.   No, sir, it would not appear.

25     Q.   No texts appear on the Verizon bill?

1      A.   No, but they would appear on the phone calls

2  that they were sent to and from -- I mean, on the phones

3  that they were sent to and from.

4      Q.   Right.

5           But text calls wouldn't appear on -- on the

6  Verizon bill, Exhibit Number 7; is that correct?

7      A.   Correct.

8      Q.   And the same for missed calls.

9      A.   Correct.  And declined calls.

10     Q.   And declined calls.  Okay.

11          So, in other words, none of these nine

12 calls listed on Exhibit 6, table A, on page 11 would

13 appear on the Verizon bill.

14     A.   That's not correct, sir.

15     Q.   Which one would?  Oh, the three-minute call on

16 April 5?

17     A.   Yes.

18     Q.   And where is that on Exhibit 7?

19     A.   Okay.  I'm looking at the wrong date.

20          MR. MILTENBERGER:  I'll help you.  It's

21 about the 10th entry down, 12th entry down on page 28.

22          THE WITNESS:  I found it, yeah.

23     A.   It's rounded up.  The call could have lasted

24 two minutes and one seconds -- anywhere from two minutes

25 and one seconds to three minutes.

ACR Ink, LLC

1          MR. MILTENBERGER:  The 13th entry down,

2    Mike.

3          MR. NEVAREZ:  Okay.  At 2:48?  Okay.

4      Q.  (BY MR. NEVAREZ)  Now, what about the call

5    above that that's been redacted?

6      A.  I redacted all the personal phone calls that I

7    received.

8      Q.  So these are -- these redact- -- that redacted

9    call above that April 5th call on page 28, was that also

10   to or from your phone number, that -4064 that...

11     A.  Yes, sir.

12     Q.  How do you know that?

13     A.  Because it says so right above "Ana Callier."

14     Q.  I see.  Okay.  So that's -- that's the number.

15          So your phone calls on Exhibit 7 begin on

16   page 22.  Would that be correct?

17          MR. MILTENBERGER:  21.

18     A.  Yeah, 21.

19     Q.  (BY MR. NEVAREZ)  21?  Oh, okay.  Yeah.  All

20   right.

21          So all of these redacted calls you're

22   claiming are personal calls?

23     A.  Yes.

24     Q.  Are they -- any of those calls related to other

25   TCPA actions that you filed?

1    A.   It's possible that an attorney called me

2  related to a case.

3    Q.   Is it possible that another defendant out

4  there, one of your numerous TCPA defendants --

5    A.   No, I wouldn't --

6    Q.   -- may have -- may have called you on --

7    A.   I would not have redacted that, no.

8    Q.   But we don't know that for a fact.

9    A.   Well, I'm telling you that I redacted phone

10 calls from people that are relatives and friends.

11   Q.   And possibly attorneys.

12   A.   I -- I don't think that I would because I

13 wouldn't have recognized the number.  I'm just saying

14 that I don't want to say definitively that I did not,

15 but I doubt that I would have.

16   Q.   So let's go to page 12 of Exhibit 6, your first

17 amended complaint.  There's an entry there, number 17,

18 4-12-2022.  Where -- where is that?

19   A.   It may be -- I have to look.  It may have been

20 a missed call.  Okay.  You said number 17?

21   Q.   Yes.

22   A.   I believe 17 is a missed call.

23   Q.   And -- and what page are you looking at?

24   A.   I'm looking on page 34, which shows that I

25 answered the call at 4:16 p.m.

1    Q.   Hold on, sir.  Page 34?

2    A.   Yes.

3    Q.   Okay.  And where is that?  4:56?

4    A.   4:56 is a missed call.  I don't have a

5  characteriza- -- characterization for it there.  And

6  then I also don't have a characterization for number

7  416 -- excuse me -- the call at number si- -- table

8  number 16.

9    Q.   You mean row 16?

10   A.   Row 16.  And -- but that call was answered.

11   Q.   So, you know, in 17, your -- row 17 of phone

12  call at -- on April 12th at 4:56, you're claiming that's

13  a missed call?

14   A.   Yes.

15   Q.   But it doesn't show up here.

16   A.   No missed calls show up there, sir.

17   Q.   Missed calls don't show up.

18   A.   No, they don't.

19   Q.   So -- but you're -- you're asking, as part of

20  damages under the TCPA, missed calls?

21   A.   Yes.

22   Q.   Okay.  And -- and the same for declined calls?

23   A.   For any calls that were transmitted to my cell

24  phone that did not have an EBR attached to it.

25   Q.   On that same page 12 of Exhibit 6, row 43, you

1  say "spoke to Constants [sic]."  Who is -- what is --

2  who is Constance?

3      A.   I don't know.

4      Q.   Did you prepare this table?

5      A.   I did prepare that table.  I prepared the

6  entire complaint independently.

7      Q.   But you don't know who Constance is?

8      A.   It has been over a year.  I do not remember who

9  Constance is.  I would have to refer back to my records.

10     Q.   Okay.  So, again, on Exhibit 7, the -4604

11 numbers are -- begin on page 21 and where -- where do

12 they end?  Is that page 45?

13     A.   Yes.

14     Q.   So let me refer you to Exhibit 8.

15              (Exhibit 08 marked.)

16     Q.   And, again, this is a copy of Ana Callier's

17 phone bill?

18     A.   That is a copy of our phone bill.

19     Q.   Did you apply for this Verizon account?

20     A.   I pay the bill on that Verizon account.

21     Q.   Did you apply for it?

22     A.   No.  She applied for it.

23     Q.   Okay.

24     A.   It is a joint account that we -- that I -- we

25 maintain together.

1      Q.   Okay.  Where -- where does the -4604 calls

2  begin on -- on this Exhibit 8?

3      A.   (No verbal response.)

4      Q.   Is it page 18 or 19?

5      A.   It's -- this appears to be a bad copy.

6      Q.   A bad copy?  Why is it bad?

7      A.   Because every single number is blacked out.

8      Q.   Well, yeah.  It's all -460- -- -04 number there

9  is --

10             MR. SHARPE:  You have to go toward the end.

11     Q.   (BY MR. NEVAREZ)  No.  Let me ask the question.

12     A.   Oh, I know what --

13     Q.   Where -- where does it begin?

14     A.   Right.

15     Q.   Where does the -4604 begin?

16     A.   Page 18.

17     Q.   Is that page 19?  18?

18     A.   18.

19     Q.   18?

20     A.   Wait.  No.  No.  No.  Sorry.  19.

21     Q.   Okay.  So the first entry for -4604 starts on

22  page 19 and then continues on through page 40?

23     A.   Yes.

24     Q.   21 pages?

25     A.   (No verbal response.)

1     Q.   Is that correct?

2     A.   If your math is correct, that's correct.

3     Q.   And from what I can tell, every single call in

4  this Exhibit Number 8 for -4604 has been blacked out.

5     A.   One second, sir.

6     Q.   Is that correct?

7     A.   26.  Yes.

8     Q.   And why is that?

9     A.   Well, I submitted two different sets of phone

10 numbers for you as part of the discovery.  One I

11 submitted that only contained phone calls from JaScott

12 or Upwise, and then I submitted another that contained

13 all my calls, that would show all the nonpersonal calls,

14 which were all telemarketers, and this looks like one of

15 the -- an exhibit for the ones where I blacked out

16 everything that wasn't JaScott.

17     Q.   Okay.  So there were no phone calls between

18 April 26, May 25, related to the case at hand?

19     A.   Well, yes, there were.  I ignored those calls.

20     Q.   But you -- but you --

21     A.   I just --

22     Q.   -- blocked them out?

23     A.   I -- no, sir.  If you look at my table on the

24 26th --

25     Q.   Oh, whoa.

1      A.    -- I say that there -- they are --

2      Q.    Hold on.  Hold on just a second.  Let me look

3  at your table so I can follow along with what you're

4  saying, okay?  What page on the --

5      A.    Page 14.

6      Q.    Page 14 of Exhibit 6?  Okay.  Go ahead.

7      A.    I didn't answer the phone calls because I was

8  ignoring JaScott because they would not stop calling me

9  after my repeated do-not-call requests.

10     Q.    Well, let's -- let's look at page 14 of that

11 Exhibit 6, line 87.  Where on Exhibit Number 8 is that

12 call on line 87?

13     A.    Sir, this starts on April 26th.  That call is

14 on April 25th.

