```
 1         IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                   EL PASO DIVISION

 3   BRANDON CALLIER,            )
                                 )
 4                               )
                 PLAINTIFF,      )
 5                               )
     VS.                         ) CIVIL ACTION
 6                               )
                                 ) NO. 3:22-cv-00301-FM
 7   JASCOTT ENTERPRISES, LLC,   )
     et al.,                     )
 8                               )
                                 )
 9                               )
                 DEFENDANTS.     )
10

11       ------------------------------------

12              ORAL DEPOSITION OF

13              MITCHELL SCOTT

14              JANUARY 12, 2024

15       ------------------------------------

16

17       ORAL DEPOSITION OF MITCHELL SCOTT, produced as a

18   witness at the instance of the PLAINTIFF, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on the 12th of January, 2024, from 9:34 a.m. to 12:06

21   p.m., via Zoom video teleconference, pursuant to the

22   Federal Rules of Civil Procedure.

23

24                                 Reported By:

25                                 Melody C. Joiner, CSR
```

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3        Mr. Chris R. Miltenberger (via Zoom)
          THE LAW OFFICE OF CHRIS R. MILTENBERGER, PLLC
 4        1360 N. White Chapel, Suite 200
          Southlake, Texas 76092
 5        (817) 416-5060
          chris@crmlawpractice.com
 6

 7   FOR THE DEFENDANTS:

 8        Mr. Michael Nevarez (via Zoom)
          THE NEVAREZ LAW FIRM, PC
 9        7362 Remcon Circle
          El Paso, Texas 79912
10        (915) 225-2255
          mnevarez@lawofficemrn.com
11

12

13                         INDEX
                                                     PAGE
14   Appearances....................................... 2

15   MITCHELL SCOTT

16        EXAMINATION BY MR. MILTENBERGER................ 3
          EXAMINATION BY MR. NEVAREZ..................... 55
17        FURTHER EXAMINATION BY MR. MILTENBERGER........ 86
          FURTHER EXAMINATION BY MR. NEVAREZ............. 96
18

19   Reporter's Certificate ........................... 99
     Changes and Signature page .......................100
20

21

22

23

24

25
```

Mitchell Scott - January 12, 2024

1          THE REPORTER:  My name is Melody Joiner,

2     Texas CSR Number 5525.  I am located in my office in

3     El Paso, Texas.  Our witness, Mitchell Scott, is located

4     in Eden Prairie, Minnesota.

5                    MITCHELL SCOTT,

6     having been first duly sworn, testified as follows:

7                     EXAMINATION

8     BY MR. MILTENBERGER:

9          Q.  Mr. Scott, my name is Chris Miltenberger.  And

09:34AM  10  I'm an attorney representing Brandon Callier in his TCPA

11    lawsuit against JaScott Investments, one of the

12    defendants.  When we talk today about JaScott -- how do

13    you say it, first?  Is it JaScott?

14         A.  You got it.  Yeah, correct.

09:34AM  15       Q.  When we talk about JaScott Investments, we

16    understand that that references JaScott Investments,

17    LLC, okay?

18         A.  Correct.  Yeah.

19         Q.  And are you the owner of JaScott Investments?

09:35AM  20       A.  Correct.  Yes.

21         Q.  Are you the sole owner?

22         A.  Yes.

23         Q.  And do you have a position with JaScott

24    Investments, employment position?

09:35AM  25       A.  Yeah.  Are you -- are you asking me if I

```
 1   collect a paycheck from JaScott Investments?

 2       Q.   I'm trying to determine if you make the

 3   decisions and you're running the JaScott Investments.

 4       A.   I do make the decisions, and I do run JaScott

 5   Investments.

 6       Q.   Does anybody else make the decisions for

 7   JaScott Investments?

 8       A.   No.

 9       Q.   And how long have you been the owner and the

10   person making the decisions on behalf of JaScott

11   Investments?

12       A.   I believe since 2019.

13       Q.   And, at some point in time, JaScott Investments

14   hired a firm over in Bangladesh to work as its customer

15   service representatives; is that right?

16       A.   That is correct.

17       Q.   And Mark Fawzy was one of those individuals

18   that was assigned to work as a customer service

19   representative on behalf of JaScott Investments,

20   correct?

21       A.   So I want to clarify that:  So my relationship

22   was with the company called Synagis -- probably not

23   saying it right, but Synagis [sic] -- so we hired

24   Synagis, and they are the ones that hired Mark Fawzy to

25   rep- -- to contract with us.  So my contract was
```

09:35AM (line 5)
09:35AM (line 10)
09:36AM (line 15)
09:36AM (line 20)
09:36AM (line 25)

Mitchell Scott - January 12, 2024

1   actually with Sygnius -- sorry -- Sygnius Group.  And

2   they are the ones who gave us Mark Fawzy as a

3   representative to take on that task.

4       Q.   So they gave you Mark Fawzy to work as a

09:36AM   5   customer service representative on behalf of JaScott

6   Investments, correct?

7       A.   Correct.  Correct.  So we called them

8   customer --

9       Q.   You -- you can just answer my question.  If I

09:36AM   10   want you to explain, I'll ask you to explain.  But it

11   will go quicker if you just answer my question, okay?

12      A.   So, to clarify, my -- what you're asking me, we

13   referred to them internally as "customer care

14   representatives," but they refer to that position as a

09:37AM   15   "chaser."  So their role was to chase down the

16   documents.  So I apologize, Mr. -- how do you say your

17   name, sir?  I'm sorry.  Is it Miltenberger?

18      Q.   Miltenberger, that's correct.

19      A.   So, sorry.  Sorry.  But that -- your question

09:37AM   20   needed a little bit more clarification, because I want

21   to be as -- as clear as possible, that -- of what they

22   were referred to.  So that -- that's why I went more.

23      Q.   So you referred to them as a "customer service

24   representative," and they referred to them as a

09:37AM   25   "chaser"?

Mitchell Scott - January 12, 2024

1       A.    "Chaser," yeah.

2       Q.    And, as a customer service representative, they

3  were speaking with potential customers of JaScott

4  Investments, correct?

09:38AM  5       A.    Correct.

6       Q.    And you hired that firm in Bangladesh because

7  it was cheaper than hiring U.S. employees to fill that

8  role as customer service representative, correct?

9       A.    In part.  Also, because they had systems and

09:38AM 10  processes already in place.  And, in order for me to --

11  to duplicate those systems and processes, I would have

12  to have a lot more resources, opposed to -- to one

13  person and build that out myself.  So it was more --

14  cheaper, yes.  But the process and systems were already

09:38AM 15  in place.

16       Q.    And you gave -- or you allowed Mr. Fawzy to use

17  a JaScott Investments e-mail address, correct?

18       A.    Correct.

19       Q.    And you allowed Mark Fawzy to use the JaScott

09:38AM 20  Investments phone number, correct?

21       A.    So that was not a JaScott phone number.  Our

22  number is a 214 number.  It's an 877 number.  It's a

23  completely different phone system.  He wasn't -- he

24  didn't have access to our phone system.

09:39AM 25             In order to -- in order to kind of monitor

Mitchell Scott - January 12, 2024

1   or -- or at least be aware of what they were doing, I

2   did purchase a phone number, a VOIP separate from the

3   JaScott number, and I -- and I gave that to them and

4   they made phone calls on that.

09:39AM  5       Q.   Okay.  So, just so I'm clear, JaScott

6   Investments, when you say "I," you're meaning you on

7   behalf of JaScott Investments, right?

8       A.   Correct -- sorry about that -- investments.

9       Q.   So JaScott Investments purchased the phone

09:39AM  10  number for Mark Fawzy to use as a customer service

11  representative for JaScott Investments, correct?

12      A.   Correct.

13      Q.   Now, I am going to share my screen with you.

14  Can you see that shared screen?

09:40AM  15      A.   I can, yes.

16      Q.   And can you see the document?  Looks like it's

17  a text back and forth with Brandon Callier, correct?

18      A.   Correct.

19      Q.   And, up at the top, it says "Mitchell Scott,"

09:40AM  20  correct?

21      A.   Correct.

22      Q.   So were you actually the one doing that

23  texting?

24      A.   No.

09:40AM  25      Q.   That texting was being done by Mark Fawzy,

1    right?

2         A.    Correct.

3         Q.    And that's the telephone number that you --

4    that JaScott Investments purchased for Mark Fawzy to use

09:41AM   5    on behalf of JaScott Investments, right?

6         A.    Yes.

7         Q.    So all of the communications Mark Fawzy had

8    connected with this suit, they were on behalf of JaScott

9    Investments, right?

09:41AM   10        A.    From the time period of April, correct.

11        Q.    Because, at some point in time, you were

12   disengaged with that company in Bangladesh?

13        A.    Correct.

14        Q.    Now, Mark Thurber was also making

09:41AM   15   communications on behalf of JaScott Investments, wasn't

16   he?

17        A.    He was making communications on behalf of

18   himself.  So -- so my relationship with Thurber, which

19   is Upwise, is that I have the ability to do deals of my

09:42AM   20   own, right?  And I have my own personal -- not only can

21   we issue out loans, but we have the ability to have our

22   own private investors that handle loans, okay?  So my

23   relationship with Thurber, or Upwise, is -- so --

24   sorry -- Investments has the ability to issue loans, and

09:42AM   25   we -- and we -- Investments has its own private

Mitchell Scott - January 12, 2024

1    investors that we work with.

2              So, when we have a situation such as

3    Brandon, where you have multiple bankruptcies, it's

4    not -- it's not a loan that we want to do, so we go --

09:43AM  5    we work with Upwise, who has a lot more vendors than we

6    do, and then they have ISO agreements with these --

7    "they," as in Upwise, have ISO agreements with those

8    vendors, and they can get the deal done.

9              And then what we do is, if -- if Upwise is

09:43AM  10   able to close a deal, we had an informal relationship

11   where I would get, like, a referral fee.

12        Q.   And how much of a referral fee would you get

13   for the loan that you proposed to Mr. Callier?

14        A.   30 percent.

09:43AM  15        Q.   30 percent of what?

16        A.   Of whatever commissions Western agreed to pay

17   Upwise.

18        Q.   And do you know how much those commissions

19   would have been on that loan to Mr. Callier?

09:43AM  20        A.   I do not know for sure.

21        Q.   So Upwise and JaScott Investments would share

22   the commissions if the deal got closed, right?

23        A.   We would get a referral fee, yes.

24        Q.   Now, who is Max Williams?

09:44AM  25        A.   Max Williams worked for a company called Green

1    Arrow.

2        Q.   And how did you get Mr. Callier's name from Max

3    Williams?

4        A.   So I don't have a direct relationship with Max

09:44AM  5    Williams.  I have a relationship with the owner of Green

6    Arrow.  And when they have deals that they don't want to

7    do or that they can't do, they send them over to JaScott

8    Investments.  "They," as in Green Arrow, when they have

9    deals that they can't do or they -- they don't want to

09:45AM  10   do, they send them over to JaScott Investments to see if

11   we can do them.

12            So I got -- how I collected his information

13   was we have a -- a spreadsheet that we are given where,

14   if they have X amount of leads this particular day that

09:45AM  15   they think is going to be a good fit for us, they put

16   them on this spreadsheet.  I get these spreadsheets, and

17   then I send them out to my team.

18       Q.   So let me see if I understand you correctly:

19   Green Arrow somehow got Mr. Callier's name and they

09:45AM  20   didn't think the deal for them was a -- was a fit, and

21   they sent it to you to see if you could do a deal with

22   Mr. Callier; is that right?

23       A.    I can't speak to their business model, but my

24   understanding is they give me leads that they don't --

09:45AM  25   they can't handle or they don't want to do, and then --

Mitchell Scott - January 12, 2024

<br>

1    Q.   And Mr. -- and Mr. Callier was one of those

2  leads, correct?

3    A.   Correct.

4    Q.   So, prior to receiving Mr. Callier's

09:46AM  5  information from Green Arrow, you didn't have any

6  relationship with Mr. Callier, did you?

7    A.   I did not.

8    Q.   And JaScott Investments -- again, when I say

9  "I," JaScott Investments didn't have any relationship

09:46AM  10  with Mr. Callier prior to that time, did it?

11    A.   Correct.

12    Q.   So, prior to calling Mr. Callier, JaScott

13  Investments had no business with Mr. Scott -- I mean,

14  Mr. Callier, did it?

09:46AM  15    A.   Correct.

16    Q.   And so that first call to Mr. Callier was a

17  cold call on behalf of JaScott Investments, right?

18    A.   I disagree.

19    Q.   Why do you disagree?

09:46AM  20    A.   Because we were given -- when I think of the

21  word "cold call," it is something where I don't have any

22  information on the caller going into a relationship, and

23  I pick up a call to try to sell that particular person

24  on getting a loan.

09:47AM  25          My relationship with Green Arrow was I knew

1    what his revenue was, his -- the amount of time he had

2    been in business.  I knew what his -- his credit score

3    was, why he wanted the money, how much money he was

4    looking for.  So all of that information was the reason

09:47AM   5    why we sent out an e-mail and called to see if he was

6    interested.  Mr. -- Mr. Callier -- we got all that

7    information from Mr. Callier prior to us ever picking up

8    the phone call or sending out an e-mail.

9         Q.   So you did some background -- you had some

09:47AM   10   background information on Mr. Callier before you made

11   that first call to him, correct?

12        A.   Mr. Callier provided all that information to

13   Green Arrow, correct.

14        Q.   But he didn't provide it to you, did he?

09:47AM   15   A.   No.

16        Q.   And how did he provide it to Green Arrow?

17        A.   It's my understanding it was provided multiple

18   different times.  And Web Leads was one of the ways that

19   they got that information, as well as, I believe, via

09:48AM   20   phone call.

21        Q.   Say the first one again?  Web-what?

22        A.   Web Leads.

23        Q.   Web Lease?

24        A.   Web Leads, L-E-A-D-S.

09:48AM   25   Q.   So I'm assuming you believe that Mr. Callier

Mitchell Scott - January 12, 2024

