1           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                   EL PASO DIVISION

3   BRANDON L. CALLIER,          .   Case No.: 3:22-CV-00301-LS
                                 .
4           Plaintiff,           .   **FILED**
                                 .   February 11, 2025
5           vs.                  .   El Paso, Texas  CLERK, U.S. DISTRICT COURT
                                 .                   WESTERN DISTRICT OF TEXAS
6   JASCOTT ENTERPRISES, LLC,    .   BY: _____ Belinda Gamez _____
    et al.,                      .                   DEPUTY
7                                .
            Defendants.          .   Monday, January 27, 2025
8   . . . . . . . . . . . . . .      2:20 P.M.

9        TRANSCRIPT OF TESTIMONY OF BRANDON L. CALLIER
          BEFORE THE HONORABLE LEON SCHYDLOWER
10          UNITED STATES DISTRICT COURT JUDGE

11  APPEARANCES:

12  For the Plaintiff:      Law Office of Chris R. Miltenberger
                            BY: CHRIS R. MILTENBERGER, ESQUIRE
13                          1360 North White Chapel Boulevard
                            Suite 200
14                          Southlake, Texas 76092

15  For the Defendants:     The Nevarez Law Firm, PC
                            BY: MICHAEL R. NEVAREZ, ESQUIRE
16                          P.O. Box 12247
                            El Paso, Texas 79913
17
    Electronic Court
18  Recording Operator:     Belinda Gamez

19  Deputy Clerk:           Veronica Medina
                            United States District Court
20                          525 Magoffin Avenue, Suite 105
                            El Paso, Texas 79901
21
    Transcription Service:  Liberty Transcripts
22                          9107 Topridge Drive
                            Austin, Texas 78750
23                          (847) 848-4907
                            DBPATEL1180@GMAIL.COM
24                          www.libertytranscripts.com

25
    Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

**LIBERTY TRANSCRIPTS**
**(847) 848-4907**

2

1                                INDEX

                                                        Page
2

3   WITNESSES FOR THE PLAINTIFF:

4   BRANDON L. CALLIER
         Direct Examination by Mr. Miltenberger          3
5        Cross-Examination by Mr. Nevarez               38

6   WITNESSES FOR THE DEFENDANT:

7   (None)

8

9

10                                   Marked      Received

11  EXHIBITS FOR THE PLAINTIFF:

12  1    Verizon phone bill Page 1          6           7
    2    Do Not Call Registry listing     13          13
13  3    Text message                     24          24
    4    Text message                     25          26
14  6    Screenshots                      29          34
    7    Text messages                    18          19
15  8    Text messages                    19          19
    9    Text messages                    19          20
16  10   Verizon phone bill               20          20
    12   Email                            20          20
17  13   Text messages                    21          21
    14   Chart of phone calls             15          17
18

19  EXHIBITS FOR THE DEFENDANT:

20  2    Phone call audio                 65          66
    3    Phone call audio                 66          67
21  4    Phone call audio                 67          67
    5    Phone call audio                 67          68
22  6    Phone call audio                 68          71

23

24

25

                        **LIBERTY TRANSCRIPTS**
                          **(847) 848-4907**

1    **EL PASO, TEXAS, MONDAY, JANUARY 27, 2025, 2:20 P.M.**

2        (Whereupon, the Testimony of Brandon L. Callier commenced

3    at 2:20 p.m., inside the presence of the jury.)

4            THE COURT:  Mr. Miltenberger, are you ready to call

5    your first witness?

6            MR. MILTENBERGER:  Yes, sir, Your Honor.  We'll call

7    Mr. Callier.

8            THE COURT:  Raise your right hand, please.

9          BRANDON L. CALLIER, PLAINTIFF'S WITNESS, SWORN

10           THE COURT:  You may be seated.  The record should

11    reflect the witness has been sworn.

12           When you're ready, Mr. Miltenberger.

13           MR. MILTENBERGER:  Can you turn the screen back on

14    for just a second?

15           THE COURT:  Only for counsel, though.

16           MR. MILTENBERGER:  Oh, wait, wait, wait.  I'm not

17    plugged in.

18                      DIRECT EXAMINATION

19    BY MR. MILTENBERGER:

20    Q   Mr. Callier, before I start the normal introduction, we

21    just heard counsel in his opening statement say that you

22    called in to initiate this whole thing.  Did you hear him say

23    that?

24    A   Yes, sir.

25    Q   So that means that you would have called in, according to

1  them, prior to April 5th.

2  A    That's my understanding of their allegation.

3  Q    I mean, he clearly said that.  You called and said, we

4  only respond to people that call us.  And he clearly said you

5  called in and started it.  Did you call Jascott prior to

6  April 5th?

7  A    I have never called Jascott.

8  Q    Did you call Jascott on April 5th?

9  A    No.

10  Q    Did your phone records have any record of you calling

11  Jascott on April 5th?

12  A    No, they don't.

13  Q    Do they have any records of you ever calling Jascott?

14  A    No, sir.

15  Q    Would you expect your Verizon phone records to have a

16  record of that if you called them?

17  A    If I called, yes, they would have a record.

18  Q    Okay.  I just wanted to cover that one point before we

19  got started.  Could you introduce yourself to the jury?

20  A    My name is Brandon Callier.  I just turned 50 this past

21  year.  Just recently divorced.  I have a daughter.  She's a

22  senior at Seattle University in Seattle, Washington.

23  Q    Where do you live?

24  A    I've lived here in El Paso, Texas, for the past 18 years.

25  I moved here in -- excuse me, the past 22 years I've lived in

1  El Paso.

2  Q    And could you tell the jury about your work at Fort

3  Bliss?

4  A    I went to go work at Fort Bliss on September 29th, 2023,

5  excuse me, 2003.  Just after grad school, I got hired as an

6  auditor at Fort Bliss.  At the time, I had a Bachelor of Arts

7  in Psychology from Texas Tech and a Master's of Business

8  Administration from UT Tyler, and really didn't have an

9  accounting background.

10     But the Army saw some potential in me and hired me as an

11  auditor and sent me to school, trained me to be an auditor.

12  They sent me to school to get a Bachelor's degree in

13  accounting, and then eventually they sent me to Penn State

14  where I got a Master's of Public Administration.  I worked

15  for the Army for 17 years.

16  Q    Do you have a security clearance with the Army?

17  A    Yes, sir.  I had a secret security clearance.  It's a

18  mid-level security clearance.  It's not the top secret, but

19  it's, you know, not at the bottom either.  It's a mid-level

20  security clearance.  I worked in the headquarters building

21  right up the hallway from the General.

22  Q    So you weren't actually in the military.  You were

23  civilian military?  Explain that.

24  A    Yes.  I was an Army civilian employee.  So everyone's

25  familiar with soldiers, obviously.  And then most people know

1  that the military has contractors.  But a lot of people don't

2  know that the Army, Air Force, Navy, they all have civilian

3  employees also.  And I was an Army civilian employee.

4  Q    So this lawsuit involves a telephone number, 913-383-

5  4604.  We're going to call that the 4604 number.  Whose

6  telephone number is that?

7  A    That's my telephone number that I've had for the better

8  part of 20 years or so.

9  Q    And who is the regular user of that phone number?

10 A    I am the regular and only user of that telephone number.

11 Q    And I want to ask you, whose name is on the account?

12 A    So I said I was recently divorced.  The phone bill at

13 that time was in my wife's name, Anna Callier.  It was in her

14 name because she was a teacher, and they got a bigger

15 discount from Verizon than what Verizon gave to people

16 affiliated with the Army.  So the line was -- the phone bill

17 was actually in her name.

18         MR. MILTENBERGER:  Your Honor, I believe we -- did

19 we pre-admit the exhibits, or do I need to offer them?

20         THE COURT:  You need to offer.

21 BY MR. MILTENBERGER:

22 Q    Okay.  I'll show you what's been marked as Exhibit Number

23 1, which there's been no objection to.  And I'll offer into

24 evidence Plaintiff's Exhibit Number 1 and ask you to look to

25 see if this is your number, and explain why it's listed under

1  Anna Callier.

2  A    Yes.  That's my phone number.  And, again, it's under

3  Anna Callier because we were married.  And when we went to go

4  open up the lines with Verizon, it was cheaper to get it

5  under her name because the teachers got a, I don't know if it

6  was a 20 percent discount, but it was a larger discount than

7  what they offered federal civilian employees.

8  Q    And there's three other numbers on that.  Who uses those

9  numbers?

10  A    One of the numbers belonged to Anna Callier, my wife at

11  the time.  There was another number for our daughter, Emma,

12  who I previously mentioned is going to school in Seattle.

13  The third number belonged to my mother, Wynona Callier.  I,

14  you know, trying to be a good son and would pay her phone

15  bill for her.  And then the last number was mine.

16           MR. MILTENBERGER:  Your Honor, I move for the

17  admission of Exhibit Number 1.

18           THE COURT:  No objection; is that correct?

19           MR. NEVAREZ:  That's correct, Your Honor.

20           THE COURT:  All right.  Exhibit 1's admitted.

21      (Whereupon, Plaintiff's Exhibit Number 1 was admitted

22  into evidence.)

23           THE COURT:  Do you want to publish it?

24           MR. MILTENBERGER:  No.  They just looked at it.

25           THE COURT:  They have not.

 1          MR. MILTENBERGER:  Oh, they can't see what's -- oh,

 2    yes.  I'd like to publish it.  I'm sorry.

 3          THE COURT:  Now that it's in, you can publish.

 4          MR. MILTENBERGER:  All right.  Exhibit Number 1 is

 5    the Verizon phone bill.  I'm sorry, I thought the jury was

 6    looking at this exhibit a minute ago.

 7          MR. NEVAREZ:  Objection, Your Honor.  That's

 8    incorrect.  Exhibit P-1 is the first page of the Verizon

 9    phone bill.

10          THE COURT:  Whatever it is, we're looking at P-1?

11          MR. MILTENBERGER:  P-1.

12          THE COURT:  Okay.

13          MR. MILTENBERGER:  He's correct, it's the first page

14    of the Verizon phone bill.

15    BY MR. MILTENBERGER:

16    Q    And that number, 915-383-4604, is that your number?

17    A    Yes, sir.  That's my number.

18    Q    And who pays that bill?

19    A    I pay that bill.

20    Q    Does any company pay that bill?

21    A    No, sir.

22    Q    Do you deduct any portion of that bill off your federal

23    income taxes?

24    A    No, sir.

25    Q    And is that a cellular number?

1  A    Yes.  It's a cellular; a cell phone.

2  Q    Who was the carrier back then?

3  A    Verizon.

4  Q    And who's your carrier now?

5  A    AT&T is the carrier now.  I recently switched carriers

6  maybe 45 days ago.

7  Q    And why did you switch?

8  A    I bought a new home.  And when I was getting the internet

9  set up, I was getting the internet through AT&T.  And they

10 had, I guess, a bundle plan that saved me about 40 percent

11 off of what I was paying with Verizon.

12 Q    So did you switch to AT&T then?

13 A    Yes.  I switched to AT&T.

14 Q    And how long have you had that phone number?

15 A    I don't know the exact date, but it's been right around

16 20 years.

17 Q    And can you tell the jury how you use that phone?

18 A    I use the phone like most normal people use their phone.

19 I look at TikTok videos.  I will talk to my friends, my

20 family.  I'll play music in the shower from my phone.  I'll

21 use it to -- last night I made brownies.  I put them in the

22 oven at 7 o'clock.  I looked at my phone and went upstairs

23 and said, okay, I know it said 35 minutes.  When my phone

24 says 7:35, I'll come downstairs and get the brownies out.

25 But, yeah, I use the phone for the normal type personal

1  reasons that people use their cell phones.

2  Q    Now, one of the issues in this case, we believe, will be:

3  is that a personal cell phone for residential uses, or is

4  that a business line.  So I'm going to ask you some questions

5  about business lines.  Have you held that cell phone out to

6  the public as a business number?

7  A    No.  I have never held my phone out to the public as a

8  business line.  Each time, if I have a business, I will get

9  the business's own distinct separate phone line.  I have

10 never once held my phone number out to the public or

11 advertised my number in any way.

12 Q    Do you use that phone for business transactions or

13 employment in any way?

14 A    No, sir.

15 Q    Have you listed that phone number anywhere for the public

16 to see?

17 A    I've never listed that phone number anywhere for the

18 public to see.

19 Q    Have you used it even in the slightest way with any of

20 your businesses?

21 A    I have.  So on a couple of occasions, I've put my phone

22 number on documents that weren't being held out to the

23 public.  For instance, 15 or so years ago when I was starting

24 Aero Finance and I was filling out the corporate paperwork,

25 the corporate documents for it, I listed my cell phone number

Callier - Direct                          11

1  on the application.

2      And this was prior to me having Articles of

3  Incorporation, prior to me having an EIN for the business.

4  So I listed the phone number because I didn't actually have

5  an established business where I could then go and get a phone

6  number to use for that business.

7      And then I've had a few reports, I think maybe four

8  reports that were due to the State of Texas, or maybe they

9  were El Paso County, not the State of Texas, where I listed

10 my cell phone number on the document that I filled out that

11 went to the state.

12 Q   And why would you list your cell phone number on that

13 document?