15     Q.    Okay.  So that would be in the previous one?

16     A.    Yes.

17     Q.    Exhibit Number 7?

18     A.    It's on page 45, sir.

19     Q.    Okay.  Which that would be...

20     A.    It says one second on the phone bill because

21 Verizon rounds up.

22     Q.    You mean one minute.

23     A.    One minute.  Sorry.

24     Q.    Okay.  All right.  Well, are -- are -- so this

25 Exhibit Number 8 starts on April 26, so that would be on

1   your table A for Exhibit 6, row 88?

2       A.   Excuse me.  I'm not following you.

3              MR. MILTENBERGER:  They're all missed calls

4   except for the one down at 108, so we would owe you a

5   phone bill for the 108.  But the others are missed calls

6   and don't show up on the phone bill.

7              MR. NEVAREZ:  Or the text calls.

8              MR. MILTENBERGER:  Yeah.  They're all

9   missed calls, so they won't show up on the phone bill.

10  But the one down at row 108 is a June 30th, and we owe

11  you a phone bill for that call.

12             MR. NEVAREZ:  Okay.  You're going to

13  provide that or --

14             MR. MILTENBERGER:  Yeah.

15             MR. NEVAREZ:  Okay.

16      Q.   (BY MR. NEVAREZ)  Okay.  Well, let me ask you

17  to go back to Exhibit Number 6.  Well, scratch that.

18             MR. NEVAREZ:  Let -- can we take a little

19  break, go off the record?

20             THE VIDEO TECHNICIAN:  Off the record at

21  3:01.

22             (Break taken.)

23             VIDEO TECHNICIAN:  We are back on the

24  record at 3:18 p.m.

25             (Exhibit 09 marked.)

1    Q.   (BY MR. NEVAREZ)   Exhibit Number 9, Can you

2  identify that, Mr. Callier?

3    A.   This is a printout from an Excel spreadsheet

4  that I kept related to the contacts between myself and

5  JaScott and Upwise.

6    Q.   So this is the log that you referred to

7  earlier?

8    A.   Yes.

9    Q.   Okay.  So these are, unfortunately, unnumbered,

10 because we -- we provided the Excel spreadsheet and we

11 just printed out the -- the tabs.  So Exhibit 9 consists

12 of three pages?

13   A.   Yes.

14   Q.   And this relates to the case that we're here

15 for today involving Upwise, Pac Western?

16   A.   Yes.

17   Q.   That -- that was the name of your tab.  So

18 that's -- that's why we -- we put Up- --

19   A.   Yes.

20   Q.   -- Upwise, dash, Pac Western here.

21        So let me -- let me ask you:  Why -- the

22 fourth column, Notes, it says, Before license sent?

23   A.   I believe that should say "application sent."

24   Q.   Oh, I see.  Okay.  Okay.  And so why are -- why

25 are we color-coded?  That's April 4, '22, through

Brandon L. Callier - January 8, 2024          166

1   April 12, '22?

2       A.   The color-coding is for me, because it tells me

3   that everything before they sent an application would

4   have been before an EBR would have been established.

5   And then, at that point -- again, it's not color-cod- --

6   or it's not shaded.  And then I shaded back again at the

7   point that I told them to never call me back.

8       Q.   Okay.  And -- and for definition purpose, "EBR"

9   is?

10      A.   "Established business relationship."

11      Q.   Okay.  So, all of these that are color-coded,

12  April 4 through April 12 of '22, they're color-coded

13  because that was before you established a business

14  relationship?

15      A.   It was before they sent me an application,

16  which, you know, could have -- you know, if I fill out

17  an application, I establish an -- an EBR.  And then, you

18  know, obviously, those aren't calls that I could -- I'm

19  differentiating between when I had an EBR and when I

20  didn't have an EBR.

21      Q.   I see.  So, on page 1, everything that is not

22  color-coded is after you established an -- an

23  existing -- established a business relationship?

24      A.   Theoretically.  It's really not for me to

25  determine.  What I can tell you is that everything

1   that's shaded was before I was sent the application.

2        Q.   Okay.  And then after -- after -- everything

3   that's not shaded on page 1 is after you establish a

4   business relationship?

5        A.   It was after I received the application.

6        Q.   Okay.  Well, you used the "EBR."

7        A.   Yeah.

8        Q.   Now, did -- are you stop using your EBR or --

9        A.   Well, I -- I'm making a legal determination

10  that I -- I can't really make, so I'm backtracking on

11  that and just differentiating between when I was sent an

12  application and when I -- or prior to me being sent an

13  application and after me being sent the application.

14       Q.   Okay.  And, when you received the application,

15  that's when the EBR was established, according to your

16  use of the term "EBR"?

17       A.   According to my use of the term, then that

18  would have established an EBR.

19       Q.   Okay.  So now, go on -- going on to page 2,

20  we've got five calls that are not color-coded.

21       A.   Yes.

22       Q.   So then, beginning with April 19 at 2:29 p.m.,

23  you get -- you have another color code?

24       A.   Yes.

25       Q.   And then, the column -- the fourth column, you

1  say, Told to never call back.  And then the next column

2  is, Knowing and willful violations.

3          So what -- what does this color code

4  represent there, on that page 2?

5      A.   That represents the point in time that I first

6  told them to not ever call me again.

7      Q.   Okay.  And then, on page 3 of that Exhibit

8  Number 9, why is portions color-coded and other portions

9  not color-coded?  Could you decipher that?

10     A.   That's just an error on my part.  The entire

11 thing is supposed to be shaded.  I just --

12     Q.   So all of that should be shaded?

13     A.   Well, it came -- all of that came after I --

14 those multiple requests to not call me back.  So yes,

15 they should be shaded.

16     Q.   I see.

17          Okay.  Now, I've got a whole bunch of other

18 ones.  Exhibit 10 through 39, that are -- also come from

19 your Excel spreadsheet, similar col- -- similar logs

20 from that same Excel spreadsheet.  If -- if you don't

21 mind, we can just set a little conveyor belt here.

22     A.   Yeah.

23          (Exhibit 10 marked.)

24     Q.   (BY MR. NEVAREZ)  Exhibit 10, would you

25 identify that?

```
1       A.   I have to give these --
2       Q.   I'm sorry.  What?
3       A.   I have to give these to her or --
4       Q.   Yeah.  She's got to stamp them.
5            THE REPORTER:  I need to mark them, but I
6    need y'all to not talk.  Sorry.
7            MR. NEVAREZ:  I -- if -- okay.
8            THE REPORTER:  Go ahead.
9            MR. NEVAREZ:  Do you want to hand me and I
10   can --
11           THE REPORTER:  Sure.
12           MR. NEVAREZ:  -- pin them over here with
13   your assistance?
14           MR. SHARPE:  Sure.
15      Q.   (BY MR. NEVAREZ)  Okay.  Do you recognize that
16   Exhibit Number 10?
17      A.   Yes, sir.
18      Q.   That's a log pertaining to which case?
19      A.   That is a log pertaining to the phone -- the
20   MCA phone calls that I received from Unified Funding, or
21   Capybara.
22           MR. SHARPE:  Where -- where -- where do you
23   want the sticker?  Bottom right?
24           MR. NEVAREZ:  No, not on this one.  This
25   one's mine.
```

```
1                MR. SHARPE:  Gotcha.  Where do you want the
2    sticker?
3                MR. NEVAREZ:  Anywhere.
4                MR. SHARPE:  Gotcha.
5                MR. NEVAREZ:  Other than on mine.
6        Q.  (BY MR. NEVAREZ)  So that's another TCPA case?
7        A.  This one was a TCPA case, yes.
8                (Exhibit 11 marked.)
9        Q.  (BY MR. NEVAREZ)  Okay.  Now, let me refer you
10   to Exhibit 11.  And this one's entitled "Direct Funding
11   Now-Kalamata."  Is that -- is that a log for another one
12   of your TCPA cases?
13       A.  This is a log for an MCA company that called me
14   however many number of times are on this list.  And no,
15   I did not sue them.
16       Q.  You did not what?
17       A.  I did not sue them.
18       Q.  Okay.  But you kept this for purposes of the
19   TCPA?
20       A.  I kept that to keep track of who -- of some of
21   the companies that were calling me, yes.  But I get a
22   bunch of phone calls, and I don't sue everyone --
23       Q.  I see.
24       A.  -- not even close.
25       Q.  Okay.
```

```
1              (Exhibit 13 marked.)
2      Q.   (BY MR. NEVAREZ)  Exhibit 13 --
3              MR. MILTENBERGER:  What happened to 12?
4              MR. NEVAREZ:  Oh, 12.  Okay.  Don't put
5  them on the ones with my initial.
6              MR. SHARPE:  Gotcha.
7              (Exhibit 12 marked.)
8      Q.   (BY MR. NEVAREZ)  Exhibit 12, that's entitled
9  "Lionhead-Kalamata."  Is that -- is that a TCPA case?
10     A.   This is a company that was calling me for an
11 MCA loan in the same manner that JaScott was calling.  I
12 did not sue this company, because, when I sent them the
13 text message saying, Do not call me back, they honored
14 it and stopped calling me.  And I did not sue them.
15     Q.   You did not submit?
16     A.   I did not sue them.
17     Q.   Oh, you didn't -- okay.
18     A.   They honored my DNC request.
19     Q.   But it was kept for TCPA purposes?
20     A.   It was kept to keep track of who was bombarding
21 my phone.
22              (Exhibit 13 marked.)
23     Q.   Okay.  Exhibit 13 entitled "Pearl Capital,"
24 that a TCPA case?
25     A.   I think I sued Pearl Capital --
```

Brandon L. Callier - January 8, 2024          172

1      Q.   Okay.

2      A.   -- in -- in a TCPA case.

3                 (Exhibit 14 marked.)