```
 1    put information into Web Leads and that was sent to
 2    Green Arrow somehow?
 3         A.   Yes.
 4         Q.   And then Green Arrow sent that information to
 5    you, correct?
 6         A.   Correct.
 7         Q.   Now, do you know if you have a signed, written
 8    consent from Mr. Callier for you to call him about a
 9    loan?
10         A.   I do not.
11         Q.   And do you know if Green Arrow has a signed
12    written consent from Mr. Callier to call him about a
13    loan?
14         A.   "A signed" or Web Leads or -- or did he fill
15    out information online?  I guess I really can't speak to
16    Green Arrow's business arrangements.  I know that
17    they -- that that information was provided by
18    Mr. Brandon, yes.  I know that, but I can't confirm if
19    it was signed or not.
20         Q.   And -- and you don't have any signed consent
21    for JaScott Investments to call him, do you?
22         A.   What I have is the verbal agreement -- the
23    verbal that, when we called him and asked if he was
24    looking for a loan, he said "yes."  That is what I have
25    as -- as proof that he was interested in getting a loan.
```

09:48AM (line 5)
09:48AM (line 10)
09:49AM (line 15)
09:49AM (line 20)
09:49AM (line 25)

Mitchell Scott - January 12, 2024

1   And then he corroborated the story on that -- on that

2   phone call with what we received from Green Arrow.

3        Q.   Okay.  But, prior to that first phone call, he

4   did not give JaScott Investments consent to call him,

09:50AM  5   did he, prior to the first phone call?

6             MR. NEVAREZ:  Objection, calls for

7   speculation.

8        Q.   (BY MR. MILTENBERGER)  You can tell me what you

9   know.  If he did, you can tell me how he did.  Did --

09:50AM 10   prior to the first phone call, did he give JaScott

11   Investments permission to call him?

12       A.   As part of the relationship with Green Arrow,

13   it is -- the one thing that they ask is -- the one thing

14   that they say is, We're going to get -- We thank you for

09:50AM 15   getting your information.  We're going to have someone

16   reach out to you.  And they are going to be able to help

17   you with this loan.  And they asked if that was okay.

18             That is standard process for Green Arrow.

19   So I believe that verbal consent was given.

09:51AM 20       Q.   To Green Arrow?

21       A.   To Green Arrow, for us to follow up with a

22   phone call.  That is -- that is standard operating

23   procedures between our two organizations.

24       Q.   Okay.  So that's standard operating procedure;

09:51AM 25   meaning, that should happen.  But you don't have any

```
 1  evidence and don't know that that did happen, do you?
 2      A.  We do not -- we no longer- I do not have that
 3  tape-recorded phone call.  So, correct, I don't have
 4  that -- that recorded information for that --
 5      Q.  So when you -- when you get in front of the
 6  jury, you're not going to be able to raise your hand and
 7  swear and say, "I know for certain that Mr. Callier told
 8  Green Arrow that it was okay for someone to call him,"
 9  are you?
10      A.  Correct.
11      Q.  Now, after you received that information from
12  Green Arrow, what did you do with it?
13      A.  That information is -- is populated on a
14  spreadsheet.  I took the -- the lead from Mr. Callier,
15  and I put it in our system that generates a standard
16  e-mail.  So, once I download it into my system, an
17  e-mail from our referral system goes out to everybody
18  that we've got leads from that day.  And it's generic
19  information introducing the company, as well as
20  highlighting where we got the information from and the
21  information that was communicated to us by the web lead
22  or, you know, the refer- -- our referring partner.
23      Q.  And what did you do with the phone number,
24  then?
25      A.  I didn't do any- -- what do you mean?  I don't
```

09:51AM (line 5)
09:51AM (line 10)
09:52AM (line 15)
09:52AM (line 20)
09:53AM (line 25)

Mitchell Scott - January 12, 2024

```
 1  think I understand.
 2       Q.   Well, how did the telephone call get generated?
 3  I want to follow the trail from you receiving
 4  Mr. Callier's phone number to how someone actually made
 5  a call to Mr. Callier.  What did you do with that
 6  telephone number?
 7       A.   That information, like I said, is uploaded to a
 8  spreadsheet that we all share.  And, when it's on that
 9  spreadsheet, we share -- that information is
10  communicated via spreadsheet to, in this scenario,
11  Sygnius Group.
12       Q.   And then Mark Fawzy picked that phone number up
13  from that spreadsheet and he called Mr. Callier,
14  correct?
15       A.   Correct.
16       Q.   And he did that as a customer service
17  representative for JaScott Investments, correct?
18       A.   He did that on behalf of JaScott Investments,
19  correct.
20       Q.   Now, prior to that phone call, you don't have
21  any evidence that Mr. Callier knew Mark Fawzy, do you?
22       A.   I do not.
23       Q.   So, from Mr. Callier's viewpoint, he was
24  receiving a cold call from someone he didn't know,
25  right?
```

09:53AM (lines 5, 10, 15, 20)
09:54AM (line 25)

1          MR. NEVAREZ:  Objection, calls for

2     speculation.

3          Q.   (BY MR. MILTENBERGER)  You can answer.

4          A.   I -- I disagree.  From his perspective, he knew

09:54AM  5     that he communicated this information earlier, that --

6     and multiple times, as a matter of fact, for multiple

7     companies.  And he knew he communicated this information

8     to -- to someone and was told that that information --

9     that they were going to call back.

09:54AM  10          And, if you hear the first recording, he

11    says, I got -- I got a call from someone, and he says, I

12    heard you was looking for a loan, and Mr. Callier said

13    "yes."  So, in terms of speculation, I have every reason

14    to speculate that that call did happen, and that he

09:55AM  15    communicated those facts to Green Arrow, who

16    communicated those facts to us.

17          Q.   Okay.  I understand that's what you believe,

18    and the jury will get to decide that.  But, when

19    Mr. Callier received the call from Mr. Fawzy, he had no

09:55AM  20    idea who Mr. Fawzy was, did he?

21          MR. NEVAREZ:  Objection, calls for

22    speculation.

23          Q.   (BY MR. MILTENBERGER)  You can answer.

24          A.   I -- I'm answering that question.  He was told

09:55AM  25    that -- he -- he put information out there to get a

1  callback for a loan.  He was called back.  And, on that

2  first call, they said, This is Mark; I've received

3  information from someone that says you're looking for a

4  loan.  He communicated "yes."

09:55AM  5        That, to me, has -- I -- I don't see how

6  that was a cold call.  In my -- from my perspective, if

7  I'm cold-calling you, I'm asking, Hey -- I'm trying to

8  sell you on the idea that you need to take the loan, not

9  that that demand was already there.  So -- so --

09:56AM  10    Q.  Okay.  I -- I understand we disagree about a

11  cold call, and -- and that's okay that we do.

12        At some point in time, after Mr. Fawzy

13  communicated by text -- well, let me back up:  The phone

14  calls were on behalf of JaScott Investments from

09:56AM  15  Mr. Fawzy, right?

16    A.  In the month of April, correct.

17    Q.  And, in the month of April, the texts that

18  Mr. Fawzy sent to Mr. Callier were on behalf of JaScott

19  Investments, correct?

09:56AM  20    A.  Correct.

21    Q.  And the e-mails that Mr. Fawzy used was a

22  JaScott Investment e-mail address, correct?

23    A.  Correct.

24    Q.  So anybody that communicated with Mr. Fawzy

09:57AM  25  regarding your company, it would appear to them that

 1    Mr. Fawzy's a representative of your company, right?

 2        A.   Correct.

 3        Q.   Now, at some point in time, Mr. Callier text

 4    Mr. Fawzy and said, No more calls, no more texts; please

09:57AM   5    don't call me or text me anymore.

 6             Did you see that text?

 7        A.   No.  And I don't believe that text occurred

 8    in -- in the fashion in which you're -- you're saying it

 9    did.

09:57AM  10        Q.   Have you seen that text?

11        A.   I have seen that text when I got the -- when I

12    received the information from the -- from being served,

13    was the first time I saw that text.

14        Q.   So Mark Fawzy received that text, but you

09:57AM  15    didn't receive it, right?

16        A.   Could you repeat that question?

17        Q.   Yes.  Mark Fawzy received the text from

18    Mr. Callier, but you personally didn't receive it,

19    correct?

09:58AM  20        A.   Correct.

21        Q.   And Mark Fawzy was told, Don't call or text me

22    anymore, correct?

23        A.   No.  He -- he was told, I don't know who you

24    are.  So, after -- after Callier said that, I'm going

09:58AM  25    to -- I want to accept the loan -- after Callier said --

1  in -- in the DocuSign, he communicated an e-mail --

2  well, he communicated in the DocuSign, I agree to accept

3  the terms of this loan.  Only thing I don't like is that

4  you're going to look into my account, but I accept the

09:58AM  5  terms of this loan.  He received an e-mail -- a text

6  message saying, I don't know who you are.

7          So no, that -- in the way you're phrasing

8  that, that didn't happen.  And -- and we were trying to

9  clarify, Yes, you do know who we are.  You've sent in

09:58AM  10  the application.  You've sent in your bank statements.

11  You sent in a voided check.  You told me you were going

12  to move forward with the loan at the lake.  We -- we

13  were calling for that.

14      Q.  Okay.  So, after Mark Fawzy received the text

09:59AM  15  that said, Stop calling or texting me, Mark Fawzy

16  continued to call and text, correct?  Did he or did he

17  not?

18      A.  Mark Fawzy received a text message saying, I

19  don't know who you are.  50 people are calling me.  Stop

09:59AM  20  texting me.  But this was right after the --

21      Q.  Stop right there.  After receiving that text,

22  Mark Fawzy continued to call and text Mr. Callier,

23  correct?

24      A.  After that text, Mark Fawzy tried to get

09:59AM  25  clarification, as well as Dave Thurber, on who that text

1    was directed to.

2        Q.   And they did that by calling and texting

3    Mr. Callier, right?

4        A.   Yes.

09:59AM   5        Q.   That's a "yes" or "no" -- okay.

6                 Now, are you aware of the Telephone

7    Consumer Protection Act?

8        A.   I am not as aware of that as everyone else on

9    this phone call, because we don't actually cold-call.

10:00AM  10   So I -- I am not as versed in it as yourself, sir, and

11   Mr. Nevarez and Brandon.

12       Q.   Are you aware that you're required to have

13   consent before you call someone who's on the "Do Not

14   Call" list?

10:00AM  15       A.   I don't -- yes, I am aware you cannot call --

16   you shouldn't -- I'm aware that you cannot cold-call

17   anyone on the "Do Not Call" list.

18       Q.   Well, you're aware you cannot call anybody on

19   the "Do Not Call" list unless you have consent, right?

10:01AM  20       A.   Unless they reach out in terms of looking for a

21   loan through a web lead or -- unless they reach out

22   to -- unless they reach out looking for a loan.  And

23   that's what I -- I believe what happened here.

24       Q.   Okay.  So, if they reach out looking for a

10:01AM  25   loan, does that mean any loan company in the world can

Mitchell Scott - January 12, 2024

```
 1   call them?
 2        A.   I don't know.  I don't -- I don't know how the
 3   law reads in that fashion.  But the only people who
 4   would know he was looking for a loan are the people he
 5   reached out to.  So I don't -- I don't know how to
 6   answer that question.
 7        Q.   Now, the purpose of all of the calls and texts
 8   from JaScott Investments, itself or through its customer
 9   service representative, Mr. Fawzy, was to close a loan
10   with Mr. Callier, correct?
11        A.   It was to see if we could help him secure a
12   loan, if that's what he was looking for, yes.
13        Q.   And that was the services that JaScott
14   Investments provided, correct?
15        A.   When you say that's the services JaScott,
16   you're saying -- are you -- ask me the question one more
17   time.
18        Q.   Yeah.  You weren't calling him to talk about
19   the NFL football games?  You were calling him to try to
20   sell your services to him, right?
21        A.   We were calling to see if we could be a
22   resource for someone who called requesting, looking for
23   a loan.
24        Q.   And -- and by being "a resource," you would get
25   paid for that service if the loan closed, right?
```

10:01AM (line 5)
10:01AM (line 10)
10:02AM (line 15)
10:02AM (line 20)
10:02AM (line 25)

Mitchell Scott - January 12, 2024

1      A.   Yes.  Most of the time, that is -- that does --
2  that is what occurs.
3      Q.   And JaScott Investments is in the business of
4  being a resource to get compensated when a loan closes,
10:03AM  5  right?
6      A.   JaScott Investments is in the business of being
7  a resource for everyone, regardless if we get paid on
8  the loan or not.  The -- my -- my philosophy on business
9  is, I get -- if everybody is coming toward me for advice
10:03AM 10  or consulting, that at the end of the day, yes, I will
11  get paid.  But I don't really care about getting paid on
12  an individual prospect, as long as I have channels of
13  prospects and leads coming to me for advice.
14           So, for instance, it would have been up to
10:03AM 15  Thurber to agree to give me compensation for that loan,
16  because I was not an ISO of Western.  I'm very
17  comfortable with that arrangement, because, A, I had a
18  good relationship with Upwise; but more so than that, I
19  want people to continue to come to me so that I am the
10:03AM 20  resource they come to first.
21           So it's not necessarily about the money.
22  It was about being a resource to a wide scope of people,
23  and then we can provide the best solutions for them.
24      Q.   So you -- you're promoting your business,
10:04AM 25  whether you get compensated or not, right?

Mitchell Scott - January 12, 2024

1    A.   Yes.

2    Q.   So the calls to Mr. Callier were to promote

3 your business and provide your business services to him,

4 right?

10:04AM 5    A.   My call to Callier was to see if we could help.

6    Q.   Okay.  And to "help," you would provide your

7 business services to him, right?

8    A.   If -- or -- or direct him to somebody who could

9 help.  And that's what --

10:04AM 10    Q.   Okay.  Let me just get a "yes" or "no" answer

11 first.  Your call to Mr. Callier was the purpose of

12 providing your business services to Mr. Callier,

13 correct?

14    A.   My call to Mr. Callier was to see if I could

10:04AM 15 help.  If my -- if my business services did help, great,

16 I will take it.  If not, then you go to someone who can

17 help.

18    Q.   It was your hope that your business services

19 would help, correct?

10:05AM 20    A.   Correct.  That is also always my hope.

21    Q.   And that's your primary hope, isn't it?

22    A.   That is my primary hope, I agree.

23    Q.   What finally convinced you to stop calling or

24 texting Mr. Callier?

10:05AM 25    A.   Mark got sick and went to the hospital around

Mitchell Scott - January 12, 2024

```
 1   the 23rd.  And, at that point in time, he did not
 2   come -- we -- Mark was sick for like two weeks.  And, at
 3   that point in time, we did not renew our agreement with
 4   Sygnius Group moving forward.
 5              So, the very -- the very last phone call we
 6   got from Mr. Callier -- and -- and that is recorded --
 7   he said, Hey, have you had the opportunity to look at my
 8   loan?  And Mr. Callier said, Give me 10 minutes, and
 9   I'll call you right back.  So -- so, we had so reason to
10   believe that he wasn't interested in this loan.
11              So it was just by luck that Mark went to
12   the hospital and that ended the -- that ended the
13   processes.  Otherwise, as long as Mr. -- Mr. Callier
14   would have continued to say he was interested or to give
15   me a call back, or that he hadn't looked at the
16   documents yet, or to send him another e-mail to make
17   sure it was at the top of the e-mail file -- as long as
18   he would have continued to go down that path, I -- I
19   would imagine Mark would've kept calling him.  So it was
20   just by luck that he went to the hospital.
21      Q.   Well, after Mark -- after you discontinued your
22   relationship with Fawzy, somebody from JaScott
23   Investments continued to call Mr. Callier, didn't they?
24      A.   Disagree.  No.
25      Q.   Okay.
```

10:05AM (line 5)
10:06AM (line 10)
10:06AM (line 15)
10:06AM (line 20)
10:07AM (line 25)

Mitchell Scott - January 12, 2024

```
       1        A.   I never called Mr. Callier.