14 A   Well, at the time, I was still working at Fort Bliss, and

15 I worked in a secure building.  Excuse me, I worked at Fort

16 Bliss, and I would be at Fort Bliss from 8 o'clock till 4:30.

17 And I listed my cell phone number on there just in case I

18 needed to be reached for some reason because I wouldn't have

19 been at the office to take a call, you know, if a call was

20 needed with respect to that document that I filled out.

21     But again, that's a document that went to the state that

22 didn't go to the public, and I never actually got any calls

23 related to listing it on those documents.

24 Q   So you've mentioned a couple of businesses.  Could you

25 explain to the jury the businesses that you have and whether

Callier - Direct                    12

1  they have their own business line?

2  A   I had a loan and tax company called Aero Finance.  It's

3  defunct now, but it had -- Aero Finance had two landlines and

4  a fax number.  Those two landlines and that fax number were

5  issued by Spectrum.  And the bill for those two phone numbers

6  and that fax number were paid out of the business account.

7      I currently have -- excuse me.  I then opened up a nail

8  salon called Vanity Nail Bar.  Vanity Nail Bar again had a --

9  we didn't have a fax number, but there was a landline for

10  Vanity Nail Bar.  It was the phone number that went on our

11  website.  The website's not up anymore, but, you know, a

12  simple Google search can find what those old numbers were.

13     And then I currently have Aero Tax Services.  Aero Tax

14  Services is a current business.  There's a website that I've

15  had for since the business opened.  And the phone number for

16  Aero Tax Services is published on the website.

17         MR. MILTENBERGER:  Ms. Medina, you can turn off my

18  screen while I go to another.

19  BY MR. MILTENBERGER:

20  Q   So there's been talk about registering a phone on the

21  National Do Not Call Registry.  Did you register your phone

22  number with the National Do Not Call Registry?

23  A   Yes.  I personally registered my phone number on the

24  National Do Not Call Registry in December 2007.

25  Q   And do one of our exhibits show your registry on the Do

1  Not Call List?

2  A    Yes.  It shows the e-mail confirmation that you get when

3  you register your phone on the National DNC.

4          MR. MILTENBERGER:  Your Honor, I'd like to move for

5  the introduction of Exhibit Number 2 that's been pre-

6  admitted.

7          THE COURT:  Without objection, it's admitted.

8      (Whereupon, Plaintiff's Exhibit Number 2 was admitted

9  into evidence.)

10         MR. MILTENBERGER:  Could you turn it on, please?

11  BY MR. MILTENBERGER:

12  Q    Is this an e-mail that comes from the National Do Not

13  Call Registry when your number gets registered?

14  A    Yes, sir.

15  Q    And if you'll look, it shows that it was registered on

16  December 13th, 2007.  Is that correct?

17  A    Yes, sir.

18         MR. MILTENBERGER:  Thank you.  Ms. Medina, you can

19  turn it off.

20  BY MR. MILTENBERGER:

21  Q    Now, do you have a second phone number as well?

22  A    I do have a second number, yes.

23  Q    And I hate to get too personal, but can you tell the jury

24  why you have a second phone number?

25  A    So a number of years back, my now ex-wife had an affair

 1  with a co-worker.  And we agreed that we were going to stay

 2  together for my daughter's sake, at least until she went off

 3  to college.  So I was living basically my own life and

 4  sleeping in a separate bedroom.  And we had an agreement how

 5  we were going to split things once the divorce -- once my

 6  daughter moved out and we got divorced, which was recently

 7  finalized back in October.

 8      So anyway, I would talk to -- with us living basically

 9  our own lives, I started talking to other people.  But I

10  didn't want to, like, get caught or have her try to use that

11  against me, so I had a different -- so I had a second cell

12  phone number to talk to people while I was waiting for the

13  divorce to finalize.

14  Q   And the number that we're here on today, the old phone

15  number, that's the number that you primarily use?

16  A   That's the number that I use for basically -- everyone

17  has that number for me, all my friends, my relatives.  It's

18  the number that I've had for 20 years.  So it's not a number

19  that I would want to give up or have, you know, everyone, you

20  know, learn anew, I guess, so to speak.

21  Q   So have you prepared a document that lists the number of

22  texts and the calls and the dates that you received those

23  texts and calls from Jascott?

24  A   Yes, sir.  I prepared a document that shows all the

25  calls.  There were other calls, but the only calls on that

Callier - Direct                    15

1  document are the calls that I was able to substantiate and

2  get the proof for before bringing it to the Court.

3  Q   So what did you use to -- when you said substantiate and

4  have proof of those calls, can you explain to the jury what

5  documents you used?

6  A   I used the phone records from Verizon, from my Verizon

7  phone bills.  I used screenshots of missed calls.  You know,

8  after a while, those calls will disappear if you don't

9  screenshot them.  And I used screenshots for the text

10 messages, the text threads from the text messages back and

11 forth between myself and the defendant or the defendant's

12 representatives.

13 Q   And this call log that you prepared, have you reviewed it

14 to make sure that it is accurate?

15 A   Yes, sir.  I reviewed it to make sure that nothing except

16 what we could substantiate was listed on the call log.

17 Q   And would that exhibit be helpful to the jury to

18 understand your testimony today about the number of calls and

19 texts that you've received?

20 A   Yes, sir.

21     MR. MILTENBERGER:  Your Honor, I'll move for the

22 introduction of Exhibit Number 14 and ask for request for

23 permission to produce it to the jury.

24     THE COURT:  Any objection?

25     MR. NEVAREZ:  Yes, sir, Your Honor.  The document is

1  hearsay.  By Mr. Callier's own testimony, he's got the source

2  documents.  I suggest that the best evidence is the source

3  documents themselves, the messages that he's referred to, the

4  phone bills that he's referred to.  So, yeah, I would object

5  on the basis of hearsay.

6          THE COURT:  Are the underlying documents in evidence

7  yet?

8          MR. MILTENBERGER:  They're not in evidence yet, but

9  they have been pre-admitted --

10          THE COURT:  All of them?

11          MR. MILTENBERGER:  -- and stipulated.  All of them.

12          MR. NEVAREZ:  I beg to differ with that, Your Honor.

13 He's got a one-page Verizon bill that's been admitted into

14 evidence.  That hardly provides a justification for the calls

15 that supposedly are in the call log.

16          THE COURT:  Is the entire Verizon bill going to be

17 in evidence?

18          MR. MILTENBERGER:  It will be in evidence.  Each of

19 these documents that he reviewed has been pre-admitted or

20 reviewed by the Court prior with no objection.

21          THE COURT:  Is there any evidence on the proposed

22 exhibit that comes out -- that is derived from something that

23 will not be in evidence before the jury?

24          MR. MILTENBERGER:  No, Your Honor.

25          THE COURT:  All right.  Overruled.

1      (Whereupon, Plaintiff's Exhibit Number 14 was admitted

2  into evidence.)

3          MR. MILTENBERGER:  May I approach the witness, Your

4  Honor, and give him a hard copy of that exhibit?

5          THE COURT:  You may.  Just bear in mind that while

6  you're walking, you can't be talking because we have to

7  record what you're doing.

8          MR. MILTENBERGER:  Have you published that exhibit?

9  BY MR. MILTENBERGER:

10  Q   Mr. Callier, I've handed you Exhibit Number 14 that I'd

11  like you to go through the jury with.  And Exhibit Number 14,

12  in the far right it shows references.  Do you see that?

13  A   Yes, sir.

14  Q   Can you explain to the jury what the references mean?

15  A   The references are where in the record that these --

16  where the documentation for the calls or text messages can be

17  found.

18  Q   So if we look at text message number one, it says Exhibit

19  P-7.

20  A   Yes, sir.

21  Q   Do you see that?

22  A   Yes.

23          MR. MILTENBERGER:  Your Honor, may I give him a hard

24  copy of the various exhibits so he'll know what he's seeing

25  before he testifies?

1          THE COURT:  Can you see it in front of you,

2    Mr. Callier?  Can you see that exhibit on your screen in

3    front of you?

4          THE WITNESS:  Yes.

5          THE COURT:  He can see it.  But you can give him

6    hard copies if you want.

7          MR. NEVAREZ:  Your Honor, can I get a copy of the

8    hard copies that the witness is going to be looking at to

9    see?

10          THE COURT:  Yes.  Do you have duplicate copies,

11    Counsel?

12          MR. MILTENBERGER:  We have an additional copy --

13          MR. NEVAREZ:  May I examine what you --

14          MR. MILTENBERGER:  Oh, yeah.  You can

15    (indiscernible).

16          MR. NEVAREZ:  -- are going to hand the witness?

17    BY MR. MILTENBERGER:

18    Q    Okay.  Keep in mind, Exhibit Number 7 has not been

19    admitted yet.  The jury is not looking at it yet.  But can

20    you tell me what Exhibit Number 7 is?

21    A    Exhibit number 7 is a text message from Mark Fawzy, or a

22    string of text messages between Mark Fawzy from Jascott

23    Investment and myself.

24          MR. MILTENBERGER:  Your Honor, I move for the

25    introduction of Exhibit Number 7 and wish to publish it to

1  the jury.

2          THE COURT:  All right.  Without objection.

3      (Whereupon, Plaintiff's Exhibit Number 7 was admitted

4  into evidence.)

5          THE COURT:  Just to expedite things, why don't you

6  just get them all in, and then you can go back and publish as

7  you need.

8          MR. MILTENBERGER:  Okay.

9          THE COURT:  So we don't have to turn the screen on

10 and off.

11 BY MR. MILTENBERGER:

12 Q   Can you next -- can you then look at Exhibit Number 8?

13 Can you tell the jury what that is?

14 A   That would be a string of text messages between myself

15 and Dave Thurber at Upwise Capital.

16         MR. MILTENBERGER:  I move for the admission of

17 Exhibit Number 8.

18         THE COURT:  Without objection, 7 and 8 are admitted.

19     (Whereupon, Plaintiff's Exhibit Number 8 was admitted

20 into evidence.)

21 BY MR. MILTENBERGER:

22 Q   Can you look at Exhibit Number 9?

23 A   Exhibit Number 9 is a string of text messages between

24 myself and Mark Fawzy of Jascott Investments.

25         MR. MILTENBERGER:  I move for the introduction of

1  Exhibit Number 9.

2          THE COURT:  Without objection, 9 is admitted.

3      (Whereupon, Plaintiff's Exhibit Number 9 was admitted

4  into evidence.)

5  BY MR. MILTENBERGER:

6  Q   Can you look at Exhibit Number 10, please?

7  A   Exhibit Number 10 is the Verizon phone bill covering the

8  period of March 26th, 2022 to April 25th, 2022.

9          MR. MILTENBERGER:  I move for the introduction of

10 Exhibit Number 10, please.

11         THE COURT:  Without objection, 10 is admitted.

12     (Whereupon, Plaintiff's Exhibit Number 10 was admitted

13 into evidence.)

14 BY MR. MILTENBERGER:

15 Q   Can you look at Exhibit Number 11 and tell the jury what

16 that is?  No, excuse me, not number 11, number 12.  I

17 apologize.

18 A   That is an email from Mark Fawzy of Jascott to myself on

19 April 5th, 2022.

20         MR. MILTENBERGER:  I move for the admission of

21 Exhibit Number 11.

22         THE COURT:  No, it's 12.

23         MR. MILTENBERGER:  12, excuse me.

24         THE COURT:  Without objection, 12 is admitted.

25     (Whereupon, Plaintiff's Exhibit Number 12 was admitted

1  into evidence.)

2  BY MR. MILTENBERGER:

3  Q   And the last one in this group is Exhibit Number 13.

4  Could you explain what that is to the jury?  It's down at the

5  very bottom.  It may be hard to see.

6  A   Yeah.  It's really small.  I was making sure it was 13.

7  It looks like a string of text messages from Dave Thurber at

8  Upwise Capital, between him and myself.

9          MR. MILTENBERGER:  I move for the introduction of

10 Exhibit Number 13.

11         THE COURT:  Without objection, 13 is admitted.

12     (Whereupon, Plaintiff's Exhibit Number 13 was admitted

13 into evidence.)

14         MR. MILTENBERGER:  Okay.  So I'd like to publish now

15 Exhibit Number 6.  Excuse me, excuse me.  Not 6, but Exhibit

16 Number 7.

17         THE COURT:  You may.

18 BY MR. MILTENBERGER:

19 Q   Exhibit Number 7, can you tell the jury what that shows?

20 A   Exhibit 7 shows a text message that I received from Mark

21 Fawzy from Jascott Investment on April 5th, 2022 at 11:38

22 a.m.

23 Q   And at the top of that exhibit, does it show the number

24 that it came from?

25 A   Yes, sir.

1  Q    And who is that number?

2  A    That (612) 662-4225 is a phone number that Mark Fawzy

3  used to contact me on a few occasions.

4  Q    Okay.  Turning back to Exhibit Number 14, numbers one and

5  two, one is a text message and number two is a call.  Do you

6  see that?

7  A    Yes, sir.

8  Q    Had you called Jascott prior to those entries in one and

9  two?

10  A    No, sir, I had not.

11  Q    Can you tell me what occurred in that call under number

12  two that says the call lasted three minutes?