4      Q.   (BY MR. NEVAREZ)   All right.  Exhibit 14,

5   entitled "Todays Advance Arsenal WH Road."  Did I get

6   that correct?

7      A.   Yeah.  I can't remember what it stands for,

8   but --

9      Q.   Okay.  Is Exhibit 14 reflective of another TCPA

10  case?

11     A.   Yes, when I sent them the "do not call"

12  request, they kept calling and texting me.  So yes, I --

13  I did file a TCPA complaint against them.

14                (Exhibit 15 marked.)

15     Q.   (BY MR. NEVAREZ)   Okay.  Exhibit 15, entitled

16  "AR Capital Direct Merchants FU"?

17     A.   Direct Merchants Funding.

18     Q.   Oh, Funding, okay.

19     A.   It cut off.

20     Q.   I see.  Okay.  So is Exhibit 15 relating to

21  another TCPA case?

22     A.   No, sir.

23     Q.   You did not sue them?

24     A.   I did not.

25     Q.   But you kept -- kept it for purposes of -- to

1   see if they were compliant with TCPA?

2       A.   I -- yes.

3       Q.   Okay.

4            (Exhibit 16 marked.)

5       Q.   (BY MR. NEVAREZ)  Exhibit 16, entitled

6   "FundKite Peak Source, LLC," is that also a TCPA case?

7       A.   Yes, sir -- no.  Excuse me.  I'm sorry.  This

8   is -- again, all of these are merchant cash advance

9   companies that were contacting me.  I did not sue this

10  company, no.

11      Q.   Okay.  But you kept this for purposes of TCPA,

12  in -- in the event they were noncompliant in -- in your

13  determination?

14      A.   Yes.

15           (Exhibit 17 marked.)

16      Q.   (BY MR. NEVAREZ)  Exhibit 17, entitled "CFS Cap

17  LLC Qualifier," is this a TCPA case?

18      A.   No, sir.

19      Q.   But you kept this for purposes of -- in the

20  event they were noncompliant --

21      A.   Sir, let -- let me clarify what -- because

22  you're putting words in my mouth when I answer that

23  question.  I kept all of these -- all of these companies

24  did not have permission to call me and violated the "do

25  not call" provisions.  I sued the companies that did not

Brandon L. Callier - January 8, 2024          174

1   honor my DNC request.  So, even though a company may

2   have called me -- in this case, this company -- I don't

3   know.  There's 60 phone calls on here.  I did not sue

4   them, because they honored my request.

5       Q.   The -- the question was:  Did you keep this

6   Exhibit Number 17 for purpose of TCPA, in the event they

7   didn't comply with TCPA?

8       A.   I -- I kept all of these to have a track

9   record --

10      Q.   Okay.

11      A.   -- of the bombardment of MCA phone calls that I

12  was receiving.

13                 (Exhibit 18 marked.)

14      Q.   (BY MR. NEVAREZ)  Okay.  Exhibit 18, entitled

15  "Mulligan FinWise," is this a TCPA case?

16      A.   No, sir, it is not.

17      Q.   And -- but you kept this log in the event

18  that --

19      A.   I kept this log to have a record of the

20  numerous MCA-related phone calls and text messages I was

21  receiving.

22      Q.   And -- and, again, by definition "MCA" --

23      A.   "Merchant cash advance" --

24      Q.   Okay.

25      A.   -- which is what your client was calling me

Brandon L. Callier - January 8, 2024          175

1  about.

2      Q.   Right.   Okay.

3              (Exhibit 19 marked.)

4      Q.   (BY MR. NEVAREZ)   Exhibit 19, entitled

5  "Mulligan Trust FI," is this a TCPA case?

6      A.   It is not, sir.

7      Q.   Okay.   And you kept this log why?

8      A.   I kept this log to have a record of the

9  numerous MCA phone calls and text messages I was

10  receiving.

11      Q.   I see.

12              MR. SHARPE:   I'm out of stickers.

13              (Exhibit 20 marked.)

14      Q.   (BY MR. NEVAREZ)   Okay.   Exhibit 20, entitled

15  "True Cash Offer-House," is that a TCPA case?

16      A.   No, sir.

17      Q.   And you kept this log why?

18      A.   Because I was also getting a bunch of offers to

19  buy my house.

20      Q.   Buy your house?

21      A.   Yes.

22      Q.   Okay.   Was your house for sale?

23      A.   No.

24              (Exhibit 21 marked.)

25      Q.   (BY MR. NEVAREZ)   Exhibit 21, entitled "Tax

1   Resolvers," is that a TCPA case?

2       A.   No, sir.

3       Q.   And so why did you keep this log?

4       A.   I would generally keep logs just in case people

5   do not honor my "do not call" request.

6       Q.   Okay.  So, in this case, they honored your "do

7   not call" request?

8       A.   I did not sue them or any of the other

9   companies that I didn't sue to protect my privacy

10  rights, and so I would say that, yes, they stopped

11  contacting me when they were supposed to stop contacting

12  me.

13              (Exhibit 22 marked.)

14      Q.   (BY MR. NEVAREZ)  Exhibit 22, entitled "UCES

15  United Wealth"; is that correct?

16      A.   Yes, sir.

17      Q.   Is this a TCPA case?

18      A.   Yes, sir.  I sued them because I told them, I'm

19  at a funeral; don't call me back.  I was at my

20  grandmother's funeral.  They called me right back.  They

21  didn't honor my DNC request, so I filed a TCPA complaint

22  against them.

23              (Exhibit 23 marked.)

24      Q.   (BY MR. NEVAREZ)  Okay.  Exhibit 23, entitled

25  "Coach Christian," is this a TCPA case?

Brandon L. Callier - January 8, 2024          177

1      A.   Yes.

2      Q.   And what is Coach Christian?  Is that a person

3  or --

4      A.   That is a person.  He goes by "Coach

5  Christian."  His name is Oscar Kenny.

6      Q.   Okay.  He -- he's a coach?

7      A.   No.  He's a scam artist.

8                 (Exhibit 24 marked.)

9      Q.   (BY MR. NEVAREZ)  Okay.  Exhibit 24 -- but --

10  but -- I'm sorry.  Going back to 23, that's -- that's a

11  TCPA case?

12     A.   I did file a TCPA complaint against him.

13     Q.   Okay.  Exhibit 24, entitled "Shopfunder," is

14  that a TCPA case?

15     A.   No, sir.

16     Q.   What is this?

17     A.   An MCA company soliciting for a merchant cash

18  advance.

19     Q.   I see.  Okay.

20                 (Exhibit 25 marked.)

21     Q.   (BY MR. NEVAREZ)  Exhibit 25, entitled "Direct

22  Funding Club," is that a TCPA case?

23     A.   No, sir.

24     Q.   What is this?

25     A.   That is a merchant cash advance company that

1    was soliciting me for a merchant cash advance.

2         Q.   I see.  Okay.

3                   (Exhibit 26 marked.)

4         Q.   (BY MR. NEVAREZ)   Exhibit 26, entitled

5    "Verite," is that a TCPA case?

6         A.   No, sir.

7         Q.   What is that?

8         A.   That is a merchant cash advance company that

9    was soliciting me for merchant cash advance.

10                  (Exhibit 27 marked.)

11        Q.   (BY MR. NEVAREZ)   I see.  Okay.  Exhibit 27,

12   entitled "PMF," is that a TCPA case?

13        A.   Yes, sir.

14                  (Exhibit 28 marked.)

15        Q.   (BY MR. NEVAREZ)   Okay.  Exhibit 28, entitled

16   "Debt Consultants Group," is that a TCPA case?