       2        Q.   Does JaScott Investments have an internal "Do

       3   Not Call" list?

       4        A.   So it's a blank list, because we don't cold-

10:07AM 5   call.  So --

       6        Q.   Okay.  Do you have an internal "Do Not Call"

       7   list, yes or no?

       8        A.   There -- we -- we do not have anyone on a list

       9   that has told us to do not call them.

10:07AM 10       Q.   Do you have procedures that describe an

      11   internal "Do Not Call" list?

      12        A.   Yes.

      13        Q.   And what are those procedures?  Do they mention

      14   "internal 'Do Not Call' list"?

10:08AM 15       A.   Well, basically, the procedures are simple.

      16   We -- we get tons of leads a day.  If someone doesn't

      17   want to be called, flag them into the system that they

      18   don't want to be called, and no one calls them again.

      19        Q.   And do you have that in writing somewhere?

10:08AM 20       A.   I have a -- I have a phone script that says

      21   that we don't cold-call.  I -- I would have to -- I

      22   haven't read that policy, so I don't know exactly what

      23   we have in writing.  So I -- I'd have to get back to you

      24   on that one, Mr. Miltenberger.  But we --

10:08AM 25       Q.   So --
```

Mitchell Scott - January 12, 2024

1    A.    -- we don't cold-call.

2    Q.    Okay.  So, basically, you don't need an

3 internal "Do Not Call" list because you don't cold-call,

4 right?

10:08AM  5    A.    Correct.

6    Q.    And you don't have any written procedures about

7 an internal "Do Not Call" list because you don't need

8 one, because you don't cold-call, do you?

9    A.    We -- so if -- if -- let's say someone wants to

10:09AM 10 have a loan, right?  They go down the process, and then

11 they say, I'm not interested anymore.  That is the --

12 the extent of a "Do Not Call" list for us.  If they're

13 not interested anymore and they say that, do not call.

14    Q.    And do you have that in written procedures

10:09AM 15 somewhere?

16    A.    I believe so.  I'd have to go look at the

17 procedure to see exactly what it says.

18    Q.    Have you given those to your attorney, those

19 procedures?

10:09AM 20    A.    I believe so.  Like I said, I -- the thing that

21 I'm talking about, I -- I believe I've given that, but I

22 don't know exactly what it says.

23    Q.    And would that be a document that's standard

24 operation procedures for phone calls?

10:10AM 25    A.    Correct, yes.

 1    Q.  And that's the document that you think
 2  comprises your internal "Do Not Call" policy and
 3  procedures, correct?

 4    A.  Correct.

10:10AM  5    Q.  Who have you communicated with from Green Arrow
 6  regarding the lead or this case?

 7    A.  Jack Dawson.

 8    Q.  Who?

 9    A.  Jack Dawson.

10:11AM  10    Q.  And what did Mr. Dawson tell you?

11    A.  Repeat the question -- what did he tell me
12  about what?

13    Q.  Did you have any conversation with Mr. Dawson
14  about this case?

10:11AM  15    A.  No.  I -- I really -- for the most part, I -- I
16  introduced him to Michael's team, Mr. Nevarez's team,
17  but I have not been in on those -- those conversations.

18    Q.  Did you ever call Mr. Dawson and say,
19  Mr. Dawson, I'm getting sued over the lead you sent me.
10:11AM  20  What's the deal here?  Do you have any information on
21  this guy?

22    A.  Yes.  I'm -- I'm quite positive that happened.

23    Q.  And what did Mr. Dawson tell you?

24    A.  I -- I don't recall that conversation.

10:12AM  25    Q.  Have you had any conversation with Max Williams

1  about this case?

2      A.   I've never spoken to Max Williams.

3      Q.   And you were paying Mr. Fawzy's company $150 a

4  week?

10:12AM  5      A.   Yes.

6      Q.   And how much -- let me see.  How many hours was

7  Mr. Fawzy's company expected to work for that $150 a

8  week?

9      A.   We never discussed that.

10:13AM 10      Q.   I mean, were they expected to be full-time

11  customer service representatives?

12      A.   No, no, no.  So we had no -- no -- we had no

13  contract or anything like that that outlined work

14  schedules or anything like that.  The -- the only thing

10:13AM 15  they needed to do was to collect the paperwork.

16  Because -- because, remember, these -- all of these

17  people had already expressed interest in -- in receiving

18  loans.

19           So we -- it -- it was -- and it was a trial

10:13AM 20  period, right?  We didn't even know how it was going to

21  work out.  So we were just trying to play it out by ear.

22  So we -- there was no formal agreement or anything in

23  writing.

24      Q.   Well, did you think they would only work five

10:13AM 25  hours a week?

1      A.   I mean, they reached out to me to be a partner,

2  so I figured that they would make it work, if they

3  wanted it to work.  And so, at the end of the day, we

4  were just trying to figure out if they were going to be

10:14AM   5  an asset to me or not, or --

6      Q.   Oh, I understand that.  I'm just trying to

7  figure out:  How many man hours did you think you needed

8  help with?  I mean, five hours a week, 40 hours a week,

9  ten hours a week?  What did you expect them to spend as

10:14AM  10  your representative?

11      A.   So -- so yes, we were trying to figure all of

12  that stuff out.  That was the purpose of this.  The --

13  the challenge with the business and amount of web leads

14  and leads that we get in is that you've got to stay in

10:14AM  15  front of them, right?  So -- so what we were trying to

16  figure out was what is the best way to -- a lot of

17  times, what happens is the first person they speak to is

18  the person that they build a relationship with, and that

19  they -- they tend to trust and -- that our -- that our

10:15AM  20  prospects tend to trust and go with.

21           So we were trying to figure out, when is

22  the best time to call, right?  Because you never want to

23  call at 8 o'clock, 9 o'clock, 10 o'clock, because

24  they're busy.  So you wanted to call really only in the

10:15AM  25  afternoon, when their day's settled.  So, to answer your

Mitchell Scott - January 12, 2024

1    question, we were still trying to figure all of that

2    stuff out, and there was no expectations.

3        Q.   And your standard operating procedures say you

4    receive 30 to 60 leads a day?

10:15AM   5        A.   Correct.

6        Q.   So did you expect Mr. Fawzy to handle those 30

7    to 60 leads per day?

8        A.   No.  We -- we had multiple people on our teams.

9        Q.   How many people did you have working those 30

10:15AM  10   to 60 leads per day?

11            Let me back up:  How many people in

12   Bangladesh did you have working those 30 to 60 leads per

13   day?

14       A.   So we'd just hired Sygnius Group to do that.

10:16AM  15   So we hired Sygnius Group in order to -- to handle the

16   leads that I gave them.  But that -- that 30 to 60 leads

17   that you're talking about -- so that policy wasn't

18   written for Sygnius Group.  It was written for the

19   organization as a whole.  And so that's why -- like,

10:16AM  20   that was really -- so we get a bunch of web leads that

21   come in.  And a lot of times, what happens is they want

22   to -- they don't want to provide us the same information

23   that we got from Mr. Callier, like revenue, you know --

24       Q.   Okay.  Let me back up:  I'm just trying to find

10:16AM  25   how many employees Sygnius had working on your behalf.

 1      A.   To my knowledge, it was Mark -- Mark was the

 2 only name I was given.  But I don't -- I don't have any

 3 oversight over that business, so they had the ability

 4 to, you know, probably do whatever they wanted to do, as

10:17AM  5 long as they were getting the -- the calls back, or as

 6 long as we were getting applications.

 7      Q.   Besides yourself, how many other employees are

 8 there of JaScott Investments?

 9      A.   I am the only employee of JaScott Investments.

10:17AM 10      Q.   So you had nobody to work the loans, other than

11 this Sygnius, during that period of time you were using

12 them; is that right?

13      A.   No, I have other contractors that do it.  I'm

14 the only employee, but I -- I operate with -- from a

10:17AM 15 contractor model.

16      Q.   And how many other contractors did you have

17 working those leads?

18      A.   I don't know.

19      Q.   Approximately?  I mean, I just want to know the

10:17AM 20 size.  Is it two or three or is it 200?

21      A.   No, probably two or three.

22      Q.   Okay.  And where were those contractors

23 located?  Were they in the United States?

24      A.   Correct.

10:18AM 25      Q.   So you went offshore to try to get that cheaper

Mitchell Scott - January 12, 2024

 1  price, right?

 2      A.   No, I went offshore to get a better, more

 3  consistent model.  That was the main reason why.  But it

 4  didn't -- it did help that it was also cheaper.  So,

 5  yes.

 6      Q.   Very cheap.  I see $150.  That seems extremely

 7  cheap, doesn't it?

 8      A.   It was way better than what I was -- what I was

 9  doing before.  So, yes.

10      Q.   Now, when you say "web leads," you're just

11  describing any lead off the web, not a particular

12  website; is that correct?

13      A.   So, a lot of times, we market on Facebook and

14  Instagram, and we do have particular websites and stuff

15  like that.  But, most of -- when I talk about "web

16  leads," we have a landing page on Facebook and

17  Instagram, and so does Green Arrow, so does HelloTech.

18  They -- we have -- that's where most of the leads come

19  from, is Facebook and Instagram.

20      Q.   Okay.  So do you know the particular web page

21  that Green Arrow claims it got its information from

22  Mr. Callier from?

23      A.   No, I do -- I do not -- I don't have that

24  information.

25      Q.   So -- and I don't want to put words in your

10:18AM (line 5)
10:18AM (line 10)
10:18AM (line 15)
10:19AM (line 20)
10:19AM (line 25)

1  mouth, but you're just hoping Green Arrow did it right,

2  aren't you?

3      A.   No.  So I don't know all of their internal

4  processes, so to a cert- -- a certain extent, I'm hoping

10:19AM  5  they do it right every time.  But we -- but I have -- I

6  have combed through all of their processes, I've combed

7  through -- they audit a lot of the information before I

8  get it, so I -- I walked through their processes before

9  we ever agreed to start this informal partnership.

10:20AM 10              So -- and again, this is the only issue

11  I've -- I've ever had with this model, was -- is this

12  particular case.  So I'm very confident that the model

13  that was audited was, in fact, the one that happened on

14  this particular case.

10:20AM 15      Q.   And what you think happened is that Mr. Callier

16  went to some website of Green Arrow and inputted all

17  this information that you received from Green Arrow,

18  right?

19      A.   That, I'm not -- I don't know.  So, at some

10:20AM 20  point, something like that happened, yes.  But they

21  would have called to confirm that information, I

22  believe, at some point.  But again, I don't under- -- I

23  don't know all their processes.  But -- but that

24  information was given somehow by -- via Mr. Callier.

10:21AM 25      Q.   Well, I'm looking at your Exhibit Number 1 in

1  this case, and it's a spreadsheet that shows, date

2  April 2nd, 2022, Max Williams, Brandon Callier, phone

3  number, company, e-mail address, loan amount.

4  Now, it doesn't have any of the additional

10:21AM  5  information you asked -- doesn't have anything about

6  revenue, purpose of funds, time in business.  It doesn't

7  have any of those qualifying fields that you mentioned

8  earlier.

9  A.  That information is removed because, as we

10:22AM  10  mentioned earlier, Mark wasn't an employee of -- of

11  JaScott Investments.  And Green Arrow and -- and

12  HelloTech did not like the fact that I was -- I would be

13  sharing all of this information outside of my

14  organization.  So that -- that information was removed

10:22AM  15  because of that.

16  Q.  So you received more information than what's

17  shown on Exhibit Number 1, right?

18  A.  Correct.

19  Q.  And where is that document of the information

10:22AM  20  you received?  Do you have that document?

21  A.  No, it is re- -- it is deleted, so it won't be

22  exposed to -- to outside of the company.

23  Q.  When was it deleted?

24  A.  Very, very, very soon after we got the lead in.

10:23AM  25  Q.  Okay.  So you got the lead in, you deleted all

Mitchell Scott - January 12, 2024

1 the personal information except for what we just read

2 about on the spreadsheet, and you sent that spreadsheet

3 or that information to Mr. Fawzy somehow, right?

4     A.   Correct.

10:23AM 5     Q.   And you mentioned Green Arrow and somebody

6 else.  Who else -- you said someone else?

7     A.   HelloTech.  So HelloTech is a --

8     Q.   Hello Texas?

9     A.   No.  HelloTech, T-E-C-K [sic].

10:23AM 10     Q.   And who is that?

11     A.   It's -- it's -- it's the same relationship.

12 They -- they market under the name "HelloTech" when they

13 do their Facebook leads and Instagram leads.  So it's --

14 it's the same kind of organization.

10:23AM 15     Q.   So it's Green Arrow marketing as HelloTech, or

16 is it a separate company from Green Arrow?

17     A.   It's a separate company from Green Arrow.

18     Q.   So when -- you got this lead from Green Arrow,

19 not from HelloTech, right?

10:24AM 20     A.   So HelloTech is the marketing arm, of which

21 they -- so Green Arrow is the lender -- is the lender,

22 right?  So it's -- it's -- basically, it's the same --

23 it's the same company, but they market under their --

24 their Facebook comes under HelloTech sometimes.  And,

10:24AM 25 like I said, I don't understand all the ins and outs of

Mitchell Scott - January 12, 2024

1  that, but those are the two -- the two names that --

2  that are used.

3      Q.  Do you know if Green Arrow or HelloTech called

4  Mr. Callier?

10:24AM  5      A.  I don't know that for sure.

6      Q.  Did you ever ask anybody from Green Arrow or

7  HelloTech whether they called Mr. Callier?

8      A.  No.

9      Q.  So, if I go to Bank of America and asked for a

10:25AM  10  loan, in your opinion, am I telling Citibank they can

11  call me about that loan?

12      A.  In that -- in that scenario, no.  But that's

13  not what happened here.  I believe that information was

14  commun- -- he -- I believe that they -- that they

10:25AM  15  followed their process, and they said -- as they'd done

16  with me tens of times, Mitch is here -- even when I do a

17  warm transfer, they -- they've even warm-transferred

18  calls to me, and they say, JaScott is here, and they're

19  going to be able to help you -- help you from here.

10:26AM  20      Q.  So do you -- do you think Green Arrow or

21  HelloTech told Mr. Callier, I'm going to have someone

22  from JaScott call you?

23      A.  If they -- yes, I believe -- I believe that it

24  was communicated that someone was going to be reaching

10:26AM  25  out to him to help -- that was a good fit to help him

1    get this loan.  Yes, I agree -- I believe that that's

2    what happened.

3         Q.   Do you believe they told Mr. Callier that

4    JaScott Investments would be reaching out to him?

5    That's a "yes" or "no."

6         A.   I -- I can't confirm that.

7         Q.   Okay.  So, going back to my example of Bank of

8    America:  If I call Bank of America, ask for a loan,

9    they say, We'll have someone call you back and reach out

10   to you, do you think I've consented for Citibank to call

11   me, then?

12        A.   I do this in the mortgage industry all the

13   time.  A realtor says, I'm going to have someone reach

14   out to you to help you find a loan.  So, to me, this is

15   no different.  I -- they say, I'm going to have one of

16   my partners reach out to you to -- to service this loan

17   or to collect this information.  So yes, I agree, and

18   then that -- that's why I use someone's name.  So I may

19   say, This realtor just gave me her information and told

20   me to call you --

21        Q.   Wait a minute.  We're not talking about a

22   realtor.  We're talking about this particular

23   transaction.

24        A.   You gave the analogy of Citibank.  I'm giving

25   you another analogy of how this works the same way in

Mitchell Scott - January 12, 2024

1  the mortgage industry.

2      Q.  Okay.  Let me stay with my analogy of Bank of

3  America and Citibank, and you answer it.  If I call Bank

4  of America and ask for a loan and they tell me, Okay,

10:27AM  5  someone will call you back and reach out to you, do you

6  think I've given consent to Citibank, then, to call me

7  back?  That's a "yes" or "no" question.

8      A.  That -- that doesn't apply, because -- because

9  what was actually said --

10:28AM 10      Q.  No, I'm not asking if it applies.  I'm asking

11  you, in that situation, do you believe that I've given

12  consent to Citibank to call you back -- call me back,

13  yes or no?

14      A.  You are -- if you -- if you say "okay," you are

10:28AM 15  giving consent to someone to call you back to help

16  you -- who can better help you get this loan.  So you

17  are giving consent to be called back to -- to help get

18  this loan, yes.

19      Q.  Anyone in the world can call me back, then,

10:28AM 20  right?  I just want to know your understanding of how

21  you apply the TCPA to your business.

22      A.  I'm -- I'm talking about not how I apply TCPA

23  to my business; I'm talking about how I would apply a

24  referral to my business.  A referral is -- this is --

10:28AM 25  this is how I believe it works, right?  Like, if I can't

Mitchell Scott - January 12, 2024

```
        1  help you and somebody else can help you and I find out

        2  that somebody can help you, then -- and you say, Yes,

        3  it's okay for me to be called by someone that you

        4  believe that can help me, I believe that's you

10:29AM 5  consenting that -- that -- that someone who can help you

        6  can call you.