13  A    Yes.

14    So I had received a few missed phone calls from the 4225

15  number.  And then at 11:38 that day I received that text

16  message that we just looked at.  And then he called back at

17  2:48 p.m.  On the call at 2:48 p.m., after having received

18  between the phone calls and the text messages, I think that

19  was the fifth or sixth time they attempted to contact me, I

20  pretended like I was interested in their services and

21  obtaining a loan, and I had them email me.

22  Q    So you said you had some missed calls that aren't on this

23  log.  Why are they not on this log?

24  A    They're not on the log because when -- I had logged them

25  on an Excel spreadsheet.  But when I went back during

1  discovery, I think I confused the 4205 and the 4225 numbers,

2  and I forgot to take screenshots of the missed calls from the

3  4225 phone number.  So in trying to be as accurate as

4  possible and only include what I could substantiate and what

5  I could prove, I removed those from the call logs.

6  Q   And so after this call on the 5th, 2:48 on the 5th, this

7  shows a number of calls and texts leading up to the 19th.  Do

8  you see that?

9  A   Yes, sir.

10 Q   Are you asking for any recovery for those calls and texts

11 from the 5th leading up to the 19th?

12 A   No, sir, I'm not.

13 Q   And why not?

14 A   At the point that I pretended to be interested in their

15 services, that would have created what's called an

16 established business relationship.  And under the Telephone

17 Consumer Protection Act, you can't sue for phone calls if you

18 have an established business relationship.  So I did not

19 include any of those phone calls as part of -- or, excuse me.

20 I'm not seeking to recover for any of those phone calls.

21 Q   So we heard some opening statements about driver's

22 license and bank statements.  Did you provide that to

23 Jascott?

24 A   Yes.  I did provide those documents to Jascott.  I

25 provided those documents as part of an investigation to find

1   out who the lender was.  That was necessary because when

2   Mr. Fawzy was calling me and texting me, he never once said

3   that he was calling to try to make a loan to me on behalf of

4   Pac Western.  So they didn't disclose who they were lending

5   on behalf of.  And so I pretended to be interested to find

6   out who they were lending on behalf of.

7   Q   And at some point in time, did you determine that you

8   understood who they were calling on behalf of, and you then

9   wanted the calls to stop?

10  A   Yes.  I determined that the phone calls had been made on

11  behalf of Pac Western. And then on I believe April 19th of

12  2022, I sent a text message to them, and I said don't ever

13  call or text me again.

14          MR. MILTENBERGER:  Your Honor, we'd like to

15  introduce Exhibit Number 3 which has been previously pre-

16  admitted.

17          THE COURT:  Without objection, 3 is admitted.

18      (Whereupon, Plaintiff's Exhibit Number was 3 admitted

19  into evidence.)

20          MR. MILTENBERGER:  I'd like to publish that to the

21  jury.

22          THE COURT:  You may.

23  BY MR. MILTENBERGER:

24  Q   Could you read that for the jury?

25  A   It says I'm being -- excuse me.  "I'm getting bombarded

1  with phone calls from funding agencies, literally 50 per day.

2  I can't even work because of the calls.  I don't know who's

3  who."  That's sic.  "I'm sending this to everyone.  Nothing

4  personal.  Please don't call or text again."  And I sent that

5  text message to basically every company that was calling me.

6  Q   Did you send that individually to Mr. Fawzy?

7  A   Yes.  It was sent individually to Mr. Fawzy, to the (612)

8  662-4205 phone number.

9  Q   And did Mr. Fawzy immediately respond to it a couple of

10 times as we can see on the exhibit?

11 A   He immediately responded saying he just sent me an email

12 again even though I had just told him seconds earlier not to

13 text me.

14 Q   Did you expect him to continue to text and call you?

15 A   I did not.  The PCPA requires telemarketers to honor do

16 not call requests, and I was pretty explicit not to call or

17 text again.

18 Q   And did Mr. Fawzy acknowledge that he received your do

19 not call request?

20 A   Yes, sir.  He acknowledged that he had received my

21 request.  He --

22        MR. MILTENBERGER:  Your Honor, I'd like to move for

23 the introduction of Exhibit Number 4 which has been

24 previously discussed and stipulated to.

25        THE COURT:  Without objection, 4 is admitted.  And

1  you may publish.

2      (Whereupon, Plaintiff's Exhibit Number 4 was admitted

3  into evidence.)

4  BY MR. MILTENBERGER:

5  Q   And first I ask who this is a text from.

6  A   That is a text from Mark Fawzy who was an agent for

7  Jascott Enterprises.

8  Q   And what does he say right here in the very front?

9  A   He says, "As you have said, you are getting blasted with

10 calls," which was an acknowledgement that he had received the

11 text message where I asked him to stop calling me.

12 Q   Did you expect him to continue to call and text you after

13 he even acknowledged your do not call request?

14 A   I would have expected anyone to honor that request.  It

15 wasn't ambiguous.  And he acknowledged that he received that

16 request.

17         MR. MILTENBERGER:  Ms. Medina, you can de-publish.

18 Thank you.

19 BY MR. MILTENBERGER:

20 Q   Now, can you tell the jury who Mark Thurber is?

21 A   Mark Thurber was a -- was working in -- working with

22 Jascott as part of I guess establishing this loan for Pac

23 Western.  He also was calling and texting on behalf of

24 Jascott.

25 Q   Did you have any conversations with him to tell him to

1  stop calling or texting?

2  A    Yes.  I also told Mr. Thurber to stop calling and stop

3  texting, I believe both over the phone and in writing.

4          MR. MILTENBERGER:  Ms. Medina, may I publish Exhibit

5  Number 14 again?

6  BY MR. MILTENBERGER:

7  Q    I'm going to ask you to look at the number that I'm going

8  to highlight, 376-3680.  Do you see that number?

9  A    Yes.  That's Mr. Thurber's number.

10 Q    And the other numbers, the one I'm circling now, and I'll

11 actually do it in red, 662-4205.  Is that Mr. Fawzy's number?

12 A    Yes, sir.

13 Q    So does each of the entries on this log accurately

14 reflect either a call or a text and show who the source of

15 that call or text is?

16 A    Yes, sir.

17 Q    So if it's a 4205 number, that's coming from Mr. Fawzy,

18 correct?

19 A    Yes, sir.

20 Q    And if you'll look, let's just look at, like, on the

21 25th.  Missed call, missed call.  You had two missed calls on

22 the 25th.  How do you know those came from Fawzy?

23 A    Each and every time I spoke to someone that would call

24 with that phone number, it was Mr. Fawzy.  I didn't speak to

25 any other person who identified themselves as someone other

1   than Mr. Fawzy whenever I spoke to someone on that phone

2   number.  Obviously taking it from the caller identification.

3         THE COURT:  Mr. Miltenberger, we won't take a --

4   let's have everybody just stand up and stretch if you'd like

5   to.  I noticed there were some droopy eyes.  So if you need

6   to stretch, stand up and stretch.  We'll take a couple of

7   seconds here as you collect your next question,

8   Mr. Miltenberger.  That includes my staff.

9         MR. NEVAREZ:  Your Honor, could we take a couple

10   minutes?

11         THE COURT:  Okay.  Would the jury like a comfort

12   break, as well?  You know what, if you need to, Mr. Nevarez,

13   we'll do that.  Let's try to be back in the room at 3:10,

14   please.

15         Mr. Miltenberger, please remember where you were in

16   your examination.  We'll pick up right there.

17         Don't discuss the case, please.  And we will stand

18   in recess.  Thank you.

19     (Whereupon, at 3:02 p.m., a brief recess was taken,

20   reconvening at 3:11 p.m., outside the presence of the jury.)

21         THE CLERK:  All rise.

22         THE COURT:  Mr. Nevarez, wait.  Don't leave the

23   courtroom until the jury has left, okay?  Just out of

24   courtesy to them just going forward.  Thank you.

25         Let's bring in the jury.

Callier - Direct                         29

1          THE CLERK:  All rise for the jury.

2       (Whereupon, at 3:12 p.m., the jury entered the

3    courtroom.)

4          THE COURT:  All right.  Please be seated.  Ladies

5    and gentlemen, if I haven't told you already, although we're

6    running short the rest of the day, you're welcome to bring in

7    drinks if you'd like.  Just please make sure they have tops

8    on them.  So as long as you have drinks with tops on them,

9    it's perfectly fine to bring them into the courtroom.

10          And if your eyes get droopy, we're late in the

11   afternoon, feel free to stand.  You're more than welcome.  I

12   just need to make sure everybody listens to all the evidence

13   in the case, please.

14          Okay.  Mr. Miltenberger, when you're ready.

15   BY MR. MILTENBERGER:

16   Q   Mr. Callier, I'm not sure I covered it with you earlier,

17   but I've handed you a copy of Exhibit Number 6.  Can you tell

18   the jury what Exhibit Number 6 is?

19   A   Exhibit Number 6 are a series of screenshots that were

20   taken from my cell phone, from the phone numbers at issue.

21          MR. NEVAREZ:  Your Honor, I don't think Exhibit

22   Number 6 has been admitted.  In fact, I objected to it.

23          THE COURT:  Well, that's probably what we're about

24   to deal with.

25   BY MR. MILTENBERGER:

1   Q    When did you prepare Exhibit Number 6?

2   A    Can you define prepare?  Let me --

3   Q    When did you take the screenshots and put them together

4   in the form, and it's got a Bates label number down there, in

5   the form?

6   A    The screenshots were initially taken in real time as the

7   phone calls were coming in because eventually, missed phone

8   calls will disappear from your -- from your cell phone.  And

9   then in the form that they're in now, I believe that was

10  produced during discovery.

11  Q    And how did you get them in that form off of your phone?

12  A    I emailed the screenshots to myself and then created PDFs

13  of those screenshots.

14  Q    And does that Exhibit Number 6 reflect an accurate

15  representation of the screenshots of the missed calls from

16  the 4205 number?

17  A    Yes.  It's an accurate representation of the missed phone

18  calls from the 4205 number, and then also the -- one second,

19  the phone number ending in 3638 -- 3680.

20       MR. MILTENBERGER:  Thank you.  Your Honor, I'll move

21  for the introduction of Exhibit Number 6.

22       THE COURT:  Ms. Medina, may I have that on my

23  screen?  Only me and Counsel, please, so I can see what it

24  looks like.

25       MR. MILTENBERGER:  You want me to bring it up, or do

1    you have it?

2              THE COURT:  You'll need to bring it up.

3              MR. MILTENBERGER:  Oh, I will?

4              THE COURT:  Yeah, you need to.  Why don't you

5    retrieve a hard copy of that, let me take a look at that.

6              MR. MILTENBERGER:  Brandon, can you give him --

7              THE COURT:  All right.  Any objection, Mr. Nevarez?

8              MR. NEVAREZ:  Well, yes, sir.  The screen itself

9    doesn't really -- each screen doesn't really indicate what

10   number it's about.  So that's my first objection.  The second

11   objection is it's got a lot of missed calls.  I'm not sure

12   what -- missed calls are not -- do not follow the PCPA, Your

13   Honor.  They're not prohibited.  So I --

14             THE COURT:  So it's a relevance objection?  Let's

15   not do speaking.  Just give me legal objections, please.

16             MR. NEVAREZ:  Well, that was it, they're irrelevant.

17   The foundation has not been accurately laid because it

18   doesn't show -- each page doesn't really show what the phone

19   number is.

20             THE COURT:  I'm sustaining the objection to the

21   extent that some of these don't have the phone number on

22   them.  But I'll allow you some latitude to clean that up.

23   You could try again.

24             MR. MILTENBERGER:  Thank you, Your Honor.

25             THE COURT:  I'll sustain the objection for now.

1  BY MR. MILTENBERGER:

2  Q   Mr. Callier, you can see, let's, like, look at the first

3  page.  You didn't have a phone number on it.  Why does it not

4  have a phone number?

5  A   There's no phone number because in my preparation, when I

6  was putting this together, I wasn't aware that you could --

7  there was a button you could push when you were taking

8  screenshots that would move the page down and take continual

9  screenshots.  So I just did a bad job and didn't know that I

10  could do that.

11      So I didn't capture the number on the April 13th and

12  April 12th, the -- on that first page, or the second page for

13  that matter.  I think it would be useful to point out with

14  respect to those numbers, that those are all phone calls that

15  we're not seeking damages for.

16          THE COURT:  Hold on.  Let's just --

17          THE WITNESS:  Oh, sorry.

18          THE COURT:  Let's answer the question posed.  Go

19  ahead.

20  BY MR. MILTENBERGER:

21  Q   Okay.  If you'll look down to the fifth page of that

22  document, it shows at the top 612-662-4205.

23  A   Yes, sir.

24  Q   Could you explain why that showing isn't on the first

25  pages?

1  A   So when I would put it together, when I was taking the

2  screenshots -- or let me start at the beginning.  So I put

3  612-662-4205 into my phone to bring up the history.  And so

4  because of the sheer number of phone calls, not all the calls

5  would fit on the same page.  So I would take -- I took a

6  screenshot of the very top which is what you see here.  And

7  it was able to capture six of the phone calls to include the

8  source phone number that those phone calls came from.

9  Q   So did all of the calls, even though it doesn't show the

10 4205, come from the 4205 number?

11 A   Yes, sir.

12         MR. MILTENBERGER:  Judge, we will move for the --

13 re-move for the admission of Exhibit Number 6.