17        A.   I -- I don't remember.  I don't want to say

18   "no," because it's -- I -- I think I filed a TCP- -- a

19   TCPA complaint against a company that had a similar

20   name, and I don't know if that was them or the company

21   with the similar name.  More likely than not, based on

22   just two text messages, it would've been the other

23   company.  But I don't want to say "no."

24                  (Exhibit 29 marked.)

25        Q.   (BY MR. NEVAREZ)   Okay.  Exhibit 29, entitled

1  "Titan," is that a TCPA case?

2      A.   Yes.

3              (Exhibit 30 marked.)

4      Q.   (BY MR. NEVAREZ)  Exhibit 30, entitled "El Paso

5  Cosmetic," is that a TCPA case?

6      A.   Yes.

7              (Exhibit 31 marked.)

8      Q.   (BY MR. NEVAREZ)  Exhibit 31, entitled

9  "American First Life," is that a TCPA case?

10     A.   I don't think so, but it's possible.  I can't

11 say definitively.

12     Q.   Is this another MCA case?

13     A.   No.  That's a life insurance company.

14     Q.   They were trying to sell you life insurance?

15     A.   Yeah.  They had a whole bunch of, you know,

16 life insurance.  Yeah.

17              (Exhibit 32 marked.)

18     Q.   (BY MR. NEVAREZ)  All right.  Exhibit 32,

19 entitled "Ethos Life 4374" --

20     A.   Okay.  That's what it -- "yes" to Ethos.  "No"

21 to American First Life.

22     Q.   "Yes," Ethos is a TCPA case?

23     A.   Yes.

24     Q.   "No," American First Life --

25     A.   Yes.

Brandon L. Callier - January 8, 2024          180

1      Q.    -- is not?

2      A.    Correct.

3      Q.    So what is American First Life?

4      A.    An insurance company that was contacting me

5   to -- for insurance.

6      Q.    Okay.  But it's not a TCPA?

7      A.    I don't remember suing them.  I remember suing

8   Ethos Life.

9                 (Exhibit 33 marked.)

10     Q.    (BY MR. NEVAREZ)  Okay.  33.  Exhibit 33,

11   entitled "Alexa Assurance 4374," is that a TCPA case?

12     A.    Yes and no.

13     Q.    Okay.

14     A.    I sued Alexa Assurance as part of a case that

15   had -- I don't know -- seven or eight defendants, that

16   was resolved.  They continued contacting me.  All of

17   these came after that.  I did not sue them.

18     Q.    Okay.

19     A.    So I sued them before, but not as part of these

20   phone calls.

21     Q.    Okay.  But you sued them before, as part of the

22   TCPA?

23     A.    Yes.

24                 (Exhibit 34 marked.)

25     Q.    (By MR. NEVAREZ)  Okay.  Exhibit 34, entitled

1   "Splash Advance LLC Bridge Conso," is that a TCPA case?

2       A.   No.

3       Q.   What is that?

4       A.   That's a merchant cash advance company that was

5   contacting me.

6       Q.   I see.

7               (Exhibit 35 marked.)

8       Q.   (BY MR. NEVAREZ)   Exhibit 35, entitled "Fortune

9   500," is that a TCPA case?

10      A.   No.

11      Q.   What is that?

12      A.   That is a -- a merchant cash advance company

13  that was contacting me as -- trying to give me a

14  merchant cash advance.

15              (Exhibit 36 marked.)

16      Q.   (BY MR. NEVAREZ)   Okay.   Exhibit 36, entitled

17  "MGM Funding," is that a TCPA case?

18      A.   No, sir.

19      Q.   Is that an MCA case?

20      A.   Yes, sir.

21              (Exhibit 37 marked.)

22      Q.   (BY MR. NEVAREZ)   Exhibit 37, entitled

23  "Commercial Lending," is that a TCPA case?

24      A.   I believe this was a TCPA case.

25              (Exhibit 38 marked.)

1    Q.   (BY MR. NEVAREZ)   Okay.   Exhibit 38, entitled

2    "Spearhead," is that a TCPA case?

3    A.   No, sir.   It was an MCA company that was

4    contacting me for --

5    Q.   I see.   Okay.

6              (Exhibit 39 marked.)

7    Q.   (BY MR. NEVAREZ)   Exhibit 39, "Sheet 1" --

8    entitled "Sheet 1," is that a TCPA case?

9    A.   Those are -- no, it's not TCPA cases.   They're

10   actually just -- well, no, they're not TCPA cases.

11   Q.   Is this an MCA case?

12   A.   I don't know what it is.

13   Q.   You don't know what it is?

14   A.   Aside from the -- the first one that says

15   "LPG," which is "Litigation Practice Group" -- I don't

16   know what the other calls are, no.

17   Q.   "LPG" stands for what?

18   A.   "Litigation Practice Group."

19   Q.   I see.

20              So they were trying "to verify payment

21   tomorrow," according to the entry on October 21?

22   A.   Yeah, if that's what it says.   I don't remember

23   what that was about.   I -- I just know that "LPG" stood

24   for "Litigation Practice Group," and they sent me,

25   apparently, a prerecorded voice message.

1    Q.   I see.

2    A.   That probably wasn't intended for me.

3    Q.   Okay.  Okay.  Well, let me -- let me ask you:

4  Go back to Exhibit Number 9, please.  So same question

5  for -- I'm going to ask you for 9 through 39:  Does this

6  relate to that phone number ending in 4064?

7    A.   Yes.

8    Q.   Same question for Exhibit Number 10?

9    A.   Yes.

10    Q.   Same question for Exhibit Number 11?

11    A.   Yes.

12    Q.   Same question for Exhibit Number 12?

13    A.   Yes.

14    Q.   Same question for Exhibit Number 13 --

15    A.   Just one second.

16    Q.   -- the Pearl Capital one?

17    A.   Yes.

18    Q.   Same -- same question for Exhibit Number 14?

19    A.   Just one second.  Okay.  Yes.

20    Q.   Okay.  Same question for Exhibit 15?

21    A.   Yes.

22    Q.   Same question for Exhibit 16?

23    A.   Yes.

24    Q.   Same question for Exhibit 17?

25    A.   Yes.

1    Q.   Same question for Exhibit 18?

2    A.   Yes.

3    Q.   Same question for Exhibit 19?

4    A.   Yes.

5    Q.   Same question for Exhibit 20?

6    A.   Yes.

7    Q.   Same question for Exhibit 21?

8    A.   Yes.

9    Q.   Same question for Exhibit 22?

10   A.   Yes.

11   Q.   Same question for Exhibit 23?

12   A.   Yes.

13   Q.   Same question for Exhibit 24?

14   A.   Yes.

15   Q.   Same question for Exhibit 25?

16   A.   Yes.

17   Q.   Same question for Exhibit 26?

18   A.   Yes.

19   Q.   Same question for Exhibit 27?

20   A.   Yes.

21   Q.   Same question for Exhibit 28?

22   A.   Yes.

23   Q.   Same question for Exhibit 29?

24   A.   Yes.

25   Q.   Same question for Exhibit 30?

Brandon L. Callier - January 8, 2024          185

1      A.   Yes.

2      Q.   Same question for Exhibit 31?

3      A.   Yes.

4      Q.   Same question for Exhibit 32?

5      A.   No.

6      Q.   No?  What number was Exhibit 32?

7      A.   Says, at the top, "4374."

8      Q.   Okay.  That's your Boost Mobile?

9      A.   Yes.

10     Q.   And then, same question for Exhibit 33?

11     A.   No.

12     Q.   It doesn't pertain to 4064?

13     A.   No.

14     Q.   What does that pertain?

15     A.   4374.

16     Q.   Okay.  Same question for Exhibit 34?

17     A.   Yes.

18     Q.   Same question for Exhibit 35?

19     A.   Yes.

20     Q.   Same question for Exhibit 36?

21     A.   Yes.

22     Q.   Same question for Exhibit 37?

23     A.   Yes.

24     Q.   Same question for Exhibit 38?

25     A.   Yes.

1    Q.   Same question for Exhibit 39?

2    A.   Yes.

3    Q.   Okay.  Now -- so most of these computer logs

4    were kept for your phone ending in 4064, a couple are

5    for your phone ending in 4374 --

6    A.   Yes.

7    Q.   -- if math serves me well.

8              Now, what about your main number at

9    Aero Tax?

10   A.   What about it?

11   Q.   Do you have any logs -- any other logs for

12   your -- your number in Aero Tax?

13   A.   That is a business number, and there would be

14   no reason for me to keep logs for a business number.

15   Q.   Why?  You kept logs for these other two

16   numbers.

17   A.   These two numbers are registered on the

18   national "Do Not Call" list.