        7      Q.   Okay.  Thank you for explaining that to me.

        8           Now, that text where -- that text where

        9  Mr. Callier told Mr. Fawzy, Don't call or text me

10:29AM 10 anymore, that was the telephone number that JaScott

        11 Investment had provided to Mr. Fawzy, right?

        12     A.   Correct.

        13     Q.   And that was the telephone number that

        14 Mr. Fawzy had been communicating with Mr. Callier with,

10:30AM 15 right?

        16     A.   Correct.

        17     Q.   Okay.  I'm going to share my screen again with

        18 you.  Can you see that document?

        19     A.   I do, yes.

10:31AM 20     Q.   And can you see down here where it says,

        21 4/19/2022.  You see that date?

        22     A.   Yes.

        23     Q.   Now, this is your attorney's exhibit list for

        24 the trial in this case, and it said, Brandon Callier

10:32AM 25 texted Mark Fawzy.
```

1                    See that?

2        A.    Yeah.

3        Q.    And it describes, Text stating do not call or

4    text again.

10:32AM    5                    See that?

6        A.    Uh-huh.

7        Q.    So you agree with me that you received a text

8    stating, Do not call or text again, right?

9        A.    I agree that I received the text saying that I

10:32AM    10    didn't know who you were, and that's why you should not

11    text again.  But --

12        Q.    It's saying, Whoever you are, don't call or

13    text me again, right?

14        A.    I -- I don't believe it says -- that's not

10:32AM    15    my -- my understanding is, since I don't know who you

16    are, don't call me again.

17        Q.    Oh.  But, if I know who you are, you can call

18    me or text me?

19        A.    Well, if you said that you wanted to have this

10:33AM    20    money in your bank account in two -- in -- in the next

21    two days, and if you said you were ready to move forward

22    with the loan at the lake, I believe that -- that if --

23    if it was -- if it was me -- and this looks like it was

24    sent to 50 people.

10:33AM    25                    But, if you were really trying to get me to

Mitchell Scott - January 12, 2024

```
  1  not call you back, you would say, Hey, JaScott
  2  Investments, thank you so much for all you've done.  I'm
  3  no longer interested in the loan.  That is -- is clearly
  4  defined that you mean Mark or JaScott Investments to not
10:33AM  5  call you back.
  6              In this scenario, you said, Hey, so many
  7  people are calling you, I don't know who you are.
  8  That -- that's not -- that could -- could mean me or
  9  anyone else.  And you see Thurber, when he responded to
10:33AM 10  that, he said, You know this is Dave from Upwise, right?
 11  You -- this -- the guy that you've been working with
 12  that says you have the $50,000 contracts.
 13              And, at that particular point in time,
 14  if -- if Mr. Callier meant for that text message to be
10:34AM 15  us, he would have said, I -- Yes, Dave, stop calling me
 16  back.  I meant that for everybody.  But he didn't.  He
 17  kept it vague.  And -- and then -- and then, after that,
 18  the -- Mr. Callier seems to be confused too, because he
 19  says, Oh, you know, I must have -- I must not have seen
10:34AM 20  the -- the application or I must not have seen the
 21  contract.  Why don't you send it to me again so it's at
 22  the top of my inbox?
 23              So, clearly, everybody was confused.  And
 24  it doesn't appear that that text message was meant for
10:34AM 25  us at all, because, when Mr. Callier had him on the
```

Mitchell Scott - January 12, 2024

1    phone, he would've reiterated the text message.  But

2    that didn't happen.

3        Q.   And you said you think it went to 50 people.

4    How do you know that?  For whom did that text message --

5    how can you say that it went to 50 people?

6        A.   That -- that's the problem with the text

7    message.  It's so vague that it looks like there's -- it

8    appears to me that he's saying, I'm sending this --

9    there's 50 people calling me; I'm sending this out --

10   this text message out to 50 people all at one time.

11           That -- that's the way the text message

12   reads, to me.  And that's -- it just seems so vague.

13   And that's why a clarification from Dave Thurber was

14   requested, that we never got.  And then again -- again,

15   the client must have been confused, because he says, Oh,

16   I didn't get -- I must have missed the -- the

17   application or I must have missed the contract.  Why

18   don't you send it to me again so that it's at the top of

19   my e-mail?

20           Clearly, everybody was confused.

21       Q.   Has JaScott Investments ever purchased any

22   leads?

23       A.   We have in the past.

24       Q.   And how did you do that?  Explain that to me.

25       A.   We went on Fiverr, and we asked someone to give

1   us, like, ten leads.

2       Q.   What'd they do?

3       A.   They -- they called some people and they got us

4   ten leads, and none of them did anything, so we -- we

10:36AM 5   stopped that a long time ago.  So we got --

6       Q.   Is your personal phone number -- cell phone

7   number on the "Do Not Call" list?

8       A.   I don't believe so.

9       Q.   Do you get a lot of unsolicited cold calls on

10:37AM 10  your cell phone?

11      A.   Nowhere near what the client states that

12  he gets.  But I may get -- I get some, for sure, but

13  nothing like -- nothing like what you guys are -- are

14  claiming to have received.

10:37AM 15      Q.   Do the calls that you get annoy you?

16      A.   No, I -- I don't -- I might get, like, five a

17  month.  I mean, I -- I'm not on a "Do Not Call" list.  I

18  don't have my phone number out on business websites.

19  I'm not actively pursuing -- I'm not actively pursuing

10:37AM 20  litigation.  TPC- -- so I don't get anywhere near the

21  amount of calls that would be annoying.  And I -- so

22  yeah, to answer your question, no, I don't -- I just

23  hit -- hit "silence," and the four or five times it

24  happens a month or every two months doesn't bother me.

10:38AM 25      Q.   Now, Mr. Callier receives calls from people

Mitchell Scott - January 12, 2024

1  that he believes are unsolicited calls, and he attempts

2  to hold those people accountable for that.  Do you have

3  any problem with him doing that?

4      A.  I have -- I have a problem with initiating

10:38AM  5  the -- initiating the transaction, and then, when we

6  respond back to it, then we start the scam.  And that --

7  that's the part of the problem that I -- I do have a

8  problem with, sir.

9      Q.  Okay.  So let -- let me just go to the first

10:38AM  10  one:  He gets an unsolicited call, didn't ask for any

11  services, didn't ask for anything.  He gets an

12  unsolicited call to sell him outdoor speakers, and he

13  attempts to hold that company accountable for that

14  unsolicited call.  Do you have any problem with that?

10:39AM  15      A.  Yes.  If he didn't -- if -- no, if he did not

16  initiate the call and someone randomly called him and

17  tried to sell him something, I have -- I -- I have no

18  issue with -- with that.

19      Q.  And, if that speaker company after he talks to

10:39AM  20  them and says, Who are you?  Send me an e-mail showing

21  me who you are, and they do.  And he tells them don't

22  call me anymore.  Do you have any problem with him

23  attempting to hold that company responsible for

24  continuing to call him in that instance?

10:39AM  25      A.  Well, that's -- I mean, are -- are you ref- --

 1  are you claiming that that's -- are you asking me a

 2  hypothetical question or are you --

 3      Q.  Yes.

 4      A.  -- implying that that's what happened here?

 5      Q.  I'm asking a hypothetical question.

 6      A.  You're not implying that that's what I believe

 7  that happened here?

 8      Q.  That's correct.  I understand you think

 9  something different.

10      A.  Well, we have the tapes.  We -- we have it on

11  tape.  We have everything in --

12      Q.  I understand.  I'm not talking about this case.

13  I'm talking about that hypothetical and about your

14  feelings about him enforcing the TCPA.

15             MR. NEVAREZ:  Well, I'm going to have to

16  object to these hypotheticals.  It calls for

17  speculation.  It's irrelevant.  It's immaterial.

18      Q.  (BY MR. MILTENBERGER)  It goes to your views on

19  the TCPA.  So your attorney can object --

20             MR. NEVAREZ:  No, no, no.  I'm going to

21  object because it has nothing to do with the TCPA.  It

22  has to do with speakers that somebody initiated the want

23  to buy personal speakers.  What -- what we have in front

24  of us is a business relationship that was es- --

25  initiated by Mr. Callier and developed by Green Arrow.

10:39AM  (line 5)
10:40AM  (line 10)
10:40AM  (line 15)
10:40AM  (line 20)
10:40AM  (line 25)

          1              MR. MILTENBERGER:  Are you telling your

          2    client not to answer the question?

          3              MR. NEVAREZ:  No.  I'm filing my objection.

          4              MR. MILTENBERGER:  Okay.  Your objection's

10:41AM   5    on the record.

          6        Q.  (BY MR. MILTENBERGER)  Now, Mr. Scott, you can

          7    now answer.  In that circumstance, do you have any

          8    problem with Mr. Callier enforcing the TCPA?

          9        A.   I'm sorry.  Ask me -- ask me one more time.

10:41AM  10        Q.   Yes.  A company calls Mr. Callier, solicits to

         11    sell him outdoor speakers.  He asks -- he asks --

         12    unsolicited, he doesn't have any relationship with them

         13    whatsoever --

         14        A.   He didn't reach out to anybody, is not even

10:41AM  15    looking for speakers?  No, I have absolutely no issue

         16    with -- if -- if he -- he did not initiate any sort of

         17    conversation and some random guy called him to sell

         18    speakers, I have no issue with him enforcing TCPA.

         19        Q.   And after --

10:41AM  20              MR. NEVAREZ:  Same -- same objection.

         21        Q.  (BY MR. MILTENBERGER)  Okay.  After the first

         22    call he says, Send me an e-mail so he can try to find

         23    out who's calling him, and after he gets that e-mail, he

         24    said, Don't call me anymore, and they continue to call

10:42AM  25    him, do you have any problem with him enforcing the TCPA

Mitchell Scott - January 12, 2024

1    in that instance?

2         A.   If --

3              MR. NEVAREZ:  Sa- -- same objection.

4         Q.   (BY MR. MILTENBERGER)  Okay.  You can answer.

10:42AM  5              MR. NEVAREZ:  It's irrelevant, immaterial.

6    Calls for speculation on -- on matters that are not

7    pertinent herein.

8         Q.   (BY MR. MILTENBERGER)  The objection's for the

9    record, so you can answer.

10:42AM  10        A.   I feel like we're talking about hypothetical,

11   but we're using words that's very close to this

12   scenario.  So I -- I need to clarify:  We're not talking

13   about what transpired between here?  We're -- you're --

14   you're talking about if this random speaker guy --

10:42AM  15        Q.   Correct.  Yes, I understand that.

16        A.   So -- so, if a random speaker guy was told -- I

17   believe that Mr. Callier, if he didn't want this random

18   speaker guy to continue to call him, he needs to say,

19   Mr. Random Speaker Guy, thank you for your time; I am no

10:43AM  20   longer interested in the conversation.  And I have no

21   problems with that.

22        Q.   Now, the process for completing an

23   application -- you take information over the phone,

24   correct?

10:43AM  25        A.   No.  The client completes the information,

Mitchell Scott - January 12, 2024

1 because we need to have his signature.

2     Q. So you take some information, then you send

3 them a written document that they have to fill out?

4     A. So, in order for me to pick up the phone and

10:43AM 5 even call you initially, you have to give that

6 qualifying information which we talked about earlier,

7 right? Like monthly revenue, how many years have you

8 done in business, what's your average credit score. I

9 need all of that information before I ever even decide

10:44AM 10 that it's worth my time reaching out.

11         Once I have that information, then we call

12 to see what you're looking for. We see how can we help.

13 And, if it still feels like a good fit, we e-mail you

14 over a link to a contract.

10:44AM 15     Q. And then complete the contract online and send

16 it back, or do they just sign it?

17     A. So -- and this is one of the reasons why we

18 used the -- the e-mail address for JaScott. So what

19 happens is, once you complete the -- once you complete

10:44AM 20 the application -- again, it's a link -- then once you

21 hit "approved" or "submit," or whatever that word is, it

22 gets submit- -- sent directly to JaScott.

23         So, once the -- and the client is the only

24 one who can really do that. So you have to enter in

10:45AM 25 your e-mail address, your phone number, the telephone

Mitchell Scott - January 12, 2024

1  number that you want us to call you, all of that

2  information -- your company information, tax ID

3  information, you enter all that in.  As soon as you hit

4  "submit," it's -- the contract is forwarded right to --

10:45AM  5  to our support team.

6      Q.  And then the contract gets sent back to be

7  signed?

8      A.  No, you -- you electronically sign it all at

9  the same time.

10:45AM  10      Q.  Okay.  So you -- do you ever walk them through

11  that process on the phone itself, while you're on the

12  phone, saying, Here, here's the document, pull it up,

13  let me tell you what -- what to complete?

14      A.  Yeah.  I mean, if you -- I mean, it's -- it's

10:45AM  15  pretty self-explanatory.  But yeah, if you had any

16  questions, absolutely we would walk you through it.

17      Q.  So you could actually sign the contract -- the

18  client could sign the contract while they're on the

19  phone with you or your representative explaining the

10:46AM  20  contract to them, right?

21      A.  Correct.

22      Q.  So, in an ideal world, it might happen where

23  somebody needs a loan, you get them on the phone, they

24  say, Yeah, I'm interested; I need it today, Man; send me

10:46AM  25  something right away.  You'll send them a contract, walk

Mitchell Scott - January 12, 2024

1   them through it, and they could sign it right there on

2   the phone when you're talking; is that right?

3       A.   Yes, they could.

4       Q.   And then that loan, it has the funder's name on

10:46AM  5   it?  The actual contract has the funder's name on it,

6   right?

7       A.   So JaScott has the -- yes, yes, it has

8   JaScott's name on it.  So JaScott has the ability to

9   fund business loans, real estate loans, as well.  So,

10:47AM 10   once you fill out that application, it has that on

11   there, and then, in writing, it talks about all of

12   our -- this -- this goes into conjunction with all of

13   the people that we work with as well.

14       Q.   So sometimes JaScott may be the lender and

10:47AM 15   other times somebody like Pac Western may be the lender;

16   is that right?

17       A.   Yes.  Yes.  A lot of what we do is -- yes.

18       Q.   So what's the total amount of money JaScott has

19   out in loans at any given time?  Like today, for

10:47AM 20   example.

21       A.   We could -- we -- we primarily deal in real

22   estate loans.  That's the primary bulk of what we loan

23   out.  So it's -- that would be a lot higher dollar

24   amount than what it'd be if we did like a business loan.

10:48AM 25   So we -- we primarily deal in real estate, and --

```
 1        Q.   So what's the amount?