14         THE COURT:  All right.  Mr. Nevarez, I'll hear legal

15 objections.

16         MR. NEVAREZ:  Well, that's incorrect, Your Honor.

17 There's a page regarding Constance Kim (phonetic) which isn't

18 -- it's a 516 number, 376-3680, that I'm not sure --

19 Mr. Callier testified it had to do with this 4604 number.  So

20 that's obviously incorrect.

21         MR. MILTENBERGER:  We'll delete those last two

22 pages, Your Honor.

23         THE COURT:  How are you going to do that?

24         MR. MILTENBERGER:  Take them off of the exhibit.

25         THE COURT:  All right.  Any objection with those --

1  let me ask you this.  With those last two pages excised, do

2  all of those numbers reflect calls from the 4205 number?

3  This is to you, Mr. Callier.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Did you take these screenshots yourself

6  off of the phone?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  All right.  And when did you do that?

9  When did you prepare this exhibit?

10         THE WITNESS:  When?  I -- the screenshots were taken

11 as the phone calls were coming in, which would have been in

12 April of 2022.  And then I received -- and I would have taken

13 screenshots then.  And then I also took screenshots as I

14 continued to get more calls I believe in June of 2022,

15 September.  But as the calls would come in, just to

16 memorialize the phone calls, I would take text -- I would

17 take screenshots.

18         THE COURT:  All right.  I'll admit it.  I will admit

19 it conditioned on your removing the last two pages.  So

20 Plaintiff's Exhibit 6 will be admitted.

21    (Whereupon, Plaintiff's Exhibit Number 6 was admitted

22 into evidence.)

23         THE COURT:  Do not publish the last two pages to the

24 jury.  And, Mr. Nevarez, you can cross-examine on that

25 exhibit when you have the opportunity.

1          MR. NEVAREZ:  Yes, sir.

2          THE COURT:  Okay.  So P-6 is in.  Don't publish the

3    last two pages, please.

4          MR. MILTENBERGER:  Can you publish again?  I have

5    Exhibit 14 on the screen.

6    BY MR. MILTENBERGER:

7    Q    And then rather than go through line-by-line and day-by-

8    day, I'd just like to take a look at April 27th.  Can you

9    explain what April 27th shows to the jury so that they can

10   then obviously read the rest of the chart, as well?

11   A    Looks like on April 27th, I received seven phone calls

12   and text -- six phone calls and one text message it looks

13   like.

14   Q    And the phone calls were missed phone calls, correct?

15   A    Yes, sir.  They were all missed phone calls.

16   Q    And they would have been taken from that exhibit we just

17   talked about, Exhibit Number P-6?

18   A    Yes, sir.

19   Q    And so if you go down through the rest of this chart,

20   does that accurately show the calls that you either received,

21   missed, or the text messages received from Jascott?

22   A    Yes, sir.

23   Q    What was the purpose of Jascott and Mr. Fawzy's calls to

24   you?

25   A    They -- the initial calls were an attempt to get me to

1  fill out a loan application to take out what's called a

2  merchant cash advance, which is a high interest loan,

3  oftentimes exceeding, like, 50 percent interest.  The

4  subsequent calls, even after the DNC requests, were them

5  attempting to get me to actually accept the loan.  I didn't

6  have any interest in accepting the loan, and which is why,

7  you know, I told them to stop calling me.

8  Q   Do you know if Jascott would have made any money, you may

9  not know, off of you completing the loan?

10        THE COURT:  Isn't that complete speculation?

11 BY MR. MILTENBERGER:

12 Q   Did you do anything to determine if Jascott was

13 registered with the Secretary of State?

14 A   Yes.  I performed two searches of the Texas Secretary of

15 State website.  I don't know the website right off the top of

16 my head, but there's a website published by the Texas

17 Secretary of State.  You can go in there and you can put in

18 the name of the company.  And you perform research.

19    And it will show you each company that's registered to

20 telephone solicit in Texas currently.  It will show all past

21 registrations.  It will show who's bonded.  It shows all the

22 -- who has an application that's pending.  And when I did the

23 search, there was no mention of Jascott anywhere for any of

24 those circumstances.

25 Q   And in what state were you physically located when you

Callier - Direct                    37

1   received the telephone calls from Jascott?

2   A   I was in El Paso, Texas, for each of the phone calls.

3           MR. MILTENBERGER:  I'll pass the witness, Your

4   Honor.

5           THE COURT:  Thank you, Mr. Miltenberger.

6           Mr. Nevarez, cross-examination.

7           MR. NEVAREZ:  Yes, Your Honor.

8           THE COURT:  I think Mr. Nevarez needs to have access

9   to your exhibits if he wants to cross-examine on them.  Do we

10  have that ability to do that?

11          MR. NEVAREZ:  Yes.  I do plan to start off with his

12  exhibits because I have --

13          THE COURT:  Okay.  Do you have them on your

14  computer, too?

15          MR. NEVAREZ:  Yes.

16          THE COURT:  Okay.  Thank you.

17          MR. NEVAREZ:  Do you want me to use mine or his?

18          THE COURT:  However you want to use them.  I just

19  want to make sure you have access to them so you can use

20  them.

21          MR. NEVAREZ:  Well, I think it would be easier if I

22  just used his, Your Honor.

23          MR. MILTENBERGER:  You want to use mine?

24          MR. NEVAREZ:  Yeah.  Oh, I'm sorry.  I was thinking

25  about having the Court call them up on the screen.

1          THE COURT:  Well, you all bring them up.  You have

2    to bring them up.

3          MR. NEVAREZ:  Oh, okay.

4          THE COURT:  We just turn the screen off and on for

5    you.

6      (Whereupon, there was a brief pause in the proceedings.)

7          MR. NEVAREZ:  Okay.  Let me -- can we publish P-3,

8    Your Honor?

9          THE COURT:  It's published.

10         MR. NEVAREZ:  Okay.  Thank you.

11                      CROSS-EXAMINATION

12   BY MR. NEVAREZ:

13   Q   So, Mr. Callier, regarding this is your copy of the April

14   19th text message?

15   A   Yes, sir.

16   Q   Okay.  And so this is for -- this says this is marked

17   from Jascott Investment, right?

18   A   Yes, sir.

19   Q   Now, you keep saying that you wanted to find out -- that

20   you kept feigning, to use your attorney's word, that you kept

21   feigning interest because you wanted to find out who the

22   funding company was, or the loan company?

23   A   Yes.

24   Q   Well, this tells you, right?

25   A   No, sir.

1   Q    It doesn't tell you Jascott Investments?

2   A    The contract that was sent over was -- the loan was

3   through Pac Western.

4   Q    But Jascott Investments was going to be funding,

5   providing you with the loan, right?

6   A    No, sir.  Pac Western was making the loan.

7   Q    And do you realize that Pac Western has no affiliation

8   with my client, Jascott Investments?

9   A    What I know is that the contract that sent over by

10  Mr. Fawzy came -- the company making the loan was a company

11  named Pac Western.

12  Q    Okay.  But this says Jascott Investments, not Pac

13  Western.

14  A    Yes, sir.

15  Q    Okay.  Now, you sued Pac Western in this court for this

16  case, right?

17  A    Yes, sir.

18  Q    And you had to dismiss Pac Western.  Isn't that correct?

19  A    Pac Western was eventually dismissed from the case, yes.

20  Q    And that's because they have nothing to do with this

21  case, right?

22  A    It was because we've reached a settlement.

23  Q    And that was because they have nothing to do with this

24  case, right?

25  A    As part of the settlement, they didn't admit to

Callier - Cross                          40

1   liability.  But we've reached a settlement in the case.

2   Q   Okay.  But you had the dismissal because they had nothing

3   to do with -- in fact, they had filings in this case saying

4   they had nothing to do with it.  Isn't that correct?

5   A   It's correct that they were dismissed because we've

6   reached a settlement in this case.

7   Q   And that was because -- let me show you the filings where

8   they claim they had nothing to do with this case.  And in

9   fact, you signed the filings.

10          THE COURT:  Hold on.  Let's -- are we going to read

11  from exhibits here?  What are we going to do here?  Are you

12  going to try to read from something because it needs to be in

13  evidence.

14          MR. NEVAREZ:  Yes, sir.  I'm just going to ask him

15  to --

16          THE COURT:  Okay.  So take --

17          MR. NEVAREZ:  -- authenticate --

18          THE COURT:  Take off the publishing, please.  Okay.

19  You can proceed.

20          MR. NEVAREZ:  Okay.

21     (Whereupon, there was a brief pause in the proceedings.)

22          MR. MILTENBERGER:  What number is this?

23          MR. NEVAREZ:  It's ECF-26.

24          MR. MILTENBERGER:  Is it an exhibit?

25          MR. NEVAREZ:  No.  I'm going to introduce it into

                              Callier - Cross                    41

 1    evidence.  I need him to authenticate it, unless you want to

 2    stipulate that it's a court filing.

 3              THE COURT:  Well, talk to me.  Don't talk to each

 4    other.  What are you trying to do?

 5              MR. NEVAREZ:  I want to refer him to ECF-26 which is

 6    the joint federal rules --

 7              THE COURT:  Well, let's then do it the right way.

 8    So let's publish it to the witness and counsel only, please,

 9    Ms. Medina.  And now you can ask your questions.

10              MR. NEVAREZ:  Yes, sir.

11              THE COURT:  Don't refer to the contents of it unless

12    I admit it.

13              MR. NEVAREZ:  Yes.

14    BY MR. NEVAREZ:

15    Q    Do you see ECF-26, Document 26?

16    A    Yes.

17    Q    You're familiar with this?

18    A    Yes, sir.

19    Q    You were representing yourself at the time?

20    A    Yes, sir.

21    Q    Okay.  So you're familiar with this document?

22    A    Yes, sir.

23    Q    In fact, you participated in the creation of this

24    document.  Is that correct?

25    A    That's correct.

Callier - Cross                    42

1  Q   Okay.  And it got filed in this court.  is that correct?

2  A   Yes.

3          MR. NEVAREZ:  Okay.  Offer into evidence, Your

4  Honor.

5          THE COURT:  On what basis?  Any objection?

6          MR. MILTENBERGER:  Yes, Your Honor.  I object based

7  on relevance.

8          THE COURT:  What's the relevance, Mr. Nevarez?

9          MR. NEVAREZ:  Pac Western wasn't involved in this --

10          THE COURT:  Show me where in this document there's

11  something relevant.

12          MR. NEVAREZ:  Paragraph 7 on Page 3.

13          THE COURT:  I don't see how that's relevant.

14          MR. NEVAREZ:  Well, it gets to Pac Western's denial

15  of liability.  And then I have an email from Mr. Callier

16  that's a follow up to this.

17          THE COURT:  I'm going to sustain the objection.

18  It's not admitted.  You got to mark this as -- what Defense

19  exhibit do you want to mark this as?

20          MR. NEVAREZ:  Well, if it's not admitted, I don't

21  want to mark it.

22          THE COURT:  Well, we have to mark it for the record.

23  So can I assume what -- we have to put a number on it.

24          MR. NEVAREZ:  Okay.  D -- how about D-300?

25          THE COURT:  Round figure.  Okay.  Defense Exhibit 1

1  is not admitted.  I find it's not relevant.  I'm also not

2  sure that it's been properly -- well, no.  It was adopted.  I

3  don't find it's relevant.  And it's overly broad.

4          MR. NEVAREZ:  Very well, then.

5      (Whereupon, there was a brief pause in the proceedings.)

6          THE COURT:  Go ahead, Mr. Nevarez.

7          MR. NEVAREZ:  Yes, Your Honor.  I'm looking for --

8  BY MR. NEVAREZ:

9  Q   Now, you also sued Jascott Enterprises, LLC.  Right?

10 A   Yes, sir.

11 Q   And that case was dismissed by this Court.  Is that

12 correct?

13 A   I believe you and my attorney reached an agreement to

14 dismiss Jascott Enterprises.

15 Q   Well, no.  That's incorrect.  Your --

16         THE COURT:  Hold on.

17         MR. MILTENBERGER:  Your Honor --

18         THE COURT:  Is there an objection?

19         MR. MILTENBERGER:  Object based on relevance.

20         THE COURT:  What's the relevance?

21         MR. NEVAREZ:  Mr. Callier's sued several entities,

22 and he -- and two of which had to be dismissed because they

23 had nothing to do with this case.

24         THE COURT:  Well, don't testify, Mr. Nevarez.  I

25 mean, you can ask the questions.

Callier - Cross                    44

1  BY MR. NEVAREZ:

2  Q   So you're aware that Jascott Investments was dismissed

3  because your attorney moved to dismiss it from this case?

4  A   That's my understanding.

5  Q   Okay.  And I opposed that motion.  Are you aware of that?

6  A   Yes, sir.

7          MR. NEVAREZ:  Okay.  Your Honor, I have another

8  exhibit that I want to offer into evidence that I'd like for

9  the Court to -- Mr. Callier to see on the screen.

10         THE COURT:  Okay.  Is it before Counsel and

11 Mr. Callier?  You can bring it up.  Go ahead.

12         MR. NEVAREZ:  Okay.

13 BY MR. NEVAREZ:

14 Q   You see that email on the screen?

15         MR. MILTENBERGER:  I can't see it, Your Honor.  I

16 don't know.