19   Q.   Okay.  Including 4374?

20   A.   Yes.

21   Q.   Okay.  Now, your phone number at Aero Tax is

22   that (915) 929-8309?

23   A.   No.

24   Q.   No?

25   A.   That's not my phone number.

Brandon L. Callier - January 8, 2024          187

1    Q.   Okay.  Your -- and your office -- where is your

2  office for Aero Tax?

3    A.   I thought we went over this earlier.  10921

4  Pellicano, Suite 100 --

5    Q.   Okay.

6    A.   -- El Paso, Texas 79935 or -36.  I forget -- I

7  forget about the ZIP Code.

8    Q.   Okay.  Yeah.  And so -- and the phone number

9  there is not (915) 929-8309?

10    A.   No, it is not.

11    Q.   Okay.  And so is your -- is your number there

12  at Aero Tax listed on the "Do Not Call" registry?

13    A.   No, it is not.

14    Q.   Okay.  And so it is -- you -- the 10921

15  Pellicano, Suite 100, is that -- do you have employees

16  there?

17    A.   The same ones I told you about earlier.

18    Q.   So they -- that -- that's where they're

19  located?

20    A.   Yes.

21    Q.   Okay.

22         MR. NEVAREZ:  Let's see.  What time is it?

23  3:49.  Yeah, I -- I think we need to -- I'll just

24  reserve the rest of my time for Friday, after you're

25  done with Mitch.

1          MR. MILTENBERGER:  Well, why don't we keep

2   going till 5:15 or so?  I mean, that -- that'll shorten

3   our Friday.

4          MR. NEVAREZ:  Well, yeah, I can do that.

5          MR. MILTENBERGER:  I'd say let's go till

6   5 o'clock --

7          MR. NEVAREZ:  Let --

8          MR. MILTENBERGER:  -- if you've got an area

9   that --

10         MR. NEVAREZ:  Let's break for a few

11  minutes.  Let me get myself coordinated.

12         VIDEO TECHNICIAN:  All right.  Off the

13  record at 3:49.

14         (Break taken from 3:49 p.m. to 4:03 p.m.)

15         VIDEO TECHNICIAN:  We are back on the

16  record at 4:03 p.m.

17     Q.  (BY MR. NEVAREZ)  Okay.  So, Mr. Callier, I --

18  I just have one more phone call.  And this one's dated

19  October 4 of 2022.

20     A.  Okay.

21         (Audio played.)

22         MR. CALLIER:  Hello.

23         SAM:  Hi.  Brandon?

24         MR. CALLIER:  This is Brandon.

25         SAM:  (Indiscernible) Sam over here with

1    FDR Funding.  How are you today, sir?

2              MR. CALLIER:  I'm good.  Who's this?

3        A.   Sam with who?

4        Q.   (BY MR. NEVAREZ)  Is that -- is that your -- is

5    that your voice?

6              SAM:  Sam with FDR Funding.  We spoke about

7    a week --

8              (Audio stopped.)

9        Q.   (BY MR. NEVAREZ)  Did -- did you hear that?

10       A.   Yeah.  I'm just asking to clarify who -- if he

11   said "FTR Funding"?

12       Q.   I think -- I don't think it was "FTR."  But

13   let's -- let's play it again.

14             (Audio played.)

15             MR. CALLIER:  Hello.

16             SAM:  Hi.  Brandon?

17             MR. CALLIER:  This is Brandon.

18             SAM:  (Indiscernible) Sam over with FDR

19   Funding.  How are you today, sir?

20             (Audio stopped.)

21       Q.   (BY MR. NEVAREZ)  "FDR Funding"?  Not "FTR

22   Funding."

23       A.   Okay.

24       Q.   I -- I don't know.  Which is it?  Is that -- is

25   that your voice?

1    A.   Yes, that's my voice.  I'm just trying to

2  clarify who I'm speaking to.  It's -- it's not any

3  company that's been introduced thus far in this case, so

4  I want to clarify what I'm hearing correct -- see if

5  what I'm hearing is correct on the --

6    Q.   Right.

7    A.   Yeah.

8    Q.   I -- you know, you -- you tell me.  It sounded

9  like FD- -- as in "David" -- R Funding, as opposed to

10 what I thought you said FT- -- as in "Tom."

11   A.   Well, initially, I thought it said "FTR," but

12 sounds like it's "FDR."

13   Q.   Okay.  And do -- do you recall dealing with FDR

14 Funding?

15   A.   I do not.

16   Q.   Do you recall dealing with Sam or Siam?

17   A.   I do not.

18   Q.   Okay.  That is your voice?

19   A.   That is my voice, but I've received over a

20 hundred phone calls from these types of companies.  I'm

21 not -- I'm not going to remember every single one.

22   Q.   Sure.  Sure.

23   A.   But go ahead.

24         (Audio played.)

25         MR. CALLIER:  I'm good.  Who's this?

1          SAM:  Sam, with the FDR Funding.  So we

2     spoke about a week ago.  You mentioned you had -- you

3     said you had an opera- (indiscernible)?

4          MR. CALLIER:  FDR Funding?

5          SAM:  FDR Funding, right.

6          MR. CALLIER:  Oh.  Did you used to be with

7     Upwise?  Because I -- I have it saved in my phone as

8     "Upwise."

9          A.   Oh, okay.

10          SAM:  Upwise?  Okay, that's probably

11     because they --

12          (Audio stopped.)

13          Q.   (BY MR. NEVAREZ)  I'm sorry.  Did -- so you

14     remember that call?  Why did you say "okay"?

15          A.   I don't remember the call.  I just -- I'm

16     listening to myself, and it says -- I said "okay"

17     because, apparently, there's -- that's the connection,

18     because I saved that number as "Upwise" in my phone.

19          Q.   I see.  Okay.

20          A.   Which, you have a copy of it.  So that tells me

21     it probably was an Upwise phone number.

22          Q.   Okay.  Well, let's continue on.

23          (Audio played.)

24          SAM:  (Indiscernible).  We gotta call a lot

25     of people (indiscernible).

Brandon L. Callier - January 8, 2024          192

1          MR. CALLER:  I'm sorry --

2     A.   That was ineligible [sic].

3          MR. CALLER:  -- I didn't understand what

4 you just said.

5               (Audio stopped.)

6     Q.   (BY MR. NEVAREZ)  I -- I'm sorry.  What was it

7 that you --

8     A.   I said that was ineligible.  I -- I couldn't

9 understand the audio on that.

10    Q.   You couldn't understand that?

11    A.   No.  Yeah.

12          MR. NEVAREZ:  Okay.  Let me --

13          THE REPORTER:  I couldn't either.  And if

14 I'm supposed to be writing those, that -- that's not

15 happening --

16          MR. NEVAREZ:  Okay.  Well, let me stop.

17 See?

18          THE REPORTER:  -- because there's a lot I

19 don't understand.

20          MR. NEVAREZ:  Let me -- let me start from

21 the beginning.  Well, I'll move the computer a little

22 closer.  Let me see if I've got the volume cranked up.

23          THE REPORTER:  It's not the volume.  Some

24 of it's unintelligible.

25          MR. NEVAREZ:  Oh, yeah, a lot of this is

1  going to be unintelligible, I'm afraid.  Okay.  Oh,

2  okay.

3                 (Audio played.)

4                 MR. CALLIER:  Hello.

5                 SAM:  Hi.  Brandon?

6                 MR. CALLIER:  This is Brandon.

7                 SAM:  (Indiscernible) Sam over here with

8  FDR Funding.  How are you today, sir?

9                 MR. CALLIER:  I'm good.  Who's this?

10                 SAM:  Sam with the FDR Funding.  So we

11  spoke about a week ago.  You mentioned you had -- you

12  said you had an opera- (indiscernible)?

13                 MR. CALLIER:  FDR Funding?

14                 SAM:  FDR Funding, right.

15                 MR. CALLIER:  Oh.  Did you used to be with

16  Upwise?  Because I -- I have it saved in my phone as

17  "Upwise."

18                 SAM:  Upwise?  Okay, that is probably

19  because the internet dialer (indiscernible).  We gotta

20  call a lot of people (indiscernible).  I'm sorry.

21                 MR. CALLIER:  I'm sorry, I didn't

22  understand what you just said.

23                 SAM:  I -- I said we're using an internet

24  dialer, actually, sir.  So the number is not -- is not

25  really valid.  We gotta call a lot of people every day.

Brandon L. Callier - January 8, 2024          194

1  We use -- we use this (indiscernible).  Hope you don't

2  mind.

3                    MR. CALLIER:  Oh.

4                    SAM:  Did you recover from the operation

5  (indiscernible)?