 2        A.   We could -- I don't -- I would have to look to

 3   confirm.  Is that -- can you tell me why that's a

 4   relevant question?

 5        Q.   Yeah.  For relevant size of your company, who

 6   you are.  I'm just trying to get some background.  I

 7   mean, do you have a hundred million out in loans, a

 8   billion?

 9        A.   No.  We deal -- we deal more in the six-

10   figures-and-less range.

11        Q.   Okay.  So how many total loans do you have out?

12   I'm trying to get a total amount:  We've got a hundred

13   bill- -- I mean, a hundred million under loan right now.

14        A.   No, no, no.  We -- we are -- we probably have

15   not that much out right now.  We have other things that

16   we're working through right now.  So we -- we have less

17   than a hundred grand.

18        Q.   A hundred grand or a hundred million?

19        A.   A hundred grand.

20        Q.   So you've got less than a hundred grand in

21   loans out right now?

22        A.   Yeah.

23        Q.   And that's in real estate loans?

24        A.   Yes.  Yes.

25        Q.   How many loans does that consist of?
```

10:48AM (line 5)
10:48AM (line 10)
10:49AM (line 15)
10:49AM (line 20)
10:49AM (line 25)

Mitchell Scott - January 12, 2024

1    A.    Two.

2    Q.    And how many business loans, like you were

3    trying to make with Mr. Callier -- how many loans of

4    that do you have outstanding?

10:49AM    5    A.    I don't have any -- any loans -- any business

6    loans outstanding.

7    Q.    And how many loans, per year, do you get a

8    commission or referral fee off of?

9    A.    It's -- it's tough to say.  We're not really --

10:50AM    10    we're not -- that piece of our business, we're not

11    really actively marketing at this point in time.

12    Waiting for, you know, this kind of understanding --

13    I've never been in a situation before where I was

14    submitted fake bank statements and -- so we're really

10:50AM    15    kind of retooling that -- this piece of our business.

16         So we're not actively pursuing a lot of

17    business loans with people we don't already have

18    relationships with right now.  So we -- we don't have a

19    lot out there at this point in time.

10:50AM    20    Q.    Let's go back to 2023.  Just round numbers, how

21    much revenue did your company make?

22    A.    I would probably say, close to 150-, 200-.

23    Q.    150- to 200,000?

24    A.    I don't know.  I would have to look.  I -- I

10:51AM    25    don't know.  We -- my company's involved in a lot of

1    different things.  A lot of these businesses outsource

2    parts of their operations to us.  So they may outsource

3    bookkeeping.  They may outsource marketing.

4              The lending piece of our business is --

5    it's something that we are -- we're looking to -- we're

6    looking to expand upon, because we already have this

7    business relationship out there that -- where we're

8    getting all these other services.  So people ask us for

9    money because we are doing other things for them.  So I

10   really don't know.

11        Q.   Let me -- let me rephrase it this way:  I'm

12   trying to determine, when I talk to the jury, whether

13   you're a company like Bank of America or you're a

14   company like little Joe Blow down here at the bottom of

15   the pond.  So I'm just trying to get an idea of the size

16   of your revenue for your business, JaScott Investments.

17        A.   Yes.  I am nowhere near Bank of America.

18        Q.   I understand that.  I'm not either.

19             So you'd say you're in the 150- to $200,000

20   revenue range.

21        A.   Right around there, yeah.

22        Q.   Okay.

23             MR. MILTENBERGER:  That's all the questions

24   I've got.  I appreciate you, Mr. Scott.

25             THE WITNESS:  Thank you.

1          MR. NEVAREZ:  Great.

2                    EXAMINATION

3  BY MR. NEVAREZ:

4      Q.  Let me -- Mr. Scott, I've got a few questions

10:52AM  5  with you.  I want to clarify a few things.  I -- I heard

6  a lot of -- lot of views in this deposition, a lot of

7  "evers," in the questions, I didn't want to keep

8  objecting, so let me clarify it.

9              Did you personally ever call Mr. Callier?

10:53AM  10     A.  No.

11     Q.  So did any employee of Invest- -- JaScott

12  Investments, LLC, ever call Mr. Callier?

13     A.  No.

14     Q.  Did anybody employed or owning JaScott

10:53AM  15  Investments ever personally deal directly with

16  Mr. Callier?

17     A.  No.

18     Q.  So would it be correct to say that, once you

19  sent the lead to Sygnius, you -- you didn't ever get

10:53AM  20  involved personally with Mr. Callier?

21          MR. MILTENBERGER:  Objection, leading,

22  form.

23     Q.  (BY MR. NEVAREZ)  Did you ever -- after --

24  after you sent the lead to Sygnius, did you or

10:54AM  25  Investments -- JaScott Investments ever deal with

Mitchell Scott - January 12, 2024

1    Mr. Callier, personally?

2         A.    No.

3         Q.    Did you ever take information from Mr. Callier?

4         A.    No.

10:54AM  5    Q.    Did you ever talk to Mr. Callier about the

6    contract?

7         A.    No.

8         Q.    Did you ever talk to Mr. Callier about the loan

9    application?

10:54AM  10   A.    No.

11        Q.    So all communications after you got the lead

12   from Sygnius was conducted by Syg- -- after you got the

13   lead from Max Williams, was conducted by Sygnius and

14   Fawzy?

10:55AM  15   A.    Correct.

16        Q.    Okay.  Now, you used the term "chaser."

17   What -- please define "chaser."

18        A.    So a "chaser" is what we refer to as -- as --

19   what JaScott Investments refers to as a "customer care

10:55AM  20   person."  Their job is to get the -- the person that's

21   already interested in the loan.  Their job is to simply

22   collect their documents.  So they are the ones that

23   e-mails and they're the ones that's going to collect the

24   application and the bank statements to be sent to

10:55AM  25   underwriting.

1    Q.    Okay.  So -- so the chaser is a paper chaser?

2    A.    Correct.

3    Q.    Now, you also indicated that you purchased the

4    phone number for Sygnius.  Could you go through that

10:55AM    5    process of how you did that?

6    A.    Yes.  Well, I -- it's not necessarily I

7    "purchased."  I leased that phone number for 12 months.

8    Q.    When you say "I," you mean you, personally?

9    A.    JaScott Investments leased that phone number

10:56AM    10    for 12 months, so I went to a service call -- Aircall,

11    which is a VOIP.  And I was forced to -- not necessarily

12    "forced," but -- I had to buy one phone number, but I

13    had to buy three seats.  So I couldn't just buy -- and a

14    seat, from what they're called, is -- is called -- what

10:56AM    15    we refer to as a "user," right?  There's three people

16    that can have access to make calls on that particular

17    phone.

18         So the service required that I buy three

19    seats, and it required that I buy it -- or lease it for

10:56AM    20    a year.  And so, basically, I just went in there, put in

21    a username and password, and, you know, paid the money

22    for that one -year lease, and then I gave that

23    information to Sygnius so that they could, you know,

24    continue their role as -- as a customer care chaser, the

10:57AM    25    person that was going to collect the documents.

1    Q.    Okay.  And where did the money to -- to pay

2    that VOIP service come from?

3    A.    JaScott Investments.

4    Q.    Not -- not you, personally?

10:57AM 5    A.    Not me, personally.

6    Q.    And JaScott Investments has an account with

7    who?

8    A.    Chase Bank.

9    Q.    So it -- it was a Chase Bank account for

10:57AM 10   JaScott Investments that paid for the phone?

11   A.    Correct.

12   Q.    Okay.  Define what "VOIP" is?

13   A.    It's an internet-based phone where all you need

14   it an internet connection to access the phone.  So you

10:57AM 15   can -- you can do it on your computer.  And it's also an

16   app on your phone that you can download.

17   Q.    Okay.  So, when you say you purchased the

18   phone, you -- doesn't sound like you really purchased

19   the phone.  You purchased the VOIP account?

10:58AM 20   A.    Yes.  There's ab- -- there's no phone -- I -- I

21   purchased -- I leased the ability to make calls with

22   Aircall for that year.

23   Q.    And that's via computer or -- or a phone app?

24   A.    Yeah.

10:58AM 25   Q.    Okay.  And -- and please spell the name of this

Mitchell Scott - January 12, 2024

```
 1   VOIP service that you got involved with.
 2        A.   Aircall, A-I-R C-A-L-L.
 3        Q.   Okay.  Now, let's -- so let's go through the --
 4   the website.  Please explain that website, JaScott org?
 5        A.   Yes.
 6        Q.   No, no.  I'm sorry.  Before we get to that,
 7   let -- let's -- let me ask you about something else:
 8   You -- you indicated that -- I just want to make sure I
 9   get the definition correct of the "cold call."  What --
10   what exactly is in your -- your definition of a cold
11   call?
12        A.   So, when I think of the word "cold call," I
13   randomly got someone's phone number, and I -- they --
14   they expressed absolutely no interest in my products
15   whatsoever, and I call them up to try to sell them on
16   something that -- that I have to offer while they've not
17   expressed any inkling of an interest for that particular
18   service or product.
19        Q.   Okay.  Now, you also mentioned "web leads."
20   Please define "web leads," give -- give some examples.
21        A.   So, a lot of times, what happens is we market
22   on Facebook and Instagram and other social media
23   platforms, and we have -- we have ads that run under
24   those screens.  And, when you're scrolling on Facebook
25   or you're scrolling on Instagram, you click on the ad
```

10:59AM (line 5)
10:59AM (line 10)
10:59AM (line 15)
11:00AM (line 20)
11:00AM (line 25)

1  and that ad asks you -- when you click on the ad, you

2  enter in some information -- phone number, cell phone

3  number, name of your business -- and it asks you a

4  couple qualifying questions, and that gives us the --

11:00AM 5  the information we need to either e-mail you or call you

6  back and to get those web leads and see if we can be a

7  resource for you.

8       Q.   Okay.  All right.  Now, let me -- let me refer

9  you to a document that Mr. Miltenberger asked you about.

11:01AM 10  So I'm -- I'm going to share my screen.

11            Okay.  Do you see on the screen what's at

12  the top listed as Exhibit A, List of Proposed Exhibits?

13       A.   Uh-huh, yes.

14       Q.   Okay.  Have you seen that page before?

11:02AM 15       A.   Yes, I have.

16       Q.   Okay.  Now, you indicated that you worked with

17  my team to assemble some documents.  Is this part of

18  what you worked with Denise Dominguez Rodriguez, my --

19  Macias, my paralegal?

11:02AM 20       A.   Correct, correct.  I -- I was asking to forward

21  her all the communications, so that we could chron- --

22  we could chronolize [sic] everything, and this is what

23  she helped us put together.

24       Q.   Okay.  Now, this is -- if you go to the -- do

11:02AM 25  you see up here it says -- we're on page 1, and there's

1    275 pages.

2        A.   Uh-huh.

3        Q.   Okay.  So I'm going to just kind of walk you

4    through to make sure you -- you're familiar with this

5    page.  Exhibit A consists of a spreadsheet?  And you

6    worked -- did you work with my paralegal to compile this

7    spreadsheet?

8        A.   Yes.

9        Q.   Okay.  And then who made the entries under the

10   Comments section?

11       A.   The paralegal.

12       Q.   Denise?

13       A.   Denise, yes.

14       Q.   Okay.  And then -- so -- so that -- that -- and

15   that's off of an Excel spreadsheet; would that be

16   correct?

17       A.   Correct.

18       Q.   And so that list of proposed exhibits is five

19   pages long.  Do you see that?

20       A.   Uh-huh, yes.

21       Q.   Okay.  So the next page is Exhibit Number 1.

22   And you see that it's Bates stamped JaScott-001?

23       A.   Uh-huh.

24       Q.   That's a Bates stamp.  Are you -- are you aware

25   of that?

1          A.   No, no.

2          Q.   It's called a "Bates stamp," because there was

3     a company way back when called "Bates" that invented an

4     automatic stamper.  Every time he pushed on the stamp,

11:04AM  5     it -- it would roll to another number.

6          A.   Got it.

7          Q.   Okay?

8                    So that -- so I'm going to refer to this as

9     "Bates 1," okay?  So now on Bates 2, do you see that,

11:04AM 10     the entry?

11          A.   Yes.

12          Q.   Okay.  You see, is that the -- is that the

13     spreadsheet that you were talking about, that you got

14     from Green Arrow?

11:04AM 15          A.   Correct.  Yes.

16          Q.   Well, there's more to -- more to that

17     spreadsheet, right?

18          A.   Yes.

19          Q.   But is that the entry that initiated this

11:05AM 20     referral from Max Williams on the --

21          A.   Yes.

22          Q.   -- Callier business loan at issue herein?

23          A.   Yes, this is -- that is correct.

24          Q.   Okay.  And that's time-stamped April 2nd, 2022?

11:05AM 25          A.   Correct.

Mitchell Scott - January 12, 2024

1    Q.   And you say you never talked to Max Williams?

2    A.   Correct.

3    Q.   Did you ever have any e-mail communications

4    with Max Williams?

11:05AM   5    A.   No.  I -- I only had a relationship with the --

6    his -- his -- who he reported to.

7    Q.   And that was?

8    A.   Jack Dawson.

9    Q.   Okay.  And so the next column is Brandon

11:05AM   10   Callier.  And I think you said you never had any

11   communication with Mr. Callier whatsoever?

12   A.   Correct.

13   Q.   Okay.  Now -- and there's -- there's a Phone --

14   a column entitled Phone, and that's Mr. Callier's --

11:06AM   15   that's the phone number that was given to you by Max

16   Williams?

17   A.   Correct.

18   Q.   And that ends in 4604; is that correct?

19   A.   That is correct.

11:06AM   20   Q.   And it says, Company, Aero Services, LLC.

21   What -- what is that to -- what is that column supposed

22   to be?

23   A.   That is the company -- so we -- we -- when the

24   lead came in, that's who we were supposed to -- so the

11:06AM   25   information looking for $60,000 loan and all the other

ACR Ink, LLC

Ph. 915.542.3422                    schedule@acr-ink.com

Mitchell Scott - January 12, 2024

1   information we got, that was supposed to be in regards

2   to Aero Services, LLC.  So that -- that was who we were

3   actually calling.  We were calling that company, was who

4   we were trying to call and e-mail.

11:06AM  5      Q.  Okay.  And then, the e-mail, that's Callier's

6   e-mail address that was given to you by Max Williams?

7      A.  Correct.

8      Q.  And the next column is Look- -- Looking Amount.

9   That's what Mr. Callier was looking for on behalf of

11:07AM 10   Aero Services, LLC?

11      A.  Correct.  Yeah.

12      Q.  And -- and the Funding Purpose, what -- what

13   does that signify?

14      A.  That's working capital.  So you -- that just

11:07AM 15   tells us, kind of, what he needs the money for, to see

16   if it's going to be a good fit for -- for, you know, us

17   or -- or, you know, who -- it's just to see what type of

18   loan we think is going to be a good fit for -- that's

19   the purpose for that field.

11:07AM 20      Q.  Okay.  And, in this case, the "working capital"

21   signifies what kind of a loan?

22      A.  So the "working capital," it could signify a

23   line of credit.  It could signify a term loan.  It could

24   signify an SBA loan.  It could -- if you wanted to buy

11:07AM 25   equipment, it could signify equipment financing.

1          So those are really the -- the majority of
2    what we do, and so that's what we always lead with.  But
3    if you have, you know, bank records, you have -- like, a
4    lot of -- a lot of small businesses don't have -- they
11:08AM 5    don't keep cash in their bank -- right? -- or they have
6    bankruptcies.  So if you -- if you don't have cash in
7    your bank, a lot of times, we can't offer those types of
8    loans, or if you haven't been in business that long, we
9    can't offer those types of loans.  And so then we have
11:08AM 10   to go more -- you know, more revenue-share-type loans,
11   versus an actual true interest-rate-type loan.
12       Q.   Okay.  I guess the question is:  Does "working
13   capital" signify to you that it's a business loan?
14       A.   Yes, correct.
11:08AM 15       Q.   As opposed to a personal loan for an individual
16   to buy personal items?
17       A.   Correct.  If -- if this would have been a
18   personal loan, it would have said "personal loan,"
19   because that's a completely different -- that's a
11:09AM 20   completely different vertical.  It has nothing to do
21   with -- we couldn't even offer Aero Services a personal
22   loan, because it's -- it's a completely different
23   underwriting department.
24       Q.   Okay.  And this last column, Deposits, what
11:09AM 25   does that signify?

Mitchell Scott - January 12, 2024