17         MR. NEVAREZ:  Why don't you come over here?

18 BY MR. NEVAREZ:

19 Q   Can you see that, Mr. Callier?

20 A   Yes, sir.

21 Q   And that's from you to me, copying a bunch of other

22 people?

23 A   Yes.

24 Q   The subject is meet and confer, amending complaint?

25 A   Yes.

Callier - Cross                      45

1  Q   Okay.  You see that -- you see the last sentence there

2  that begins with finally?

3  A   Yes.

4  Q   Okay.  Now, this is a true and accurate copy of an email

5  that you sent me.  Is that correct?

6  A   Yes, sir.

7  Q   And you authored that email?

8  A   Yes.

9       MR. NEVAREZ:  Okay.  I'd like to offer it into

10  evidence, Your Honor.

11       MR. MILTENBERGER:  I'm going to object based on

12  relevance.

13       THE COURT:  What's the relevance, Mr. Nevarez?

14       MR. NEVAREZ:  The last sentence, Your Honor.

15       THE COURT:  I can't --

16       MR. NEVAREZ:  You can't read the last sentence?  Or

17  the last sentence before thank you.

18       THE COURT:  I don't see the relevance.  It's not

19  admitted.  So what -- this is Defense Exhibit what?

20       MR. NEVAREZ:  Well, we would make it --

21       THE COURT:  301?

22       MR. NEVAREZ:  301.

23       THE COURT:  Okay.  Not admitted, not relevant.  And

24  we'll need to have copies of these, okay?

25       MR. NEVAREZ:  Yeah.

Callier - Cross                                46

1        (Whereupon, there was a brief pause in the proceedings.)

2    BY MR. NEVAREZ:

3    Q   All right.  So let's go back to your exhibit.  So again,

4    I ask you, regarding that exhibit --

5        (Whereupon, there was a brief pause in the proceedings.)

6            THE COURT:  Are you looking for the one you had

7    before?

8            MR. NEVAREZ:  Yes, sir.

9            THE COURT:  It was P-3.  That's what you were

10   referring to.

11           MR. NEVAREZ:  P-3, okay.  Thank you, Your Honor.

12   BY MR. NEVAREZ:

13   Q   Okay.  So again, have you seen P-3 in front of you?

14   A   Yes, sir.

15   Q   Okay.  So Mark from Jascott Investment texted you

16   regarding did you -- saying did you complete -- completed the

17   bank verification.  And you responded I'm getting bombarded

18   with phone calls from funding agencies.  Were you calling a

19   lot of funding agencies, or a lot of funding agencies were

20   calling you?

21   A   I --

22   Q   Or both?

23   A   I never called any funding agencies.  A lot of funding

24   agencies were calling me.

25   Q   Well, you say I don't know whose who.  I'm sending this

Callier - Cross                        47

1  to everyone.  Nothing personal.  Please don't call or text

2  again.  So you didn't -- you didn't really say Mark from

3  Jascott, please don't call again.  Is that correct?

4  A    Correct.  I didn't say Mark, don't call.  My message

5  indicated I wanted everyone to stop calling.

6  Q    And have you any idea what bank verification Mr. Mark

7  from Jascott Investments is talking about?

8  A    He's referring to I think the final process in an MCA

9  loan where they verify the bank account and --

10  Q    I see.

11  A    -- deposit the funds.

12  Q    Well, so he completed the bank verification for you.

13  A    No, sir.

14  Q    How -- well, then who completed the bank verification?

15  A    No one.

16  Q    No one?  So why is he -- so you didn't want to respond to

17  say who is Mark from Jascott Investments and what bank

18  verification are you talking about?

19  A    I just wanted him to stop texting and calling me.

20  Q    But this is the Mark from Jascott that you were talking

21  to and emailing to and texting to about getting a business

22  loan in the amount of $60,000, right?

23  A    He was the Mark that I was conversing with trying to find

24  out who the lender was.

25  Q    Okay.  So, and he was trying to help you get a $60,000

1  loan, right?

2  A    Yes.  He was trying to help me get a $60,000 loan even

3  after I told him to stop calling and texting me.

4  Q    Well, he was trying to get you the $60,000 loan because

5  you gave him bank account statements, you gave him a copy of

6  your driver's license, and you gave him an application.

7  Isn't that correct?

8  A    Yes.  All that occurred prior to me sending that text

9  message saying don't call or text again.

10  Q    Okay.  Why didn't you just tell him I'm not interested in

11  a loan anymore, because he obviously didn't know what's going

12  on.  You give him a -- you sent him a text, a general text,

13  non-specific as to Jascott Investments, saying do not call.

14  He doesn't know if you're trying to communicate with the --

15  those people that you didn't seem to be knowing who's who.

16  A    The text message was clear that I wanted everyone, to

17  include Mr. Fawzy, to stop calling and texting.  So it

18  applied to him, whether or not I mentioned him by name,

19  because he's part of everyone.

20  Q    But you already -- you've been doing an application,

21  right?

22  A    Yes.  I gave him an application --

23  Q    Okay.

24  A    -- because he didn't -- he didn't identify Pac Western as

25  the lender.  So I went through the process.  And then I found

 1  out Pac Western was the lender.  And then I didn't want to be

 2  contacted by Mr. Fawzy anymore.

 3  Q   Well, did you get a loan from Pac Western?

 4  A   I was offered a loan that I declined.

 5  Q   Okay.

 6  A   So no, I never did.

 7  Q   And who offered you the loan from Pac Western?

 8  A   Pac Western was the company that offered the loan.

 9  Q   Yes.  Who were you speaking to to get the loan from Pac

10  Western?

11  A   That was part of this Fawzy --

12  Q   A name, sir.  That's what I'm asking.

13  A   Mr. Fawzy and Mr. Dave Thurber.

14  Q   Dave Thurber?

15  A   Yes.

16  Q   Okay.  And did you ever communicate with Mr. Thurber?

17  A   I also told Mr. Thurber to stop calling me.  He ignored

18  those requests, also.

19  Q   Okay.  Did you ask Mr. -- are you aware that Mr. Thurber

20  wasn't an agent of Jascott investments?

21  A   I don't have a knowledge of inner workings of Jascott

22  Enterprises or --

23  Q   I'm sorry --

24  A   -- Jascott --

25  Q   What?

1   A    I don't have a working knowledge of their internal

2   processes, employees and all that stuff.  I just know that

3   those were the two people that were speaking to me, and those

4   were the ones that sent the contract over.

5   Q    Okay.  So you're not aware of whether Mr. Thurber was an

6   employee of Jascott Investments.  Is that correct?

7   A    Correct.

8   Q    Okay.  Now, going back to P-3, Mr. Mark from Jascott

9   says, "I just sent you the email again at Callier74."  You

10  got the email from markFawzy@Jascott.org?  You see that?

11  A    Yes, sir.

12  Q    And then you reply with a smiley?

13  A    I don't believe so.

14  Q    Well, what's the little smiley there that's on April

15  19th, 2022, at 4:26 p.m.?

16  A    (No audible response)

17  Q    You see the little smiley here?

18  A    I don't know what you're referring to.

19  Q    Do you see a smiley there down at the bottom?

20  A    Oh, yes.  I see what you're referring to.  On my phone,

21  you can press that button, and various emojis will come up to

22  select from.

23  Q    Right.

24  A    So if I wanted to send a smiley face or a happy face, sad

25  face, whatever, then I could do that.  But that's just the

Callier - Cross                        51

1  option to select.  That's not me sending or replying with

2  anything.

3  Q   But that's really not a do not call, a clear, convincing

4  do not call, is it?

5  A   I'm sending this to everyone.  Please don't call or text

6  again is pretty clear to me that I don't want anyone to call

7  me.

8  Q   Okay.  But you'd already told Mark that you were going to

9  -- that you wanted a loan.  So can you see that he's confused

10 why you're sending him a general do not call to everyone?

11 A   I indicated to him that it was nothing personal. That the

12 same message was going out to everyone.  I indicated to him

13 that I was being bombarded, that it was making it difficult

14 for me to even work, and that I wanted the phone calls to

15 stop.  And he ignored that.

16 Q   Well, you said nothing personal.  You told -- you told

17 Mark Fawzy please don't call again.  But before that you said

18 nothing personal because you had been bombarded.

19 A   Nothing personal --

20 Q   So you end up confusing.  On the one view, you're

21 applying for a loan and he's ready to get the -- he's ready

22 -- he sends you the completed bank verification telling you

23 basically that you're ready to get the money, the 60,000.

24 A   So, the nothing personal was so that he wouldn't feel bad

25 about me telling him to stop.  You know, it wasn't anything

Callier - Cross                    52

1  personal.  I just want the phone calls to stop.  That's why I

2  put my phone number on the DNC registry.

3  Q   Wouldn't you agree that telling him nothing personal is

4  kind of vague.  Maybe he feels that you're not directing it

5  to Mark Fawzy because you're saying you've -- you're sending

6  it to everyone.

7  A   It's common for people when they're car shopping,

8  mortgage shopping, to fill out multiple loan requests.  And

9  then they go with one.  I didn't go with anything.  I'm not

10 saying -- I'm just painting a hypothetical here.  But if

11 someone were to select a loan for a car, and then they tell

12 the other three or four car --

13         MR. NEVAREZ:  Well, I'm sorry.  Your Honor,

14 strike --

15         THE WITNESS:  -- things that they don't want to be

16 contacted, and they should honor it.

17         MR. NEVAREZ:  Move to strike, Your Honor.  That's

18 non-responsive.  It's a hypothetical.

19         THE COURT:  Overruled.  It's an answer to the

20 question.  I think we've probably exhausted this area.  Why

21 don't you move on?

22         MR. NEVAREZ:  Yes, sir.  I was going to move on.

23         THE COURT:  Thanks.

24 BY MR. NEVAREZ:

25 Q   Now, referring to P-6, is it correct that these calls are

1  not recoverable under TCPA?

2          MR. MILTENBERGER:  Objection, Your Honor.  Calls for

3  a legal conclusion.

4          THE COURT:  Sustained.

5  BY MR. NEVAREZ:

6  Q   All right.  So let me refer you to P-13.  Do you see

7  that?

8  A   (No audible response)

9          THE COURT:  Why don't you use your screen.

10         THE WITNESS:  Yeah.

11         THE COURT:  It's right there on the screen.

12         THE WITNESS:  Yes.

13  BY MR. NEVAREZ:

14  Q   Okay.  And that was sent to you by Dave over at Upwise?

15  A   Yes, sir.

16  Q   Okay.  And so why didn't you sue Upwise?

17  A   I did attempt to sue Upwise.  I had trouble locating

18  them.  So I wasn't able to -- I don't think I was able to

19  find the correct Upwise.  I think I sued the wrong Upwise.

20  Q   You sued Pac Western thinking they were Upwise, right?

21  A   I thought that Pac Western -- that, excuse me, Upwise was

22  a DBA of Pac Western because it says so on their Secretary of

23  State filing in the State of Utah, I believe.  I subsequently

24  found out that that was a completely different Upwise.

25  Q   Right.  So why didn't you sue Upwise.  Even though you

 1  thought it was Pac Western, and they got dismissed, why

 2  didn't you join Upwise in this lawsuit?

 3  A   Because Upwise only called me a couple times after the

 4  DNC request whereas Jascott called me and texted me, like,

 5  100 times afterwards.

 6  Q   Okay.  Okay.  Well, let me ask you to go to P-12.  You

 7  see that?

 8  A   Yes, sir.

 9  Q   And that's from Mark Fawzy to you?

10  A   Yes, sir.

11  Q   On April 5, 2022?

12  A   Yes.

13  Q   And then so Mr. Fawzy's basically -- well, could you read

14  that into the record, please, just the first sentence?

15  A   "Hi, Brandon.  We just spoke on the phone regarding

16  capital options for the business."

17  Q   What does that mean, the capital options for the

18  business?

19  A   It means that Mr. Fawzy called me soliciting me for a

20  business loan.

21  Q   Okay.  Did you reply to him telling him do not call,

22  Mr. Fawzy?  Or do not email me again?

23  A   At that point, no.

24  Q   Did you ever tell Mr. Fawzy I'm not interested in a

25  business loan?

Callier - Cross                        55

1  A    No.  I only told Mr. Fawzy to stop calling, texting.

2  Q    Okay.  Did you ever make it to Mr. Fawzy -- did you ever

3  make it clear that he's wasting his time calling you and

4  texting you because you have no interest in a business loan

5  at all?

6  A    I just made it clear to Mr. Fawzy that I didn't want him

7  calling and texting me.

8  Q    And the second line says, "I sent my application via

9  DocuSign which you can complete on your computer,

10  smartphone."  You see that?

11  A    Yes, sir.

12  Q    Did you complete the application via DocuSign?

13  A    At some point, I did complete an application, yes.

14  Q    Okay.  Again, you did not just simply reply I don't want

15  to sign an application because I'm not interested in a

16  business loan?

17  A    No, sir, I did not because then I wouldn't have been able

18  -- I would not have found out that the lender was Pac

19  Western.

20  Q    Okay.  So you were looking to see who you could sue?

21  A    I was looking to see who was responsible for the phone

22  calls.