6                    MR. CALLIER:  Huh?  Yeah, I'm back in the

7  office, finally.

8                    SAM:  Okay.  That's great.  That's great.

9  By any chance, are you ready to apply or get the money

10 in your account, (indiscernible)?

11                   MR. CALLIER:  Yeah, I -- I can -- I'm

12 actually --

13                   SAM:  (Indiscernible)?

14                   MR. CALLIER:  -- in front of -- in front of

15 the computer, so I can, like, go ahead and pull the --

16 do the application and get the bank statements now while

17 I got -- while I got --

18                   SAM:  That's great.  That's great.  Let me

19 get the underwriter on the line, sir.  Just -- just a

20 moment.

21                   By the way, what -- during the time you

22 were having the operation, did the business go down, by

23 any chance?

24                   MR. CALLIER:  No, no.  (Indiscernible),

25 so --

1              SAM:  I have (indiscernible) --

2              (Audio stopped.)

3       Q.   (BY MR. NEVAREZ)  You had an operation?  Is

4  that what he's referring to?  Is that what -- what the

5  conversation -- you had surgery?

6       A.   That was October '22?  Yeah, I had a detached

7  retina.

8       Q.   Oh, wow.  Another accident?  Another car

9  accident?

10      A.   No.  I was sitting in a restaurant in

11  Philadelphia and just noticed something in my eye all of

12  a sudden and --

13      Q.   Oh.

14      A.   -- went back home and had a detached retina.

15      Q.   Okay.  Well, sorry to hear that.  It's -- okay,

16  then --

17             (Audio played.)

18             SAM:  I have Brandon with me on the line.

19  He's looking for about $60,000.  You can take over.

20             CARLOS:  Hey, Brandon.  How are you, Buddy?

21             MR. CALLIER:  I'm good.  How are you?

22             CARLOS:  Yeah.  Good.  So thank you so much

23  for staying on the line.  Can you tell me a little bit

24  more about your business?  And I know this may seem

25  redundant, but I am the underwriter here at Fun Cube,

1   and we are a direct lender --

2              MR. CALLIER:  I'm sorry.  It -- it cut out.

3   Underwriter at where?

4              CARLOS:  My name is Carlos, and we -- we --

5   we are a direct lender.  We're based out of California.

6              MR. CALLIER:  No, no.  I -- you -- you had

7   said with who, but I -- I didn't -- I couldn't

8   understand it.  It -- it cut out on me, is what I was

9   saying.

10             CARLOS:  Oh, sorry about that.  We -- we

11  are a direct lender.  We're based out of California.

12  Our name is Benefit -- our marketing name is Fun Cube.

13  And you were --

14             MR. CALLIER:  Oh, okay.

15             CARLOS:  -- speaking to my account manager.

16  I am the -- I'm the director here, and I just would like

17  to ask a few questions.

18             MR. CALLIER:  Sure.

19             CARLOS:  So how much are you looking for?

20             MR. CALLIER:  About 50,000.

21             CARLOS:  Okay.  And how much are you -- did

22  you deposit last month?

23             MR. CALLIER:  Last month?  70- -- a little

24  over 73,000.

25             CARLOS:  Okay.  Do you have any outstanding

Brandon L. Callier - January 8, 2024          197

1  loans out?

2          MR. CALLIER:  No, I -- I don't have any

3  debt at all.

4          CARLOS:  Okay.  And what -- what kind of

5  loans are you looking for, to get?  What kind of --

6          MR. CALLIER:  What kind of loans?

7          CARLOS:  -- (indiscernible)?

8          MR. CALLIER:  I've never had any debt, so I

9  don't really know what's out there or what types of

10 loans would be available.  So I'd kind of be relying on

11 you to guide me on that.

12         CARLOS:  Sure.  So the -- this works

13 like -- like personal credit.  You know, you go to the

14 car dealership your first time.  You -- you try to build

15 your personal credit just like business credit, okay?

16         MR. CALLIER:  Uh-huh.

17         CARLOS:  Since you've got never had a loan

18 before, we won't be able to report on the Dunn &

19 Bradstreet credit bureau, which is essentially a

20 business credit reporting bureau.  That, essentially,

21 builds your -- your -- you know, your business credit

22 report, you know.

23         MR. CALLIER:  Gotcha.

24         CARLOS:  In a year or two, you'll be

25 bankable, and you'll be able to get, you know, let's

1  say, half a million, a million dollars for, like, ten

2  years.  Right now, it's kind of impossible to come out

3  of the gate and be like, Hey, I want to five-, ten-year

4  terms, when, on the banking side, they don't have any

5  sort of (indiscernible) -- any proof that, you know, you

6  can pay off the loan.  It's sort of a catch-22, you

7  know.  (Indiscernible).

8                    MR. CALLIER:  Okay.

9                    CARLOS:  The term wasn't that bad either,

10 so -- but it -- it -- but it did help me build my

11 personal credit, and it's just like that.  I give that

12 example because, you know, business owners like

13 yourself, you know, you focus solely on building your

14 business.  And, obviously, you know, the financing

15 aspect is always like, Oh, shoot, I financed this all my

16 life; now I want to start building my business credit.

17 What do I do or what do I -- how I do begin, right?

18                    So, you know, we typically need four months

19 of bank statements from you and a signed application.

20 And I can generally get -- get it to underwriting and

21 get you an approval within 70- -- no, within 24 hours,

22 okay?

23                    MR. CALLIER:  Okay.

24                    CARLOS:  And, in regards to needing the

25 funds, how soon -- is this like a time-sensitive matter

1  or are you shopping around or --

2              MR. CALLIER:  No, no, no, no, I'm not

3  shopping around.  It's a -- I mean, I wouldn't call it

4  "time-sensitive."  If I, you know, get funded, then I'm

5  just going to use the money to put another truck on the

6  road.

7              CARLOS:  Oh, (indiscernible) --

8              MR. CALLIER:  So -- so yeah, that --

9              CARLOS:  (Indiscernible).

10             MR. CALLIER:  Go ahead.

11             CARLOS:  Sorry.  A lot of people are coming

12  to me right now, and, you know, can get 2-, 3-, 4-,

13  $5,000 each week on these tru- -- on, you know, the --

14  on the trucks, you know.

15             MR. CALLIER:  Right.

16             CARLOS:  It's there.  It serves -- the

17  money serves a purpose.  The loan serves a purpose.  You

18  know, it's fast.  You know, obviously -- are you putting

19  the money down as down payment to get in the truck or

20  are you -- how are you financing the truck?

21             MR. CALLIER:  So I -- I have the rest of

22  the money.  So I -- I would take, you know, the 50- from

23  you, if I were to get approved, and then take the rest

24  of the funds from my account and then just -- and just

25  buy the truck.

Brandon L. Callier - January 8, 2024          200

1                    CARLOS:  Okay.  All right.  How much is the

2       truck?  Like a-hundred-and-something?

3                    MR. CALLIER:  Yeah, it's like -- actually,

4       it's a little lower.  It's like 95- -- the one I want is

5       like 95-.

6                    CARLOS:  All right.  Well, you could,

7       actually, save your cash or savings and finance the

8       rest.  I could give you the -- the 40- -- you know,

9       50,000 as down payment and just finance the rest.  So,

10      not only are you building your credit both ways, the

11      equipment's in-hand (indiscernible).  But you're saving

12      yourself money on the back end as well, because you --

13      you keep that money, the -- the ones that are -- the

14      money that you'll be getting out of the savings.

15                   I'm assuming you're taking saving -- money

16      out of your savings account, right?

17                   MR. CALLIER:  Right.

18                   CARLOS:  So what I would do is, you know,

19      get you approved for the loan or, you know, vice versa.

20      You can do whatever you want.  You're the business

21      owner.  But, in my suggestion, you know -- obviously, it

22      takes a little bit longer, but, you know, it helps you

23      build -- it -- it's called "equipment leasing," okay?

24      And we -- we do have terms up to, like, four years.

25      However, it does take a little bit of time.

Brandon L. Callier - January 8, 2024          201

1          You -- this might be a little bit time-

2   sensitive.  Because of the business that you're in, you

3   might -- it might be a (indiscernible), right?  You

4   there?

5          MR. CALLIER:  Right.

6          CARLOS:  Okay.  So let -- let's start by

7   doing this.  I don't have anything in front of me in

8   regards to paperwork or anything.  Let me get four

9   months of bank statements from you and the application.

10  I think we can get to work, okay?

11         MR. CALLIER:  Okay.  Can you e-mail it --

12  the application to me?

13         CARLOS:  Yes, sir.  I'm going to send that

14  (indiscernible).  Can we get your -- your e-mail address

15  already?