```
  1        A.   Deposits is how much revenue that he has told
  2   us -- or he told Mark -- Max Williams that he has coming
  3   through his bank account, on average, for the last three
  4   to six months' --
11:09AM  5        Q.   I see.  Okay.
  6        A.   -- business revenue through his bank account.
  7        Q.   Okay.  Now, going on to the next page is the
  8   title page, Exhibit Number 2, so we'll skip that one.
  9   The -- the page after that is a copy -- is a printout of
11:10AM 10   an audio file.  Are you familiar with that file?
 11        A.   Yes.  I'm pretty -- I haven't seen it in this
 12   format, but yes, I -- I'm familiar with the audio files.
 13        Q.   It says here the date is April 8 of 2022?
 14        A.   Perfect, yes.
11:10AM 15        Q.   What -- what is that audio file, to your
 16   knowledge?
 17        A.   This is the -- the first communication -- this
 18   was the first recorded communication that we have where
 19   Mark is asking Mr. Callier if he's in- -- if he was
11:10AM 20   looking for a loan.  And then he goes into detail about,
 21   not only is he looking for a loan, what is he looking
 22   for that loan for, and corroborates a lot of things that
 23   we got on the spreadsheet initially from Green Arrow.
 24        Q.   Okay.  And -- and that's Bates stamp number 4.
11:11AM 25   You see that at the bottom?
```

Mitchell Scott - January 12, 2024

```
 1          A.   Uh-huh, yes.

 2          Q.   So the next page is Exhibit Number 3, Bates

 3    stamp 5.  After that is Bates stamp 6.  Are you familiar

 4    with that, Bates stamp --

 5          A.   I am.

 6          Q.   And what is that?

 7          A.   This is Mr. Callier giving us over bank

 8    statements that we need to underwrite the case.  So, if

 9    you see up top, Mark must have copied and paste my

10    information into this website where the application is.

11    So you would've completed the application.  And then,

12    after we complete the application, we actually need bank

13    statements to send to underwriting, so that we can

14    confirm your account -- well, we confirm -- we can send

15    you to underwriting so we can see what kind of loans

16    that you would qualify for.

17          Q.   And what are those -- those four items in the

18    bo- -- bank -- are those the bank statements?

19          A.   Those are bank statements, yes.

20          Q.   And -- and those are bank statements from who?

21          A.   Those -- well, so, at the time, we thought that

22    they were bank statements from Aero Services, because

23    that's who we initially -- you know, we were -- we were

24    calling on behalf of.  But, at some point, the

25    application -- even though we were calling on Aero
```

11:11AM (line 5)
11:11AM (line 10)
11:12AM (line 15)
11:12AM (line 20)
11:12AM (line 25)

```
 1   Services, somehow the application that was signed was
 2   for a company called "Gonna Keep Truckin."  And then
 3   these bank statements were for that company, Gonna Keep
 4   Truckin.
```
11:12AM
```
 5        Q.   And so you -- you were forwarding them to
 6   Mr. -- where did you get the bank statements?
 7        A.   He -- Mr. Callier, for -- cop- -- got these
 8   bank statements from -- at the time, I thought from his
 9   bank.  And he sent us these bank statements.  And it
```
11:13AM
```
10   appeared that Gonna Keep Truckin was his company, these
11   were his bank statements, and this is what we needed in
12   order to underwrite him and -- and, you know, see if we
13   could offer him a loan.
14        Q.   Okay.  And -- and now, that -- that -- it says
```
11:13AM
```
15   from Brandon Callier to Mark Fawzy at the top, and then
16   it's got the mark.fawzy@jascott.org.  Is that the e-mail
17   that -- address that you provided Mr. Fawzy?
18        A.   Correct, yes.
19        Q.   Okay.  And -- and please explain how you got
```
11:13AM
```
20   that e-mail address --
21        A.   The Mark Fawzy?
22        Q.   -- to provide to Mr. Fawzy.
23        A.   Ask me one more time.  I'm sorry.
24        Q.   Okay.  Well, let's begin with JaScott.org.
```
11:14AM
```
25   What is JaScott.org?
```

Mitchell Scott - January 12, 2024

```
 1       A.   That is a website designed for JaScott
 2  Investments, and it's primarily a website that focuses
 3  on our ability to lend money to real estate investors,
 4  small businesses, and -- and we also do our mortgage --
 5  we're also a -- JaScott Investments also has mortgage --
 6  has a mortgage license.  And that revenue is run
 7  through -- through JaScott Investments as a whole as
 8  well.
 9            So that website encompasses strictly -- for
10  the most part, loans for those three verticals.
11       Q.   Okay.  And how did you get that website,
12  JaScott.org?
13       A.   So, initially, that website was -- was a
14  JaScott Enterprise website, back in 2014.  And right
15  around the time of -- of 2018 -- so the -- the initial
16  website was designed to get -- we wanted to -- so
17  Enterprise wanted to attract investors to grow its real
18  estate portfolio, as well as sell units to -- to
19  customers, consumers.  By the time 2018 rolled around,
20  Enterprise decided that it did not like working with
21  investors, and that it didn't want to be -- it didn't
22  want to be client-facing anymore.  So they wanted to get
23  rid of all marketing.
24            So I then purchased the assets, which was
25  this -- this JaScott.org e-mail address, from
```

11:14AM   5
11:15AM  10
11:15AM  15
11:15AM  20
11:16AM  25

```
 1   Enterprise, when I -- when I created JaScott
 2   Investments, and then I redid the website, took it away
 3   from the vendor that JaScott Enterprises was doing.  I
 4   restructured and redid the website as a JaScott
 5   Investments website.  And so that's how we turned this
 6   website into a JaScott Investments website.
 7        Q.   Okay.  Well, you say "I purchased."
 8        A.   JaScott Investments purchased -- sorry.
 9        Q.   Go ahead.
10        A.   JaScott Investments purchased -- well, JaScott
11   Investments took over the domain name of JaScott.org
12   when JaScott Enterprises decided that it did not want to
13   be client-facing any -- any longer.
14        Q.   Did that involve the payment of money by
15   JaScott Investments?
16        A.   The money that was paid was for -- to redo the
17   website.  And then, when the contract ended for JaScott
18   Enterprises, JaScott Investments took over the contract.
19        Q.   And how did it -- how did it take over the
20   contract?
21        A.   We just re- -- when we renewed it, we renewed
22   it under JaScott Investments.
23        Q.   And when you renewed it under JaScott
24   Investments, did you have to pay money?
25        A.   Yes.
```

11:16AM (line 5)
11:16AM (line 10)
11:17AM (line 15)
11:17AM (line 20)
11:17AM (line 25)

Mitchell Scott - January 12, 2024

```
 1        Q.   And where did that money come from?

 2        A.   From -- from the credit card of JaScott

 3   Investments.

 4        Q.   And that was a Chase credit card?

11:17AM   5        A.   Yes.

 6        Q.   Chase Bank?

 7        A.   Yes.

 8             And so I -- we -- we used our -- still a

 9   JaScott Investments account, but we used our PayPal

11:18AM  10   account to pay for redesigning the -- the website.  So

11   we used the Chase, the -- the Chase JaScott Investments

12   credit card and we also used the JaScott Investments

13   PayPal account to -- to fund the redoing of the website.

14        Q.   Okay.  Well, once that occurred, once you took

11:18AM  15   over, did -- did JaScott Invest- -- Enterprises have any

16   other involvement with the -- the website JaScott.org?

17        A.   No.

18        Q.   Did they have any involvement in the payment of

19   the website of JaScott.org?

11:18AM  20        A.   No.

21        Q.   Did Enterprises have any involvement in the

22   development of the Investments website?

23        A.   No.

24        Q.   Okay.  And who developed the -- the -- the

11:19AM  25   content on the JaScott Investments website?
```

Mitchell Scott - January 12, 2024

72

1       A.   Digital Korbax developed the content, and I

2  kind of -- and me, Mitchell Scott, kind of oversaw the

3  process or -- or approved those changes.

4       Q.   Okay.  All right.  So let me refer you back to

11:19AM 5  Exhibit A.  And we were on page -- Bates stamp 6.  And

6  in there -- here -- here's the Bates stamp page 7.  And

7  is that the bank statements you got from Mr. Callier,

8  that you forwarded on to Mr. Fawzy, from Gonna Keep On

9  Truckin, LLC?

11:20AM 10      A.   So he sent these bank statements -- Mr. Callier

11  sent these bank statements directly to Fawzy, and then

12  Fawzy forwarded to -- to me --

13      Q.   I see.

14      A.   -- or to Ja- -- yeah.

11:20AM 15      Q.   Okay.  And so that continues on.  And you've

16  reviewed all these documents that are -- are in this

17  Exhibit A; is that correct?

18      A.   Did I -- did I personally review the bank

19  statements?  Is that what --

11:20AM 20      Q.   No.  Have you reviewed all these pages that are

21  on Exhibit 275 [sic]?

22      A.   I -- I haven't seen this document in this --

23  this fashion, but I -- I believe I -- I gave -- I

24  would've given Denise, the paralegal, this information.

11:20AM 25  So I'm sure I have.  I just haven't seen it all in one

Mitchell Scott - January 12, 2024

1  file before.  But yes, all of this stuff, I -- I did --

2  I did review and did send over.

3       Q.   To Denise, my paralegal?

4       A.   To Denise, yes.

11:21AM 5       Q.   Okay.  And -- and so, now, taking you to

6  Exhibit Number 4, which is Bates page number 9 -- 39.

7  And -- and there's the e-mail dated -- on -- on Bates

8  stamp 40 -- you see that?

9       A.   Yes.

11:21AM 10      Q.   And that's an e-mail from Mark Fawzy to

11  Mitchell Scott -- you? -- da-- -- Upwise Capital is

12  copied on this, dated April 8, 2012.  You see that?

13      A.   Yes.

14      Q.   Okay.  And so how is it that you got this

11:21AM 15  e-mail?  You were copied?

16      A.   I was copied, yes.

17      Q.   And -- and so you have an e-mail client that

18  gets all these e-mails?

19      A.   Yes.  We use Zoho as our e-mail server, and so

11:22AM 20  yes, we -- oh, are you -- sorry -- are you asking me,

21  how did I -- how did I obtain all of these e-mails?

22      Q.   Yes.  You provided this e-mail to my paralegal

23  Denise?

24      A.   Uh-huh.

11:22AM 25      Q.   How -- explain that process.

Mitchell Scott - January 12, 2024

```
 1        A.   So I still had access to the Mark -- the -- the

 2   Zoho e-mail account for Mark Fawzy, because it was on a

 3   yearly-contract basis as well.  And so, when -- when I

 4   was asked to provide all the documents to all the

11:23AM  5   communications, I went in -- because I'm a super user,

 6   because I own the company, I went under Mark Fawzy's

 7   account, and I forwarded out all of these e-mails from

 8   Mark Fawzy's account to Denise and myself.

 9        Q.   I see.  Okay.  And is that true for all e-mails

11:23AM 10   in this Exhibit A?

11        A.   Correct.  Yes, I did the same thing.

12        Q.   Okay.

13        A.   Yeah, that's why they all say "Forward" on

14   them.

11:23AM 15        Q.   Right.  Okay.  Now, let me refer you to Bates

16   stamp 54 of this Exhibit A.  You see that?  That's the

17   loan application?

18        A.   Uh-huh.

19        Q.   Did you receive a copy of this?

11:24AM 20        A.   It -- it gets downloaded -- as soon as you hit

21   "Submit," it gets downloaded directly to my DocuSign

22   account.  And yes, I -- I do have -- do get a copy of it

23   there.