23  Q    So you could sue.

24  A    So that I could find out who was responsible for the

25  phone calls.

Callier - Cross                         56

1  Q   So you could sue.  Why else --

2          THE COURT:  Okay.  I think we've gotten it.  Let's

3  move on.

4      (Whereupon, there was a brief pause in the proceedings.)

5          MR. NEVAREZ:  Okay.  Well, let me bring up P-9.

6  BY MR. NEVAREZ:

7  Q   Tell me when you have that in front of you.

8  A   Yes, I have it.

9  Q   Okay.  That's also -- that's the same -- I'm sorry.

10  That's also from Mark from Jascott?

11  A   Yes, sir.

12  Q   And that says -- and that's April 12th?

13  A   Yes, sir.

14  Q   Okay.  And that's -- and so the last sentence there says,

15  "I got a good news for you.  Call me back, please?"

16  A   Yes.

17  Q   And then your reply was, "In a meeting, will call when

18  able."

19  A   Yes.

20  Q   Why didn't you tell him not interested, Mark, in anything

21  Jascott has to offer?

22  A   Because I was trying to find out who the lender was.

23  Q   Again, and why is that?

24  A   Because telemarketers don't properly identify on whose

25  behalf phone calls are being made.  And if they had done so,

1  I would have known that Pac -- they were calling on behalf of

2  Pac Western.  But they didn't do that.

3  Q   But he's telling you Jascott Investments.  Why didn't you

4  just sue Jascott Investments and then find out in discovery

5  who the lender is that you want to find out about?

6  A   Well, that may have been an option to try it that way.

7  Or Jascott could have properly identified Pac Western on any

8  one of the 25 calls leading up to that.

9  Q   Why would Jascott Investments identify Pac Western?

10 A   Because when you telemarket, you're supposed to properly

11 identify the company that you work for and on whose behalf

12 the phone calls are being made.

13 Q   How do you know that Jascott Investments wasn't

14 identifying themselves properly?

15 A   They didn't properly identify Pac Western.

16 Q   Well, they have nothing to do with Pac Western, sir.

17 Jascott Investments was giving you the loan.

18 A   I never received -- I received loan paperwork from Pac

19 Western.

20 Q   Is that in the record here?  I've never seen anything

21 from Pac Western, as you say, in the record.  Do you have

22 that?

23 A   I don't have the contract on me that was sent to me, no.

24 Q   And then further down on Tuesday, April 12th, he's

25 telling you please check your email.  Just send over the

1  business voided check and driver's license.  That all --

2  that's all we require.  Do you know what he's talking about?

3  A   Yes, sir.

4  Q   and what is that?

5  A   He wants me to complete the process so that they can

6  finalize a loan and give the money.

7  Q   Okay.  The $60,000?

8  A   You keep saying 60,000, so I'll take your word for it

9  that that's what they were offering.

10 Q   Okay.  And then further down, that's on Tuesday, April 9,

11 a week later.  And it says, "Sir, this is Mark from Jascott

12 Investment.  Did you complete the bank verification?"  That

13 was the email that we looked at.  And then that's your

14 bombarded phone call.  And then you go through --

15         THE COURT:  You have to ask questions, Mr. Nevarez.

16         MR. NEVAREZ:  Yes, sir.

17         THE COURT:  Let's move along.

18 BY MR. NEVAREZ:

19 Q   And then further down on April 19th, he says, as you say,

20 you're getting bombarded with calls, just save my number and

21 my underwriter phone number, as we are the ones who will be

22 getting you funded.  Right?

23 A   Yes, sir.

24 Q   So then you know who the lender is.  They're the ones who

25 are going to fund you your loan.

1   A    That text message does not say Pac Western.

2   Q    And it's from -- well, it's not Pac Western, sir.  It's

3   Jascott Investments.  They're in the -- they're in the

4   business of giving business loans.  It's not Pac Western.

5   Jascott Investments had nothing to do with Pac Western.

6           MR. MILTENBERGER:  Is there a question, Your Honor?

7           THE COURT:  Yeah, sustained.  So what you say,

8   Mr. Nevarez, has to be in the form of a question.

9           MR. NEVAREZ:  Yes.

10  BY MR. NEVAREZ:

11  Q    So again, you didn't reply to Mr. Fawzy telling him no,

12  don't need a loan, don't want a loan, right?

13  A    Correct.

14  Q    And again, on Friday the 22nd, do you see that?

15  A    Yes, sir.

16  Q    He says, "Sir, can you please call back?"  I guess he's

17  getting annoyed by this time.  And your reply is -- read that

18  into the record.

19  A    "I'm eating lunch with my staff."

20  Q    No I'm not interested in a loan, stop calling me back

21  about the loan because I'm not interested?

22  A    No, sir, I did not say that because I don't have to

23  qualify why I want someone to stop calling me.

24      (Whereupon, there was a brief pause in the proceedings.)

25           MR. NEVAREZ:  So --

1        (Whereupon, there was a brief pause in the proceedings.)

2            THE COURT:  Let's take it off publish.

3   BY MR. NEVAREZ:

4   Q   Now, you indicated that you -- well, I'm sorry.

5        (Whereupon, there was a brief pause in the proceedings.)

6            THE COURT:  Are you going to ask some questions,

7   Mr. Nevarez?

8            MR. NEVAREZ:  Yes, sir.  Yes, sir.

9   BY MR. NEVAREZ:

10  Q   You indicated that you've never held out your phone to

11  the public?

12  A   Yes, sir.

13       (Whereupon, there was a brief pause in the proceedings.)

14           THE COURT:  Mr. Nevarez, I'm going to have to ask

15  you to move along.

16           MR. NEVAREZ:  Yes, sir.  I'm doing it.

17           THE COURT:  Please.

18           MR. NEVAREZ:  I'm doing it.  If you -- Your Honor,

19  I'd like the witness to view Exhibit 10 for authentication

20  purposes.

21           THE COURT:  Whose Exhibit 10?

22           MR. NEVAREZ:  My Exhibit 10.

23           THE COURT:  Defense Exhibit 10.

24           MR. NEVAREZ:  That's correct.

25           THE COURT:  So let's publish it to counsel and the

1  witness only, please, Ms. Medina.  Counsel and witness only,

2  please.

3  BY MR. NEVAREZ:

4  Q   Do you recognize that document, sir?

5  A   Yes, sir.

6  Q   And what is it?

7  A   That is the PTIN directory created by the IRS that shows

8  all the people in the United States that has a tax preparer

9  identification number.

10 Q   And so down at the bottom is your -- is Aero Tax

11 Services, Brandon Callier?

12 A   Yes.

13 Q   Okay.  And the IRS posts these on the web, the PTIN

14 directory?

15 A   I presume it's on the IRS website.

16        MR. NEVAREZ:  Okay.  Your Honor, I'd like to offer

17 it into evidence.

18        THE COURT:  Any objection?

19        MR. MILTENBERGER:  Objection, Your Honor.  Hearsay.

20        THE COURT:  I'm still not clear what this is.  Will

21 you lay a better foundation for me, please?

22        MR. NEVAREZ:  Yes, sir.

23 BY MR. NEVAREZ:

24 Q   Who is PTIN again?

25 A   Who is a -- you said what is a PTIN?

1  Q    Yes.

2  Q    If you prepare taxes, the -- you have to be registered

3  with the IRS.  And they issue you a tax preparer

4  identification number.

5  Q    All right.  And in fact, you also have to be registered

6  with PTIN to be registered with the IRS.  Is that not

7  correct?

8  A    No.  I only registered with the IRS.  I don't know who

9  publishes the PTIN directory or what you're showing me.  I

10  don't know where you got that from.

11  Q    Well, it's the PTIN.  You understand what PTIN is, right?

12  It's an association.

13  A    I know what a PTIN is.  I don't know where you got this

14  document from.

15  Q    Well, if you look at the top, it says PTIN directory.

16  A    I don't know who publishes that.

17  Q    You don't know who the -- well, it's the PTIN directory.

18  Who else would publish it?

19  A    Sir, I don't know.  I just know I registered with the

20  IRS.

21  Q    Well, and did you also register with PTIN?

22  A    No, sir, I did not.

23  Q    Well, you have to have registered.  How else would they

24  get your name and number?

25              THE COURT:  Let's not have that discussion.  I guess

Callier - Cross                    63

1    what I'm looking for is authentication.  Authenticate the

2    document.  First of all, you have it marked as Exhibit 2 and

3    15.  I thought this was Defense Exhibit 10.  What number is

4    this?

5              MR. NEVAREZ:  I thought it was 15.

6              THE COURT:  Okay.  So we're talking about 15 now?

7    Okay.  So authenticate it, if you can, through this witness.

8              MR. NEVAREZ:  Yes, sir.

9    BY MR. NEVAREZ:

10   Q    Sir, you say you didn't -- you would have -- you've

11   never, ever applied with the PTIN?

12   A    I applied with the IRS to get a PTIN.  But I don't think

13   this document comes form the IRS.  Just by looking at this,

14   it looks like it's some company that I'm assuming just pulls

15   PTINs from wherever they pull them from and make a list of

16   them.  I don't know.  But that's not from the IRS.  And I've

17   never applied with PTIN Directory or sent PTIN Directory any

18   information whatsoever.

19             MR. NEVAREZ:  Well, Your Honor, that's -- I believe

20   that's incorrect, Mr. --

21             THE COURT:  Okay.  It's not admitted because you

22   have to authenticate it.  I need to know what the document

23   is, where it came from, where it was derived.  The witness

24   has stated he is unfamiliar with the document.  He doesn't

25   know where you got it.  So I presume you got it.

1          MR. NEVAREZ:  Well, Your Honor, it's derived from

2    the website.

3          THE COURT:  Okay.  So then --

4          MR. NEVAREZ:  So it's public --

5          THE COURT:  So then --

6          MR. NEVAREZ:  -- information.

7          THE COURT:  Then that makes my case.  Not admitted.

8          MR. NEVAREZ:  Okay.

9          THE COURT:  Let me make sure.  You didn't generate

10   this document or pull it off the web?

11         THE WITNESS:  No, sir.

12         THE COURT:  Not admitted.

13         MR. NEVAREZ:  Okay.  Well I -- I'd like to begin,

14   Your Honor, to play an audio file.  Mr. Miltenberger

15   (indiscernible) really approved it yet.  I asked him, but he

16   says he --

17         THE COURT:  Don't talk.  Just do -- we're here in

18   court.

19         MR. NEVAREZ:  Okay.

20         THE COURT:  So lay the foundation, ask the

21   questions, and then I'll rule on --

22         MR. NEVAREZ:  Right.

23         THE COURT:  -- admissibility.  That's all there is

24   to it.

25         MR. NEVAREZ:  Right.

Callier - Cross                    65

1  BY MR. NEVAREZ:

2  Q   Do you remember having a telephone call with Mr. Fawzy on

3  April 8, 2022?

4  A   I won't remember the specifics of the conversation.  But

5  when I look back at -- if I look at the call log, I'm sure

6  there is a call from April 8th, 2022 on there.

7  Q   Okay.

8          THE COURT:  Mr. Miltenberger, do you know what

9  exhibit we're about to get into?

10          MR. MILTENBERGER:  No, I don't.

11          THE COURT:  Okay.  Why don't -- let's just cut to

12  the chase.  Tell him what you're going to try to produce.  If

13  you have an objection, let me know.  And if you don't, let me

14  know.  So let's just get to it.  What exhibit is it going to

15  be, and what is it about?

16          MR. NEVAREZ:  It's the audio file between

17  Mr. Brendon Callier and Mark Fawzy --

18          THE COURT:  Okay.

19          MR. NEVAREZ:  -- that was presented to Mr. Callier

20  during deposition.

21          THE COURT:  Okay.  So let's call it an exhibit.

22  What exhibit would you like to call it?

23          MR. NEVAREZ:  2.

24          THE COURT:  Defense Exhibit 2.  Do you have any

25  objection to the playing of Defense Exhibit 2?

1          MR. MILTENBERGER:  I don't have an objection other

2   than I don't know what date it occurred.

3          THE COURT:  Yeah.  I think he said April what?

4          MR. NEVAREZ:  April 8th, 2022.  And I think

5   Mr. Callier just confirmed it was --

6          THE COURT:  Okay.  Are we all on board?  Any

7   objection?

8          MR. MILTENBERGER:  No objection.

9          THE COURT:  All right.  Defense Exhibit 2 admitted.

10     (Whereupon, Defendant's Exhibit Number 2 was admitted

11  into evidence.)

12          THE COURT:  And you can play it.

13          MR. NEVAREZ:  Well, Your Honor, while we're going at

14  it, maybe it would be a good time to go into Defendant's

15  Exhibit Number 3.  It's also another audio file between

16  Mr. Callier and Mark Fawzy that was played during

17  Mr. Callier's deposition.  And that was --

18          THE COURT:  You don't have to tell me when it was

19  played.  Just describe the exhibit.

20          MR. NEVAREZ:  It's Exhibit Number Defendant's 3.

21          THE COURT:  Okay.

22          MR. NEVAREZ:  Audio file dated 4/12/2022.

23          THE COURT:  Okay.  Have you heard this before,

24  Mr. Miltenberger?

25          MR. MILTENBERGER:  Yes, sir, Your Honor.

 1          THE COURT:  Do you have any objection to its

 2   admission?