16         MR. CALLIER:  It's my last name,

17  C-A-L-L-I-E-R, -74@gmail.com.

18         CARLOS:  Okay.  Did you also give that to

19  the account manager?

20         MR. CALLIER:  I don't recall if he asked me

21  for it or not.

22         CARLOS:  What's -- what's your cell phone

23  number?

24         MR. CALLIER:  (915) 383-4604.

25         CARLOS:  (915) 383-4604?

1          MR. CALLIER:  Yeah.

2          CARLOS:  Okay.  Let me text you right now,

3  okay?  Is that okay?

4          MR. CALLIER:  Yeah.

5          CARLOS:  All right.  Let me text you right

6  now and you can send me that e-mail.  Thank you.

7          MR. CALLIER:  All right.  Bye.

8          (Audio stopped.)

9     Q.   (BY MR. NEVAREZ)  So, do you remember that

10  conversation?

11     A.   I do not.

12     Q.   You don't?

13     A.   No.  But it obviously happened.

14     Q.   Yeah.  And -- and that was your voice?

15     A.   Yes.

16     Q.   Okay.  And that was related to that -- that

17  same phone number, 4064?  That -- that's what it said --

18     A.   I assume --

19     Q.   -- at the end --

20     A.   Well --

21     Q.   -- confirmed at the end?

22     A.   Yeah.

23     Q.   Right?

24     A.   Yes.

25     Q.   Okay.  So that seems like the same modus

Brandon L. Callier - January 8, 2024          203

1   operandis [sic] that -- that you performed on my

2   clients, JaScott Investments, as well as Mark Fawzy, as

3   well as Upwise.  You -- you called somebody.  In this

4   case, it was FDR Funding, Sam.

5        A.   I did not call FDR Funding.  They called me.

6        Q.   Okay.  Well, how did they get your number if --

7   how -- how is it that all -- you've got all these TCPA

8   lawsuits that seem to call you?

9        A.   You can ask your clients where they got my

10  phone number.

11       Q.   Well, they got it from Max Williams because you

12  called Max Williams.

13       A.   I did not call Max Williams.

14       Q.   Well, you den- -- you denied knowing who Max

15  Williams was, and it's in your petition --

16       A.   Sir --

17       Q.   -- your complaint.

18       A.   -- that was written a -- a year ago -- over a

19  year ago.  I hadn't heard Max Williams' name until

20  today.  I did not remember.  I do not know Max Williams.

21  And it may be in the complaint, but that doesn't mean

22  that I know or remember Max Williams.  And I can assure

23  you, I never at one time called Max Williams.  There's

24  no outbound phone call to Max Williams.  And there's no

25  outbound phone call to FDR Funding.

1    Q.   Well, how -- how do you think they -- FDR

2  Funding got your name -- Sam?  Same way Max Williams got

3  your number?

4    A.   I can't spec- -- if -- I can't speculate on how

5  FDR Funding got my phone number.  I do know that there

6  are unscrupulous lead generators that sell contact

7  information.

8    Q.   It seems to be highly coincidental that, in --

9  in both cases, there's discussion about $60,000 loan,

10  $50,000 loan for buying trucks and you're shopping

11  around, is your -- is your term.

12    A.   No, I was -- sorry.

13    Q.   So it -- it seems like the same MO.  You

14  somehow engage companies to try to borrow 50-, $60,000

15  as a business loan for trucks.  You're not even in the

16  trucking business, right?

17    A.   Correct.

18    Q.   And you engage them in discussions about a loan

19  application, you confirm your e-mail.  You don't tell

20  them, Don't call me, I -- I don't want the loan.  But

21  then -- I don't know.  Did you -- did you sue FDR

22  Funding?

23    A.   I did not.

24    Q.   Did you sue that -- that Carlos, Fun Cubes, or

25  whatever that --

Brandon L. Callier - January 8, 2024          205

1      A.   No, I did not.

2      Q.   Did you tell them, Do not call?

3      A.   I don't recall if that's the only phone

4  conversation I've ever had with them or not, so I

5  can't -- I can't answer that question.

6      Q.   It -- well, was that one of the exhibits that

7  we passed around?

8      A.   It was not.

9      Q.   So there's other phone calls that you've made

10  soliciting business loan applications?

11      A.   Sir, I'm going to correct you again:  I did not

12  call FDR Funding.

13      Q.   Well, they called you.  They -- we -- we know

14  they called you.

15      A.   You just said that I called them.

16      Q.   Yeah.  I deny -- I'm trying to figure out --

17      A.   There's another couple things that we need to

18  correct from your initial statements that weren't

19  questions.

20      Q.   Okay.  That's fine.  I -- I'm trying to figure

21  out how companies keep getting your phone number.

22      A.   Sir, you just played a clip from a company

23  that, presumably, is not related to this case, and you

24  have a recording from them.  Maybe you should ask them

25  where they got my phone number.

ACR Ink, LLC

```
1        Q.   Well, no, I'm -- I'm trying to find out from
2   you, because that -- that seems to be your MO:   You
3   solicit a business loan and -- and you -- you tell them
4   to e-mail you the application, you fill out a loan
5   application, and then -- I don't know -- you turn around
6   and sue them, like you sued my client, when they're
7   trying to give you a loan for 50,000 that you requested.
8              MR. MILTENBERGER:   Objection to the form.
9   Is there a question there?
10       Q.   (BY MR. NEVAREZ)   So I -- is that -- does that
11  not appear to be your modus operandis here?
12             MR. MILTENBERGER:   Objection to the form of
13  the question, compound, soliloquy leading up to a
14  question.
15       A.   Sir, at the beginning of that phone call, I
16  clearly expressed that that is showing up as "Upwise" on
17  my caller identification.  I had sued Upwise two months
18  prior and had them served -- excuse me -- sued JaScott
19  and Pac Western -- at this time, I didn't know there was
20  a differentiation between the two -- had the company
21  served.  So, in my mind, I'm thinking -- I can guarantee
22  you what I'm thinking is:  Wait a minute, this company
23  that I just sued and served is calling me?  Yes, I
24  played along.  And then the guy, on two different
25  occasions, indicated he was using some type of
```

1  autodialer.  So yes, I played along to figure out if

2  that was Upwise or not.

3      Q.  (BY MR. NEVAREZ)  You're -- you're saying that

4  that phone call was the result of an autodialer?

5      A.  I'm saying that he indicated -- he said twice,

6  on two different occasions, that he used some type of

7  dialer to call me, and he said that the phone number was

8  spoofed.

9      Q.  Well, I don't think he said that.

10     A.  Well, he didn't use the word "spoofed," but he

11 said he -- you can play it back.

12     Q.  Well, he said he used a VOIP.  You know what a

13 VOIP is, right?  Voiceover internet protocol?

14     A.  Okay.  Well, I don't have any VOIP, so I wasn't

15 quite sure about that.  What I do -- what I am sure of

16 is that he explicitly said that the number that showed

17 up on my caller ID was not the number that he had called

18 me from -- or that was used to transmit and call me.

19     Q.  Well, no, that's not what he said.  He -- he

20 said -- you said, The number that shows up on my end is

21 from Upwise.

22     A.  That's what I said.

23     Q.  Yes.  And he said, Well, that's because we're

24 using the VOIP.  Let's play that again.

25              (Audio played.)

```
1              MR. CALLIER:  Hello.
2              SAM:  Hi.  Brandon?
3              MR. CALLIER:  This is Brandon.
4              SAM:  (Indiscernible) Sam over here with
5   FDR Funding.  How are you today, sir?
6              MR. CALLIER:  I'm good.  Who's this?
7              SAM:  Sam with FDR Funding.  So we spoke
8   about a week ago.  You mentioned you had -- you said you
9   had an opera- (indiscernible).
10             MR. CALLIER:  FDR Funding?
11             SAM:  FDR Funding, right.
12             MR. CALLIER:  Oh.  Did you used to be with
13  Upwise?  Because I -- I have it saved in my phone as
14  "Upwise."
15             SAM:  Upwise?  Okay.  That's probably
16  because the internet dialer I'm using (indiscernible).
17  We gotta call a lot of people, so we (indiscernible).
18             MR. CALLIER:  I'm sor- --
19             (Audio stopped.)
20     Q.  (BY MR. NEVAREZ)  See what he's saying?  The
21  internet dialer, it's -- it's a voiceover internet
22  protocol phone.  Do -- do you understand what that is?
23     A.  I understand that he called me -- well, the
24  number that showed up on my phone was not the number
25  that belonged to him.
```

Brandon L. Callier - January 8, 2024          209

1     Q.   Well, it -- he said it -- it belonged to --
2  that he was calling from FDR Funding.  He was using a
3  phone that showed up in your end as "Upwise," right?
4     A.   He was using a phone that showed up on my end
5  with a number that belonged to Upwise.
6     Q.   Exactly.  Okay.
7     A.   He didn't say that number belonged to him.
8     Q.   And he didn't say it didn't belong to him
9  either.  But you said it -- it was an autodialer.
10    A.   He twice said he used a dialer.
11    Q.   Well, but it wasn't an autodialer.
12    A.   I don't know what it is, because we haven't had
13 access to the system that was used to call me, because
14 this is the first time we've been presented with
15 anything related to FDR in this case.
16    Q.   Right.  Okay.
17    A.   So I can't say --
18    Q.   But do you --
19    A.   -- whether it's an autodialer or not.
20    Q.   Do you know what a -- a VOIP number is?
21    A.   I don't use a VOIP number.  I'm not exactly
22 sure what a VOIP number is.  I just know that he said
23 "dialer" twice.
24    Q.   Okay.  All right.  So --
25    A.   He didn't -- yeah, go ahead.  Sorry.