24        Q.   I'm sorry.  Repeat that?

11:24AM 25        A.   So, when you sign it, it goes directly into my
```

1    DocuSign account.  And it's housed there, and then we

2    grab it and we send it -- we do whatever we need to do

3    with it in order to find the best solution for our --

4    our clients and prospects.

11:24AM    5         Q.   Okay.  Well, when you received this, did you

6    look at it?

7         A.   Yes.

8         Q.   Okay.  And so this suggests that this is that

9    $60,000 amount -- that's the requested financing -- and

11:24AM   10    use of the funds was supposed to be more trucks,

11    according to this?

12         A.   Uh-huh.

13         Q.   And -- and the legal company name, or DBA, is

14    "Gonna Keep On Truckin, LLC"?

11:25AM   15         A.   Yes.  So that's --

16         Q.   Go ahead.

17         A.   So this is the part that threw us off, because,

18    again, we were calling on behalf -- to Aero Services.

19    And you can probably see our confusion in the -- in the

11:25AM   20    communication log, where we didn't know how this ended

21    up being Aero's -- we went from Aero Services to Gonna

22    Keep On Truckin.  So -- but yes, everything else appears

23    to be the same, except for they changed the name on the

24    account.

11:25AM   25         Q.   So you were under the impression that this was

Mitchell Scott - January 12, 2024

1  going to be a business loan for Gonna Keep On Truckin,

2  LLC?

3       A.   Yes.

4       Q.   Okay.  Now, the owner -- did -- the next

11:25AM  5  section below Business Owner Information, you see there

6  it says "Brandon Callier"?

7       A.   Yes.

8       Q.   And then, apparently, his percent ownership

9  interest a hundred percent?

11:26AM  10       A.   Correct.

11       Q.   Well, I'll represent to you that Mr. Callier

12  testified he -- he -- that's not true.  He doesn't have

13  a hundred percent ownership, and, in fact, he doesn't

14  have any ownership interest in Brandon Callier -- in --

11:26AM  15  in Gonna Keep On Truckin.

16       A.   Okay.

17       Q.   Now, did -- did he ever tell you that -- or --

18  or, to your knowledge, did he ever tell Mr. Fawzy or

19  JaScott Investments or yourself that Gonna Keep On

11:26AM  20  Truckin was never actually interested in a personal

21  loan?

22       A.   Or a business loan?  No, he -- this entire

23  time -- the whole underwriting process is based on

24  the -- the company information that was provided in the

11:27AM  25  bank -- the bank records.  And then they're -- and then

```
 1   it's based on the -- the personal habits of the owner.

 2   So, if we would have known that Brandon Callier was not

 3   the owner, it would have been an automatic decline,

 4   because we -- we -- we need the owner's credit score

 5   and -- and personal financial health in order to decide

 6   if we could even do this loan.

 7              So no, that -- if that information would

 8   have been given, it would have been a direct, like,

 9   decline.

10   Q.   Okay.  Well, my -- my question, actually, is:

11   Did Mr. Callier ever tell you that he never actually

12   even wanted to close this loan -- business loan?

13   A.   No.  It was the exact opposite.

14   Q.   What -- explain that.

15   A.   He told Mark -- and, again, we have the

16   audio -- to where when Mark said he got approved for the

17   loan, he said, I'm at the lake; I'll be signing all the

18   documents when I get back -- oh, I -- I'm going to

19   accept the loan, and I'll give you all the information

20   you needed to -- to process it when I get back from the

21   lake.

22              And, in addition to that, when -- when he

23   read the contract, in there, there was a communication

24   that Mr. Callier actually provided in his -- in his

25   initial ser- -- when he served us -- when he served not
```

11:27AM  (line 5)
11:27AM  (line 10)
11:27AM  (line 15)
11:28AM  (line 20)
11:28AM  (line 25)

1   JaScott Investments, but when he served JaScott

2   Enterprises initially, where in there it says, I agree

3   to accept the terms of this loan; the only thing I don't

4   like is the fact that you're looking into my bank

11:28AM  5   account; I don't like for people to look in my bank

6   account for an extended amount of time.

7            But the -- the first sentence of this

8   communication in the DocuSign is:  I've read the terms

9   and I agree to accept.

11:29AM  10   Q.   Okay.  Well, what would have happened if -- if,

11   in- -- Mr. Callier, instead of filing this loan

12   application with you and Fawzy, would have told you, I'm

13   not interested in any business loan?  Would that have

14   caused you to stop contacting Mr. Callier?

11:29AM  15   A.   Yes, we would've immediately stopped.

16   Q.   And why is that?

17   A.   Because we're in the business of helping

18   businesses get loans.  And, if we're not a good fit or

19   if you don't have -- if -- if you weren't interested in

11:29AM  20   a loan, there would be no reason for us to call you,

21   because, again, at the time, we were getting like 30 --

22   we were getting 30 to 60 leads a month -- oh, no, I

23   actually think we were getting them a week.  We were

24   getting that many leads a week.  And there would be no

11:30AM  25   point in wasting another second when we had that much

1  activity coming through our pipeline.

2      Q.  Well, did -- did Mr. Callier ever tell you or

3  Sygnius or Mr. Fawzy that he did not really want the

4  business loan that he's applying for?

11:30AM  5      A.  No.  Quite the opposite.  And even all the way

6  up until, you know, late August -- or not "August," but

7  April, when Mark went to the hospital -- the very last

8  phone call that was recorded during that time period,

9  with -- with Mr. Callier and -- and Fawzy, Fawzy asked

11:30AM  10  him, Were you -- have you had an opportunity to review

11  our -- our offer?  And he says, No, not yet; give me 10

12  minutes, and I'll call you right back.

13          So, from our perspective, he was interested

14  in day one and he was interested in this loan up until

11:31AM  15  the point where Mark Fawzy went to the hospital in

16  April -- end of April.

17      Q.  Interested in continuing communications

18  regarding the business loan?

19      A.  Correct.  Correct.

11:31AM  20          THE REPORTER:  Mr. Nevarez, between

21  documents at some point, can we please have a break?

22  It's been two hours on the record.

23          MR. NEVAREZ:  Sure, we can break right now

24  if you want.

11:31AM  25          (Break taken from 11:31 a.m. to 11:39 a.m.)

1      Q.   (BY MR. NEVAREZ)  Mr. Scott, you indicated --

2  you indicated that -- well, you were being asked about

3  the standard operating procedure document?

4      A.   Yes.

11:39AM  5      Q.   No, I guess it was referred to as a "Do Not

6  Call procedures."  Now, did -- was that document ever

7  given to Sygnius?

8      A.   The document was made available to Sygnius.

9  And the reason why I -- I can't confirm -- like, it's --

11:40AM  10  it's -- it's given to all of our -- the people that work

11  for us in that capacity, in that customer care role,

12  right?  Sygnius is a little bit different in the sense

13  that we -- we definitely covered all that information.

14  But what happened was Sygnius approached me about

11:40AM  15  wanting to do co- -- they wanted to cold-call on my

16  behalf.  And, in order for them to cold-call on my

17  behalf, I had to pay them $3,200 a month.

18          So we definitely talked about the process

19  and all this other stuff.  But the fact that I said "no"

11:41AM  20  to the $3,200 a month -- what I don't recall is that if

21  that was the end of, Well, you're not cold-calling for

22  me, or if we specifically went through that document and

23  said, No, I'm not paying you $3,200 a month to cold

24  call; Oh, by the way, we don't cold call.

11:41AM  25          So that's why I can't say for sure they got

Mitchell Scott - January 12, 2024

1    it.  But it was definitely made available into the

2    Google Drive that we all shared.

3         Q.   Okay.  What -- what was your -- what was

4    Investments' policy regarding cold-calling by Sygnius?

11:41AM  5    Did you permit that or did you -- no, you weren't -- you

6    weren't going to do -- to have them do the cold-calling

7    because you didn't want to pay the 3,200?

8         A.   Ex- -- exac- -- we -- JaScott Investments

9    thinks cold-calling is -- is a waste of time.  There's

11:42AM  10   just -- we don't have the resources to randomly call

11   people who have never expressed interest in our product

12   to see if we can catch somebody at the right place at

13   the right time.  So it's -- it's always been an absolute

14   waste of time for us in any vertical that we have, and

11:42AM  15   so we just didn't do it.  And it's definitely not worth

16   paying $3,200 to see if somebody else can, you know,

17   happen to catch somebody at the right time, who's never

18   expressed interest.  So it was -- it's been perfectly

19   clear throughout the entire company that we don't do

11:42AM  20   that.

21        Q.   It was perfectly clear during the entire

22   company?

23        A.   Yeah, nobody -- no one in our company that's

24   worked for me as a contractor has cold-called anyone.

11:42AM  25   That's -- that's forbidden from what we do.  And it's --

1    it's a waste of time for -- for -- from our perspective,

2    which is JaScott Investments' perspective.

3    Q.  Okay.

4    A.  So you are -- and -- and to -- to further that

11:43AM 5    a little bit more, not only do we not cold-call random

6    people, but, if you look at that document, we don't

7    cold-call people who don't answer all of our questions,

8    because that's a waste of time too.  Because a lot of

9    times what happens is -- let's say people made -- say, I

11:43AM 10    want the $60,000 loan, they don't answer the rest of the

11    questions because they really don't qualify and they

12    want you -- they want you to tell them their story,

13    right?  They want to listen to you so you can have

14    empathy for their certain scenario.

11:43AM 15          And, for us, if you don't -- if you don't

16    have the minimum requirements, we don't even call you

17    back there.  And so that's what we -- that's what

18    that -- that document actually illustrates, is that, you

19    know, not only are we not cold-calling, we're not cold-

11:43AM 20    calling you if you don't give us -- if you don't answer

21    all our questions either.

22    Q.  I see.  Okay.  Well, let me now refer you to

23    Exhibit B on the screen.  Can you see Exhibit B on the

24    screen?

11:44AM 25    A.  Yes.

Mitchell Scott - January 12, 2024

```
          1      Q.   That's a five-page document.  You see it says
          2  "Exhibit B" up at the top, JaScott website screenshot?
          3      A.   Yes.
          4      Q.   Are you familiar with that?
11:44AM   5      A.   Yes.
          6      Q.   What is that page 1 of Exhibit B?
          7      A.   So this is the -- the home page of the
          8  JaScott.org web page.  So this is -- this is the -- the
          9  website as it looks today and then.  And it talks about
11:44AM  10  the -- our process for qualifying for a loan.
         11      Q.   So is this the JaScott Enterprises website or
         12  the JaScott Investments website?
         13      A.   This is the JaScott Investments website.
         14      Q.   And that's the one that you -- that JaScott
11:45AM  15  Investments completely took over from JaScott
         16  Enterprises?
         17      A.   Correct.
         18      Q.   Okay.  Now, what happens if on -- on this
         19  Exhibit B, page 1, if you click on the "Apply Now"?
11:45AM  20      A.   It takes you to a survey form, and that survey
         21  form asks you those same exact questions that were
         22  provided by -- that we got in that spreadsheet.  So
         23  this -- this survey form completes that -- when you --
         24  when you enter in your information here, your revenue,
11:45AM  25  your -- how long you've been in business, what you want
```

1  the money for, it's going to ask you those questions,

2  and then that populates the spreadsheet that we showed

3  earlier, or one of the spreadsheets that's very similar

4  that we showed earlier.

5      Q.  Okay.  Now, does this also apply towards

6  business loans?

7      A.  This is all business loans.

8      Q.  No consumer loans?

9      A.  No consumer loans.  The -- the only consumer

10 loan we offer -- let's say if you're a business, and

11 let -- let's say if you're in real estate -- you're in

12 real estate.  And, in real estate, you've got to have

13 some cash to -- to do the deal.  And let's say -- you

14 know, let's say you -- you want a hundred thousand

15 dollar loan.  In order to qualify for a real estate

16 investment, you've got to -- you've got to have

17 20 percent equity into that house, right?  And let's say

18 you don't have equity into the house -- you don't have

19 enough equity into the house, but it's still a very good

20 deal and you think you have a very good exit strategy.

21 The only personal loans that we really offer are the

22 ones where we give you either, A, a business loan or we

23 give you a real estate loan, but we can't give you all

24 the money, so we can wrap it around with a personal

25 loan.

11:46AM (lines 5, 10, 15, 20)
11:47AM (line 25)

Mitchell Scott - January 12, 2024

85

```
  1              But we really don't do any personal loans
  2    just ran- -- like -- that -- that aren't stacked on top
  3    of a -- a business loan that you have with -- with a
  4    very good exit strategy.
```
11:47AM
```
  5         Q.   So the answer was "no," you don't do personal
  6    loans?
  7         A.   Not -- not on -- not on their own, correct.
  8         Q.   Okay.  Going to page 2, these are
  9    testimonials --
```
11:47AM
```
 10         A.   Yes.
 11         Q.   -- from the JaScott Investments web page?
 12         A.   Yes.
 13         Q.   Page 3, that's -- what's that?
 14         A.   This is the header.  So this is -- this is all
```
11:47AM
```
 15    the home page.  And this is at the top of the home page.
 16    So this is -- talks about, you know, that the
 17    JaScott.org is into the lending business.
 18         Q.   Okay.  Page 4 of Exhibit B, what is that?
 19         A.   This is -- just gives you a quick rundown of
```
11:48AM
```
 20    the business loans that we do offer and the industries
 21    that we service.
 22         Q.   I see.  And page 5?
 23         A.   This is just frequently asked questions.  In
 24    addition to business loans -- again, we're in the real
```
11:48AM
```
 25    estate, so we had a relationship with a company called
```

1   Trio that we were providing lease-to-own home financing.

2   So, over to your right, it's just some Q and A over that

3   particular product.  And then, to your left, that is the

4   business loan.

11:48AM  5              And this -- this is really -- these are

6   really the two products that we have in addition to

7   investor real estate loans that we offer at JaScott.org.

8        Q.   Okay.

9              MR. NEVAREZ:  Well, I have no further

11:49AM 10  questions.  I'll pass the witness.

11              FURTHER EXAMINATION

12  BY MR. MILTENBERGER:

13        Q.   Let me share my screen.  Can you see my shared

14  screen, which appears to be that website?

11:49AM 15        A.   Correct.

16        Q.   Lease-to-Own Home Finance, those are consumers,

17  right?

18        A.   No.  Actually, no.  Those are -- so how this

19  works is we offer -- we have -- we have -- let's say

11:49AM 20  if -- I'm sorry, tell me your last name one more time,

21  Chris.

22        Q.   Miltenberger.

23              But it says Lease-to-Own Home Finance, so

24  those are dealing with consumers' homes, right?

11:50AM 25        A.   No.  So let me -- please give me an opportunity

1   to explain.  So, Mr. Miltenberger, let's say you don't

2   have enough money to offer -- let's say you don't have

3   enough money to -- or you don't qualify for getting a

4   loan on your own, right?  So what we do is, we have the

11:50AM  5   house, and then what we can do is we actually have -- we

6   don't sell the house to the individual.  We sell it to

7   this company called Trio.

8              So -- so our deal is with Trio.  Trio

9   leases the house back to you, gives you the ability to

11:50AM  10  increase -- to have equity into the house, and then they

11  sell it to you at somewhere down the road.

12      Q.   And I get that.  But what you're marketing is

13  to consumers that need a house to live in, right?

14  That's -- that's the customer?  You find somebody who's

11:51AM  15  a consumer that needs a house to live in, and he goes

16  through you to get Trio to buy it, and then that

17  consumer leases it from Trio, right?

18      A.   My rel- -- my deal is with Trio.  So the

19  client --

11:51AM  20      Q.   Your deal is.  But -- but the target audience

21  for this frequently asked question, that's a consumer

22  who needs to live in a house, correct?

23      A.   Correct.

24      Q.   Okay.  Now, let me ask you this:  When I apply,

11:51AM  25  do I get a TCPA message that says, We have -- that you

Mitchell Scott - January 12, 2024

```
 1  agree we can call you even if you are on the "Do Not

 2  Call" list?

 3      A.   No.  We say, Thank you for your information and

 4  we'll be reaching out to you if you -- if you qualify

 5  for our -- our product.