 3          MR. MILTENBERGER:  Just the relevance of it.  It's

 4   during the time period where we're not asking for any

 5   recoverable --

 6          THE COURT:  Well, but I saw that you did put in some

 7   calls that are within the blocked period.  So I'm going to

 8   overrule the objection.  Defense Exhibit 3 is admitted.

 9       (Whereupon, Defendant's Exhibit Number 3 was admitted

10   into evidence.)

11   You are able to play both 2 and 3 when you're ready.

12          MR. NEVAREZ:  Okay.  And same for Number 4, Your

13   Honor.  It's an -- Defendant's Exhibit 4 is an audio file of

14   April 21, 2022, between Mr. Callier and Mr. Fawzy.

15          THE COURT:  Any objection, Mr. Miltenberger?

16          MR. MILTENBERGER:  No, sir, Your Honor.

17          THE COURT:  Defense Exhibit 4 is admitted.

18       (Whereupon, Defendant's Exhibit Number 4 was admitted

19   into evidence.)

20          THE COURT:  You can play it when you're ready.

21          MR. NEVAREZ:  And Defendant's Exhibit 5, audio file

22   of a phone call between Mr. Callier and Mr. Fawzy on April

23   22, 2022.

24          THE COURT:  Any objection, Mr. Miltenberger?

25          MR. MILTENBERGER:  No, sir, Your Honor.

 1          THE COURT:  Defense Exhibit 5 is in.

 2       (Whereupon, Defendant's Exhibit Number 5 was admitted

 3   into evidence.)

 4          THE COURT:  You can play it when you're ready.

 5          MR. NEVAREZ:  And then I also have Exhibit D-6.

 6          THE COURT:  Let's just -- how many do you have?

 7          MR. NEVAREZ:  This is the last one.

 8          THE COURT:  Okay.  Tell me about Defense Exhibit 6.

 9          MR. NEVAREZ:  It's an audio file also between

10   Mr. Callier and Mark Fawzy.

11          THE COURT:  Okay.

12          MR. NEVAREZ:  Dated October 14th, 2022.

13          THE COURT:  October 14?

14          MR. NEVAREZ:  Yes, sir.

15          THE COURT:  Okay.  Any objection, Mr. Miltenberger?

16          MR. MILTENBERGER:  Yes, sir, Your Honor.  May we

17   approach?

18          THE COURT:  Come on up.

19       (Bench conference begins at 4:19 p.m.)

20          THE COURT:  Okay.  We're on the record.

21          UNIDENTIFIED SPEAKER:  The jury can't hear it.

22          THE COURT:  Okay.  The timeframe I understand is

23   April of 2022.  You want to play a recording from October of

24   2022?

25          MR. NEVAREZ:  Yes, sir.

1          THE COURT:  Okay.  What is it?

2          MR. NEVAREZ:  It's a phone call where Mr. Callier is

3    talking about Mr. Thurber.

4          THE COURT:  Okay.  And what's the relevance?

5          MR. NEVAREZ:  Well, Mr. Thurber is the one that he

6    was trying to get the loan from.  It -- Mr. Thurber indicates

7    that he -- as I recall, he indicates that he's not with the

8    Jascott, but he's with Upwise.

9          THE COURT:  Okay.  What's the objection?

10         MR. MILTENBERGER:  It has no relevance.

11         THE COURT:  Well, except that we're trying to -- the

12   Defense is trying to establish that Thurber was acting on

13   behalf of your client, not Upwise, right?

14         MR. NEVAREZ:  Thurber was acting on behalf of my

15   client?  No.  Thurber wasn't acting on behalf --

16         MR. MILTENBERGER:  He was acting on behalf of

17   Upwise.

18         THE COURT:  Okay.  So how is that relevant?

19         MR. NEVAREZ:  Well, he sued Pac Western thinking

20   that Pac Western was Upwise.

21         THE COURT:  Okay.

22         MR. NEVAREZ:  And he said that the Upwise -- he

23   thought that --

24         THE COURT:  Does Thurber have anything to do with

25   Jascott?

1    MR. NEVAREZ:  Yes.  Yes.  In fact, he does.  What

2 happened, Your Honor --

3    THE COURT:  So your ground -- your narrow ground is

4 relevance?

5    MR. MILTENBERGER:  Narrow ground is relevance.  He

6 initially said he thought it was between Fawzy and Jascott,

7 and that's why I called for the conference because he said he

8 fired Fawzy on April 25th.  Now he's saying it's Thurber.

9 And now I say it's not relevant if it's Thurber.  I don't

10 know how it applies --

11    THE COURT:  All right.  You can play it.  It's going

12 to come in.  How long are these recordings?

13    MR. NEVAREZ:  Oh, these are just a couple -- few

14 minutes.

15    THE COURT:  Okay.  Has Callier heard all these?

16    MR. MILTENBERGER:  He has heard them all.

17    THE COURT:  Okay.

18    MR. MILTENBERGER:  And they're longer than a couple

19 of minutes.

20    THE COURT:  Okay.  So now it's 2, 3, 4, 5, and 6

21 you're going to play.

22    MR. NEVAREZ:  Right.

23    THE COURT:  Okay.  Okay.

24    (Bench conference ends at 4:21 p.m.)

25    THE COURT:  All right.  Are you offering 6, Mr. --

1  are you offering 6?

2          MR. NEVAREZ:  Yes, sir.

3          THE COURT:  Okay.  6 is admitted.

4      (Whereupon, Defendant's Exhibit Number 6 was admitted

5  into evidence.)

6          THE COURT:  And you can play it when you're ready.

7          MR. NEVAREZ:  Okay.  No, I need the audio.  Okay.

8      (Whereupon, there was a brief pause in the proceedings.)

9          THE COURT:  Does anybody on the jury need a comfort

10 break?  We can take a quick one and finish up by five if

11 you'd like.  If not, we can plow through.  Would you all like

12 one?  Okay.  Let's stand in recess.  We'll get the technical

13 stuff going.  and then if you could be back by 4:30, we'll

14 finish up at five, I promise.  Okay.  All rise for the jury,

15 please.

16     (Whereupon, at 4:23 p.m., the jury exited the courtroom.)

17         THE COURT:  All right.  Be seated.  Do you need some

18 help getting that set up, Mr. Nevarez?

19         MR. NEVAREZ:  No.  No, sir.  I --

20         THE COURT:  I'd really like to get this done before

21 the end of the day, if we could.

22         MR. NEVAREZ:  Okay.

23         THE COURT:  Do you have it turned up on your

24 computer?

25         MR. NEVAREZ:  Yes, sir.

1        THE COURT:  All right.  I'll tell you what.  If you

2   don't have it ready to go by 4:30, you can try to pick it up

3   tomorrow.  And let's -- I do want to get another half hour of

4   testimony in if we could, okay?  We will stand in recess.

5   Everybody can stay seated.  Thank you.

6        (Whereupon, at 4:25 p.m., a brief recess was taken,

7   reconvening at 4:32 p.m., outside the presence of the jury.)

8        THE COURT:  Okay.  We're back on the record.

9   Counsel and the parties are present.  The jury is not

10  present.  Let's bring in the jury, please.

11       (Whereupon, at 4:33 p.m., the jury exited the courtroom.)

12       THE COURT:  All right.  Be seated, please.  All

13  right.  The jury is once again present.  We're on our home

14  stretch for the day.

15       Mr. Nevarez, are you prepared to proceed?

16       MR. NEVAREZ:  Yes, sir.

17       THE COURT:  How -- you may proceed.  Go ahead.

18       MR. NEVAREZ:  Okay.  This is the audio of April 8,

19  2022, which was Exhibit Defendant's 2.

20       THE COURT:  Okay.

21       (Audio plays from 4:34 p.m./pauses at 4:34 p.m.)

22  BY MR. NEVAREZ:

23  Q   Okay.  So you recognize that phone call, Mr. Callier?

24  A   Yes, sir.

25  Q   Okay.  And that was -- that's you talking?

1  A    Yes.  That was me.

2  Q    And that's to Mark Fawzy from Jascott Investments?

3  A    Yes.  He indicated it was Mark Fawzy.

4       (Audio resumes at 4:34 p.m./Pauses at 4:36 p.m.)

5  BY MR. NEVAREZ:

6  Q    I'm sorry.  Was he asking for the checks there?

7  A    Excuse me, sir?

8  Q    Was he asking you for the checks?  Is that what he was

9  asking?

10 A    I believe he asked me if I have received a DocuSign.

11 Q    Oh, okay.  And this was for the $60,000 loan, right, that

12 he's talking about?

13 A    I don't know that his price was -- or an amount was

14 specified in the call up to that point.

15 Q    Well, let me show you where he does say that.

16      (Audio resumes at 4:36 p.m./Pauses at 4:37 p.m.)

17 BY MR. NEVAREZ:

18 Q    Did he say 50 or 60?

19 A    Sounded like 50 to me.

20 Q    Fifty, okay.

21      (Audio resumes at 4:37 p.m./Pauses at 4:37 p.m.)

22 BY MR. NEVAREZ:

23 Q    At this point, why didn't you just tell Mark don't send

24 me the application?  Don't waste your time, I'm not

25 interested in the 50 or $60,000 loan.

1    A    Because he didn't say he was calling to solicit a loan

2    from Pac Western.  I didn't know who the lender was.  And I

3    wanted to find out.

4    Q    Well, you knew it was Mark Fawzy from, and he said

5    Jascott Enterprises -- Investments?

6    A    Yes, sir.

7    Q    Okay.

8        (Audio resumes at 4:38 p.m./Pauses at 4:38 p.m.)

9    BY MR. NEVAREZ:

10   Q    And there, you confirmed your email address.  Is that

11   correct?

12   A    Yes.  I confirmed my email address because I wanted to

13   get the application.

14   Q    Okay.  Well, why didn't you just tell him don't send me

15   the application, sir, I'm not interested in a loan?  Stop

16   bothering me.

17   A    Because I wanted to find out who was responsible for the

18   phone calls, on whose behalf the phone calls were being made

19   because ultimately, they should -- I my opinion, they should

20   be held accountable.

21   Q    But this is April 8 of 2022, early on in this whole

22   process.  April 8th.  Had you told him, Mr. Fawzy, I'm sorry,

23   you're maybe confused.  Do not call me again.  Do not send me

24   any applications.  Do not message me.  Why didn't you just

25   tell him that?

1          MR. MILTENBERGER:  Your Honor, asked and answered.

2          THE COURT:  Sustained.

3      (Audio resumes at 4:39 p.m.)

4          THE COURT:  Did you start it over at the beginning?

5      (Audio pauses at 4:40 p.m.)

6          MR. NEVAREZ:  I'm sorry, what?

7          THE COURT:  Did you start it over at the beginning?

8          MR. NEVAREZ:  No, sir.

9          THE COURT:  Okay.

10      (Audio resumes at 4:40 p.m./Pauses at 4:40 p.m.)

11  BY MR. NEVAREZ:

12  Q   He informed you that email he was going to send you, the

13  application was being sent to DocuSign, right?

14  A   Yes, sir.

15  Q   Okay.  Well, why don't you just hang up on him?

16          MR. MILTENBERGER:  Asked and answered.

17          THE COURT:  Sustained.  Move on.  Don't rewind it.

18          MR. NEVAREZ:  No.  I'm not rewinding, sir.

19      (Audio resumes at 4:40 p.m.)

20          THE COURT:  Is there any more?

21      (Audio ends at 4:43 p.m.)

22  BY MR. NEVAREZ:

23  Q   So in that last part, just to be clear, you confirmed the

24  email -- receiving the email that he sends you containing the

25  application, right?

1  A   Yes, sir

2  Q   And you understand that you said it's very simple, just

3  go to DocuSign to sign the application.  Is that your

4  understanding?

5  A   Yes.

6  Q   And that was, again, April 8th, 2022.  Right?

7  A   Yes.

8  Q   Okay.  And then, okay.  So let me play another phone call

9  now.  This is Exhibit 3, identified as April 12, 2022, call

10  recording.

11      (Audio plays at 4:44 p.m./Pauses at 4:45 p.m.)

12          THE COURT:  You might want to start it over.  Or

13  not --

14          MR. NEVAREZ:  Sorry, Your Honor.

15          THE COURT:  -- all the way.  Just 15 seconds.

16          MR. NEVAREZ:  Okay.

17      (Audio resumes at 4:45 p.m./Pauses at 4:37 p.m.)

18  BY MR. NEVAREZ:

19  Q   And again, that's between -- that's Mark Fawzy calling

20  you, right?

21  A   Yes, sir.

22  Q   And that's your phone -- that's your voice on the phone.

23  A   Yes.

24      (Audio resumes at 4:46 p.m./Pauses at 4:46 p.m.)

25  BY MR. NEVAREZ:

 1  Q    So you just confirmed that you had two bankruptcies, one

 2  in '17 and one in '19?

 3  A    Well, it was one, and it was converted in '19.

 4  Q    I see.  Okay.  Converted to 7?

 5  A    I believe so.

 6  Q    From what, Chapter 13?

 7  A    Yes.

 8  Q    To Chapter 7?

 9  A    Yes.

10  Q    Okay.  And you realize that that's why they sent you for

11  an MCA, a merchant cash advance, because of those two

12  bankruptcies?