Brandon L. Callier - January 8, 2024          210

1    Q.  Yeah, no.  Well, I didn't -- I -- I mean, I'm

2  -- I'm wondering, how -- how do these people get your

3  phone number.  And -- and I know you don't know.  I --

4  I'm trying to -- I'm wondering why people have your

5  number, they call you, and instead of saying, Do not

6  call ever again, I'm on the "Do Not Call" registry, you

7  just did the same thing that you did to my client,

8  JaScott Investments and -- and Mark Fawzy.

9    A.  Are you asking me a question?

10    Q.  You -- yes, I am.  And -- and, instead of

11  telling them, I'm not interested in a business loan for

12  $50,000 for trucks, because I'm not in the trucking

13  business, you play along and you conceal the fact that

14  you're really not interested in -- in doing a loan, but

15  you don't tell them and then you turn around and sue

16  them after enticing them --

17            MR. MILTENBERGER:  Mike, is there a

18  question there?  I mean --

19            MR. NEVAREZ:  Don't -- don't -- please

20  don't interrupt me.

21            MR. MILTENBERGER:  I -- I am --

22            MR. NEVAREZ:  State your objection.  State

23  your objection.

24            MR. MILTENBERGER:  Objection,

25  uncomprehensible [sic].  You're making long soliloquies

1    and then, at the end, trying to ask some question that

2    incorporates that long soliloquy.  And I'm not going to

3    let the record be unclear.

4                    MR. NEVAREZ:  Okay.  Fine.

5         Q.   (BY MR. NEVAREZ)  So you -- you engage them in

6    this conversation over a business loan application and

7    you don't tell them that you're really not interested in

8    a $50,000 loan.  So do you do that with all of your TCPA

9    cases -- in all your TCPA cases?

10        A.   Do I do what, sir?

11        Q.   Do you -- do you have this $50,000 loan,

12   $60,000 loan for trucks in -- in the process?  You're

13   engaging people to process a loan un- -- for you for

14   50-, 60-thou- -- and then you sue them under TCPA?  Is

15   that -- is that part of the factual scenario?

16                   THE WITNESS:  Can I interrupt him?

17                   MR. MILTENBERGER:  No, you can --

18                   THE WITNESS:  Okay.

19                   MR. MILTENBERGER:  He can state and then

20   you can ask him to repeat if you don't understand his

21   lengthy question.

22        Q.   (BY MR. NEVAREZ)  Is that part of --

23        A.   Sir, I am getting lost --

24        Q.   Okay.

25        A.   -- in all of your -- you go on for five

1    minutes, seemingly, and -- and hurl 15 different things

2    at me.  I cannot keep them straight in my head.

3          Q.   You cannot keep what straight?

4          A.   Everything that you are asking.  If you can

5    break these things down into one question at a time and

6    allow me to respond, because, when you go for two or

7    three or four or five minutes uninterrupted and ask five

8    or ten different questions, it makes it difficult for me

9    to keep straight what you're asking me.

10         Q.   My -- so my question to you is:  In your TCPA

11   cases, are -- is this the same modus operandi where

12   you're discussing business loans with people and then

13   you sue them afterwards?

14         A.   Sir --

15         Q.   That's a "yes" or "no."

16         A.   No.

17         Q.   Okay.  So how is it that -- that these $50,000

18   loans appear like they did in -- for my client's case

19   and for Sam at FDR Funding, and you don't tell them, I'm

20   not interested in $50,000?  Why don't you tell these

21   people that?

22              MR. MILTENBERGER:  Been asked and answered.

23   Objection.

24         A.   Sir, with respect to FDR, you have access to

25   them that I do not have.  And, if you would like to know

Brandon L. Callier - January 8, 2024        213

1   how I got their phone number -- or excuse me -- how they

2   got my phone number, then direct that question to them.

3   They're the ones in the best position to answer the

4   question.  With respect to me fi- -- this last question,

5   less than 5 percent -- less than 4 percent of the

6   cases -- TCPA cases that I have filed involve MCA

7   companies.  And I filed cases against less than 4

8   percent of the -- or probably less than 2 percent of the

9   MCA cases -- or companies that called me.

10                The cases like your client that ignore

11  repeated "do not call" requests are the companies that I

12  went after.  If your company had honored any one of the

13  "do not call" requests that I made to them, we probably

14  would not be sitting here.

15                MR. NEVAREZ:  Okay.  Well I am going to

16  reserve the rest of my time, because I -- I'm just going

17  to have to open up a whole 'nother train, okay?

18                MR. MILTENBERGER:  Yeah, that's okay.

19  That's fine.

20                VIDEO TECHNICIAN:  Want to go off the

21  record?

22                MR. NEVAREZ:  Yeah, off the record.

23                VIDEO TECHNICIAN:  Off the record at 4:33.

24                MR. MILTENBERGER:  Well, wait.  Let --

25  let's go back on the record real quick.  It doesn't need

Brandon L. Callier - January 8, 2024          214

1   to be this.  But just confirming that we'll regroup on

2   Friday?

3               MR. NEVAREZ:  Well, we don't have to go on

4   the record for that.  I can confirm it to you right now.

5               MR. MILTENBERGER:  Okay.  We'll regroup on

6   Friday after Mitchell Cox's deposition?

7               MR. NEVAREZ:  Right.

8               MR. MILTENBERGER:  Okay.

9               MR. NEVAREZ:  We'll just stay on the line,

10  I guess.

11              MR. MILTENBERGER:  Yeah.

12              (Deposition adjourned at 4:34 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3   STATE OF TEXAS     )

4   COUNTY OF EL PASO  )

5

6

7

8        I, Ginger G. Zachary, Registered Professional

9   Reporter, Certified Realtime Reporter, and Certified

10  Shorthand Reporter in and for the State of Texas, and

11  Melody C. Joiner, Certified Shorthard Reporter, hereby

12  Certify that this transcript is a true record of the

13  said proceedings, and that said transcription is done to

14  the best of my ability.

15        Given under my hand and seal of office on

16  January 22, 2024.

17

18  Ginger G. Zachary, CSR          Melody C. Joiner, CSR
    Texas Cert. No. 5710            Texas Cert. No 5525
19  Date of Exp:  1/31/2026         Date of Exp:  10/31/2024
    ACR INK, LLC                    ACR INK, LLC
20  221 North Kansas Street,        221 North Kansas Street,
    Suite 505                       Suite 505
21  El Paso, Texas 79901            El Paso, Texas 79901
    Ph.:  915.542.3422              Ph.:  915.542.3422

22

23

24

25

**CORRECTIONS AND SIGNATURE**

**BRANDON LATREULL CALLIER**                    **JANUARY 8, 2024**

PAGE   LINE   CORRECTION                REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

1    I, **BRANDON LATREULL CALLIER**, have read the

2  foregoing deposition and hereby affix my signature that

3  same is true and correct, except as noted above.

4

5                          _____

6                          **BRANDON LATREULL CALLIER**

7  THE STATE OF TEXAS )

8  COUNTY OF EL PASO  )

9

10    Before me, _____, on this

11  day personally appeared **BRANDON LATREULL CALLIER** known

12  to me (or proved to me under oath or through

13  _____) (description of identity card or other

14  document) to be the person whose name is subscribed to

15  the foregoing instrument and acknowledged to me that

16  they executed the same for the purposes and

17  consideration therein expressed.

18    Given under my hand and seal of office this

19  _____ day of _____, _____.

20

21                          _____
                           NOTARY PUBLIC IN AND FOR
22                          THE STATE OF TEXAS

23  My commission expires: _____

24

25