 6      Q.   So you don't have a TCPA disclaimer on your

 7  website, do you?

 8      A.   No.

 9      Q.   So any of the leads that come through this

10  website, none of those have that TCPA disclaimer, do

11  they?

12      A.   They're not cold calls.  You reached out to --

13      Q.   Okay.  No, I'm just asking:  None of the leads

14  that come through this website that I'm sharing with

15  you -- none of those have the TCPA claim- -- disclaimer,

16  do they?

17      A.   I -- I don't even know.  I don't know what that

18  is.  So, if you reached out to me and you filled out

19  this form, you're authorizing me to give you a call

20  back, or you're -- you're collecting on that

21  information.  So, in terms of what -- again, we don't

22  cold-call, so we're not as versed in TCP.  But we have

23  the ability to respond to inquiries when you come

24  through our website.

25      Q.   Okay.  Max Williams, how did he transfer that
```

11:52AM (line 5)
11:52AM (line 10)
11:52AM (line 15)
11:52AM (line 20)
11:53AM (line 25)

1    spreadsheet to you with the lead in it of Mr. Callier?

2         A.   We have -- we -- it was -- it's on the

3    spreadsheet that we all have access to.  So, when --

4    when -- it's a live worksheet -- a live worksheet, and

11:53AM  5    we have that information -- once he plugs in that

6    information on the spreadsheet, we all have access to

7    it.

8         Q.   When you say "we all," is it a Google Docs that

9    you and everybody at Green Arrow have access to?

11:53AM  10        A.   Yes.  Yes.  Everybody who -- yes.  So --

11        Q.   Who else -- who else has access to it, besides

12   people at Green Arrow and JaScott Investments?

13        A.   And Sygnius Group had access to it.

14        Q.   Okay.  And so you didn't actually receive an

11:53AM  15   e-mail about that lead?

16        A.   No, I did not.

17        Q.   So Max Williams, what's he got to do -- I mean,

18   he's been designated as a witness.  Why is he designated

19   as a witness?

11:54AM  20        A.   He -- he was the one who handled the lead

21   coming from -- from Callier.

22        Q.   So he's the one that spoke with Callier?

23        A.   I can't speak to that, because a lot of leads

24   come in through the web and a lot of leads come in from

11:54AM  25   phone.  So I don't know exactly how he got the lead.

Mitchell Scott - January 12, 2024

1    But, if it was by phone, I would assume he was the one
2    that spoke to him, because he was the one who -- who the
3    lead was designated as -- as part of working the lead.

4         Q.   Okay.   Now, what happens if a loan goes bad?

11:54AM  5    So like this loan to Mr. Callier, let's say it gets

6    funded, and six months later it goes bad.   Is JaScott

7    Investments on the hook for any of that bad loan?

8         A.   Yeah.

9         Q.   And how is that?

11:54AM 10        A.   Any -- well, I don't know the exact timing of

11   it all.   But if -- if it's within six months -- or if

12   it's within a year and the loan goes bad, we have to pay

13   back our -- whatever -- whatever money was paid to us,

14   it gets paid -- we have to give it back.

11:55AM 15        Q.   So whatever you got in commission, you have to

16   pay back, if -- if that loan goes bad within some period

17   of time, right?

18        A.   I believe -- I believe that's the way it works,

19   yes.

11:55AM 20        Q.   So, basically, you make these loans and you

21   pass them on to someone else to take the risk on the

22   loan, right?

23        A.   Sometimes, yes.

24        Q.   So you really don't care if the loan is a good

11:55AM 25   loan or a bad loan?   As long as it goes through and you

1   get paid, you're in good shape, aren't you?

2      A.   No, that's not true at all.  It's all about

3   relationships.  So, at the end of the day, if you're

4   writing bad loans, you're going to lose your partners.

11:55AM   5   So you definitely don't want to get into the habit of --

6   of doing bad loans.  Second of all, yes, we do have to

7   give the money back.  And third, we have the ability to

8   syndicate.

9           So what we were working toward was the

11:56AM   10   ability to take a portion of that loan on all the loans

11   that we offer.  So like, say, if we give you a $25,000

12   loan, maybe we take -- we have someone else underwrite

13   it, but we can syndicate it, where we take 5 and the

14   other company takes 20.  That's what we were all working

11:56AM   15   to- -- that's what JaScott Investments was working

16   toward.  So definitely --

17      Q.   Let -- tell me this:  On -- on the loan to

18   Mr. Callier -- again, I think I asked you earlier and

19   you told me you weren't real sure.  But, in general, how

11:56AM   20   much do you make on a loan like that?  How much do you

21   get in revenue into your company on a loan like that?

22      A.   I can make anywhere from 2 percent of the

23   loan -- I can make as -- as much as 12 and as little as

24   2.

11:57AM   25      Q.   From 2 to 12 percent of the principal of the

Mitchell Scott - January 12, 2024

 1  loan, that's how much you can make?

 2      A.   Correct.

 3      Q.   And how many loans did you close last year?

 4      A.   2023?  We only did real estate loans.  We -- we

11:57AM  5  didn't do any business loans last year.

 6      Q.   In 2022, how many business loans did you close?

 7      A.   I don't know.

 8      Q.   Give me an approximate.

 9      A.   I -- we -- I don't know.  I -- I would -- I

11:57AM 10  would be guessing at the very least.  So, if you're

11  looking for round numbers, less than 50.

12      Q.   Less than 50?  Less than 20?

13           MR. NEVAREZ:  Let -- let me make sure I

14  file my objection.  Tho- -- it calls for speculation.

11:57AM 15      Q.   (BY MR. MILTENBERGER)  I don't mean for you to

16  speculate.  I mean, it's your business.  You're talking

17  with the jury.  I just want you to tell the jury how

18  many loans you think you closed.

19      A.   We -- the -- how -- the -- the bulk of our

11:58AM 20  business -- so yeah, it was probably -- I -- honestly,

21  Mr. Miltenberger, I don't know.  The revenue -- I don't

22  know.  I don't know.  I don't know that answer.  Just

23  leave it at that.

24      Q.   Okay.  Is your cell phone number

11:58AM 25  (214) 206-9382?

Mitchell Scott - January 12, 2024

1    A.    No.

2    Q.    What number is that that I just gave you?

3    A.    That's the business loan number.

4    Q.    Business number for who?  For what?

11:58AM 5    A.    Actually, let me look.  We have the one -- the

6    887 number -- that appears to be the number for the call

7    directory.  I'd have to look for -- that's -- that is a

8    personal number, but I don't know -- I don't really --

9    I'd have to look to see.

11:59AM 10    Q.    Whose personal number is it?

11    A.    Yeah, I -- I would have to look it up to see.

12    I haven't -- I haven't used that number or called that

13    particular number in a while.

14    Q.    Can we call that number right now?

11:59AM 15         MR. NEVAREZ:  That was a "yes" or "no"

16    question.

17         THE WITNESS:  Oh.  Oh.  Oh.

18    A.    I don't know.  I don't -- I haven't called that

19    number.  I don't know what that number -- what that

11:59AM 20    number is for.

21    Q.    (BY MR. MILTENBERGER)  Well, I understand that.

22    But this -- I'm trying to find out whose number that is.

23    Do I have your permission to call that number and see

24    who answers?

11:59AM 25         THE WITNESS:  Michael, is that an issue?

           1   Do we have an issue?

           2                MR. NEVAREZ:  I don't know.  Can he look on

           3   the "Do Not Call" registry first?  Mr. Miltenberger,

           4   please, please go to the "Do Not Call" registry.

12:00PM    5                MR. MILTENBERGER:  Is it on the "Do Not

           6   Call" registry?

           7                MR. NEVAREZ:  That's what I want you to

           8   find out before you call.

           9                MR. MILTENBERGER:  Oh, I'm not going to --

12:00PM   10                MR. NEVAREZ:  I don't want your client

          11   suing somebody again.

          12                MR. MILTENBERGER:  No, my client's not

          13   going to sue.  I'm going to make it right here on the

          14   deposition.  I'm going to dial the number myself.  You

12:00PM   15   can't sue if you dial a number.  You sue for when

          16   numbers are called to you.  I've got my phone here, and

          17   I just -- if it's your number, I don't want to be

          18   improperly contacting you.  But I want to see whose

          19   number you list -- you know, what you list with that

12:00PM   20   number.  (214) 206-9382.

          21                ELECTRONIC VOICE:  Hi.  You've reached the

          22   personal assistant for Mitch Scott.  Please tell me your

          23   name, and I'll try to connect you.

          24        Q.   (BY MR. MILTENBERGER)  Okay.  Did you just hear

12:01PM   25   that said I reached the personal assistant for Mitch

1   Scott?  Did you hear that?

2         A.   Yes.

3         Q.   Okay.  That's you, Mitch Scott, right?

4         A.   Yes.  So that -- that number is probably

12:01PM   5   connected to our IVR.  So it's connected to the -- that

6   number rolls over to my cell phone number.

7         Q.   To your cell phone number?

8         A.   Yeah.  So that is still a VOIP number -- that's

9   still a VOIP number and -- tied to JaScott Investments.

12:01PM   10  And yes, it -- well, it doesn't roll over to my cell

11  phone number.  It rolls over to the app on my phone.

12  And that's -- that's how it comes directly to me.

13        Q.   So that's the cell phone that you carry around

14  every day, right?

12:02PM   15        A.   No, that -- that is not my cell phone number.

16  That is an -- his -- there's an app on my phone that has

17  my cell phone number on it -- I mean, it's -- I have my

18  cell phone, and it's a VOIP number that's an app on --

19  on my cell phone and on the web.  So it's very similar

12:02PM   20  to the Aircall program that we talked about earlier.

21        Q.   Okay.  So, when I dial that number, that number

22  eventually goes to your cell phone, right?

23        A.   Correct.

24        Q.   Okay.  Now, I just want to make sure:  In my

12:02PM   25  questions earlier, your attorney was right, there were a

```
 1  lot of questions about "you."  When I was talking about
 2  "you," we were talking about JaScott Investments,
 3  correct?  I think we said that at the start of the
 4  deposition, right?
 5       A.   Yes.
 6       Q.   And so, all of Mr. Fawzy's calls, while you
 7  didn't make them personally, JaScott Investments,
 8  through Fawzy, made those calls, right?
 9       A.   Fawzy was under contract to go be a chaser for
10  JaScott Investments, that is correct.
11       Q.   Okay.  So those calls were made on behalf of
12  JaScott Investments, right?
13       A.   Correct.
14       Q.   Okay.
15       A.   For -- for the --
16            MR. MILTENBERGER:  I don't have -- I don't
17  have any further questions.
18            MR. NEVAREZ:  Okay.  I've got a little bit
19  of follow-up.
20                 FURTHER EXAMINATION
21  BY MR. NEVAREZ:
22       Q.   I want to share that screen of that website
23  that Mr. Miltenberger took you to.  Do you see the
24  website on the -- on the screen?
25       A.   Correct.
```

1    Q.   Okay.  Now, it says here, the Meet Our Team for

2  JaScott.org -- that's JaScott Investments?

3    A.   Yes.

4    Q.   Now, throughout this website, I -- I think the

12:04PM  5  only reference to JaScott Enterprises is under

6  Dr. Lynn -- would you pronounce that for me?

7    A.   Mallaiah.

8    Q.   Mallaiah, okay.

9         And why is JaScott -- the word "JaScott

12:04PM  10  Enterprises" on that page that under Mr. Mallaiah's

11  name?

12    A.   When we took over the website for JaScott

13  Enterprises in 2018, 2019, somewhere around in that time

14  space, Dr. Mallaiah's profile was already there.  And I

12:05PM  15  did not realize that that -- I didn't catch that one

16  word when we restructured the website and -- and turned

17  it into the JaScott Investments website.  So that was --

18  either that was a typo or it was an oversight on my part

19  to leave that word in there.

12:05PM  20         But we're still not marketing JaScott

21  Enterprises.  And he still, you know, was -- you know,

22  it's still true, but this website was making no

23  reference to that this was a JaScott Enterprises

24  website.

12:05PM  25    Q.   Okay.

1                    MR. NEVAREZ:  All right.  Well, I -- I have

2     no further questions.  Does this conclude the

3     deposition?

4                    MR. MILTENBERGER:  Okay.  Should we come

12:05PM    5     back at, say, 1 o'clock your time and resume the

6     deposition of Mr. Callier?

7                    MR. NEVAREZ:  Sure, that's fine.

8                    (Deposition concluded at 12:06 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   STATE OF TEXAS          )

4   COUNTY OF EL PASO       )

5

6           I, Melody C. Joiner, Certified Shorthand

7   Reporter in and for the State of Texas, hereby certify

8   that this transcript is a true record of the testimony

9   given in said proceedings, and that said transcription

10  is done to the best of my ability.

11          Given under my hand and seal of office on this

12  22nd day of January, 2024.

13

14

15

16          _____

17          Melody C. Joiner, Texas CSR 5525
            Expiration Date:  10/31/24
18          ACR Ink, LLC Firm
            Registration No. 11613
19          221 N. Kansas, Suite 505
            El Paso, Texas  79901
20          (915) 542-3422

21

22

23

24

25

Mitchell Scott - January 12, 2024

```
 1                     CHANGES AND SIGNATURE

 2      PAGE      LINE      CHANGE                    REASON

 3      _____

 4      _____

 5      _____

 6      _____

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____
```

```
 1          I, MITCHELL SCOTT, have read the foregoing

 2  deposition and hereby affix my signature that same is

 3  true and correct, except as noted above:

 4

 5                  _____
                    MITCHELL SCOTT
 6

 7
    THE STATE OF TEXAS      )
 8
    COUNTY OF EL PASO       )
 9

10

11          Before me, _____, on this

12  day personally appeared MITCHELL SCOTT, known to me (or

13  proved to me under oath or through _____) to

14  be the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed the

16  same for the purposes and consideration therein

17  expressed.

18          Given under my hand and seal of office this

19  ____ day of _____, 2024.

20

21

22

23                  _____
                    NOTARY PUBLIC IN AND FOR
24                    EL PASO COUNTY, TEXAS
                    MY COMMISSION EXPIRES_____
25
```