13  A    I can't speak to why they did anything that they did,

14  sir.

15  Q    Okay.

16       (Audio resumes at 4:47 p.m./Pauses at 4:47 p.m.)

17  BY MR. NEVAREZ:

18  Q    He says, "Good news, we have an offer."  Is that correct?

19  A    Yes.

20  Q    And that's for the loan?

21  A    I assume that's what he was referring to.

22       (Audio resumes at 4:47 p.m./Pauses at 4:47 p.m.)

23  BY MR. NEVAREZ:

24  Q    Okay.  So there, he asks you if you're willing to accept

25  the offer for $50,000, and you said yes.  Is that correct?

1  A    No, sir.  He said am I willing to hear the offer.

2  Q    Oh, okay.

3       (Audio resumes at 4:48 p.m./Pauses at 4:48 p.m.)

4  BY MR. NEVAREZ:

5  Q    Did you hear that?  What was -- did you hear what he said

6  about all we need?

7  A    Yes.

8  Q    What was that?

9  A    I believe he said tax return, driver's license, and check

10 or voided check or something like that.

11      (Audio resumes at 4:49 p.m./Pauses at 4:49 p.m.)

12 BY MR. NEVAREZ:

13 Q    Okay.  So you gave him the go-ahead to prepare the

14 paperwork.

15 A    Yes, sir.

16      (Audio resumes at 4:49 p.m./Ends at 4:50 p.m.)

17 BY MR. NEVAREZ:

18 Q    Okay.  Could you -- it's a little -- the sound is a

19 little low.  He said -- you said you would be able to send

20 the what because it's on your driver's license?  What was

21 that?  Rather, I mean phone.

22 A    I believe I said my driver's license, and I don't know

23 what the other thing was.  I mean, it's on -- you can --

24 Q    Okay.  Let's play it back.  I think you said the only

25 thing you had to send them later was the tax return because

1  you didn't have it on your phone?

2  A    Yes.

3      (Audio plays back at 4:51 p.m./Ends at 4:51 p.m.)

4  BY MR. NEVAREZ:

5  Q    Okay.  So the voided check, that's what it was, and your

6  driver's license were on your phone.  So you could send that

7  to him, right?

8  A    Well, they were in my email which I could access through

9  my phone, yes.

10 Q    Okay.  And then but it's the tax return that you couldn't

11 send him then.

12 A    Yes, sir.

13 Q    Where was your tax return, back home?

14 A    It's on my computer.

15 Q    Okay.  And where were you at the time?

16 A    Well, according to the call, I was headed to the lake.  I

17 like to fish.

18 Q    The link?

19 A    Lake.

20 Q    The?

21 A    Lake.

22 Q    Lake.

23 A    Yes.

24 Q    Which lake is that?

25 A    I was probably headed to Caballo lake to go crappie

 1 | fishing.  It was crappie spot in season at the time.

 2 |          MR. NEVAREZ:  Okay.  Well, Your Honor, it's 4:52.  I

 3 | can go ahead and play 4.

 4 |          THE COURT:  No, we're going through them.  Go.

 5 |          MR. NEVAREZ:  I'm sorry, what?

 6 |          THE COURT:  Go ahead.

 7 |          MR. NEVAREZ:  Exhibit 4 dated April 21, 2022.

 8 |      (Audio plays at 4:52 p.m./Pauses at 4:53 p.m.)

 9 | BY MR. NEVAREZ:

10 | Q   Well, okay.  So they went ahead and they got everything.

11 | And it seems like did he say you accepted their offer and

12 | signed everything?

13 | A   That's not true.

14 | Q   Well, what is it that they said?  Let me play it back.

15 | And that's -- and that's, again, your voice on the phone?

16 | A   I believe so.

17 | Q   And Mark Fawzy's?

18 | A   Yes.

19 |      (Audio resumes at 4:54 p.m./Pauses at 4:54 p.m.)

20 | BY MR. NEVAREZ:

21 | Q   He asks you for permission to speak with you.  Why didn't

22 | you tell him do not bother me, I'm on the Do Not Call

23 | Registry, or I don't want to talk to you?

24 | A   At that point, they had already ignored three DNC

25 | requests.  I really didn't have an expectation that they

1  would honor the next one.

2  Q   Well, you could have hung up on them.  Right?

3  A   Yes, I could have.

4  Q   You could have told him again please stop calling.

5  Not --

6  A   I --

7  Q   I don't want the loan.  I sent you my driver's license

8  and my bank statements, and I sent you my tax statement, but

9  I don't want my -- I don't want the loan, stop calling me.

10         MR. MILTENBERGER:  Is there a question, Your Honor.

11         MR. NEVAREZ:  Why didn't you tell him that?

12         THE COURT:  Overruled.  You can answer.

13         THE WITNESS:  It has been my experience that when

14  you tell a telemarketer to stop calling you, once, twice,

15  three times, they continue to call you.  They don't honor do

16  not call requests.  One -- I would argue that they don't

17  argue the Do Not Call Registry because they never would have

18  called me in the first place.  They weren't honoring do not

19  call requests.  And I had told them repeatedly in writing and

20  over the phone, and he kept calling.

21  BY MR. NEVAREZ:

22  Q   Well, if you -- if what you say is true and you don't

23  expect them to stop calling, why are you sending them bank

24  statement, driver's license, and voided check, and tax

25  returns?

1  A    All of those things occurred prior to the do not call

2  request.

3  Q    Well, but you say you're on the registry.  So why would

4  you send all these financial documents?

5  A    In order to find out who the lender was.

6  Q    So you can sue them?

7  A    SO that I could find out who the lender was in order to

8  hold them accountable.

9  Q    Well, Jascott Investments was the lender, sir.

10  A    Sir, the contract that I received came from Pac Western.

11  Pac Western offered the loan.  Pac Western was the lender.

12  Q    Jascott Investment and Mark Fawzy aren't Pac Western.

13  Mark Fawzy didn't --

14            THE COURT:  Ask your --

15            MR. NEVAREZ:  -- work for Pac --

16            THE COURT:  Ask it in the form of a question,

17  please.  Don't testify.  Just ask questions.  Please.

18  BY MR. NEVAREZ:

19  Q    Why would you assume that Mark Fawzy was from Pac Western

20  when he kept saying he was from Jascott Investments?

21  A    My understanding was that Jay Scott or Jascott, however

22  it's pronounced, is what's called an ISO, an independent

23  sales organization.  And they make phone calls, and they

24  solicit on behalf of the lenders like Pac Western.

25        (Audio resumes at 4:57 p.m./Pauses at 4:58 p.m.)

1  BY MR. NEVAREZ:

2  Q   Okay.  It was for 50,000 and he says you accepted the

3  offer.  is that correct?

4  A   That's what he said, but I didn't accept an offer.

5  Q   Okay.  Well, you provided all the documentation that he

6  requested.

7  A   Accepting the offer would insinuate that I somehow took

8  the loan and took the money.  I didn't do that.

9          MR. NEVAREZ:  Okay.  Let's continue.

10     (Audio resumes at 4:58 p.m./Pauses at 4:59 p.m.)

11  BY MR. NEVAREZ:

12  Q   And again, you didn't tell him you're wasting your time;

13  I'm not going to sign?

14  A   No, sir, I did not.  But he also acknowledged on the

15  phone call that I was being bombarded with calls.  So he

16  acknowledged that he received my text message asking him not

17  to call me anymore, and yet he called me again.

18  Q   Yes.  And you're continuing the conversation regarding

19  your acceptance of the $50,000 loan that they offered and two

20  which you provided tax documents --

21          MR. MILTENBERGER:  Objection.  No question.

22  BY MR. NEVAREZ:

23  Q   -- driver's license, and the bank statement.  So why

24  would you not expect that they would call you after you went

25  through that, providing them everything they wanted?

1  A    I would expect that they wouldn't call me because I would

2  think that they would institute proper protocols to ensure

3  that people who make do not call requests are put on the do

4  not call -- their internal do not call list, and that they

5  honor those requests.

6          MR. NEVAREZ:  All right.  Here we go.

7      (Audio resumes at 5:00 p.m./Pauses at 5:00 p.m.)

8  BY MR. NEVAREZ:

9  Q    I'm sorry.  What was it that you said?  Let me start that

10 over again.

11     (Audio resumes at 5:00 p.m./Pauses at 5:01 p.m.)

12 BY MR. NEVAREZ:

13 Q    So you asked Mr. Fawzy to list the documents that he was

14 going to send you so you could find them on the email?

15 A    Yes, sir.  So I was not recording this phone call.

16 Q    I'm sorry, what?

17 A    I wasn't recording the phone call.  And so I asked for

18 the email to be re-sent so I could establish that it was

19 indeed a solicitation phone call.

20     (Audio resumes at 5:01 p.m./Pauses at 5:02 p.m.)

21 BY MR. NEVAREZ:

22 Q    So he asked you, "Am I being a bother to you."  And you

23 said no, it's okay?

24 A    I said yeah, yeah, it's okay, answering his question

25 about if I'm having a good day.

1          THE COURT:  All right.  We're going to take our --

2          MR. NEVAREZ:  I thought it was after right.  He said

3    am I being a bother.

4          THE COURT:  Go ahead and answer.

5          THE WITNESS:  Listening to the audio, it sounds like

6    I'm, at least to me, that I'm answering the part about

7    whether or not I'm having a good day, which was his initial

8    question.

9          THE COURT:  All right. We'll pick up tomorrow.  I

10   do want one thing on the record.  What is the date of Defense

11   Exhibit 4, please?

12         MR. NEVAREZ:  April 4, '22.

13         MR. MILTENBERGER:  '21.

14         MR. NEVAREZ:  I'm sorry, '21.

15         THE COURT:  That was just a bunch of numbers.  What

16   was the date on Defense Exhibit 4, please?

17         MR. NEVAREZ:  4_04-21-2022.

18         THE COURT:  So what was the date on Defense Exhibit

19   4, please, with a month, day, and year.  What was the date on

20   Defense Exhibit 4?

21         MR. NEVAREZ:  Well, it says the month, 04.  And 21st

22   day, and the year is 2022 is what it --

23         THE COURT:  So April 21st, 2022 --

24         MR. NEVAREZ:  Yes.  Although --

25         THE COURT:  -- is the answer to my question?  Well,

1  do you know that?  Ask the witness what the date is.

2  BY MR. NEVAREZ:

3  Q   Do you know when you made that phone call, or when that

4  phone call was made?

5  A   According to my records, I received a phone call from

6  Jascott from Mr. Fawzy April 4th -- excuse me, April 21st,

7  2022 at 2:33 p.m. Mountain Standard Time.

8        THE COURT:  All right.  That's it.  So, ladies and

9  gentlemen, we'll pick up tomorrow.  I've got some hearings

10 before we start the jury trial again.  What I've asked you to

11 do is be in the jury assembly room at nine, and we'll get you

12 started immediately as soon as I'm done with the others.

13       Please remember my admonitions.  Don't talk about

14 the case with anybody, not your family, not anybody.  Don't

15 do any independent research.  And we'll see you bright and

16 early tomorrow morning.

17       All rise for the jury, please.

18     (Whereupon, at 5:04 p.m., the jury exited the courtroom.)

19       THE COURT:  All right.  You can step down.  Don't

20 talk about your testimony with anybody except your lawyer,

21 please.  We'll retrieve those exhibits.

22       While you retrieve your exhibits, Mr. Miltenberger,

23 let's plan to be ready to go tom at 9:15 if we could.

24 Counsel, stick around.  Rachel, my law clerk, is going to

25 give you at least an early draft of some jury instructions.

 1   I'd like you to review them tonight, and we will work on them

 2   and go over them tomorrow.  Okay?

 3          Anything else we need to take up, Mr. Miltenberger?

 4          MR. MILTENBERGER:  No, sir, Your Honor.

 5          THE COURT:  And, Mr. Nevarez?

 6          MR. NEVAREZ:  Yes.  Yes, Your Honor.  On that

 7   Exhibit Number 1, the Exhibit A that has all those attached

 8   exhibits, my paralegal has uploaded each and every one of

 9   those documents without a cover page, without the three --

10   without the -- the five-page exhibit list with the comments

11   on it.  They've been uploaded.  So I was hoping to use them

12   tomorrow.

13          THE COURT:  You can try.

14          MR. NEVAREZ:  What?

15          THE COURT:  You can try.

16          MR. NEVAREZ:  Okay.

17          THE COURT:  We'll just -- I mean, unless they're

18   stipulated to in some way, you'll have to try to get them in

19   using the Rules of Evidence.

20          MR. NEVAREZ:  Okay.  All right.

21          THE COURT:  Okay?  We'll stand in recess.  Have a

22   good evening, everybody.  You can stay seated, if you'd like.

23       (Whereupon, at 5:06 p.m., the hearing was adjourned.)

24                         *  *  *  *  *

25

1              C E R T I F I C A T I O N

2         I, DIPTI PATEL, court-approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter, and to the best of my ability.

6

7

8    _____

9    DIPTI PATEL, AAERT CET-997

10   Expires: December 6, 2026

11   LIBERTY TRANSCRIPTS              DATE:  February 10, 2024

12

13

14

15

16

17

18

19

20

21

22

23

24

25